**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re

ROYAL INTERCO, LLC, *et. al.*,

Debtors.[1]

Chapter 11

Case No. 25-10674 (___)

Joint Administration Requested

**DEBTORS' MOTION FOR (I) AN ORDER PURSUANT TO SECTIONS 105, 363, 364, 365 AND 541 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006 AND 9007 AND DEL. BANKR. L.R. 2002-1 AND 6004-1 (A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING THE DEBTORS' ENTRY INTO STALKING HORSE AGREEMENT AND RELATED BID PROTECTIONS (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) SCHEDULING AN AUCTION AND SALE HEARING; (E) APPROVING FORMS AND MANNER OF NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES IN CONNECTION THEREWITH; AND (F) GRANTING RELATED RELIEF; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) CERTAIN RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move (this "Motion") for entry of an order, in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"), (a) approving the bid procedures (the "Bid Procedures") attached as **Exhibit 1** to the Bid Procedures Order in connection with the sale of all or substantially all of the Debtors' assets; (b) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (c) authorizing the Debtors to enter into and perform under an asset purchase agreement attached hereto as **Exhibit B** (the "Stalking Horse Agreement") between the Debtors and Sofidel America Corp. (the "Stalking Horse Bidder"), subject to the solicitation of

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899).  The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

higher and otherwise better offers for the Debtors' assets (the "Acquired Assets"); (d) approving the Bid Protections (defined below) granted to the Stalking Horse Bidder; (e) approving procedures for the assumption and assignment of designated executory contracts and unexpired leases (the "Designation Procedures"); (f) scheduling the auction (the "Auction") and the date and time of the hearing to approve the sale (the "Sale Hearing") of the Acquired Assets and assumption of certain liabilities of the Debtors (the "Assumed Liabilities"); and (g) granting related relief.  The Debtors further request that, at the Sale Hearing, the Court enter an order, in the form attached hereto as **Exhibit C** (the "Sale Order"), (i) authorizing the Sale of the Acquired Assets (the "Sale") free and clear of all liens, claims, interests and other encumbrances (collectively, "Encumbrances"); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Michael Ragano in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), filed contemporaneously herewith.

As discussed herein, the Debtors propose the following timeline for conducting the Sale process:

| Event | Deadline |
|---|---|
| Deadline for Debtors to File Notice of Proposed Cure Amounts and Adequate Assurance | Five (5) business days after the Petition Date |
| Bid Procedures Hearing | May 1, 2025 |
| Sale Objection Deadline | May 12, 2025, at 4:00 p.m. (ET) |
| Bid Deadline | May 12, 2025, at 4:00 p.m. (ET) |
| Deadline to Designate Qualified Bids | May 14, 2025 |
| Auction | May 15, 2025, at 10:00 a.m. (ET) |
| Deadline to Serve Notice of Winning Bidder and Supplemental Cure Notice | One (1) business day after the close of the auction |

| Deadline to File Supplemental Sale Objection and Objection to Assumption or Cure Amount (If Winning Bidder is Different Than Stalking Horse Bidder) | May 19, 2025, at 11:59 p.m. (ET) |
|---|---|
| Sale Hearing | May 20, 2025 |

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these chapter 11 cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and the Motion is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the *Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "Local Rules"), the Debtors consent to the entry of a final order with respect to this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      The statutory bases for the relief requested in this Motion are sections 105, 363, 364, 365, and 541 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

## BACKGROUND

4.      On April 8, 2025 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue

to manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in these cases.

5.     On January 31, 2025, the Debtors' investment banker, Livingstone Partners LLC ("<u>Livingstone</u>") commenced outreach to potential buyers with a one-page teaser introducing the opportunity and inviting potential buyers to enter into a confidentiality agreement ("NDA") with the Debtors to receive access to additional information.  During the prepetition marketing process, Livingstone contacted approximately 159 potential buyers, of which 70 executed NDAs. Potential buyers that executed NDAs received access to a confidential information presentation (the "<u>CIP</u>") that contained a detailed overview of the Debtors' business operations, assets, commercial arrangements, and historical financial results.  Additionally, these potential buyers received access to an online data room that contained hundreds of unique documents and diligence materials, and potential buyers were given the opportunity to request specific diligence items, which were provided on a rolling basis into the data room.  Livingstone maintained a dialogue with these potential buyers throughout the process and facilitated discussions between potential buyers and the Debtors' management.  Seven potential buyers completed site visits to the Debtors' manufacturing facilities, which were accompanied by Livingstone, Novo and the Debtors' management.

6.     This initial stage of the marketing process culminated in the receipt of 14 non-binding indications of interest ("<u>IOIs</u>") as of March 12, 2025.  After reviewing the IOIs, the Debtors and Livingstone engaged with each potential buyer to discuss the terms of each potential bid.  The potential bids representing the highest value for the Debtors' assets required that the Debtors consummate the sale through a chapter 11 sale process in order to realize the values stated

4

in the IOIs.  As such, the Debtors began to negotiate with these potential buyers to develop the terms of an agreement to serve as a stalking horse.

7.     After several weeks, the Debtors reached an agreement with Sofidel America Corp. (the "Stalking Horse Bidder"), setting the floor for other potential bids to acquire certain assets during these chapter 11 cases.  Under the April 8, 2025 asset purchase agreement between the Debtors and the Stalking Horse (as modified from time to time, the "Stalking Horse Agreement") the Stalking Horse has committed, subject to Court approval, to acquire substantially all of the assets of the Debtors in exchange for (i)(A) the amount of One Hundred Twenty-Six Million US Dollars (US$ 126,000,000) (the "Base Purchase Price"), plus (B) the Inventory Adjustment Amount, minus (C) the Sale Leaseback Adjustment, minus (D) the Cure Costs Adjustment Amount (the result of the foregoing calculation, the "Cash Purchase Price") and (ii) the assumption by the Stalking Horse Bidder of the Assumed Liabilities including payment of the Cure Amounts (the "Stalking Horse Bid").

8.     The bid submitted by the Stalking Horse Bidder for substantially all assets of the Debtors and documented in the binding Stalking Horse Agreement will serve the critical function of setting a "floor" for recoveries to creditors and a structure for further competitive bidding. While negotiating with the Stalking Horse Bidder, Livingstone and the Debtors continued facilitating diligence and engaging in discussions with the other potential buyers to further develop their interest in anticipation of the filing of these chapter 11 cases and the competitive process the Debtors intend to conduct pursuant to the Bid Procedures.

9.     The Bid Procedures proposed herein ensure that the Debtors' assets will be subject to a competitive bidding and auction process without unduly delaying the progress of these cases.  The process contemplated by the Bid Procedures will leave no doubt that, at the conclusion

of that process, the Debtors will have explored all available alternatives and identified the highest

acceptable offer for their assets.

10.     The Debtors believe, in an exercise of their business judgment, that approval

of the Stalking Horse Agreement (including the Bid Protections) and the Bid Procedures will set

these cases on a positive trajectory and are essential to the Debtors' ability to identify and

consummate the sale or restructuring transaction offering the greatest value to their creditors.

Accordingly, the Debtors respectfully submit that the Court should grant the relief requested

herein.

### THE PROPOSED SALE AND BID PROCEDURES

**A.     Summary of Key Terms of the Stalking Horse Bid**

11.     By this Motion, the Debtors are requesting approval of the designation of

the Stalking Horse Bidder and the Stalking Horse Bid on the terms provided in the Stalking Horse

Agreement, as well as approval of reasonable and customary Bid Protections.  Specifically, the

Bid Protections consist of a break-up fee in the amount of $3,780,000 (the "Break-Up Fee") and a

reimbursement of the Stalking Horse Bidder's actual, reasonable, documented out-of-pocket

expenses up to an amount not to exceed $1,260,000 (the "Expense Reimbursement," together with

the Break-Up Fee, the "Bid Protections").  Given the Debtors' need to maximize the value of the

Assets through a timely and efficient marketing and sale process, the ability to designate a Stalking

Horse Bid and offer Bid Protections is justified, appropriate and essential.

12.     In accordance with Local Rule 6004-1(b), the pertinent terms of the Stalking

Horse Agreement are summarized in the following table.[2]  The Debtors respectfully submit that

---

[2]     This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Agreement.

all terms of the Stalking Horse Agreement, including those required to be highlighted under Local Rule 6004-1(b), are fair, reasonable, and appropriate under the circumstances in light of the parties' good faith, arm's-length negotiation of the Stalking Horse Bid, the support of the Debtors' key creditor constituencies for the Debtors' entry into such agreement, and the substantial benefits the Debtors and their estates will realize as a result thereof, including the establishment of a baseline price for the Debtors' assets.

| Term | Description |
|---|---|
| **Sellers:** | Royal Interco, LLC, Royal Paper, LLC, Doubletree Paper Mills, L.L.C. and Sun Paper Company, LLC |
| **Stalking Horse Bidder:** | Sofidel America Corp. |
| **Purchase Price:** | (i)(A) the amount of One Hundred Twenty-Six Million US Dollars (US$ 126,000,000) (the "Base Purchase Price"), plus (B) the Inventory Adjustment Amount, minus (C) the Sale Leaseback Adjustment, minus (D) the Cure Costs Adjustment Amount (the result of the foregoing calculation, the "Cash Purchase Price") and (ii) the assumption by Purchaser of the Assumed Liabilities including payment of the Cure Amounts. |
| **Acquired Assets:** | The Acquired Assets are set forth in Section 2.1 of the Stalking Horse Agreement and include, among other things, all interests in Real Property, all inventory, equipment and machinery, intellectual property, Assigned Contracts, causes of action relating to the Acquired Assets, prepaid items relating to the Business or the Acquired Assets, and all Accounts Receivable arising after the Closing Date. |
| **Excluded Assets:** | The Excluded Assets are set forth in Section 2.2 of the Stalking Horse Agreement and include, among other things, cash, all Accounts Receivable arising and in existence on or before the Closing Date, and all Estate Causes of Action. |
| **Assumed Liabilities:** | The Assumed Liabilities are set forth in Section 2.3 of the Stalking Horse Agreement and include, among other things, (a) all (i) Cure Amounts and (ii) Liabilities arising after the Closing Date, in each case with respect to the Assigned Contracts and (b) all Liabilities (including for any Tax) that arise on or after the Closing Date with respect to Purchaser's ownership or operation of the Acquired Assets on and after the Closing. |

| Excluded Liabilities: | The Excluded Liabilities are set forth in Section 2.4 of the Stalking Horse Agreement and include, among other things, Liabilities relating to Business or Acquired Assets (except as expressly indicated as an Assumed Liability), employment and termination of employees of Sellers with respect to the period ending at Closing, any Employee Benefit Plan, accounts payable, Seller's Indebtedness, certain taxes and Liabilities arising under Environmental Laws. |
|---|---|
| **Rule** | **Disclosure/Location** |
| **Sale to Insider** *Local Bankr. R. 6004-1(b)(iv)(A)* | Not applicable. |
| **Agreements with Management** *Local Bankr. R. 6004-1(b)(iv)(B)* | Not applicable. |
| **Releases** *Local Bankr. R. 6004-1(b)(iv)(C)* | The Stalking Horse Agreement does not provide any releases for the Sellers or the Purchaser. |
| **Private Sale/No Competitive Bid** *Local Bankr. R. 6004-1(b)(iv)(D)* | The Sale to the Stalking Horse Bidder is subject to the Auction and the Bid Procedures. |
| **Closing and Other Deadlines** *Local Bankr. R. 6004-1(b)(iv)(E)* <br><br> Stalking Horse Agreement, § 3.1 | The Debtors' proposed timeline for the sale process in these chapter 11 cases is set forth on pages 2-3, *supra*. <br><br> The closing (the "Closing") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place by means of a virtual closing through electronic exchange of documents and signatures on the first (1st) Business Day of the week following the date that is the third (3rd) Business Day after the day on which all of the conditions to closing set forth in Article III of the Stalking Horse Agreement are satisfied or waived (other than conditions that are intended to be satisfied at the Closing), or at such other date, time or place as the Parties may agree. |
| **Good Faith Deposit** *Local Bankr. R. 6004-1(b)(iv)(F)* <br><br> Stalking Horse Agreement, § 2.6(b) | US$12,600,000 |

| | |
|---|---|
| **Interim Arrangements with Stalking Horse Bidder**<br><br>*Local Bankr. R. 6004-1(b)(iv)(G)* | The Debtors are not entering into any interim arrangements with the Stalking Horse Bidder. |
| **Use of Proceeds** *Local Bankr. R. 6004-1(b)(iv)(H)* | Not Applicable |
| **Tax Exemption** *Local Bankr. R. 6004-1(b)(iv)(I)* | Not Applicable |
| **Record Retention** *Local Bankr. R. 6004-1(b)(iv)(J)*<br><br>Stalking Horse Agreement,<br><br>§ 2.1(h) | Section 2.1(h) of the Stalking Horse Agreement provides that the Books and Records are Acquired Assets; *provided* that Sellers shall be entitled to retain a copy of such Books and Records solely for use in connection with each Seller's wind-down of their Estates, subject to customary confidentiality obligations. |
| **Sale of Avoidance Actions** *Local Bankr. R. 6004-1(b)(iv)(K)*<br><br>Stalking Horse Agreement,<br><br>§ 2.2(k) | Section 2.2(k) of the Stalking Horse Agreement provides that all Avoidance Actions are Excluded Assets. |
| **Successor Liability**<br><br>*Local Bankr. R. 6004-1(b)(iv)(L)* | The Sale Order provides that the parties intend that the Stalking Horse Bidder is not a mere continuation of the Debtor or its estate, and that the Stalking Horse Bidder shall not have any successor liability of any kind or character. |
| **Sale Free and Clear of Unexpired Leases**<br><br>*Local Bankr. R. 6004-1(b)(iv)(M)* | None |
| **Credit Bid** *Local Bankr. R. 6004-1(b)(iv)(N)* | The Bid Procedures seek to permit the Agents and Lenders (each as defined in the Bid Procedures) to credit bid the full amount of the Aggregate Debt (as defined in the interim and final orders authorizing the Debtors to obtain postpetition financing and use of cash collateral (the "<u>DIP Orders</u>") outstanding under the applicable credit agreement as of the Closing Date on a dollar-for-dollar basis in accordance with section 363(k) of the Bankruptcy Code. |
| **Relief from Bankruptcy Rule 6004(h)** | The Debtors seek a waiver of the 14-day stays under Bankruptcy Rules 6006(d) and 6004(h), as described in more detail below. |

| *Local Bankr. R. 6004-1(b)(iv)(O)* | |
|---|---|

**B.      Bid Procedures Order**

13.      By this Motion, as set more fully below, the Debtors seek entry of the Bid Procedures Order: (i) approving the Bid Procedures; (ii) approving various forms and the manner of notice of respective dates, times and places in connection therewith; (iii) approving Sofidel America Corp. as the Stalking Horse Bidder and the Bid Protections; (iv) establishing the Designation Procedures; and (v) scheduling the Auction and a Sale Hearing.

**(i)      The Bid Procedures**

14.      To maximize the value of the Acquired Assets for the benefit of the Debtors' estates and stakeholders, the Debtors seek to continue their competitive marketing process by implementing a process for soliciting higher and otherwise better bids than the bid set forth in the Stalking Horse Agreement.  The Debtors, in consultation with the Debtors' advisors, entered into the Stalking Horse Agreement to provide a floor for a bid on the Debtors' assets. The Bid Procedures would provide 34 days between the filing of this Motion and the Bid Deadline, which the Debtors believe will be sufficient to allow other potential bidders to conduct diligence and formulate competing bids given the extensive marketing process that occurred prepetition. Following the Petition Date, Livingstone will continue the marketing process as described in Sections 5-8 herein and in more detail in the First Day Declaration.  The Debtors, in consultation with the Debtors' advisors, entered into the Stalking Horse Agreement to provide a floor for a bid on the Debtors' assets.

15.      As described more fully in the Bid Procedures and the Bid Procedures Order, the Debtors seek approval to sell the Acquired Assets to a Qualified Bidder, determined in accordance with the Bid Procedures and Bid Procedures Order, that makes the highest acceptable

offer for the Acquired Assets.  The Debtors request that competing bids for the Acquired Assets

be governed by the Bid Procedures and Bid Procedures Order, which provide:

- the requirements a Potential Bidder must satisfy to be entitled to participate in the bidding process and become a Qualified Bidder;

- the requirements for Qualified Bidders to submit bids and the method and criteria by which such bids become Qualified Bids;

- the deadline by which bids must be submitted;

- the procedures for conducting the Auction;

- the assumption and assignment procedures for executory contracts and unexpired leases; and

- various other matters relating to the sale process generally, the Sale Hearing, return of any Good Faith Deposits, and designation of a Back-Up Bidder.

16.    Local Rules 6004-1(c)(i)(A) and (B) further provide that a bid procedures

motion must highlight "[a]ny provision governing an entity becoming a qualified bidder" and

"[a]ny provision governing a bid being a qualified bid." Local Rule 6004-1(c)(i)(A) and (B).  The

Bid Procedures provide as follows with respect to qualifying bids[3]:

a.    **Participation Requirements.**  To participate in the formal bidding process or otherwise be considered for any purpose hereunder, a person (other than the Stalking Horse Bidder) interested in submitting a bid (an "Interested Party") must deliver to the Debtors, Morris Nichols, and Livingstone an executed confidentiality agreement substantially in the form previously sent to Agents' counsel on March 7, 2025 (each, a "Confidentiality Agreement").  Such person or entity that has delivered an executed Confidentiality Agreement shall be considered a potential bidder (a "Potential Bidder").

b.    **Due Diligence**.  The Debtors will provide to each Potential Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, provided that if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors will not be required to disclose to such Potential Bidder any trade secrets, proprietary

---

[3]    To the extent any inconsistencies exist between the summary provided in this Motion and the actual terms of the Bid Procedures, the Bid Procedures shall control.  Capitalized terms used but not otherwise defined in connection with this summary shall have the meanings ascribed to such terms in the Bid Procedures.

information, or other commercially sensitive information unless, under the Debtors' business judgment in consultation with the Consultation Parties, the Confidentiality Agreement executed by such Potential Bidder (i) sufficiently protects the Debtors' estates, and (ii) contains appropriate provisions to ensure that such trade secrets or proprietary information will not be used by such Potential Bidder or its Affiliates for an improper purpose or to gain an unfair competitive advantage. Each Potential Bidder will comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Potential Bidder and its contemplated transaction. If the Debtors, after consultation with the Consultation Parties, determine at any time in their reasonable discretion that a Potential Bidder is not reasonably likely to be a Qualified Bidder (as defined below), then the Debtors' obligation to provide due diligence information to such Potential Bidder will terminate and all information provided by the Debtors prior to such time shall be returned to the Debtors or destroyed in accordance with the terms of the applicable Confidentiality Agreement.

c. **Bid Requirements.** To be eligible to participate in the Auction, each Potential Bidder must submit a proposal (a "<u>Bid</u>") to purchase some or all of the Debtors' assets by May 12, 2025 at 4:00 p.m. (ET) (the "<u>Bid Deadline</u>") which must:

    1)    state that the applicable Potential Bidder offers to purchase the Acquired Assets upon terms and conditions no less favorable to the Debtors' estates as the Debtors, in consultation with the Consultation Parties, may reasonably determine, than the transactions contemplated in the Stalking Horse Agreement;

    2)    be accompanied by a deposit (each, a "<u>Good Faith Deposit</u>") in the form of a wire transfer or certified check or such other form acceptable to the Debtors in their sole discretion, payable to the order of Kurtzman Carson Consultants, LLC dba Verita Global (the "<u>Escrow Agent</u>"), in an amount equal to 10% of the cash portion of the Purchase Price being bid;

    3)    specify the amount of cash or other consideration offered by the Potential Bidder (the "<u>Purchase Price</u>"), which Purchase Price must, except for a Partial Bid (defined below): (a) exceed the aggregate sum of (i) the aggregate consideration set forth in the Stalking Horse Agreement; (ii) the Assumed Liabilities set forth in the Stalking Horse Agreement; (iii) the Bid Protections, and (iv) the minimum bid increment of $500,000; and (b) include an amount of cash consideration at closing that exceeds the aggregate sum of (i), (iii) and (iv) (such aggregate sum specified in (a) and (b), the "<u>Minimum Purchase Price</u>");

    4)    include an executed asset purchase agreement, together with all exhibits and schedules thereto, pursuant to which the Potential Bidder

proposes to effectuate a proposed transaction at the Purchase Price (the "<u>Transaction Documents</u>"), which Transaction Documents must include a copy of the proposed asset purchase agreement marked against the Stalking Horse Agreement to show all changes requested by the Potential Bidder including, but not limited to, treatment of any assumed liabilities;

5) be irrevocable by the Potential Bidder until the selection of the Successful Bid in accordance with the terms of these Bid Procedures; *provided* that if such Potential Bidder is selected as the Successful Bidder or Back-Up Bidder and is required to be a Back-Up Bidder hereunder, its Bid must remain irrevocable until the Debtors' consummation of a sale with the Successful Bidder;

6) include a list which specifies in detail which of the Debtors' unexpired leases and executory contracts are to be assumed by the Debtors and assigned to the Potential Bidder in connection with the consummation of the proposed transaction and an agreement that the Potential Bidder will pay any related cure costs;

7) contain a description of how the Potential Bidder intends to treat the Debtors' current employees;

8) provide a commitment to close by June 13, 2025;

9) not be conditioned on any contingency, including unperformed due diligence, obtaining financing, obtaining third-party consents, or any internal approval;

10) include an acknowledgement that the sale or transfer of the Acquired Assets will be on an "as is, where is" basis and without representations or warranties of any kind by Debtors or their agents other than as set forth in the Stalking Horse Agreement;

11) include a description of all governmental, licensing, regulatory or other filings, approvals or consents, including all filings required under the HSR Act, that are required to be made or obtained to close the proposed transaction, together with evidence of the ability to make any applicable filings or submissions within three (3) business days of being declared the Successful Bidder;

12) contain written evidence of a commitment for financing or other evidence of the ability to consummate a proposed transaction at the Purchase Price (including sufficient financial or other information to establish adequate assurance of future performance pursuant to section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code to the non-Debtor counterparties to any executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Potential Bidder in connection with the proposed transaction), satisfactory to the Debtors in their reasonable

discretion with appropriate contact information for such financing sources;

13) contain written evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and consummation of such Bid and the transaction(s) contemplated therein and any Overbid(s) (as defined below), and related Transaction Documents;

14) not request or entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment (except to the extent consented to in writing by Debtors after consultation with Agent);

15) fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid), participating in or benefiting from (including through license or similar arrangement with respect to the assets to be acquired in connection with such Bid) such Bid (a "Participating Party"), and the complete terms of any such sponsorship, participation, financing or benefit;

16) constitute a good faith, bona fide offer to effectuate the proposed transaction;

17) include a written acknowledgement by such Potential Bidder that it agrees to all of the terms for sale set forth in the Bid Procedures;

18) include an agreement to provide any other information reasonably requested by the Debtors; and

19) be received by the Bid Deadline.

d. **Qualified Bidder.** A qualified bidder ("Qualified Bidder") is a Potential Bidder that, in the Debtors' reasonable determination, after consultation with the Consultation Parties, (i) has timely submitted a Bid that satisfies each of the requirements listed above in the section entitled "Bid Requirements" and (ii) is able to consummate the proposed transaction within the required timeframe if selected as the Successful Bidder (such Bid submitted by a Qualified Bidder, a "Qualified Bid"); *provided* that the Debtors reserve the right to work with any Potential Bidder to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid. Within two (2) business days after a Potential Bidder delivers all of the documents described above, the Debtors will determine in their reasonable discretion, after consultation with the Consultation Parties, whether such Potential Bidder is a Qualified Bidder, and notify the Potential Bidder of such determination. For the avoidance of doubt, (i) the Stalking Horse Bidder is a Qualified Bidder, (ii) the Stalking Horse Agreement is a Qualified Bid, (iii) the Stalking Horse Bidder is

14

authorized to submit any Overbids (as defined below) during the Auction, in each instance without further qualification required of the Stalking Horse Bidder and (iv) Agents and Lenders (and any of their designees) are Qualified Bidders.

17.   If the Debtors receive one or more Qualified Bids (in addition to the Stalking Horse Bid), the Debtors will conduct the Auction to determine the highest acceptable Qualified Bid with respect to the Acquired Assets. If no Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline, then the Auction shall be cancelled, the Stalking Horse Bidder will be deemed the Successful Bidder, the Stalking Horse Agreement will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek final Court approval of the sale of the Acquired Assets to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement.

18.   The Debtors propose that the following procedures govern any Auction:

a.   **Baseline Bid**.  No later than one (1) day prior to the commencement of the Auction, the Debtors will provide all Notice Parties and Consultation Parties with complete copies of all Transaction Documents and all other bid materials submitted by each other Qualified Bidder, subject to exclusion of any confidential financial information as determined by the Debtors in their reasonable discretion or which has been so designated by the applicable Qualified Bidder.  At the commencement of the Auction, the Debtors will notify all Qualified Bidders, Notice Parties and Consultation Parties of the highest acceptable Qualified Bid, as determined by the Debtors in their reasonable discretion after consultation with the Consultation Parties (the "Baseline Bid").The Debtors' determination of which Qualified Bid constitutes the Baseline Bid, in consultation with the Consultation Parties, shall take into account factors such as the projected percentage recovery to general unsecured creditors pursuant to such Qualified Bid and the certainty of such recovery, whether all administrative, priority and secured claims will be paid in full under such Qualified Bid and any other factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates.  No later than the day prior to the commencement of the Auction, each Qualified Bidder that has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; *provided* that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid will nevertheless remain fully enforceable against such Qualified Bidder.

b.   **Auction Date and Location.**  The Auction will commence on or before May 15, 2025 at 10:00 a.m. (Prevailing Eastern Time) at the offices of **Morris Nichols Arsht & Tunnell, LLP, 1201 N. Market Street, Wilmington, DE 19801**, or on such other date and/or at such other location as determined by the Debtors.

c.   **Participation Requirements.**  Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction. The authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder), the Debtors, and the Committee will be permitted to attend the Auction.  In addition, pursuant to Local Rule 6004-1, all creditors of the Debtors who have not submitted Bids may attend the Auction as observers, provided that they send an email to Debtors' counsel indicating that they intend to attend the Auction no less than one (1) Business Day prior to the Auction, provided further that the Debtors' right to object on an emergency basis to any such creditor's proposed attendance at the Auction is reserved.

d.   **Auction Procedures**.  The Debtors and their professionals will direct and preside over the Auction.  At the start of the Auction, the Debtors will describe the terms of the Baseline Bid.  All Bids made thereafter must be Overbids (as defined below) and will be made and received on an open or closed basis, as determined by Debtors in consultation with the Consultation Parties, and all material terms of each Bid will be fully disclosed to all other Qualified Bidders.  The Debtors will maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, the Successful Bid and the Back-Up Bid.  Each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the sale of the Acquired Assets.  The Debtors, in their reasonable discretion, after consultation with the Consultation Parties, reserve the right to conduct the Auction in a manner designed to maximize value based upon the nature and extent of the Qualified Bids received.  The Debtors and their professionals will consult in good faith with the Consultation Parties throughout the Auction process.

During the Auction, bidding will begin initially with the Baseline Bid and subsequently continue in minimum increments of at least $500,000 (each, an "Overbid").  The Debtors will announce at the Auction the material terms of each Overbid, value each Overbid in accordance with the Bid Procedures and provide each Qualified Bidder with an opportunity to make a subsequent Overbid (except in the event of a round of closed, final bidding). Additional consideration in excess of the amount set forth in the Baseline Bid may include cash and/or other consideration acceptable to the Debtors in accordance with the Bid Procedures; *provided*, however, that no portion of the consideration may include non-cash consideration without the prior written consent of Agents (acting at the direction of the requisite Lenders)

16

When bidding at the Auction, the Stalking Horse Bidder will receive a cash credit in the amount of the Bid Protections and will be allowed to bid the Bid Protections.

To the extent that an Overbid has been accepted entirely or in part because of the addition, deletion, or modification of a provision or provisions in the applicable Transaction Documents or the Stalking Horse Agreement, the Debtors, after consultation with the Consultation Parties, will provide notice to each participant of the value ascribed by the Debtors to any such added, deleted, or modified provision or provisions, with such value being determined by the Debtors in their reasonable discretion, after consultation with the Consultation Parties.

Any Overbid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher and otherwise better bid submitted by another Qualified Bidder during the Auction as an Overbid and (ii) such Overbid is not selected as the Back-Up Bid (as defined below). To the extent not previously provided (which will be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit at the Debtors' request, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors (in consultation with the Consultation Parties)) demonstrating such Qualified Bidder's ability to close the transaction at the purchase price contemplated by such Overbid.

19.    As set forth in more detail in the Bid Procedures and subject to the conditions provided for therein, at the conclusion of the Auction, the Debtors, in the exercise of their reasonable business judgment, in consultation with the Consultation Parties, will select as the Successful Bid the highest acceptable bid submitted by a Qualified Bidder during the Auction, and the Debtors may, in their discretion, select a Back-Up Bid as set forth in the Bid Procedures.  The Successful Bidder and Back-Up Bidder, following the completion of the Auction, must increase their Good Faith Deposit so that they equal 10% of such Successful Bid or Back-Up Bid, as applicable.

**(ii)    Partial Bids**

20.    If any of the Qualified Bids submitted by the Bid Deadline are structured as a

purchase of less than all or substantially all of the Debtors' assets (each such bid, a "Partial Bid"),
the Debtors may conduct separate auctions at the Auction for each lot of assets (each, an "Auction
Lot") subject to a Partial Bid. Any Partial Bid must meet all of the requirements of a Qualified
Bid, unless otherwise modified herein, including without limitation, the Good Faith Deposit. The
Debtors may also combine multiple Partial Bids into an Auction Lot to compete against Qualified
Bids for all of the Debtors' assets.

          **(iii)**     **Designation Procedures**

        21.     The Debtors are seeking approval of the Designation Procedures for
notifying counterparties to executory contracts and unexpired leases of proposed Cure Amounts
(as defined below) and the timing of assumption and assignment or rejection with respect to those
executory contracts and unexpired leases (the "Contracts" and "Leases") that the Debtors propose
to assume and assign to the Successful Bidder. The following is a summary of the Designation
Procedures:

    a.     **Cure Notice.** On or before the date that is five (5) business days after the
Petition Date, or as soon thereafter as practicable, the Debtors shall file with
the Court a notice of the proposed assumption and assignment of certain
executory contracts and unexpired leases in connection with the Sale,
substantially in the form attached as **Exhibit 2** to the Bid Procedures Order
(the "Cure Notice"). The Debtors will serve the Cure Notice via first class
mail on all non-Debtor counterparties to Contracts and Leases, and their
respective known counsel, and provide a copy of same to the Contract Party
and the Stalking Horse Bidder. The Cure Notice shall inform each recipient
that its respective Contract or Lease may be designated by the Contract Party
(as defined below) as either assumed or rejected and the timing and
procedures relating to such designation, and, to the extent practicable (i) the
title of the Contract or Lease, (ii) the name of the counterparty to the Contract
or Lease, (iii) the Debtors' good faith estimates of the cure amounts required
in connection with such Contract or Lease (the "Cure Amount"), (iv) the
identity of the Contract Party and (v) the deadline by which any such
Contract or Lease counterparty may file an objection to the proposed
assumption and assignment and/or cure amount, and the procedures relating
thereto; provided, however, that service of a Cure Notice does not constitute
an admission that such Contract or Lease is an executory contract or
unexpired lease. If the Debtors identify additional Contracts or Leases that

might be assumed by the Debtors and assigned to the Contract Party, the Debtors will promptly send a supplemental Cure Notice to the applicable counterparties to such Contract or Lease.

b.      **Adequate Assurance**.  The Debtors shall serve by overnight mail (or by electronic mail, if available) no later than five (5) business days after the Petition Date the evidence of adequate assurance of future performance under the Contracts and Leases provided in connection with the Stalking Horse Bidder, including the legal name of the proposed assignee, the proposed use of any leased premises, general information about the proposed assignee's financial wherewithal and a contact person with the proposed assignee whom counterparties may contact if they wish to obtain further information regarding the proposed assignee. No later than three (3) days after the Bid Deadline, the Debtors shall serve on affected counterparties and their respective known counsel by electronic mail (if available) or overnight mail the adequate assurance information provided by each Qualified Bidder.

c.      **Objections**. Objections, if any, to the proposed assumption and assignment of any Contract or Lease or to the cure amount proposed with respect thereto must: (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules and any other orders of the Court, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof and (iv) be filed with the Court and served so as to be actually received by the Notice Parties before the Sale Objection Deadline.

Following the Debtors' selection of the Successful Bidder and the Back-Up Bidder, if any, at the conclusion of the Auction, the Debtors shall announce the Successful Bidder and the Back-Up Bidder, if any, and shall file with the Court a notice of the Successful Bidder and the Back-Up Bidder, if any.  If and only if the Stalking Horse Bidder is not the Successful Bidder for the Acquired Assets, counterparties to the Debtors' Contracts and Leases shall have until May 19, 2025, at 11:59 p.m. (ET) (the "Supplemental Adequate Assurance Objection Deadline") to object to the assumption and assignment of a Contract or Lease (a "Supplemental Adequate Assurance Objection") solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.  For the avoidance of doubt, if the Stalking Horse Bidder is the Successful Bidder, all adequate assurance objections must be filed by the Sale Objection Deadline.

d.      **Dispute Resolution**. Any objection to the proposed assumption and assignment or related cure of a Contract or Lease in connection with the proposed sale that remains unresolved as of the Sale Hearing shall be heard at the Sale Hearing or such later hearing if the objection is not resolved and

the Debtors determine that an adjournment is appropriate. To the extent any such objection is resolved or determined unfavorably to the applicable Debtor, the Debtors may, subject to the terms of an agreement with the Successful Bidder, seek to reject the applicable Contract or Lease after such determination.

22.     Any party who fails to timely file an objection to its scheduled cure amount listed on the Cure Notice or to the assumption and assignment of a Contract or Lease (i) shall be forever barred, estopped and enjoined from objecting thereto, including (a) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults for the period prior to the applicable objection deadline against the Debtors, their estates or the Contract Party or the Stalking Horse Bidder or other Successful Bidder selected at the Auction, if any, with respect to any such Contract or Lease and (b) asserting that the Contract Party or the Successful Bidder has not provided adequate assurance of future performance as of the date of the Sale Order; (ii) shall be deemed to consent to (a) the sale of the Acquired Assets as approved by the Sale Order and (b) the assumption and assignment of the Contracts and Leases; and (iii) shall be forever barred and estopped from asserting or claiming against the Debtors or the assignee of the relevant Contract or Lease that any conditions to assumption and assignment of such Contract or Lease must be satisfied (pursuant to section 365(b)(1) of the Bankruptcy Code or otherwise).

**B.      Scheduling and Notice**

23.     Given the marketing efforts to date and the marketing and diligence period to be established by the Bid Procedures, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Debtors' assets.  The most likely interested bidders are those who have already indicated interest, accessed to the data room and have had the opportunity to perform due diligence.  Thus, potential bidders need a shorter length of time for due diligence to submit competing bids.  If new bidders emerge, the proposed timeline

will provide them with sufficient time to perform due diligence given that the process is well understood at this juncture. Thus, the schedule is sufficient, while respecting the necessity to consummate the Sale as quickly as possible to maximize the value received for the Debtors' assets.

24.     **Notice of Sale Hearing**. Within five (5) days of the Petition Date, or as soon thereafter as practicable, the Debtors shall cause to be served, by first-class mail, postage prepaid, a sale notice (the "Sale Notice") setting forth, among other things, the proposed dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as **Exhibit 3**, upon: (a) the United States Trustee for the District of Delaware (b) all known material creditors of the Debtors, including contingent, unliquidated and disputed creditors, as well as each  creditor listed on the Debtors' consolidated list of thirty (30) largest unsecured creditors, as filed with the Debtors' chapter 11 petitions, (c) any official committee appointed in the Debtors' cases; (d) all parties asserting a security interest in the Acquired Assets to the extent any such interest is reasonably known to the Debtors; (e) applicable federal, state, county and city tax and regulatory authorities; (f) all entities known to have expressed a written interest in a transaction with respect to the Acquired Assets or that have been identified by the Debtors or their advisors as a potential purchaser of the Acquired Assets; (g) local, state and federal authorities and agencies that have issued licenses or permits to the Debtors with respect to the operation and use of the Acquired Assets; (h) each counterparty to the Debtors' Contracts and Leases; and (i) all parties entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

25.     **Post-Auction Supplement**. Following the Auction, the Debtors will promptly file with the Court a supplement (the "Supplement") that will inform the Court of the results of the Auction. The Supplement will identify, among other things, (i) the Successful Bidder

21

as the proposed purchaser of the Acquired Assets, (ii) the amount and form of consideration to be paid by the Successful Bidder for the Acquired Assets, (iii) the Assumed Liabilities to be assumed by the Successful Bidder, and (iv) the Contracts and Leases that may be assumed by the Debtors and assigned to the Successful Bidder, or the Debtors' rights and interests therein sold and transferred to the Successful Bidder, as the case may be, in connection with the Sale. The Supplement will also include similar information relating to the Back-Up Bidder and the Back-Up Bid. In addition, the Debtors will file as soon as practicable (i) any revised proposed Sale Order approving the Sale to the Successful Bidder, (ii) a copy of the purchase agreement entered into by the Debtors and the Successful Bidder following the Auction, and (iii) any additional information or documentation relevant to the Successful Bid. The Debtors will file the Supplement on the docket for the chapter 11 cases as promptly as is reasonably practicable prior to the Sale Hearing, but will not be required to serve the same on any parties-in-interest in the chapter 11 cases.

### C. **Sale Order**

26. The Debtors request that this Court set the Sale Hearing for a date that is not later than May 20, 2025. At the Sale Hearing, the Debtors intend to seek entry of the Sale Order approving the Sale free and clear of all Encumbrances to the fullest extent possible pursuant to Bankruptcy Code section 363(f), including without limitation, successor liability or similar theories (except for those Assumed Liabilities and obligations expressly assumed by the Successful Bidder) and providing that the Successful Bidder will be protected from liability for any claims owed by the Debtors. In addition, the Sale Order will have findings that the Sale is not a fraudulent conveyance. The Bid Procedures provide proper and adequate notice for these and the other terms and conditions of the bidding, Auction and Sale processes.

## BASIS FOR RELIEF REQUESTED

**(i)    Approval of the Sale is Warranted Under Bankruptcy Code Section 363(b), and the Bid Procedures, Including Entry Into the Stalking Horse Agreement, are Appropriate and in the Best Interests of the Debtors' Estates and Creditors.**

27.    Section 363(b)(1) of the Bankruptcy Code provides that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.

28.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 if it demonstrates a sound business purpose for doing so. *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for proposed transaction); *see also In re Montgomery Ward Holding Corp.*, 242 B.R 147, 154 (Bankr. D. Del. 1999) (finding that the debtor's sound business purpose justified its sale of the assets outside of the ordinary course of business).

29.    Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty . . . is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131

23

(Bankr. N.D. Ga. 1988)); *In re Summit Global Logistics, Inc.*, No. 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties."). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of a debtor and therefore are appropriate. *See Integrated*, 147 B.R. at 659 (providing that such procedures "encourage bidding . . . to maximize the value of the debtor's assets."); *In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

30. With this in mind, courts defer to a debtor's business judgment in the context of bidding and auction procedures. *See In re Trans World Airlines Inc.*, No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

31. In exercising their fiduciary duties and in the sound exercise of the Debtors' business judgment, the Debtors have determined that the Bid Procedures, including entry into the Stalking Horse Agreement, are the most appropriate method for encouraging competing bids that will maximize creditor recoveries and that will ensure the value received for their assets is the highest and best the market can generate.

32. The Bid Procedures provide a framework to facilitate and entertain bids for the Acquired Assets and, if such bids are received, to conduct an Auction in an orderly yet competitive fashion, thereby encouraging bids that maximize the value realized from a sale of the Acquired Assets. In particular, the Bid Procedures contemplate an open and fair auction process

with minimum barriers to entry and provide Potential Bidders with sufficient time to perform due diligence, many of whom will have likely performed due diligence in the very recent past, and acquire the information necessary to submit a timely and well-informed bid. *See In re Federal Mogul*, 293 B.R. 124, at 126.

33.     The Bid Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest acceptable offer for the purchase of substantially all the Debtors' assets.  The Debtors therefore believe that submitting the purchase of their assets to a market-based test will ensure maximum recovery for all stakeholders.  Accordingly, the Debtors and their stakeholders can be assured that the consideration obtained will be fair and reasonable and at or above market. *In re Summit Global Logistics*, 2008 WL 819934, at *14.

34.     If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will (i) notify all Potential Bidders and the Court in writing that (a) the Auction is cancelled and (b) the Stalking Horse Bid is the Successful Bid, and (ii) seek authority at the Sale Hearing to consummate the Sale transactions with the Stalking Horse Bidder contemplated by its Stalking Horse Agreement.

35.     Similar bidding, auction and notice procedures have been previously approved by this Court in other chapter 11 cases. *See, e.g.*, *In re Dermitech, Inc., 24-11378 (JTD) (Bankr. D. Del. 2024); In re Vyaire Medical, Inc., 24-11217 (BLS) (Bankr. D. Del. 2024); In re MRRC Hold Co., 24-11164 (CTG) (Bankr. D. Del. 2024); In re Coach USA, Inc., 24-11258 (MFW) (Bankr. D. Del. 2024); In re Ambri Inc., 24-10952 (LSS) (Bankr. D. Del. 2024);* In re Near Intelligence, Inc., 23-11962 (TMH) (Bankr. D. Del. 2023). *In re Tuscany Int'l Holdings (U.S.A.) LTD.*, Case No. 14-10193 (KG) (Bankr. D. Del. Mar. 21, 2014); *In re Oncure Holdings, Inc.*, Case No. 13-11540 (KG) (Bankr. D. Del. July 24, 2013); *In re Protostar Ltd.*, Case No. 09-12659

(MFW) (Bankr. D. Del. Aug. 24, 2009); *In re Midway Games Inc.*, Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009).

36.     In sum, the Debtors believe that the proposed Bid Procedures, including entry into the Stalking Horse Agreement, create an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for the Acquired Assets. Accordingly, the proposed Bid Procedures and the Stalking Horse Agreement are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances.

**(ii)     Approval of the Bid Protections is Appropriate.**

37.     The Debtors believe that the Bid Protections are fair and reasonable under the circumstances.  The Bid Protections provided for in the Stalking Horse Agreement were negotiated at arms' length and in good faith and were a necessary inducement to Stalking Horse Bidder's participation in the proposed sale transaction and willingness to subject its bid to a competitive auction process.  As discussed below, the Stalking Horse Bid sets a "floor" value for the Assets that maximizes the likelihood that the Debtors will receive the highest acceptbale offer for the Assets to the benefit of the Debtors' estates.

38.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. In *O'Brien*, the Third Circuit reviewed the following nine (9) factors set forth by the lower court as relevant in deciding whether to award bid protections:

    a.     the presence of self-dealing or manipulation in negotiating the break-up fee;

    b.     whether the fee harms, rather than encourages, bidding;

    c.     the reasonableness of the break-up fee relative to the purchase price;

    d.     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

    e.     the ability of the request for a break-up fee to serve to attract or retain a

potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.  the correlation of the fee to a maximum value of the debtor's estate;

g.  the support of the principal secured creditors and creditors' committees of the break-up fee;

h.  the benefits of the safeguards to the debtor's estate; and

i.  the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

39.     Although none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections.  In particular, the Bid Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to establish an adequate floor value for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtors' estates.  The Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections given the substantial time and expense it has incurred in connection with negotiating definitive documentation and the risk that it will be outbid at the Auction. Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest acceptable offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  As discussed in the First Day Declaration, the purchase price contemplated by the Stalking Horse Bid is substantially higher than any other potential bids received as of filing, and represents a superior recovery for the estate to the alternatives, including the sizable risk of a chapter 7 liquidation. The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are at least worth the Purchase Price and puts pressure on potential competing bidders to "put their best foot forward" in formulating their bids.  Therefore,

without the benefit of the bid of the Stalking Horse Bidder, the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

40.     In addition, the Bid Protections were the product of hard-fought negotiations between the Debtors, their key creditor constituencies, and the Stalking Horse Bidder, in which the Debtors sought to both minimize the magnitude of Bid Protections payable and limit the circumstances under which they are payable.  The resulting Bid Protections fall within the range of stalking horse bid protections approved in this District and others.  *In re iSun, Inc.*, 24-11144 (TMH) (Bankr. D. Del. 2024) (approving a 5% Break-Up Fee); *In re Plastiq Inc.*, 23-10671 (BLS) (Bankr. D. Del. 2023) (Same); *In re Orexigen Therapeutics, Inc.*, 18-10518 (JTC) (Bankr. D. Del. 2018) (Same); *In re ATopTech, Inc.*, 17-10111 (MFW) (Bankr. D. Del. 2017) (Same).

41.     Finally, payment of the Bid Protections in the context of a sale to another purchaser will not diminish the Debtors' estates to the extent they become payable, as the Bid Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Bid Protections.  Accordingly, based on the foregoing, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

**(iii)    The Acquired Assets Should be Sold Free and Clear of Claims, Liens and Encumbrances Under 11 U.S.C. § 363(f).**

42.     In the interest of attracting the best offers, the Debtors request authorization to sell the Acquired Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale of the Acquired Assets and distributed as provided for in a further order of the Court.

43.     Under section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied:

> i. applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> ii. such entity consents;
>
> iii. such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> iv. such interest is in bona fide dispute; or
>
> v. such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens, claims, encumbrances, and other interests. *See, e.g.*, *In re Dura Automotive Sys., Inc.,* 2007 WL 7728109, at *6 n.32 (Bankr. D. Del. Aug. 15, 2007).

44.     Furthermore, section 105(a) of the Bankruptcy Code grants the Court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). This equitable power may be utilized to effectuate the provisions of section 363(f). *See, e.g., In re Trans World Airlines, Inc*., 2001 WL 1820325, at *6–7 (Bankr. D. Del. Mar. 27, 2001) (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

45.     The Debtors will present evidence at the Sale Hearing that the Sale satisfies the requirements of section 363(f). Accordingly, the Debtors request authorization to sell the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests.

**(iv)      A Successful Bidder Should be Entitled to the Protections of Bankruptcy Code Section 363(m).**

46.      Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Penn.*, 788 F.2d at 147; *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc*., 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp*., Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); *In re Temtechco, Inc*., 1998 WL 887256, at *4 (D. Del. 1998).

47.      As noted above, any Asset Purchase Agreement executed by a Successful Bidder (including the Stalking Horse Agreement) will have been negotiated at arm's-length and in good faith in accordance with the Bid Procedures, with each of the parties represented by its own advisors and counsel.  Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder for the Acquired Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors maintain that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Acquired Assets.

**(v)      Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Should be Authorized.**

48.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  A debtor may assume or reject an executory contract or unexpired lease if its reasonable business judgment supports assumption or rejection.  *See, In re Stable Mews Assoc., Inc*., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984); *see also Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co*., 318 U.S. 523 (1943); *Sharon*

*Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews*).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

49.     Pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default which is required to be cured, including compensating or providing adequate assurance of prompt compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).  The Designation Procedures are appropriate and reasonably tailored to provide counterparties to executory contracts and unexpired leases with adequate notice of the proposed assumption and assignment of their contracts and leases, as well as proposed cure amounts, if any.  Such counterparties will then be given an opportunity to object to such cure amounts and assumption and assignment of their contracts and leases.  The Designation Procedures further provide that, in the event an objection is not resolved, the Court will determine the disputed issues.  Therefore, the Debtors submit that implementation of the Designation Procedures is appropriate under the facts and circumstances of the chapter 11 cases and the proposed Sale.

50.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the

debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the debtor's assets).  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.

51.     The Debtors submit that the assumption and assignment of executory contracts and unexpired leases to the Contract Party or other Successful Bidder (as applicable), as of the Closing Date is necessary to the consummation of the Sale and is well within the Debtors' sound business judgment.   Those contracts and leases are essential to inducing the highest acceptable offer for the Acquired Assets because they are necessary to run the Debtors' business. It is unlikely that any purchaser would want to acquire any company on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations are included in the transaction.   In addition, the Stalking Horse Agreement and Sale Order provide that the Stalking Horse Bidder will have (i) cured and/or provided adequate assurance of cure of any default required to be cured and existing prior to the assumption and assignment; and (ii) provided compensation or adequate assurance of

compensation to any counterparty for actual pecuniary loss to such party resulting from such default.

52. Counterparties to the Debtors' executory contracts and unexpired leases will be provided with a Cure Notice and will have an opportunity to object to the potential assumption and assignment of their contracts and leases prior to the entry of the Sale Order. The Debtors propose that any counterparty that fails to object to the proposed assumption and assignment of its contract or lease will be deemed to consent to that assumption and assignment pursuant to section 365 of the Bankruptcy Code on the terms set forth in the proposed Bid Procedures Order and Sale Order, and to the cure amounts identified in the Cure Notice. *See*, *e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor was deemed to have consented to sale by not objecting to sale motion).

53. Accordingly, the Debtors submit that the assumption and assignment to the Stalking Horse Bidder or other Successful Bidder of the Debtors' contracts and leases should be approved as an exercise of the Debtors' sound business judgment.

**E.     The Proposed Notice is Appropriate Under Bankruptcy Rule 2002.**

47. The notices contemplated by the Bid Procedures give notice of the proposed Sale including a disclosure of the time and place of an Auction, the terms and conditions of the Sale, and the deadline for filing any objections. The Debtors submit that the notice procedures comply with Bankruptcy Rule 2002 and include information regarding the Bid Procedures necessary to enable interested bidders to participate in the Auction, and constitute good and adequate notice of the Bid Procedures and the other components of the Auction. Therefore, the Debtors respectfully request this Court approve the proposed notice procedures.

**F.     Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

48.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Acquired Assets, it is critical that the Debtors close the sale of the Acquired Assets as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

49.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtors' creditors holding the thirty (30) largest unsecured claims as set forth in the list filed with the Debtors' petitions; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) entities known to have expressed a bona fide interest in a transaction with respect to the Acquired Assets; (g) all entities known to have asserted any lien, claim or encumbrance in or upon any of the Acquired Assets; (h) all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; and (i) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request this Court to enter the Bid Procedures Order, the Sale Order and further relief as the Court may deem just and appropriate.

Dated: April 8, 2025
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Robert J. Dehney, Sr.*
Robert J. Dehney, Sr. (No. 3578)
Matthew O. Talmo (No. 6333)
Scott D. Jones (No. 6672)
Clint M. Carlisle (No. 7313)
Brianna N. V. Turner (No. 7468)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
mtalmo@morrisnichols.com
sjones@morrisnichols.com
ccarlisle@morrisnichols.com
bturner@morrisnichols.com

*Proposed Counsel to the Debtors and
Debtors in Possession*