**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| ROYAL INTERCO, LLC, *et al.,* | Case No. 25-10674 (TMH) |
| Debtors. [1] | Joint Administration Requested |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING**
**AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING**
**CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III)**
**GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS,**
**(IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL**
**HEARING AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors"),

respectfully state as follows in support of this motion (the "Motion"):

**PRELIMINARY STATEMENT**

1.      The Debtors filed these cases with the intention to complete a sale process

that maximizes value for their estates and stakeholders. To that end, the Debtors have a stalking

horse bid in hand from Sofidel America Corp. for the purchase of substantially all of the Debtors'

assets, subject to Court approval and any topping bids that emerge during the sale process. Like

most companies entering bankruptcy, however the Debtors lack sufficient cash on hand to fund

their operating needs and complete their intended value-maximizing sale process.

2.      As such, leading up to the Petition Date, the Debtors and their advisors

solicited proposals from third parties for potential debtor-in-possession financing.  To provide the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899).  The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

Debtors with the opportunity to run a value-maximizing sale process in chapter 11, NXT Capital, LLC, as the Prepetition Agent under the Prepetition Credit Agreement (defined below), and the participating lenders under the Prepetition Credit Agreement (together the "Proposed DIP Lenders"), offered to provide a postpetition, senior-secured financing DIP Facility (defined below) with funded principal amount of up to $10,000,000, which does not include any roll-up of the prepetition secured loans, to allow the Debtors to fund their operations in accordance with an approved budget.

3. The Debtors also solicited proposals from other potential sources outside of the Debtors' capital structure with the goal of obtaining debtor-in-possession financing on terms that were most advantageous to them. The potential third-party lenders contacted by the Debtors included various institutions that routinely provide debtor-in-possession financing, including both well-known commercial banks, credit funds and specialty lenders. The Prepetition Lenders informed the Debtors, however, that they would not consent to any financing that primed the liens granted under the Prepetition Credit Agreement. No third parties contacted by the Debtors were interested in providing debtor-in-possession financing except the Proposed DIP Lenders.

4. As such, following arm's-length, good faith negotiations on the terms set forth in the proposed DIP Facility, the Debtors agreed to enter into that certain Postpetition Credit Agreement (the "Postpetition Credit Agreement"), with the lenders party thereto and NXT, in its capacity as agent (the "Postpetition Agent," and with the Prepetition Agent, the "Agent"). The Postpetition Credit Agreement and the DIP Facility was the product of arms-length and good faith negotiations, and includes terms that are customary in this District.

5. The DIP Facility provides a crucial lifeline to the Debtors and is reasonable and fair. Crucially, the Debtors believe that the DIP Facility provides sufficient runway to allow

the Debtors to pursue and complete a value-maximizing sale transaction. The liquidity made available under the DIP Facility, coupled with the Debtors' access to Cash Collateral, signals to the Debtors' vendors, suppliers, customers, and employees that the Debtors have the liquidity necessary to continue operating while they complete a successful going concern sale of their assets. Without the DIP Facility, the value of the Debtors' business and assets would quickly deteriorate, materially and irreparably harming the Debtors' estates.  Therefore, the relief requested by this Motion is a necessary step to both preserving the Debtors' operations as well as providing a bridge to a sale transaction that maximizes value for the Debtors' estates and their stakeholders.

6.      For these reasons, as well as for the reasons set forth below in the *Declaration of Michael Ragano in Support of First Day Relief* (the "Ragano Declaration"), the Debtors believe that entry into the DIP Facility is an exercise of the Debtors' sound business judgment and will maximize value of their estates to the benefit of all of the Debtors' stakeholders. Accordingly, the Debtors respectfully request that the Court approve the Debtors' entry into the DIP Facility.

**RELIEF REQUESTED**

7.      The Debtors seek the entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order"),[2] among other things:[3]

      (a)      authorizing the Debtors to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), solely in

---

[2]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

[3]    The summaries and descriptions of the terms and conditions of the DIP Facility as set forth in this Motion are qualified in their entirety by the terms of the Interim Order, Final Order and Postpetition Documents. Undefined terms used herein shall have the meanings ascribed to them in the Interim Order or Postpetition Documents, as applicable.

accordance with the terms and provisions of the Interim Order and Final Order;

(b)     authorizing Royal Paper, LLC ("Royal Paper"), Doubletree Paper Mills, L.L.C. ("Doubletree") and Sun Paper Company, LLC ("Sun Paper" and with Royal Paper and Doubletree, the "Borrowers") to obtain postpetition financing on a secured superpriority debtor-in-possession facility from NXT Capital, LLC, in its capacity as Postpetition Agent, and the Postpetition Lenders thereto, which is comprised of a delayed draw term loan credit facility (the "DIP Facility") in an aggregate funded principal amount not to exceed $10,000,000 (the "Delayed Draw Term Loans" and proceeds received by the Borrowers from the Delayed Draw Term Loans, the "Proceeds"), $5,000,000 of which shall be available upon entry of the Interim Order, and which shall be available to the Debtors for borrowing solely in accordance with the Interim Order, Final Order, DIP Budget, the terms of the Postpetition Credit Agreement annexed to the Interim Order and Postpetition Documents;

(c)     authorizing the Debtors to (1) execute the Postpetition Documents, including all documents that the Postpetition Agent and Postpetition Lenders find reasonably necessary to implement the transactions contemplated by the Postpetition Documents; and (2) perform their obligations under and comply with all of the terms and provisions of the Postpetition Documents and the Interim Order;

(d)     subject to the Carveout, granting to the Postpetition Agent, for itself and for the benefit of the Postpetition Lenders, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of the Postpetition Debt;

(e)     granting to the Postpetition Agent, for itself and for the benefit of the Postpetition Lenders, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all Prepetition Collateral and Postpetition Collateral (both as defined in the Interim Order)

(f)     granting the Prepetition Agent, for the benefit of the Prepetition Lenders, (i) Priority Liens, subject only to the Postpetition Liens and Permitted Priority Liens, (ii) the Replacement Liens, and (iii) in the event the adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral proves insufficient, an allowed claim under section 507(b), subject to the Carveout, with priority over: (1) all costs and expenses of administration of the Cases (other than the Postpetition Agent's and Postpetition Lenders' claims under Code § 364) that are incurred under any provision of the Code; and (2) the claims of any other party in interest under Code § 507(b).

(g)     authorizing the Debtors to waive, subject to entry of the Final Order, (a) their right to surcharge the Aggregate Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(h)     authorizing the Debtors to waive, subject to entry of the Final Order, the doctrine of "marshaling" for the Agent and the Lenders on any of the Aggregate Collateral;

(i)     authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the Postpetition Documents as such become earned, due and payable to the extent provided in, and in accordance with, the Postpetition Documents;

(j)     modifying the Automatic Stay with respect to the Agent and Lenders to the extent necessary to effectuate the provisions of this Order, including, after the Termination Date, to permit Agent and Lenders to exercise their respective rights contemplated by Paragraph 6 of the Interim Order; and

(k)     scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "Final Order"), as set forth herein and the Postpetition Documents filed with this Court.

## JURISDICTION

8.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The Debtors consent pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10. The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1(m).

## BACKGROUND

### I.        General Background

11. On April 8, 2025 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court. The Debtors are operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in these cases.

12. The Debtors are a leading manufacturer of high-quality paper products—bath tissue, paper towels, facial tissue, and napkins—offering a broad range of products and packaging configurations to service their regional and national customers. As a fully integrated manufacturer, the Debtors maintain complete control over the papermaking and converting process from selecting the pulp and raw materials for their wholly-owned paper mill in Gila Bend, Arizona, to converting parent rolls into customer-specific products at their converting facilities in Phoenix, Arizona, and Duncan, South Carolina, to distributing and shipping finished goods to their customers in the At-Home market (*i.e.*, significant US retailers and distributors) and Away-from-Home markets (*i.e.*, hotels, schools, and office buildings). The Debtors' capability to produce customer-specific products and their strong customer relationships are critical in today's market, where demand for the Debtors' products is at a record high.

13. Additional detail regarding the Debtors, their business, the events leading to commencement of these cases and the facts and circumstances supporting the relief requested

herein is set forth in the Ragano Declaration filed concurrently herewith and incorporated herein by reference.

## II.    The Prepetition Capital Structure

14.    The most significant sources of the Debtors' secured and unsecured indebtedness are identified and described below.[4]

### A.    Prepetition Credit Agreement

15.    On June 15, 2018, Royal Paper Converting, LLC (the predecessor of Royal Paper), and Doubletree (together, the "Initial Borrowers"), the lenders from time to time party thereto (the "Prepetition Lenders"), NXT Capital, LLC (the "Prepetition Agent"), as agent, joint lead arranger and sole bookrunner, Fifth Third Bank, as joint lead arranger, and Webster Bank, N.A., as documentation agent, executed that certain Credit Agreement (as amended by the First Amendment on November 5, 2020, the Second Amendment on December 29, 2021, the Third Amendment on October 4, 2022, the Fourth Amendment on January 17, 2023, the Fifth Amendment on September 30, 2024, the Sixth Amendment on November 15, 2024, and the Seventh Amendment on January 29, 2025, the "Prepetition Credit Agreement"). The Prepetition Credit Agreement, among other things, provides for (i) secured term loans in the maximum principal amount of $114,500,000 (the "Term A Loans") and (ii) secured revolving credit loans in the maximum principal amount of $25,000,000, with such revolving credit facility to include a $5,000,000 letter of credit sub-facility. The Prepetition Credit Agreement also provided for incremental term loans in the original principal amount of $10,500,000.

---

[4]    In addition to the sources of indebtedness described below, there are also other sources of indebtedness described in other motions filed contemporaneously herewith, such as indebtedness related to the Debtors' employee payroll and benefit obligations, as well as other debt accruals.

16.     On June 15, 2018, the Initial Borrowers under the Prepetition Credit Agreement, along with RP Holdco, LLC and Royal Interco, LLC, entered into that certain Guarantee and Collateral Agreement (as amended, restated, modified or supplemented from time to time), guaranteeing the obligations under the Prepetition Credit Agreement in favor of the Prepetition Agent, for all Lenders party to the Prepetition Credit Agreement.  On November 5, 2020, Sun Paper executed a joinder to the Guarantee and Collateral Agreement.  The Guarantee and Collateral Agreement and related Loan Documents, as defined in the Prepetition Credit Agreement, provide a first-priority, fully-perfected security interest and lien on each of the Prepetition Borrowers' and Guarantors' (as defined in the Prepetition Credit Agreement) right, title, and interest in, to and under all the Debtors' assets and all proceeds thereof.

17.     Pursuant to that certain Incremental Term Loan Agreement and First Amendment to Credit Agreement, dated November 5, 2020, by and among the Initial Borrowers and Sun Paper (together with the Initial Borrowers, the "Prepetition Borrowers"), the Prepetition Lenders provided an additional term loan in the amount of $5,350,000, which constitutes a portion of the Term A Loans, and the Term A Loans were deemed to increase to $117,273,750.  The Term A Loan commitment was set to mature on June 15, 2024.  The additional Term A Loan commitment as well as incremental revolver borrowings and cash on hand were used to fund the acquisition of all the issued and outstanding equity interests of Sun Paper.

18.     On December 29, 2021, in connection with that certain Second Amendment to the Credit Agreement, GC Fund III RP, AIV, L.P. ("Gridiron") executed a Sponsor Limited Guaranty, in favor of the Prepetition Agent, for all Prepetition Lenders party to the Prepetition Credit Agreement.  Under the Sponsor Limited Guaranty, Gridiron guaranteed the Borrowers'

obligations under the Prepetition Credit Agreement in an amount of up to $20,000,000, plus any and all expenses incurred by the Prepetition Agent in enforcing the Sponsor Limited Guaranty.

19.     On January 17, 2023, the Borrowers entered into that certain Fourth Amendment to Credit Agreement, which provides for (i) additional secured term loans in the maximum principal amount of $12,500,000 (the "Term B Loans") and (ii) an extension of the maturity date for the existing Term A Loans and a maturity date for the Term B Loans of December 31, 2024.  The maturity date for the Term A and Term B Loans was further extended to July 15, 2025, by that certain Sixth Amendment on November 15, 2024.

20.     On January 29, 2025, in connection with that certain Seventh Amendment to the Credit Agreement, Gridiron paid the Prepetition Agent an amount equal to $8,367,007.02 in respect of its obligations under the Sponsor Limited Guaranty, a portion of which was advanced to the Prepetition Borrowers as additional Term B Loans.

21.     As of the Petition Date, the total principal outstanding under the Prepetition Credit Agreement is not less than $199,603561 plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses owing under or in connection therewith.

**B.     Sale Leaseback Transaction**

22.     On September 30, 2024, Royal Paper and Sun Paper (collectively, the "Lessees"), entered in a sale-leaseback transaction with Clarus Capital Funding I, LLC (the "Lessor"), pursuant to Equipment Schedule No. 1 and Equipment Schedule No. 2 (together, the "Schedules"), dated September 30, 2024, and October 10, 2024, respectively.  Pursuant to the Schedules, the Lessees sold certain equipment to the Lessor for approximately $8.5 million, who then leased the equipment back to the Lessees pursuant to a master lease agreement, dated September 30, 2024 (the "Lease").  The monthly rent due under the Schedules is approximately

$178,217.75 and the initial term of the lease is four years.  The Debtors intend to assign the Lease to the Stalking Horse Bidder.

### C.  Trade and Miscellaneous Unsecured Debt

23.    The Debtors estimate that as of the Petition Date claims of trade and miscellaneous unsecured creditors total approximately $24,900,000.

### CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

24.    Pursuant to Bankruptcy Rule 4001(b), (c), and (d), and Local Rule 4001-2(a), the following is a concise summary highlighting the proposed material terms of the DIP Financing, as specified in the DIP Credit Agreement, the Interim Order:

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Obligors**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(J) | **Borrower**: Royal Paper, LLC, Doubletree Paper Mills, L.L.C. and Sun Paper Company, LLC.<br><br>**Guarantor**: RP Holdco, LLC and Royal Interco, LLC<br><br>**Postpetition Agent**: NXT Capital, LLC<br><br>*See* Postpetition Credit Agreement Preamble; Interim Order ¶ 3. |
| **DIP Commitment**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A), (O). | The DIP Commitment shall be an amount up to $10,000,000, of which $5,000,000 shall be available upon entry of the Interim Order to be drawn during the period commencing on the entry of the Interim Order and until entry of the Final Order in accordance with the terms and conditions set forth in the Postpetition Credit Agreement.<br><br>*See* Postpetition Credit Agreement § 1.1 Definition of "Delayed Draw Term Loan Commitment"; Interim Order ¶ 3(c). |
| **Use of Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | **Permitted Uses of Postpetition Debt.**<br><br>Debtors are authorized and have agreed to incur Postpetition Debt solely:<br><br>(1) in accordance with the terms and provisions of the Interim Order and the Postpetition Documents, |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | (2) to the extent required to pay those expenses enumerated in the Budget, including the Carveout, as and when such expenses become due and payable, subject to the Permitted Variance, and<br><br>(3) to pay Allowable 506(b) Amounts and the Postpetition Charges.<br><br>*See* Interim Order ¶ 3(b). |
| **Conditions of Closing and Borrowing**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | **4.1.1. – Bankruptcy.**<br><br>**(a)** The Bankruptcy Court shall have entered the Interim Financing Order within three (3) Business Days of the Filing Date, which Interim Financing Order (i) shall have been entered upon an application or motion of the Loan Parties satisfactory in form and substance to Agent in its sole discretion and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent, (A) authorizing and approving this Agreement and the other Loan Documents and the transactions contemplated thereby, including without limitation, the granting of superpriority status, security interests and priming Liens, and the payment of all fees, (B) lifting or modifying the automatic stay to permit the Debtors to perform their obligations and Agent to exercise its rights and remedies with respect to this Agreement and the other Loan Documents, (C) providing for adequate protection in favor of Existing Agent and Existing Lenders, and (D) including terms and conditions customary for transactions of this type; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed, except for amendments or modifications with the written consent of Agent; and, if the Interim Financing Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Financing Order, nor the making of the Loans or the performance by the Loan Parties of any of the Obligations shall be the subject of a presently effective stay, and (iii) shall otherwise be in form and substance satisfactory to Agent.<br><br>**(b)** The Bankruptcy Cases shall have been commenced in the Bankruptcy Court, and all "first day orders" and all related orders to be entered at or promptly following the commencement of the Bankruptcy Cases shall have been provided in advance to Agent and shall be in form and substance satisfactory to Agent.<br><br>**(c)** The Bankruptcy Court shall have entered a cash management order authorizing the Loan Parties to maintain and continue to use their cash management system in the ordinary course of business, which order shall be in form and substance reasonably satisfactory to Agent (the "<u>Cash Management Order</u>").<br><br>**(d)** Agent and Lenders shall have received a copy of the Initial Approved Budget, which shall be in form and substance satisfactory to Agent and Lenders, |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | certified by the Chief Restructuring Officer, and in the form attached to the Postpetition Credit Agreement as Exhibit G.

**Section 4.1.2. – Initial Loans; Availability**

No Delayed Draw Term Loans advanced on the Closing Date other than Delayed Draw Term Loans up to an aggregate principal amount not to exceed $5,000,000, and (b) to the extent set forth in the Approved Budget, all transaction fees and expenses incurred on or prior to the Closing Date shall have been paid.

**4.1.3. Financial Conditions**

Agent shall have received such information regarding the financial condition of the Loan Parties as Agent shall have requested.

**4.1.4. Due Diligence**

Agent and Lenders shall have completed their business due diligence review to the satisfaction of Agent and such Lender, as applicable. All legal, tax and regulatory matters relating to this Agreement, the other Loan Documents and the transactions contemplated hereby and any transactions financed with the proceeds thereof shall be satisfactory to Agent. Agent and Lenders shall have received sufficiently in advance of closing all documentation and other information required pursuant to its respective policies and by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the Patriot Act.

**4.1.5. Fees**

To the extent set forth in the Approved Budget, Borrowers shall have paid all fees, costs and expenses due and payable under this Agreement and the other Loan Documents on the Closing Date.

**4.1.6. Delivery of Loan Documents**

Borrowers shall have delivered the agreements, instruments, documents and other materials, all in form and substance satisfactory to Agent set forth on the Closing Checklist attached to the Postpetititon Credit Agreement as Annex III.


*See* Postpetition Credit Agreement § 4.1 |

| Repayment Features/Provisions Limiting Repayment<br><br>Bankruptcy Rule 4001(b)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(I) | Prepayment.<br><br>**2.10.1. Voluntary Prepayment.**  Borrowers may from time to time, on at least one Business Day's written notice or telephonic notice (followed immediately by written confirmation thereof) to Agent (which shall promptly advise each Lender thereof) not later than 11:00 a.m. Chicago time on such day, prepay the Loans in whole or in part without penalty or premium but subject to Section 3.5 hereof.  Such notice to Agent shall specify the Loans to be prepaid and the date and amount of prepayment.  Any such partial prepayment shall be in an amount greater than or equal to $100,000 (or, if less, the aggregate remaining outstanding principal balance of the Loans).  Notwithstanding anything to the contrary herein, Administrative Borrower may include in any notice of termination a condition that such termination is contingent upon the occurrence of a refinancing transaction.<br><br>**2.10.2. Mandatory Prepayment.**  Borrowers shall (y) prepay the Delayed Draw Term Loans according to the principal amounts thereof (in the order set forth in Section 2.10.3) until paid in full, and (z) thereafter repay all other Obligations, ratably among such Obligations, until all such Obligations are paid in full, in each case, at the following times and in the following amounts:<br><br>**(i)** concurrently with the receipt by Holdings, any Borrower or any Subsidiary of any Net Cash Proceeds from any Disposition, in an amount equal to such Net Cash Proceeds; and<br><br>**(ii)** concurrently with the receipt by Holdings, any Borrower or any Subsidiary of any Net Cash Proceeds from any sale or issuance of its debt securities (exclusive of Debt otherwise permitted herein);<br><br>**(iii)** in the event that Existing Agent or any of the Existing Lenders are required to repay or disgorge to Debtors or any representatives of the Debtors' estate (as agents, with derivative standing or otherwise) all or any portion of the Existing Secured Obligations authorized and directed to be repaid pursuant to the Financing Order, or any payment on account of the Existing Secured Obligations made to Existing Agent or any Existing Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law (all such amounts being referred to herein as the "Avoided Payments"), concurrently with receipt of such Avoided Payments by Debtors or any representative of Debtors' estate, in an amount equal to 100% of such Avoided Payments; and |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | **(iv)** concurrently with the receipt by Holdings, any Borrower or any Subsidiary of any Extraordinary Receipt, in an amount equal to the Net Cash Proceeds of such Extraordinary Receipt.<br><br>Administrative Borrower shall give written notice or telephonic notice (followed immediately by written confirmation thereof) to Agent not later than 11:00 a.m. Chicago time at least one Business Day prior to each mandatory prepayment pursuant to clause (a) of <u>Section 2.10.2</u>, and Agent shall promptly notify each Lender of such notice.<br><br>**2.10.3. All Prepayments.**  Any prepayment of a SOFR Loan on a day other than the last day of an Interest Period therefor shall include interest on the principal amount being repaid and shall be subject to <u>Section 3.5</u>.  All prepayments of a Loan shall be applied first to that portion of such Loan comprised of Base Rate Loans and then to that portion of such Loan comprised of SOFR Loans, in direct order of Interest Period maturities.  All prepayments of Delayed Draw Term Loans shall be applied pro rata among the Delayed Draw Term Loans according to the principal amounts thereof. Subject to the preceding sentence, voluntary prepayments and mandatory prepayments shall be applied to the remaining installments of principal due on the Delayed Draw Term Loan in the inverse order of maturity (for the avoidance of doubt, any amount that is due and payable on the Delayed Draw Term Loan Maturity Date shall constitute an installment).<br><br>*See* Postpetition Credit Agreement § 2.10. |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(E) | Approved Budget means the Initial Approved Budget and as supplemented by any Weekly Cash Flow Forecast delivered in accordance with <u>Section 6.1.9</u> and approved by Required Lenders in accordance with <u>Section 6.15</u>.<br><br>Initial Approved Budget means a 11-week operating budget setting forth the projected financial operations of the Debtors, which budget shall be in form and substance satisfactory to Agent and Lenders and shall include all forecasted consolidated cash receipts, consolidated cash disbursements and consolidated net cash flow on a weekly basis for such period beginning as of the week of the Filing Date, broken down by week, including the anticipated weekly uses of the proceeds of the Loans for such period and shall in any event include, among other things as requested by Agent, available cash, cash flow, trade payables, total expenses, capital expenditures and accrued professional fees. Such Initial Approved Budget shall be in the form set forth on <u>Exhibit G</u> hereto. For all purposes hereunder, the Initial Approved Budget shall constitute an "Approved Budget". |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | *See* Postpetition Credit Agreement § 1.1 Definition of "Approved Budget" and "Initial Approved Budget." |
| **Case Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(H) | **Milestones.**<br><br>1.　　On or before the date that is 3 days following the Filing Date, the Bankruptcy Court shall have entered the Interim Financing Order, in form and substance satisfactory to Agent.<br><br>2.　　On or before the date that is 24 days following the Filing Date (or such later date as Agent may agree up to the date that is 30 days after the Filing Date), the Bankruptcy Court shall have entered the Final Financing Order, in form and substance satisfactory to Agent.<br><br>3.　　On or before the date that is 1 day following the Filing Date, Debtors shall have filed a motion (in form and substance satisfactory to Agent) requesting an order from the Bankruptcy Court approving (x) bid procedures relating to the solicitations of qualified bids for the Specified Transaction, in form and substance satisfactory to Agent (the "<u>Bidding Procedures</u>") and (y) the Specified Transaction.<br><br>4.　　On or before the date that is 3 days following the Filing Date, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, in form and substance satisfactory by Agent.<br><br>5.　　On or before May 13, 2025, Debtors shall conduct an auction for substantially all of their assets (the "<u>Auction</u>") in accordance with the Bidding Procedures.<br><br>6.　　On or before May 16, 2025, the Bankruptcy Court shall have entered an order authorizing and approving the Specified Transaction and the transactions contemplated thereby, in each case, in form and substance acceptable to Agent (the "<u>Sale Order</u>").<br><br>7.　　On or before June 13, 2025, the Specified Transaction shall be consummated in accordance with the Sale Order and at the initial closing of such Specified Transaction all proceeds from the Specified Transaction shall be applied to Pay in Full the Obligations in cash (except as may otherwise be agreed by Agent in writing) and thereafter payment of the Existing Secured Obligations until Paid in Full (as such term is defined in the Existing Credit Agreement, in each case in accordance with the Sale Order, the Loan Documents and the Existing Loan Documents. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | *See* Postpetition Credit Agreement Schedule 6.12. |
| **DIP Financing Maturity Dates**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Postpetition Debt shall mature and be due and payable in full by Debtors on the earliest of (i) the date that is 90 days after the Filing Date (which may be extended by up to 30 days thereafter with the consent of the Required Lenders), (ii) the consummation of a sale of all or substantially all of the Debtors' assets, (iii) the effective date of a plan of reorganization and (iv) the date that is 24 days after the Filing Date (or such later date as Postpetition Agent may agree up to the date that is 30 days after the Filing Date) unless the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to Postpetition Agent.<br><br>*See* Postpetititon Credit Agreement § 1.1. Definition of "Delayed Draw Term Loan Maturity Date"; Interim Order ¶ 3(c). |
| **Interest Rate**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | **Interest Rates.**<br><br>The Postpetition Debt shall bear interest at a per annum rate equal to 7.50% plus the Base Rate, in the case of Base Rate Loans, and 8.50% plus the Adjusted Term SOFR Rate, in the case of Term SOFR Loans (as such terms are defined in the Postpetition Credit Agreement) (exclusive of any default rate interest that may be imposed under the Postpetition Credit Agreement).  On the applicable interest payment date, interest shall be paid-in-kind and added to the outstanding principal balance of the Postpetition Debt.<br><br>*See* Postpetititon Credit Agreement § 2.7.1.; Interim Order ¶ 3(c). |
| **Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | <u>Closing Fee</u>.  Debtors shall pay to Postpetition Agent, for the benefit of Postpetition Lenders, a closing fee (the "<u>Closing Fee</u>") in an amount equal to $3,000,000, which Closing Fee shall be fully earned, due and payable on the closing date of the Postpetition Credit Agreement and shall be paid in kind and added to the outstanding principal balance of Postpetition Debt.<br><br><u>Exit Fee</u>.  Debtors shall pay to Postpetition Agent, for the benefit of Postpetition Lenders, an exit fee (the "<u>Exit Fee</u>") in an amount equal to $5,000,000, which Exit Fee shall be fully earned, due and payable immediately upon the earliest to occur of (i) the Termination Date, (ii) the date on which the Postpetition Debt is Paid in Full, or (iii) the acceleration of all of Postpetition Debt.<br><br>*See* Postpetititon Credit Agreement § 2.8.; Interim Order ¶ 3(c). |

| Events of Default | Events of Default. |
|---|---|
| Fed. R. Bankr. P. 4001(c)(1)(B)(v), (x)<br><br>Local Rule 4001-2(a)(i)(M) | **8.1.1. Non-Payment of Credit.**<br><br>Default in the payment when due of the principal of any Loan; or default, and continuance thereof for two (2) Business Days, in the payment when due of any interest, fee, or other amount payable by any Loan Party hereunder or under any other Loan Document.<br><br>**8.1.2. Default Under Other Debt.**<br><br>Any default shall occur under the terms applicable to (i) the Clarus Lease, or (ii) any other Debt of any Loan Party (subject to any applicable grace or cure periods) in an aggregate amount (for all such Debt so affected and including undrawn committed or available amounts and amounts owing to all creditors under any combined or syndicated credit arrangement) exceeding $50,000 and such default shall (a) consist of the failure to pay such Debt when due, whether by acceleration or otherwise, or (b) accelerate the maturity of such Debt or permit the holder or holders thereof, or any trustee or agent for such holder or holders, to cause such Debt to become due and payable (or require a Borrower or any other Loan Party to purchase or redeem such Debt or post cash collateral in respect thereof) prior to its expressed maturity, other than (i) any default arising prior to the Filing Date, (ii) due to Debtors' filing, commencement and continuation of the Bankruptcy Cases and any litigation arising therefrom, (iii) due to restrictions on payments arising as a result of the Bankruptcy Cases, or (iv) under the Existing Loan Documents.<br><br>**8.1.3. Bankruptcy Matters.**<br><br>**(a)** The Final Order is not entered within 24 days following the Filing Date (or such later date as Agent may agree up to the date that is 30 days after the Filing Date);<br><br>**(b)** The Interim Order or Final Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified in any manner not acceptable to Agent;<br><br>**(c)** Any person or entity shall file a pleading seeking to modify or otherwise alter the Interim Order, the Final Order, any Loan Document, any Existing Loan Document or any of the transactions contemplated in any of the foregoing without the prior consent of Agent;<br><br>**(d)** An order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (A) appointing a trustee under Section 1104 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the business of the Loan Parties under Section 1106(b) of the Bankruptcy Code or (B) terminating or shortening any Debtor's |

exclusive rights to file and solicit acceptances for its plan of reorganization;

**(e)** Agent, any Lender, Existing Agent, any Existing Lender or any Collateral securing the Obligations or Existing Secured Obligations are surcharged pursuant to Sections 105, 506(c) or 552 or any other section of the Bankruptcy Code, or (ii) any person or entity other than a Loan Party shall assert any claim in the any of the Bankruptcy Cases arising under Sections 105, 506(c) or 552 or any other section of the Bankruptcy Code against Agent, any Lender, Existing Agent, any Existing Lender or any Collateral, and such claim shall not be dismissed or withdrawn, with prejudice, within 10 days after the assertion thereof;

**(f)** Any person or entity other than the Loan Parties shall commence any action in any of the Bankruptcy Cases adverse to Agent, any Lender, Existing Agent or any Existing Lender, the extent, validity, perfection, enforceability or priority of any of their Liens or claims, or any of their rights and remedies under the Loan Documents, the Existing Loan Documents, the Financing Order, or any other order of the Bankruptcy Court and such claim shall not be dismissed or withdrawn, with prejudice, within 10 days after the assertion thereof;

**(g)** Any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens of Agent, the Lenders, Existing Agent or the Existing Lenders, or the claims or rights against Loan Parties or any of their Subsidiaries or to subject any Collateral to assessment pursuant to Section 105, 506(c), 552 or any other section of the Bankruptcy Code, (ii) any Lien or Superpriority Claim created by created by the Loan Documents, the Existing Credit Agreement, the Existing Loan Documents or the Financing Order shall, for any reason, cease to be valid, (iii) any action is commenced by any Loan Party or any of its Subsidiaries which contests the extent, validity, perfection, enforceability or priority of any of the Liens of Agent, Existing Agent, the Lenders or Existing Lenders created by the Loan Documents, the Existing Credit Agreement, the Existing Loan Documents or the Financing Order or (iv) any Loan Party or any Subsidiary of any Loan Party challenges the extent, validity or priority of the Obligations or the Existing Secured Obligations or the application of any payments or collections received by Agent, Lenders, Existing Agent, or Existing Lenders to the Obligations or Existing Secured Obligations as provided for herein or in the Financing Order;

**(h)** Any filing of a motion to dismiss any of the Bankruptcy Cases or to convert any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code or (ii) an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court dismissing any of the Bankruptcy Cases or converting any of the Bankruptcy Cases (or any case

comprising part of any of the Bankruptcy Cases) to a case under chapter 7 of the Bankruptcy Code;

**(i)** Any motion, supplement, amendment or other document relating to the Financing Order, the Loan Documents, the Existing Credit Agreement or the transactions contemplated in any of the foregoing that is not in form in substance satisfactory to Agent is filed by any Loan Party or entered by the Bankruptcy Court;

**(j)** Any sale of, or motion to sell Collateral pursuant to Section 363 of the Bankruptcy Code is filed, to which the Agent has not consented to in writing;

**(k)** An order with respect to any of the Bankruptcy Cases shall be entered without the express prior written consent of Agent, (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement, any other Loan Document, the Existing Credit Agreement, any Existing Loan Document, the Financing Order, or the transactions contemplated in any of the foregoing, or (ii) to permit any administrative expense, claim or lien (now existing or hereafter arising, of any kind or nature whatsoever) to have priority equal or superior to the priority of the Agent, Existing Agent, Lenders and Existing Lenders in respect of the Obligations and Existing Secured Obligations;

**(l)** An order shall be entered by the Bankruptcy Court granting relief from the automatic stay to any creditor(s) of any Loan Party or any Subsidiary of any Loan Party;

**(m)** Any plan of reorganization is filed that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in any of the Bankruptcy Cases which, does not (i) contain a provision that all Obligations and all Existing Secured Obligations shall be Paid in Full in a manner satisfactory to the Agent on or before the effective date, or substantial consummation, of such plan and (ii) provide for the continuation of the Liens granted to each of Agent and Existing Agent and priorities until such plan effective date all Obligations and Existing Secured Obligations are Paid in Full;

**(n)** A motion shall be filed seeking authority, or an order shall be entered in any of the Bankruptcy Cases, that (i) permits any Loan Party or any Subsidiary of any Loan Party to incur indebtedness secured by any claim under Section 364(c)(1) of the Bankruptcy Code or by a Lien pari passu with or superior to the lien granted under the Loan Documents and the Existing Loan Documents and Bankruptcy Code Sections 364(c)(2) or (d) unless (A) all of the Obligations and Existing Secured Obligations have been Paid in Full at the time of the entry of any such order, or (B)

the Obligations and the Existing Secured Obligations are Paid in Full with the proceeds such debt, or (ii) permits any Loan Party or any Subsidiary of any Loan Party the right to use Collateral other than in accordance with the terms of the Financing Order, unless all of the Obligations and Existing Secured Obligations shall have been Paid in Full;

**(o)** Proceeds of any sale of all or substantially all assets of Loan Parties are not directly remitted to Agent at the closing thereof, to be applied in accordance with the Financing Order, the Loan Documents and the Existing Loan Documents;

**(p)** Any motions to approve any severance, retention or incentive plan or program for employees that is not in accordance with the Approved Budget and is otherwise not in form and substance acceptable to Required Lenders;

**(q)** Any motions to sell Collateral or approve procedures regarding the same, or any orders approving or amending any of the foregoing, are not in form and substance acceptable to Agent;

**(r)** The automatic stay terminates or expires unless all of the Obligations and Existing Secured Obligations shall have been Paid in Full at the time of such termination or expiration;

**(s)** Payment of or granting adequate protection with respect to any Debt that was existing prior to the Filing Date (other than as expressly provided herein or as approved in writing by Agent); and

**(t)** Any Loan Party or any Subsidiary of any Loan Party shall fail to maintain sufficient projected cash and Commitments hereunder to pay all accrued administrative obligations and other administrative claims when due, and sufficient additional cash to enable such other unpaid administrative obligations and administrative claims that are required to be paid in full prior to such time that all Obligations and Existing Secured Obligations are Paid in Full.

### 8.1.4. Non-Compliance with Loan Documents.

Failure by any Borrower to comply with or to perform any covenant set forth in Sections 6.1, 6.3(b) and (c), 6.5, 6.7, 6.9, 6.10, 6.11, 6.12, 6.13, 6.14, 6.15 and 7; (b) failure by any Borrower to comply with or to perform any covenant set forth in Section 6.2 and continuance of such failure for more than three (3) days after the occurrence thereof; or (c) failure by any Loan Party to comply with or to perform any other provision of this Agreement or any other Loan Document applicable to it (and not constituting an Event of Default under any other

provision of this <u>Section 8</u>) and continuance of such failure described in this clause (c) for 30 days.

**8.1.5. Representations;Warranties.**

Any representation or warranty made by any Loan Party or Parent herein or any other Loan Document is breached or is false or misleading in any material respect, or any schedule, certificate, financial statement, report, notice or other writing furnished by any Loan Party or Parent to Agent or any Lender in connection herewith is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified.

**8.1.6. Pension Plans.**

Institution of any steps by any Person to terminate a Pension Plan if as a result of such termination any Loan Party could reasonably be expected to be required to make a contribution to such Pension Plan, or could incur a liability or obligation to such Pension Plan, in excess of $50,000; (b) a contribution failure occurs with respect to any Pension Plan that could reasonably be expected to give rise to a Lien on the assets of any Loan Party under Section 303(k) of ERISA or Section 430(k) of the IRC; or (c) there shall occur any withdrawal or partial withdrawal from a Multiemployer Pension Plan and the withdrawal liability (without unaccrued interest) incurred by any Loan Party to Multiemployer Pension Plans as a result of such withdrawal (including any outstanding withdrawal liability that any Borrower or any other Loan Party have incurred on the date of such withdrawal) exceeds $50,000.

**8.1.7. Judgments.**

Final judgments which exceed an aggregate of $50,000 (to the extent not covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage in writing) shall be rendered against any Loan Party and shall not have been paid, discharged or vacated or had execution thereof stayed pending appeal within thirty (30) days after entry or filing of such judgments.

**8.1.8. Invalidity of Collateral Documents.**

Any Collateral Document shall cease to be in full force and effect; or any Loan Party (or any Person by, through or on behalf of any Loan Party) shall contest in any manner the validity, binding nature or enforceability of any Collateral Document.

**8.1.10. Change of Control.**

The occurrence of a Change of Control.

**8.1.11. Activities of Holdings.**

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Parent or Holdings (i) conducts any business other than its ownership of equity securities of Holdings or Borrowers, as applicable and business incidental to the conduct of its business as a holding company, or (ii) incurs any Debt or liabilities other than (a) Debt of Parent (and non-recourse to any Loan Party) outstanding on the Closing Date in a principal amount not to exceed $4,000,000 under and pursuant to that certain Loan Agreement dated as of October 4, 2022 by and between Parent and Silicon Valley Bank and otherwise as expressly permitted under the Loan Documents and other liabilities incidental to the conduct of its business as a holding company.<br><br>**8.1.12. Permitted Variance.**<br><br>Permitted Variances under the Approved Budget are exceeded for any period of time.<br><br>*See* Postpetititon Credit Agreement § 8.1. |
| **Security and Priority Status**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(a)(i)(G), (N), (P), (U) | The Postpetition Liens are first priority, properly perfected, valid and enforceable security interests, which are not subject to any claims, counterclaims, defenses, setoff, recoupment or deduction, and which are otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Code, any agreement, or applicable nonbankruptcy law, subject only to the Permitted Priority Liens.<br><br>The Postpetition Debt is granted superpriority administrative expense status under Code § 364(c)(1), with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code, subject to the Carveout.<br><br>*See* Interim Order ¶ 3(d). |
| **Validity of Prepetition Liens**<br><br>Fed. R. Bankr. 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(Q) | Subject to the challenge provisions of paragraph 9 of the Interim Order, the Debtors stipulate and agree:<br><br>1. the Prepetition Documents evidence and govern the Prepetition Debt, the Prepetition Liens and the prepetition financing relationship among the Debtors, Prepetition Agent and Prepetition Lenders;<br><br>2. the Prepetition Debt constitutes the legal, valid and binding obligation of Debtors, enforceable in accordance with the terms of the Prepetition Documents;<br><br>3. as of the Filing Date, Debtors are liable for payment of the Prepetition Debt, and the Prepetition Debt shall be an allowed claim in an amount not less than $205,143,282.79, exclusive of accrued and accruing |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Allowable 506(b) Amounts, and is an allowed secured claim in an amount not less than $126,000,000; |
| | 4. no offsets, defenses or counterclaims to the Prepetition Debt exist, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, under applicable non-bankruptcy law or otherwise; |
| | 5. the Prepetition Liens are Priority Liens, subject to Permitted Priority Liens and secure payment of all of the Prepetition Debt; |
| | 6. upon the entry of this Order, for purposes of Code §§ 506(c) and 507(b) and Fed. R. Bankr. P. 3012, as of the Filing Date, the value of the Prepetition Lenders' interest in the Prepetition Collateral was not less than $126,000,000, provided, however, that nothing herein shall prejudice Prepetition Agent's and any Prepetition Lender's right to later: (1) assert that their respective interests in the Prepetition Collateral lack adequate protection; and (2) seek a higher valuation of the Prepetition Collateral; |
| | 7. Debtors do not have, and hereby release, and are forever barred from bringing any claims, counterclaims, causes of action, defenses or setoff rights relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Debt or otherwise, against the Prepetition Agent, the Prepetition Lenders and their respective affiliates, subsidiaries, agents, officers, directors, employees, advisors, consultants, predecessors in interest, successors and assigns. <br><br> *See* Interim Order ¶ D. |
| **Cash Collateral** <br><br> Fed. R. Bankr. P. 4001(b)(1)(B) | **Authorization to Use Cash Collateral.** <br><br> Debtors are authorized to use Cash Collateral solely in accordance with the terms and provisions of the Interim Order, to the extent required to pay when due those expenses enumerated in the Budget, including the Carveout, and to pay Allowable 506(b) Amounts and the Postpetition Charges. <br><br> *See* Interim Order ¶ 1. |
| **Adequate Protection** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(iv), (c)(1)(B)(ii) | **Adequate Protection of Interests of Prepetition Agent and Prepetition Lenders in the Prepetition Collateral and the Prepetition Liens.** <br><br> Prepetition Agent, acting at the instruction of the requisite Prepetition Lenders, has consented to the terms of this Order and Prepetition Agent and Prepetition |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Lenders are entitled to adequate protection as set forth herein and to the extent required under Code §§ 361, 362, 363 or 364 (including for any decrease in the value of such interests in the Prepetition Collateral from and after the Filing Date).<br><br>(a) **Priority of Prepetition Liens/Allowance of Prepetition Lenders' Claim**. Subject to the terms of Paragraph 9 of the Interim Order: (1) the Prepetition Liens shall constitute Priority Liens, subject only to the Postpetition Liens and the Permitted Priority Liens; (2) the Prepetition Debt constitutes the legal, valid and binding obligation of Debtors, enforceable in accordance with the terms of the Prepetition Documents; (3) no offsets, defenses or counterclaims to the Prepetition Debt exist, and no portion of the Prepetition Debt is subject to avoidance, recharacterization or subordination pursuant to the Code or applicable nonbankruptcy law; and (4) Prepetition Agent's and Prepetition Lenders' claim with respect to the Prepetition Debt shall for all purposes constitute an allowed claim within the meaning of Code § 506 in an amount not less than $205,143,282.79, exclusive of accrued and accruing Allowable 506(b) Amounts.<br><br>(b) **Replacement Liens**. Prepetition Agent is hereby granted the Replacement Liens, for the benefit of Prepetition Lenders, as security for payment of the Prepetition Debt. The Replacement Liens: (1) are and shall be in addition to the Prepetition Liens; (2) are and shall be properly perfected, valid and enforceable liens without any further action by Debtors or Prepetition Agent and without the execution, filing, or recordation of any financing statement, security agreement, control agreement, mortgage, deed of trust, title notation, or other document or instrument; and (3) shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Cases. Notwithstanding the foregoing, Debtors are authorized to and shall execute and deliver to Prepetition Agent such financing statements, security agreements, control agreements, mortgages, deeds of trust, title notations and other documents and instruments as Prepetition Agent may request from time to time in respect of the Replacement Liens and any such documents filed by Prepetition Agent shall be deemed filed as of the Filing Date. A copy of this Order (or a notice of this Order in recordable form) may be used by Prepetition Agent as a financing statement, mortgage, deed of trust or similar instrument for purposes of any public filing made by Prepetition Agent for evidence of the perfection of the Prepetition Liens and the filing of this Order (or a notice of this Order in recordable form) shall have the same effect as if such instrument had been filed or recorded at the time and on the Filing Date. All state, federal, and county recording officers are authorized to accept a copy of this Order (or a notice of this Order in recordable form) for filing for such purposes.<br><br>(c) **Allowed Code § 507(b) Claim**. If and to the extent the adequate protection of the interests of Prepetition Agent and Prepetition Lenders in the Prepetition Collateral granted pursuant to this Order proves insufficient, Prepetition Agent and Prepetition Lenders shall have an allowed claim under Code § 507(b), |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | subject to the Carveout, in the amount of any such insufficiency, with priority over: (1) all costs and expenses of administration of the Cases (other than Postpetition Agent's and Postpetition Lenders' claims under Code § 364) that are incurred under any provision of the Code; and (2) the claims of any other party in interest under Code § 507(b).<br><br>*See* Interim Order ¶ 4. |
| **Waiver of 506(c), 552(b), and Marshalling**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(i)(V), (W), (X). | <u>**No Surcharge**</u>.<br><br>In the exercise of their business judgment, subject to entry of the Final Order, Debtors (or any Trustee) agree that there shall be no surcharge of the Aggregate Collateral for any purpose, unless agreed to by Agents and Lenders. Further, Debtors represent that the Budget contains all expenses that are reasonable and necessary for the operation of their businesses and the preservation of the Aggregate Collateral through the period for which the Budget runs, and therefore includes all items potentially chargeable to Agents and Lenders under Code § 506(c). Therefore, effective upon entry of the Final Order, the Debtors (or any Trustee) shall be deemed to have waived any rights, benefits or causes of action under Code § 506(c), the enhancement of collateral provisions of Code § 552, or any other legal or equitable doctrine (including, without limitation, unjust enrichment, or the "equities of the case" exception under Code § 552(b)) as they may relate to or be asserted against the Agents, the Lenders or the Aggregate Collateral. In reliance on the foregoing, Agents and Lenders have agreed to the entry of this Order.<br><br><u>**No Marshaling**</u>.<br><br>Subject to entry of the Final Order, no Agent, Lender or any of the Aggregate Collateral shall be subject to the doctrine of marshaling.<br><br>*See* Interim Order ¶¶ 8, 16. |
| **Carveout**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Local Rule 4002-2(a)(i)(F) | **Carveout.**<br><br>**Carveout Terms**.<br><br>The Carveout with respect to each Carveout Professional: (1) shall equal an aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget for such Carveout Professional for the period commencing on the Filing Date and ending on the Termination Date and (ii) to the extent allowed at any time, whether by interim order, final order or other order, the aggregate amount of fees and expenses that accrue during the period commencing on the Filing Date and ending on the Termination Date (excluding any restructuring, sale, success, or other transaction fee) and (2) shall be reduced dollar-for-dollar |

| Material Provision | Summary Description of Material Provision |
|---|---|
|  | by any payments of fees and expenses to such Carveout Professional and any retainer or advance held by such Carveout Professional.  Further, Postpetition Agent shall have the right to reserve against the DIP Commitment an amount equal to the sum of the aggregate amount of unpaid fees and expenses set forth in the Budget for the Carveout Professionals.  Upon the Termination Date, and notwithstanding anything herein to the contrary, Postpetition Lenders shall provide Postpetition Debt to the Debtors in an amount equal to the lesser of (a) the aggregate amount of allowed fees and expenses for each Carveout Professional that accrue after the Termination Date and (b) an amount equal to $200,000 into a segregated account established for the sole purposes of maintaining amounts to repay the Carveout (the "<u>Carveout Reserve</u>"), which Postpetition Debt shall be used by the Debtors for the sole purpose of funding the Carveout Professionals after the Termination Date.  Except as set forth in the preceding sentence, Postpetition Lenders shall have no obligation to fund any fees or expenses of Carveout Professionals accrued on, prior to, or after the Termination Date.  Prior to the Termination Date, the Debtors shall fund on a weekly basis the Carveout Reserve in an aggregate amount equal to the aggregate amount provided in the Budget for such professionals for such week, which shall be earmarked and held in trust to pay unpaid fees and expenses incurred by estate professionals, subject to allowance of such fees by the Court at any time, prior to any and all other claims in the chapter 11 cases, which funds shall be used to pay the obligations of estate professionals as set forth in the Budget.<br><br>**Carveout Usage**.<br><br>No portion of the Carveout and no Postpetition Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any entity, including the Debtors, any Committee or the Carveout Professionals, in connection with claims or causes of action adverse to Agents' or Lenders' interests in the Aggregate Collateral, including (1) preventing, hindering or delaying Agents' or Lenders' enforcement or realization upon any of the Aggregate Collateral once an Event of Default has occurred; (2) using or seeking to use Cash Collateral or incurring indebtedness in violation of the terms hereof, or selling any Aggregate Collateral without Agents' and Lenders' consent; or (3) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Aggregate Debt or any mortgages, liens or security interests with respect thereto or any other rights or interests of Agents and Lenders, or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Code, against Agents or Lenders; <u>provided</u>, <u>however</u>, that the foregoing shall not apply to costs and expenses, in an amount not to exceed $25,000, incurred by the Committee's professionals in connection with the investigation of a potential Challenge in accordance with Paragraph 9 of this Order; <u>provided</u>, <u>further</u>, however, that the Carveout may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation and entry of this Order or any |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | amendment hereto consented to by Postpetition Agent.  All Carveout Professionals shall have all professional fees paid from the Carveout Reserve prior to seeking payment from any other Aggregate Collateral.  After payment in full of the Carveout for allowed professional fees of Carveout Professionals, all remaining funds in the Carveout Reserve shall be returned to the Agents on behalf of the Lenders.<br><br>**Carveout Procedure.**<br><br>The Debtors shall periodically, upon the request of the Postpetition Agent, provide to the Postpetition Agent a written report (the "Carveout Report"), in which the Debtors disclose their then current estimate of (1) the aggregate amount of unpaid professional fees, costs and expenses accrued or incurred by the Carveout Professionals, through the date of the Carveout Report, and (2) projected fees, costs and expenses of the Carveout Professionals for the 30 day period following the date of such Carveout Report.  Nothing herein shall be construed as consent by Agents and Lenders to the allowance of any fees or expenses of the Carveout Professionals or shall affect the right of Agents or any Lender to object to the allowance and payment of such fees, costs or expenses, or the right of Agents or any Lender to the return of any portion of the Carveout that is funded with respect to fees and expenses for a Carveout Professional that are approved on an interim basis that are later denied on a final basis.  For the avoidance of doubt, no Carveout Professional shall be entitled to any portion of the Carveout allocated for any other Carveout Professional in the Budget.<br><br>*See* Interim Order ¶ 7. |
| **Indemnification**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | **Indemnification.**<br><br>Debtors shall indemnify and hold harmless Agents and Lenders and such other third parties as set forth in and in accordance with the Postpetition Credit Agreement and the Prepetition Credit Agreement.<br><br>*See* Interim Order ¶ 15. |
| **Right to File Plan**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(v) | An Event of Default for the DIP Facility occurs if any plan of reorganization is filed that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in any of the Bankruptcy Cases which, does not (i) contain a provision that all Obligations and all Existing Secured Obligations shall be Paid in Full in a manner satisfactory to the Agent on or before the effective date, or substantial consummation, of such plan and (ii) provide for the continuation of the Liens granted to each of Agent and Existing Agent and priorities until such plan effective date all Obligations and Existing Secured Obligations are Paid in Full.<br><br>*See* Postpetititon Credit Agreement § 8.1.3.(m). |

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Modification of the Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | **Modification of Stay.**<br><br>The automatic stay of Code § 362 is hereby modified with respect to Agents and Lenders to the extent necessary to effectuate the provisions of this Order, including, after the Termination Date, to permit Agents and Lenders to exercise their respective rights contemplated by Paragraph 5 above.<br><br>*See* Interim Order ¶ 20. |
| **Secured Party's Expenses and Attorneys' Fees**<br><br>Local Rule 4001-2(a)(i)(K) | **Postpetition Charges.**<br><br>All Postpetition Charges must be promptly paid by Debtors in accordance with this Order and the Postpetition Documents, without need for filing any application with the Court for approval or payment thereof, within ten (10) business days of Postpetition Agent's written notice to Debtors, any Committee, and the United States Trustee. Prior to any conversion of the Cases to chapter 7, any Postpetition Agent professional fees and expenses shall be paid by the Debtors within ten (10) days after delivery of a summary invoice (redacted for privilege) to the Debtors and without the need for application to or order of this Court. A copy of such summary invoice shall be provided by the Postpetition Agent to the U.S. Trustee and counsel to the Committee, if one is appointed, contemporaneously with the Debtors' receipt of such summary invoice. Notwithstanding the foregoing, if (x) the Debtors, U.S. Trustee, or the Committee object to the reasonableness of a summary invoice submitted by the Postpetition Agent and (y) the parties cannot resolve such objection, in each case within the ten (10)-day period following receipt of such summary invoice, the Debtors, the U.S. Trustee or the Committee, as the case may be, shall file with this Court and serve on the Postpetition Agent a fee objection (a "<u>Postpetition Agent Fee Objection</u>"), which objection shall be limited to the issue of the reasonableness of such Postpetition Agent professional fees. The Debtors shall promptly pay any submitted invoice after the expiration of the ten (10)-day period if no Postpetition Agent Fee Objection is filed with this Court and served on the Postpetition Agent in such ten (10)-day period. If a Postpetition Agent Fee Objection is timely filed and served, the Debtors shall promptly pay the undisputed amount of the summary invoices, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the Postpetition Agent Fee Objection.<br><br>*See* Interim Order ¶ 17. |

| Challenge Period / Investigation of Prepetition Liens and Claims<br><br>Local Rule 4001-2(a)(i)(L) | **Reservation of Rights; Bar of Challenges and Claims.**<br><br>The stipulations and representations contained in the Interim Order, including, without limitation, in Paragraphs D, shall be binding on all Challenge Parties, unless and solely to the extent that (i) the Debtors receive notice of a potential Challenge during the Investigation Period from any Challenge Party and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.<br><br>**(a) Challenge Procedure.**  During the Investigation Period, a Challenge Party shall be entitled to determine whether a basis to assert a Challenge exists.  If a Challenge Party identifies a basis to assert a Challenge, it must notify Debtors during the Investigation Period of its demand that Debtors initiate an action or adversary proceeding relating thereto and from the date that Debtors are so notified, Debtors shall have five (5) days to notify the Challenge Party of whether the Debtors intend to initiate such action and ten (10) days to initiate such action. If the Debtors notify such Challenge Party that the Debtors do not intend to initiate an action or adversary proceeding, the Challenge Party shall have ten (10) days from the receipt of such notice to initiate an action or adversary proceeding. Nothing herein shall be deemed to grant standing in favor of any Challenge Party absent further order of this Court.  Notwithstanding anything to the contrary in this Order, if timely notified of a potential Challenge, Debtors shall retain authority to initiate, prosecute, settle or compromise a Challenge in the exercise of their business judgment and subject to any applicable further order of court.<br><br>**(b) Bar of Challenges and Claims.** If Debtors do not receive notice of a potential Challenge during the Investigation Period (or such later date as agreed in writing by Prepetition Agent and Prepetition Lenders, solely with respect to a potential Challenge against such party, or for cause shown by an order of this Court), without further order of the Court, (1) the claims, liens and security interests of the Prepetition Agent and the Prepetition Lenders shall be deemed to be allowed for all purposes in these Cases and shall not be subject to challenge by any party in interest as to extent, validity, priority or otherwise, and (2) Debtors and their estates shall be deemed to have waived, released and discharged Prepetition Agent, Prepetition Lenders and their respective officers, directors, principals, attorneys, consultants, predecessors in interest, and successors and assigns of and from any and all claims and causes of action, indebtedness, and obligations, of every type, which occurred on or prior to the date of entry of this Order with respect to or in connection with the Prepetition Debt, the Prepetition Liens, the Prepetition Documents or otherwise.<br><br>**(c)** Notwithstanding anything to the contrary herein, all of the Debtors' rights and remedies (whether at law or in equity) in connection with any potential claim or cause of action against any party holding an economic interest in any Term B Loan Obligations (as defined in the Prepetition Credit Agreement) which are, or may be, subject to investigation in accordance with this paragraph 9 are |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | preserved (and nothing shall impair any of the Debtors' rights or remedies against such parties) until the termination of the Investigation Period under subclause (x) of the definition thereof.<br><br>*Investigation Period*.  The period of (x) 120 days from entry of the first interim order approving the Motion (or longer for cause shown) with respect to any Challenge against any party holding an economic interest in the Term B Loan Obligations (as defined in the Prepetition Credit Agreement) or (y) with respect to any other potential Challenge, 75 days from the entry of the first interim order approving the Motion.<br><br>*See* Interim Order ¶ 9; Ex. A Definition of "Investigation Period." |
| **Releases**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | No offsets, defenses or counterclaims to the Prepetition Debt exist, and no portion of the Prepetition Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action or challenge of any nature under the Code, under applicable non-bankruptcy law or otherwise.<br><br>*See* Interim Order ¶ 4(a). |

## BASIS FOR RELIEF REQUESTED

**I.   The Debtors Should be Authorized to Obtain Senior Secured, Superpriority DIP Financing.**

25.    As set forth above, the Debtors' ability to maximize the value of their estates and successfully complete their going-concern sale process hinges upon them being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  *See* 11 U.S.C. § 364(c).  Under section 364(d) of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal

lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).

A.     **The Debtors Have Exercised Their Sound Business Judgment in Entering into the DIP Facility.**

26.     The Court should authorize the Debtors, as a sound exercise of their business judgment, to enter into the DIP Facility.  Section 364 of the Bankruptcy Code authorizes the Debtors to obtain secured or superpriority postpetition financing.  As long as an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference to debtors' sound business judgment in obtaining such credit.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

27.     To determine whether the business judgment standard is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business judgment when the decision involves a "business judgment made in good faith upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). Bankruptcy courts will not generally second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513 (Bankr. D. Utah 1981) (footnote omitted). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). The Court should evaluate the soundness of a debtor's business judgment, "in context, and considering the relative circumstances of the parties." *Farmland Indus.*, 294 B.R. at 886 ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable. Certainly, many of them favor the DIP Lenders. But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable.*"); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

28.     Here, as described in the Ragano Declaration, the Debtors' determination to enter into the DIP Facility was a business decision guided by the Debtors' financial needs to maximize value for the Debtors' estates, and maintain positive ordinary course relations with their employees and vendors.  Specifically, the Debtors and their advisors determined that the Debtors would require additional liquidity to continue operating "business as usual" while they pursue a value-maximizing sale transaction.  The additional certainty of having an achievable and near-term exit path from chapter 11 on the Petition Date strongly weighed in favor of the Debtors' decision to enter into the DIP Facility.

29.     The Debtors' advisors went to market in an attempt to find a third-party lender who was willing to provide financing on more favorable terms.  After finding none, the Debtors ultimately selected the Postpetition Lenders' proposal as the best available option.

30.     Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' stakeholders, is necessary to preserve the value of the estates' assets, and is an exercise of the Debtors' sound and reasonable business judgment.

**B.      The Debtors Should Be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis.**

31.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

32.    To satisfy the requirement of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not acceptable" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

33.    The Debtors easily satisfy the above standard.  Despite efforts to obtain DIP financing proposals from third parties outside the capital structure, the Debtors were unable to obtain any competing financing proposals on any terms.  In this process, Livingstone Partners LLC, as investment banker to the Debtors, contacted twelve third-party financial institutions in an effort to procure debtor-in-possession financing.  As the Prepetition Lenders would not consent to

postpetition financing by a third party that would prime the petition liens, the Postpetition Lenders' proposal was the best and only option available under the circumstances.

34.     Absent the DIP Facility, which will provide sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates, and their ability to function as a going concern, would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' dire circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the Postpetition Credit Agreement, are reasonable under the circumstances.

35.     The Debtors are unable to obtain postpetition financing that they need on terms more favorable than those provided by the DIP Facility.  Accordingly, the Debtors' efforts to obtain postpetition financing satisfy the statutory requirements of sections 364(c) and (d) of the Bankruptcy Code.

### C.     The DIP Facility Provides for Consensual Priming.

36.     Courts may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of existing lien holders if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d)(1).

37.     When determining whether to authorize a debtor to obtain credit secured by senior liens as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.  Courts consider a number of factors, including:

- whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids, or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

See, e.g., Ames Dep't Stores, 115 B.R. at 37–39; Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003); Farmland Indus., 294 B.R. at 862–79; In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); Barbara K. Enters., 2008 WL 2439649 at *10.  Here, the Prepetition Lenders have consented to the priming of their liens on the terms of the DIP Facility as set forth in the Interim Order.  Further, the Prepetition Lenders are receiving adequate protection as agreed to in the Interim Order.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**D.     The Liens Granted Under the DIP Facility Further Reflect a Sound Exercise of the Debtors' Business Judgement.**

38.     The Debtors and their advisors contacted numerous potential financing sources and ultimately determined that the Postpetition Lenders offered the best available financing under the circumstances.  The Debtors believe, after rigorous arm's-length negotiations with the Postpetition Lenders, that the DIP Facility reflects the most favorable terms on which the

Debtors are currently able to obtain postpetition financing, and that the Debtors could not obtain financing without granting the liens in the priority described herein.  Accordingly, because the Debtors' judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, the Court should grant the Debtors considerable deference in acting in accordance with their business judgment and approve the liens required by the DIP Facility.  *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (courts have discretion under Bankruptcy Code section 364 to permit debtors to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not "leverage the bankruptcy process and powers" and (ii) the financing agreement's purpose is primarily to benefit the estate, and not a party in interest).

### E.    Section 364(e) Protections Should Apply to the DIP Facility.

39.    As described above, the terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's length.  Accordingly, the Court should find that the Lenders are a "good faith" lender within the meaning of Bankruptcy Code section 364(e) and are entitled to all of the protections afforded by that section.

### II.    The Debtors Request for Use of Cash Collateral and the Proposed Adequate Protection Is Appropriate.

40.    The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

41.    Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditors consent or are adequately protected.  *See In re McCormick*, 354 B.R. 246, 251 (Bankr. C D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to the Court that the secured creditor's interest in the cash collateral is adequately protected).  "Cash Collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest."  11 U.S.C. § 363(a).

42.    As described in the Ragano Declaration, the Debtors have an urgent need for the immediate use of the Cash Collateral pending the Final Hearing on this Motion and seek to use Cash Collateral existing on or after the Petition Date in exchange for the adequate protection set forth in the Interim Order and Potpetition Credit Agreement, to which the Prepetition Lenders have consented.  The Debtors require the use of the Cash Collateral in order to effect the orderly continuation of the operation of their businesses, maintain business relationships with vendors, suppliers, and customers, make payroll, make capital expenditures, administer these chapter 11 cases, and to satisfy other working capital and operational needs.  Because such use is essential to the preservation of the Debtors' estates and the Prepetition Lenders have consented, the Court should approve the Debtors' use of Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### III.    The Postpetition Lenders Should be Deemed Good Faith Lenders.

43.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

44.     Here, the Postpetition Documents embody the best terms on which the Debtors could currently obtain DIP financing under the circumstances. *See* Ragano Decl. ¶ 35. All negotiations regarding the provisions of the DIP Facility were conducted in good faith and on an arm's-length basis. The terms and conditions of the DIP Facility are reasonable. Further, no consideration is being provided to any party to the DIP Facility other than as disclosed herein. Accordingly, the Court should find that the Postpetition Lenders are a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

## IV.     The Scope of the Carveout Is Necessary and Appropriate.

45.     Without the Carveout (as defined in the Interim Order), the Debtors and other parties-in-interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carveout does not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and powers. Additionally, the Carveout ensures that assets will be available for the Office of the United States Trustee for the District of Delaware, and professional fees of the Debtors and

39

an unsecured creditors committee, if one is appointed.  Accordingly, the Carveout is necessary and appropriate, and should be approved.

**V.    Modification of the Automatic Stay.**

46.    By this Motion, the Debtors are requesting modification of the automatic stay with respect to the Agents and Lenders as necessary to effectuate the provisions of the Interim Order, including, after the Termination Date, to permit Agents and Lenders to exercise their respective rights contemplated by Paragraph 6 of the Interim Order.  The Debtors believe that these provisions are required for the Debtors to obtain the DIP Facility and use Cash Collateral as provided in the Interim Order.

47.    Stay modification provisions of this kind are ordinary and standard terms of postpetition use of collateral by debtors-in-possession, and, in the Debtor's business judgment, are reasonable and necessary under the present circumstances.  *See, e.g., In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022); *In re Enjoy Tech., Inc.*, Case No. 22-10580 (JKS) (Bankr. D. Del. July 26, 2022) (terminating automatic stay after occurrence of event of default and applicable notice); *In re Stimwave Techs. Inc.*, Case No. 22-10541 (KBO) (Bankr. D. Del. July 14, 2022) (same); *In re MD Helicopters Inc.*, Case No. 22-10263 (KBO) (Bankr. D. Del. Apr. 26, 2022) (same); *In re Salem Harbor Power Dev. LP (f/k/a Footprint Power Salem Harbor Dev. LP)*, Case No. 22-10239 (MFW) (Bankr. D. Del. Apr. 22, 2022) (same).

48.    Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

## VI.   The Milestones Under the DIP Facility Are Reasonable.

49.     The DIP Facility contemplates, as a product of negotiation with and as required by the Postpetition Lenders as a condition to providing the DIP Facility, the Debtors must meet certain milestones throughout these chapter 11 cases, the failure of which would constitute an Event of Default.  These Milestones were required by the Postpetition Lenders as a condition to providing the DIP Facility.

50.     The DIP Facility, including the Milestones, serves as an important component of these chapter 11 cases because it will provide the Debtors with the stability and certainty they need to operate in the ordinary course of business while consummating the proposed sale, subject to identifying higher or better offers.  The continued and viable operation of the Debtors' businesses would not be possible absent access to the DIP Facility.  The DIP Facility, and the Debtors' ability to achieve the Milestones contemplated therein, will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate the proposed sale of all or substantially all of their assets to maximize the value of their estates.

## VII.   Interim Approval of the DIP Facility.

51.     Bankruptcy Rule 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code section 363 or to obtain credit under Bankruptcy Code section 364 be commenced no earlier than 14 days after the service of such motion.  Upon request, however, a court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

52.    As described in the Ragano Declaration, denial of immediate use of Cash Collateral and access to the DIP Facility will cause immediate and irreparable harm to the value of the Debtors estates to the detriment of their creditors and other stakeholders. *See* Ragano Decl. ¶ 35.

53.    Accordingly, the Debtors respectfully request that the Court conduct an expedited hearing on the Motion and authorize the Debtors from the entry of the Interim Order until the Final Hearing to use Cash Collateral and obtain credit under the terms of the Postpetition Documents.

## VIII.   Request for a Final Hearing.

54.    Pursuant to Bankruptcy Rules 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is no later than twenty-four (24) days after the entry of the Interim Order and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.   The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further requests that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

55.    Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief is "needed to avoid immediate and irreparable harm."   Fed. R. Bankr. P. 6003(a)(2).   The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of

preliminary injunctions.  In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  *See e.g.*, *Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing *Glasco Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.  *See, e.g., Acierno v. New Castle Cnty.*, 40 F.3d 645, 653-55 (3d Cir. 1994).  For the reasons discussed above, immediate and irreparable harm would result if the relief requested herein were not granted. Accordingly, the Debtors submit that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULE 6004(h)

56.    The Debtors request a waiver of any stay of the order granting the relief requested herein pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h).  As explained above and in the Ragano Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the 14-day stay imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such stay applies.

## NOTICE

57.    Notice of this Motion will be provided to:  (i) Notice of this Motion will be provided to:  (a) the Office of the United States Trustee (Attn: Linda J. Casey, Esq. (linda.casey@usdoj.gov)); (b) the Internal Revenue Service; (c) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (d) counsel to the Lenders; (e) the Delaware Secretary of State; (f) the Delaware Secretary of the Treasury; (g) all parties known to hold or assert liens against the Debtors' assets; and (g) all parties requesting notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in

accordance with Rule 9013-1(m) of the Local Rules of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, granting

the relief requested herein and such other and further relief as is just and proper.


Dated: April 8, 2025
        Wilmington, Delaware

Respectfully submitted,

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Robert J. Dehney, Sr.*
Robert J. Dehney, Sr. (No. 3578)
Matthew O. Talmo (No. 6333)
Scott D. Jones (No. 6672)
Clint M. Carlisle (No. 7313)
Brianna N. V. Turner (No. 7468)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
      mtalmo@morrisnichols.com
      sjones@morrisnichols.com
      ccarlisle@morrisnichols.com
      bturner@morrisnichols.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*