## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ROYAL INTERCO, LLC, *et al.*, | Case No. 25-10674 (TMH) |
| Debtors.[1] | (Jointly Administered) |
|  | **Re: D.I. 16, 30, 53** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS
AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO
THE PREPETITION LENDERS, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors in possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby files this objection (the "Objection") to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying The Automatic Stay, (V) Scheduling Final Hearing, and (VI) Granting Related Relief* [D.I. 16] (the "Motion").[2] In support of this Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899). The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Interim Order (defined herein), as applicable.

## INTRODUCTION

1.  There are numerous problems with the proposed DIP Facility.  Chief among them is that the DIP Facility is designed solely to benefit the Prepetition Lenders and participating lenders under the Prepetition Credit Agreement, now serving as the DIP lenders (the "DIP Lenders"), while the Chapter 11 Cases teeter on the brink of administrative insolvency.  Indeed, the DIP Lenders' concerns about ensuring their repayment have precipitated a DIP Facility and DIP Budget that provide no assurance the Debtors' estates will remain administratively solvent or that general unsecured creditors will receive any recovery.  By requiring abbreviated milestones, excessive adequate protection, and waivers of necessary safeguards for other creditors, the DIP Lenders are using the DIP Facility as leverage to get paid and get out of these Chapter 11 Cases as soon as possible without regard for the administrative carnage left behind.  While the Committee appreciates the Debtors' strained position and need to fund the Chapter 11 Cases, the Court should not approve a DIP Facility that all but ensures these Chapter 11 Cases will be run for the exclusive benefit of the DIP Lenders.

2.  Equally problematic—particularly while facing the likelihood of administrative insolvency— the DIP Motion also includes excessive protection for the DIP Lenders, such as waiving all surcharge rights under Sections 506(c) and 552(b) as well as marshaling, and granting liens and superpriority claims on previously unencumbered assets, including avoidance actions and commercial tort claims. Such provisions erode and usurp potential value that should be preserved for the benefit of unsecured creditors.

3.  In addition, the severely truncated challenge periods and investigation budget proposed in the DIP Motion further illustrate that the DIP Lenders, with the Debtors' full acquiescence, are elevating their own interests at the expense of other creditor constituencies.

Where no recovery is expected to flow to unsecured creditors from the sale of substantially all of the Debtors' assets, it is critical that the Committee have an adequate opportunity to investigate the Prepetition Lenders' alleged liens and claims, as well as any affirmative claims that may exist against them.

4.      Notwithstanding these issues, the Committee is confident that the DIP Facility can be modified to resolve any objectionable terms.[3]  First and foremost, the DIP Lenders must "pay the freight" in these Chapter 11 Cases and the Court should not permit the Prepetition Lenders to exploit the bankruptcy sale process to liquidate their collateral for their sole benefit.  Second, waivers that are prejudicial to unsecured creditors should be stricken.  Additionally, the Committee must be granted adequate time and funding to conduct a fulsome investigation in accordance with its statutorily prescribed duties.  Absent such modifications, the terms of the DIP Facility will undermine the very principles of fairness and equality that are the linchpin of the bankruptcy system.

5.      The Motion should not be granted on a final basis unless and until the issues raised through this Objection are adequately addressed in the Final Order.

## **BACKGROUND**

A.      **General Background**

6.      On April 8, 2025 (the "<u>Petition Date</u>"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

---

[3]    Prior to filing the Objection, the Committee sought to work cooperatively with the Debtors (and DIP Lenders) to resolve these issues.  Unfortunately, the Debtors (and DIP Lenders) failed to agree on the modifications necessary to provide the Committee with assurance that the current DIP Facility would not prejudice all other creditor constituencies.

7.      No trustee or examiner has been appointed in these Chapter 11 Cases.  Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors continue to operate their businesses as debtors in possession.

8.      On April 18, 2025, the Office of the United States Trustee appointed the Committee pursuant to Bankruptcy Code § 1102(a).  *See Notice of Appointment of Creditors' Committee* [D.I. 79].  The Committee is comprised of three members: Allen Lund Company LLC, Armstrong Transportation Group, LLC, and Print Pro, Inc.

9.      The Debtors filed these Chapter 11 Cases to facilitate a sale of substantially all of their assets (the "Sale").  The stalking horse bid proposed by the Debtors is insufficient to cover the Debtors' alleged secured obligations, leaving a deficit of tens of millions of dollars.

10.      Additional information regarding the Debtors' prepetition capital structure and this Chapter 11 Case is set forth in detail in the *Declaration of Michael Ragano In Support of First Day Relief* [D.I. 3].

B.      **The Proposed DIP Financing**

11.      The Debtors filed the Motion on the Petition Date.  Through the Motion, the Debtors seek approval of a $10 million DIP financing package (the "DIP Facility") to fund the Chapter 11 Cases through the proposed date of closing for the Sale.[4]

12.      The DIP Facility is granted superpriority administrative expense status, leapfrogging all other costs and expenses of administration of the Chapter 11 Cases, subject only to a $200,000 Carveout Reserve held in trust for professional fees incurred after the DIP Facility terminates (the "Termination Date").  *See* Interim Order, ¶¶ 3(d), 7.

---

[4]      Notably, under the DIP Facility, the Debtors will not have sufficient funds to operate or close on the Sale if additional time is needed in the schedule based on, for example, soliciting additional bids or obtaining pre-closing regulatory requirements.

13.     The Debtors propose to treat the alleged debt owing to the Prepetition Lenders of at least $205,143,282.79 (the "Prepetition Debt") as an allowed secured claim in an amount of not less than $126 million (including accruing and accrued interest and fees) under section 506(b) of the Bankruptcy Code. *See* Interim Order, ¶ 3(c). The DIP Facility also recognizes a Term B Loan limited by guarantee of up to $20 million, of which approximately $8.3 million was already released. The Prepetition Lenders are not required to file proofs of claim, and the Debtors' stipulations regarding the validity and the amount of their prepetition claims are binding absent a timely challenge. *See* Interim Order, ¶¶ D, 26.

14.     The Motion proposes to secure the DIP Facility with sweeping, automatically perfected, first-priority liens on substantially all of the Debtors' assets (the "Postpetition Liens").[5] *See* Interim Order, ¶ 3(d). Perhaps most troublesome, the DIP Lenders will receive Postpetition Liens on the proceeds of the estates' Avoidance Actions and commercial tort claims (as well as any related insurance proceeds), subject to entry of the Final Order.

15.     Despite the fact that the DIP Facility is essentially just a protective advance to facilitate a sale for the benefit of the Prepetition Lenders, the Debtors also propose to pay the DIP Lenders and the Postpetition Agent above-market interest and fees, including: (i) interest at a rate of 7.50% per annum plus the Base Rate, in the case of Base Rate Loans, or 8.50% plus the Adjusted Term SOFR Rate, in the case of Term SOFR Loans (exclusive of any default rate interest); (ii) a closing fee in an amount equal to $300,000 paid in kind (the "Closing Fee"); and (iii) an exit fee in an amount equal to $500,000, payable immediately on the earliest to occur of (a) the Termination

---

[5]     As adequate protection to the Prepetition Lenders, the Debtors propose, among other things: (i) priority Prepetition Liens, subject only to the Postpetition Liens and the Permitted Priority Liens; (ii) properly perfected, valid, and enforceable replacement liens; and (iii) allowed superpriority administrative expense claims. The adequate protection liens would attach to the proceeds of Avoidance Actions and commercial tort claims and all other unencumbered assets (as well as any related insurance proceeds). There is currently no requirement in the Final Order limiting adequate protection to instances where there is a demonstrable diminution in value of the Prepetition Lenders' collateral. *See* Interim Order, ¶ 4.

Date, (b) the date on which the DIP Facility is paid in full, and (c) the acceleration of all of DIP Facility (the "Exit Fee").  *See* Interim Order, ¶ 3(c).

16.     The ten-week DIP Budget *forecasts that the Debtors will exhaust the entire DIP Facility by the week of June 13, 2025*—the same week that the Debtors hope, perhaps aspirationally, that the Sale will close.  *See* Interim Order, Ex. B.  In its current form, the DIP Budget does not include an allocation for administrative claims, such as those arising under Section 503(b)(9) of the Bankruptcy Code, and does not reserve any funds to facilitate an orderly wind-down of the Debtors' operations and affairs through a liquidating plan.  *Id.*

17.     The Motion seeks approval of preemptive waivers of the Debtors' rights to: (i) surcharge the DIP Lenders' and Prepetition Lenders' collateral pursuant to Section 506(c) of the Bankruptcy Code; (ii) apply the "equities of the case" exception under Section 552(b) of the Bankruptcy Code; and (iii) seek the equitable remedy of marshaling.  *See* Interim Order, ¶¶ 8, 16.

18.     The Committee is given 75 days following entry of the Interim Order (defined below) to assert a challenge with respect to the Prepetition Lenders' alleged liens and claims other than with respect to the Term B Loan obligations, 120 days to assert a challenge with respect to the Term B Loan obligations, and a lien investigation budget limited to just $25,000.  *See* Interim Order, ¶ 9.

19.     If the Court enters the Final Order in its present form, the Prepetition Lenders and DIP Lenders will also receive broad releases of prepetition claims and causes of action. Specifically, no offsets, defenses, or counterclaims to the Prepetition Debt will exist, and no portion of the Prepetition Debt will be subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination or other claim, cause of action, or challenge of

any nature under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise. *See* Interim Order, ¶ 4(a).

20.     After a hearing on April 10, 2025, the Court entered the *Order Authorizing Debtors To: (A) Use Cash Collateral on an Emergency Basis Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to NXT Capital, LLC, as Agent and the Lenders* [D.I. 53] (the "Interim Order").[6] A hearing to consider approval of the Motion on a final basis is scheduled for May 2, 2025, at 10:00 a.m. (ET).

21.     Since the Committee's appointment, the Debtors and the Committee have attempted to resolve the Committee's objections to the form of the Final Order. In light of those negotiations, the Debtors extended the Committee's objection deadline to April 28, 2025. The issues set forth in this Objection remain unresolved but the Committee is committed to working with the Debtors and the relevant lender parties before the hearing to try to resolve any issues that can be resolved.

## OBJECTION

22.     To obtain approval of postpetition financing under section 364(d) of the Bankruptcy Code, "the debtor also has the burden of demonstrating that (i) the credit transaction is necessary to preserve the estate, and (ii) the terms of the transaction are fair and reasonable given the circumstances." *In re Futures Equity L.L.C.*, No. 00-33682 (BJH), 2001 Bankr. LEXIS 2229, at *14 (Bankr. N.D. Tex. Apr. 11, 2001) (citation omitted); *see also In re L.A. Dodgers LLC*, 457 B.R. 308, 312–13 (Bankr. D. Del. 2011) (citations omitted) ("In seeking approval of [DIP financing], the

---

[6]     The Interim Order reflects modifications contained in the *Notice of Filing of Revised Proposed Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [D.I. 30].

Debtors have the burden of proving that . . . [t]he terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender."); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (citation omitted) (debtors must show that the "terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citation omitted) ("The proposed financing [must be] in the best interests of the general creditor body").

23.    However, courts must determine whether the proposed DIP financing is fair, reasonable, adequate, and in the best interests of the debtors' estates and creditors. *See, e.g.*, *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (noting that although a court's "normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment," the court still plays an "important oversight role" and must deny requests for post-petition financing where the request "'leverage[s] the bankruptcy process' and unfairly cede control of the reorganization to one party in interest") (quoting *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)); *see also In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

24.    DIP financing is not considered fair and reasonable when it is evident that the terms of the proposed financing favor one class of creditors to the detriment of the estate or other creditors. *See In re Ames Dept. Stores, Inc.*, 115 B.R. at 39 ("[P]roposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate.").  In addition, opportunistic secured creditors cannot use postpetition financing as a means to procure

greater protection than they had prior to the bankruptcy filing. *In re Barbara K. Enters.*, 2008 WL 2439649, at *8 ("Any proposal should provide a pre-petition secured creditor with 'the same level of protection it would have had if there had not been post-petition superpriority financing.'") (quoting *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996)); *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (post-petition financing should not be used in a manner that "pervert[s] the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of only a subset of the secured creditors).

25.     The DIP Facility here would result in precisely the type of "perversion" of the bankruptcy process that the law finds offensive. The Debtors' proposed DIP Facility not only ignores the interests of the estate and its other creditors but also upends the purpose of Chapter 11 by giving the DIP Lenders unnecessary protections and excessive control. Accordingly, the proposed DIP Facility is neither fair nor equitable, and the DIP Lenders should not be afforded a "good faith" finding under section 364(e) of the Bankruptcy Code.

### A.  The DIP Budget Does Not Ensure Administrative Solvency.

26.     It is axiomatic that secured lenders cannot benefit from a section 363 sale unless they are willing to "pay the freight." In other words, to obtain the benefits of bankruptcy, a secured lender must ensure, at a minimum, that the debtor's estate is administratively solvent after the sale. *See, e.g.*, *In re Golden Cnty. Foods, Inc.*, Hr'g Tr. at 11:22–24 [D.I. 175], Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015) (requiring that sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of certain alleged prepetition secured debt); *In re Family Christian, LLC*, Hr'g Tr. at 100:17-20, Case No. 15-00643 (JTG) (Bankr. W.D. Mich. Apr. 14, 2015) ("I think we'll have a problem at the Sale Hearing if the administrative expenses are not to be paid in connection with the sale."); *In re NEC Holdings Corp.*,

Hr'g Tr. at 23:25–24:1, Case No. 10-11890 (KG) (Bankr. D. Del. July 13, 2010) (secured creditors have "got to the pay the freight, and . . . the freight is certainly an administratively solvent estate."); *In re Townsends, Inc.*, Hr'g Tr. 39:24–40:1, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011) (upon realizing that section 503(b)(9) claims would not be paid in full, the Court stated: "Well, we've got a problem. Not going to run an administratively insolvent estate."); *In re AFA Investments Inc.,* Case No. 12-11127 (MFW) (Bankr. D. Del. July 12, 2012) (requiring sale proceeds in excess of postpetition financing obligations to be held in escrow until a later date pending resolution of administrative claims).

27.     Here, absent assurance that the "freight"—i.e., all allowed administrative expense claims—will be paid through the conclusion of the Chapter 11 Cases, the DIP Lenders should not be permitted to use this Court and the chapter 11 process to liquidate or foreclose on their collateral for their sole benefit.  *See In re Encore Healthcare Assocs.*, 312 B.R. 52, 54, 56, 58 (Bankr. E.D. Pa. 2004) (denying bidding procedures motion because court would not approve the sale, "the sole purpose of which was to liquidate assets for the benefit of the secured creditor," and which would render the estate administratively insolvent, particularly because "asset sale[s] can easily be accomplished outside of bankruptcy either with the consent of [a] secured creditor or by abandoning the asset to [a] secured creditor to sell on its own").

28.     In its current form, the DIP Budget projects that the Debtors will run out of cash by June 13, 2025—the date on which the Sale must close under the milestones.  Taken as a whole, there is no assurance that the estate will remain administratively solvent or have the resources necessary to confirm a chapter 11 plan, complete the claims reconciliation process, make required distributions, or satisfy post-sale tax and reporting obligations.  To the contrary, it is currently a near

certainty that these Chapter 11 Cases will be forced to convert or more likely be dismissed shortly after the sale closes.  That is not why the chapter 11 process exists.

29.     This absence of assurance is particularly inappropriate where the DIP Facility is being used primarily for the benefit of the lenders themselves.  The DIP Budget also lacks specificity, particularly with respect to line-item disbursements, and omits any express allocation, or reserve for, wind-down costs, post-sale administrative expenses, adequate professional fees, priority claims arising under section 503(b)(9) of the Bankruptcy Code, post-petition trade claims (which are not being assumed), or stub rent, and all other accrued and unpaid administrative expense claims.  Accordingly, if the sale process does not result in bids that provide incremental value above the secured debt hurdle, the estates will be left without adequate funding to confirm a chapter 11 plan and pursue an orderly wind-down.

30.     As such, the DIP Budget must be modified to ensure that all the administrative costs of the Chapter 11 Cases are covered, and the Committee should have consent rights with respect to any initial budget approved in the Final Order and each roll-forward budget.  Likewise, the Final Order should require the DIP Lenders to fund a liquidating trust or reserve in an amount sufficient to cover all anticipated wind-down expenses, including professional fees, U.S. Trustee fees, and the costs of claims administration and distribution.

**B.      The Court Should Not Permit the Improper Waivers of Surcharge Rights under Bankruptcy Code § 506(c) and Rights Under Bankruptcy Code § 552(b) Related to the "Equities of the Case."**

31.     The Debtors propose to grant sweeping waivers of their section 506(c) surcharge, marshaling, and section 552(b) "equities of the case" rights as to the DIP Lenders and the Prepetition Lenders upon entry of the Final Order, which further insulates the DIP Lenders from having to "pay

the freight" of the Chapter 11 Cases.  These waivers are inappropriate and prejudicial to unsecured creditors.

32.     Through the proposed section 506(c) surcharge waiver, the Debtors would irrevocably waive the estates' rights to charge certain costs or expenses incurred in administering the Chapter 11 Cases as to the DIP Lenders, exacerbating the likelihood that the Debtors become administratively insolvent and eliminating a meaningful remedy for lender-inflicted administrative insolvency.  This result contravenes the very purpose of section 506(c).  *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus. Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (internal citation omitted) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate."); *see also In re Codesco*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should be required to bear the cost of protecting what is not theirs.").

33.     The Committee has yet to receive any assurance that there will be sufficient availability under the DIP Facility to pay all administrative claims against the Debtors' estates in full, including post-petition trade claims, section 503(b)(9) claims, stub rent, and professional fees, among other things.  As other bankruptcy courts have recognized, DIP financing that contains an inadequate budget coupled with a surcharge waiver should not be approved unless modified to provide for payment of administrative claims.  *See, e.g.*, *In re Townsends, Inc.*, Case No. 10-14092 (Bankr. D. Del. Jan. 21, 2011) Hr'g Tr. at 23:25–24:22 (in the context of a proposed DIP financing where the debtors sought to pay most administrative claims but exclude 503(b)(9) claims, Judge

Sontchi noted that "if it appears that the case is administratively insolvent, I would be inclined to . . . either convert or dismiss the case . . ."); *NEC Holdings Corp.*, Case No. 10-11890 (PJW) (Bankr. D. Del. Jul 13, 2010) [Docket No. 223] and Hearing Tr. at 108:1-5 [Docket No. 224] ("I need some evidence that there's a probability that admin[istrative] claims are going to be paid in full, including 503(b)(9) claims or I won't approve the financing."); *Hartford Fire Ins. Co. v. Northwest Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998) (refusing to enforce a provision in a DIP financing order purporting to immunize the postpetition lender from section 506(c) surcharge).

34.     Leaving the estates unable to recover the costs of preserving and disposing of the DIP Collateral in the Chapter 11 Cases would substantially harm general unsecured creditors and create an unbearable burden in a Sale transaction that already operates for the primary benefit of the DIP Lenders.  Therefore, the section 506(c) waiver should be stricken.  If the Court is unwilling to reject the Debtors' attempted waiver of their section 506(c) rights, the Committee should be explicitly vested with derivative standing to seek a surcharge against the collateral if a surcharge becomes appropriate under the circumstances of these Chapter 11 Cases.

35.     The DIP Motion also includes a provision that waives the enhancement of collateral provisions under section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment, or the "equities of the case" exception under section 552(b)) as they may relate to or be asserted against DIP Lenders or Collateral.  This too is inappropriate.

36.     Under the "equities of the case" exception, prepetition secured creditors are generally entitled to post-petition proceeds of pre-petition collateral unless "the court, after notice and hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(1).  The

equities of the case exception is designed "to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code . . . ." *In re TerreStar Networks, Inc*., 457 B.R. 254, 270 (Bankr. S.D.N.Y. 2011) (citing *In re Patio & Porch Sys. Inc*., 194 B.R. 569, 575 (Bankr. D. Md. 1996)). One of the primary purposes of the section 552(b)(1) exception is to prevent an unjust increase in the collateral of secured creditors "at the estate's expense, and which thus depletes the fund available for general unsecured creditors." *Id*. at 272 (internal quotation mark omitted) (quoting *In re S & Z Int'l Mgmt., Inc*., 10 B.R. 580, 582, n.1 (Bankr. S.D. Fla. 1981).

37.     Here, where the Debtors are likely administratively insolvent, there is no reason to prospectively waive such rights.  Moreover, the Committee has not had sufficient time to conduct its lien review or investigation to ascertain potential sources of unencumbered value—which may be the *only* means for unsecured creditor recoveries in these Chapter 11 Cases.  *See In re TerreStar Networks*, 457 B.R. at 272-73 (denying waiver of section 552(b) as premature because factual record was not fully developed); *In re Metaldyne Corp.*, No. 09-13412, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) (declining to waive equities of the case exception in connection with approval of a DIP facility and "declin[ing] to waive prospectively an argument that other parties in interest may make").

38.     Finally, the waiver of marshaling and other equitable doctrines is unjustified.  As articulated by the Supreme Court, marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security."  *See Meyer v. United States*, 375 U.S. 233, 236 (1963).  As such, it is well settled that bankruptcy courts can marshal a debtor's assets to enable asset values to be maximized to effectuate an equitable distribution to creditors. *See In re Tampa Chain Co.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985); *see also Off. Comm.*

*v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998); *Ramette v. United States (In re Bame)*, 279 B.R. 833 (B.A.P. 8th Cir. 2002). Here, the concept of marshaling could ensure that the DIP Lenders turn to certain assets as opposed to others in collecting on their claims, which is particularly important given the guarantee of both the Prepetition Debt and the DIP Facility by non-Debtor RP Holdco, LLC.

39.      If the Court upholds the Debtors' request to encumber certain unencumbered assets, the DIP Lenders should be required to exhaust all other collateral before seeking satisfaction from unencumbered assets (including, if allowed by the Court, the proceeds of Avoidance Actions), the value of which would otherwise be available for the benefit of unsecured creditors.

40.      Accordingly, the waiver of the Debtors' section 506(c), marshaling, and section 502(b) "equities of the case" rights are inappropriate and should be stricken from the Final Order.

**C.      The DIP Facility Inappropriately Grants Superpriority Claims and Liens on Unencumbered Assets, Including Avoidance Actions and Avoidance Action Proceeds.**

41.      It is inappropriate to encumber the proceeds of Avoidance Actions, commercial tort claims, any related insurance proceeds, and any other unencumbered assets—stripping what may be unsecured creditors' primary (or only) source of recovery in the Chapter 11 Cases. Thus, the scope of the adequate protection package must be narrowed to exclude the proceeds of Avoidance Actions and commercial tort claims, if any (as well as any related insurance proceeds), and any other unencumbered assets.

42.      Granting the DIP Lenders liens over the proceeds of all Avoidance Actions is especially unacceptable, as it contravenes the intended purpose of Avoidance Actions and robs the estates and their unsecured creditors of an important source of value. Avoidance Actions (and their proceeds) are distinct creatures of bankruptcy law designed to facilitate equality of distribution

among a debtor's general unsecured creditors; they are not property of a debtor's estate, but instead are rights that the estate holds in trust for the benefit of creditors. *See Off. Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 554 (3d Cir. 2003) (hereinafter, "*Cybergenics II*"). The underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate. *See Off. Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 245 (3d Cir. 2000) )hereinafter, "*Cybergenics I*").

43.     Accordingly, bankruptcy courts customarily restrict the ability of debtors in possession to pledge avoidance actions and their proceeds as security. *See, e.g., Off. Comm. of Unsecured Creditors v. Goold Elec. Corp. (In re Goold Elec. Corp.)*, 1993 WL 408366, *3–4 (N.D. Ill., Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions); *Mellon Bank v. Glick (In re Integrated Testing Prod. Corp.)*, 69 B.R. 901, 905 (D.N.J. 1987) (finding a secured creditor lacked a perfected security interest in preference actions because, "to allow [a secured creditor] to claim these preferences would frustrate the policy of equal treatment of creditors under the Code" and because "the debtor never possessed the right to institute a preference action, [and thus the secured creditor] could not have 'acquired' the [right] . . . .").

44.     Because of the unique nature of avoidance power actions, courts recognize that, at least with respect to proceeds recovered pursuant to section 544(b) of the Bankruptcy Code, "empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." *Cybergenics I*, 226 F.3d at 244 (citations omitted); *see also Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) (citation omitted) ("When recovery is sought under § 544(b) of the Bankruptcy Code, any recovery

is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer."); *Citicorp Acceptance Co. v. Robinson (In re Sweetwater)*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . . .").

45.     Granting liens on Avoidance Actions in these Chapter 11 Cases is especially egregious given the likely zero recovery to general unsecured creditors.  This is yet another example of how these Chapter 11 Cases are being run solely for the benefit of the DIP Lenders, without leaving even a crumb for other creditor constituencies.  Therefore, the Committee objects to any liens on Avoidance Actions and Avoidance Action Proceeds, which should be preserved for the exclusive benefit of unsecured creditors.

46.     As the Committee's lien review is not yet complete, the Committee has not determined whether the Prepetition Lenders' collateral includes any commercial tort claims, which must be specifically identified in the applicable security agreements and financing statements, and whether there are any other unencumbered prepetition assets.  *See* UCC § 9-108(e)(1) (alteration in original) ("A description only by type of collateral defined in [the Uniform Commercial Code] is an insufficient description of . . . a commercial tort claim.").  A related provision of the UCC prohibits the attachment of a security interest in after-acquired commercial tort claims.  *See* UCC § 9-204(b)(2) ("A security interest does not attach under a term constituting an after-acquired property clause to . . . a commercial tort claim").  As such, it is possible that the commercial tort claims are unencumbered assets that should remain for the benefit of unsecured creditors.

47.     Thus, the Final Order should include an express carve-out excluding the proceeds of Avoidance Actions, commercial tort claims, and any other unencumbered assets for unsecured creditors.  Moreover, to the extent that any insurance proceeds relate to Avoidance Actions,

commercial tort claims, or other assets earmarked for the benefit of general unsecured creditors, those proceeds must likewise be preserved for the benefit of general unsecured creditors. The Final Order should expressly provide that any such insurance recoveries are excluded from Postpetition Collateral and remain available for distribution to the general unsecured creditor pool.

**D.      The Investigation Periods Investigation Budget, and Mandatory Prepayment Provisions Are Unreasonable and Prejudicial to Unsecured Creditors.**

48.      The DIP Motion also proposes several provisions that constrain the Committee's ability to fulfill its fiduciary duties to investigate and prosecute potential Challenges for the benefit of the Debtors' estates. The Investigation Period (75 days after entry of the Interim Order with respect to the Prepetition Lenders and 120 days after entry of the Interim Order with respect to the Term B Loan claims and claims to insiders)[7] is unreasonably short in light of, *inter alia*, the procedural hurdles that the Committee must navigate before initiating any action. Critically, the Committee must first (i) complete its investigation; (ii) provide notice to the Debtors and demand that they pursue the claims; (iii) allow the Debtors up to five days to respond and ten additional days to initiate an action; and (iv) if the Debtors decline, seek and obtain an order granting the Committee derivative standing—all before the Investigation Periods expire. The demand process is an unnecessary charade where the Debtors have already stipulated that they believe they have no claims against the Prepetition Lenders and where one potential target (the lender under the Term B Loan) is the Debtors' sponsor or its affiliate.

49.      Further compounding these problems, the requirement that all proceeds from the Sale be used to repay the DIP Lenders in full at closing means that, under the proposed DIP Milestones, the DIP Facility would be repaid *before* the expiration of the 75-day Investigation

---

[7]      The Interim Order was entered, and therefore the clock for the Committee's investigation began running, on April 10, 2025.   However, the Committee was not appointed until April 18, 2025—effectively truncating the Investigation Period by eight days.

Period—essentially cutting off the Committee's ability to pursue potential claims and causes of action against the Prepetition Lenders by removing any available funds from the Debtors' estates.

50.     The Committee has also been provided with a paltry investigation budget of $25,000, which is inadequate given the complexity of the Debtors' prepetition capital structure and the inclusion of the Term B Loans and other claims against insiders. The limited investigation budget deliberately forces the Committee's professionals to finance matters related to the Chapter 11 Cases and harms the adversary system characteristic of the chapter 11 process. *See In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (finding cap on fees unacceptably limited the right of debtor's counsel to payment for bringing actions against the DIP lenders, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate, and therefore, refusing to approve the post-petition financing); *see also In re Channel Master Holdings, Inc.*, No. 03-13004, 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004).

51.     These provisions must be modified to provide the Committee with a fair opportunity to fulfill its fiduciary duties and determine whether the Prepetition Lenders hold valid, perfected liens on all assets of the Debtors' estates and whether there are any valuable causes of action that could drive value for general unsecured creditors. To remedy the issues outlined above, the Committee proposes that the Final Order (i) extends the Investigation Period to at least 90 days (*i.e.*, July 9, 2024) after entry of the Interim Order for all claims except Term B Loan claims and claims against insiders; (ii) eliminates the challenge deadline for Term B Loan claims and claims against insiders; (iii) increases the Committee's investigation budget to at least $200,000, without prejudice to the Committee seeking further increases to facilitate the Committee's exercise of its fiduciary duties; (iv) provides that a portion of the Sale proceeds sufficient to satisfy the DIP claims and the prepetition claims be held in escrow or otherwise segregated until the Investigation Period

with respect to the Prepetition Lenders expires and any timely-filed challenges are fully resolved; (v) provides that no final or irrevocable payment of DIP claims or prepetition claims may be made from Sale proceeds until the Investigation Period has run and all related objections have been adjudicated; and (vi) grants the Committee automatic standing to assert challenges in the Chapter 11 Cases.[8]  Furthermore, a provision should be added to the Final Order that any successful challenge could result in the disgorgement of any amounts realized by the Prepetition Lenders on a postpetition basis.

**E.      Other Aspects of the DIP Facility and Final Order Should Not Be Approved.**

52.      In addition to the foregoing, this Court should not approve the Motion on a final basis until the following issues are resolved:

i.      **Exit Fee:** The Debtors propose to pay the Agent, for the benefit of the DIP Lender, the Exit Fee in an amount to equal 5% of the DIP ($500,000), to be paid upon the earlier of (i) the Termination Date, (ii) the date on which the Postpetition Debt is paid in full, or (iii) the acceleration of all of the Postpetition Debt. While the DIP Facility's other proposed fees and interest are expensive, but they do not shock the conscience.  The Exit Fee, however, proposes to siphon even more cash away from the Debtors' estates and unsecured creditors and into the pockets of the DIP Lenders.  This provision should be stricken from the Final Order.

ii.      **Carveout Reserve:** The proposed $200,000 Carveout Reserve is unreasonably low for the Chapter 11 Cases.  An adequate post-trigger carve-out is essential to ensure that the Debtors have the necessary resources to continue their operations and to administer their estates, especially if the Chapter 11 Cases extend beyond the projected timeline (which is a strong possibility given the potential regulatory and antitrust risks that are associated with the Sale).  Absent a wind-down budget, the Carveout Reserve shall equal the aggregate amount of all unpaid fees and expenses that accrue during the period commencing on the Filing Date and ending on the Termination Date (excluding any restructuring, sale, success, or other transaction fee) and (2) shall be reduced dollar-for-dollar by any indefeasible payments of fees and expenses to such Carveout Professional and any retainer or advance held by such Carveout Professional. The Final Order should provide a "carve out from a super-priority status and post-petition

---

[8]      At a minimum, the Investigation Period should be tolled in the event that the Committee files a motion seeking standing to assert a challenge until such motion is determined by the Court, as is customary in other DIP orders.

liens in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system." *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  Furthermore, express language must be added to the Final Order that the Carveout Reserve is not the collateral of any lender and is not available to pay any lender's adequate protection or DIP superpriority administrative expense (or other) claims, and that any remaining funds shall be used to fund a trust for general unsecured creditors once all professional fees have been irrevocably paid in full.

iii.     **Lenders' Claims:** The Final Order should make clear that any amounts already paid under the Term B Loan guarantee—whether before or after the Petition Date—must reduce the Prepetition Lenders' allowed claim against the Debtors' estates on a dollar-for-dollar basis.  The Final Order should also require that the Prepetition Lenders timely file a proof of claim to assert any secured claim under section 506 of the Bankruptcy Code.  At a minimum, the Committee's right to challenge the amount, perfection, value, scope, and validity of the asserted collateral, as well as the treatment and impact of the Term B Loan guarantee, must be preserved.

iv.     **DIP Termination Events:** As drafted, the Final Order prohibits the continued use of DIP proceeds following a Termination Event, except for narrowly limited, five-business-day Remedies Notice Period—and even then, only for payroll and other "critical expenses," and only to the extent approved by the DIP Lenders.  This restriction is especially problematic here, where there are no assurances of administrative solvency.  Without continued access to DIP funds, the Debtors risk a disorderly liquidation, undermining their ability to operate, retain employees, and preserve estate value.  The Committee submits that the Final Order should be revised to ensure that the Debtors have access to necessary liquidity during the Remedies Notice Period, including: (i) the automatic, non-discretionary use of cash collateral and undrawn DIP commitments for ordinary course expenses without lender consent; (ii) the authority to draw on the DIP Facility, up to the budgeted amount, unless otherwise ordered by the Court; and (iii) the preservation of the Committee's right to seek emergency relief and to challenge any asserted Event of Default or Termination Event.

v.     **Credit Bidding:** The DIP Lenders' and Prepetition Lender's ability to credit bid should be subject to the Committee's challenge rights and limited to the extent of allowed, non-contingent, and non-disputed claims.  Additionally, any credit bid based on subsequently invalidated liens on unencumbered assets should be paid for with cash.

vi.     **Releases:** The DIP Facility requires the Debtors to provide broad releases to the DIP Lenders and the Prepetition Lenders, including releases of any claims or causes of action that the Debtors may have against them.  These

releases are to be granted upon entry of the Final Order, effectively insulating the lenders from any liability for their prepetition and postpetition conduct. The Committee submits that these releases are not fair or reasonable, as they deprive the Debtors' estates of potential sources of recovery and relief. Any releases of the DIP Lenders and Prepetition Lenders should be effective only after (a) the challenge period has expired without a challenge, or (b) any timely challenge has been fully adjudicated and resolved in favor of the lenders. Furthermore, no releases should be granted in the Final Order in favor of any insider or former or current director or officer of the Debtors. Absent such modifications, the Motion should not be granted on a final basis.

## **RESERVATION OF RIGHTS**

The Committee reserves all of its rights to supplement or amend this Objection at or prior to the Final Hearing. The Committee also reserves all of its rights with respect to any filing by the Debtors or the Prepetition Lenders/DIP Lenders prior to the Final Hearing. Nothing contained in, or omitted from this Objection constitutes an admission or stipulation by the Committee, any member of the Committee, or any other party with respect to any alleged claims against the Debtors, the Prepetition Lenders/DIP Lenders, or any other parties as applicable, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtors, the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' assets, or any money damage causes of action.

## **CONCLUSION**

For the foregoing reasons, the Committee respectfully requests that the Court deny final approval of the Motion unless and until the issues raised herein are adequately addressed in the Final Order.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 28, 2025

**GELLERT SEITZ BUSENKELL & BROWN, LLC**

*/s/ Michael Busenkell*
Michael Busenkell (DE Bar No. 3933)
Michael Van Gorder (DE Bar No. 6214)
1201 North Orange Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 425-5812
Facsimile: (302) 425-5814
E-mail: mbusenkell@gsbblaw.com
      mvangorder@gsbblaw.com

-and-

**LOWENSTEIN SANDLER LLP**
Andrew D. Behlmann (admitted *pro hac vice*)
Colleen M. Restel (admitted *pro hac vice*)
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
E-mail: abehlmann@lowenstein.com
      crestel@lowenstein.com

-and-

Bruce S. Nathan (admitted *pro hac vice*)
Lindsay H. Sklar (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
E-mail: bnathan@lowenstein.com
      lsklar@lowenstein.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*