## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>ROYAL INTERCO, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 25-10674 (TMH)<br><br>Jointly Administered<br><br>Objection Due: April 29, 2025 at noon<br>Hearing Date: May 2, 2025 at 11:00 a.m. |

### UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF (D.I. 16)

Andrew R. Vara, United States Trustee for Region 3 ("U.S. Trustee"), hereby files this Objection the ("Objection") to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "Motion") [D.I. 16]. In support of the Objection, the U.S. Trustee states:

### INTRODUCTION

1.      The Debtors owe over $205 million in secured debt and have entered into a sale agreement to sell substantially all of their assets for $126 million. As such, it is likely that the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899). The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

Debtors' secured indebtedness far exceeds the value of their assets. Absent a sufficient budget (including a wind-down budget), the Debtors are administratively insolvent.

2.      These cases apparently are being run solely for the benefit of the secured creditors.  Administrative claimants may not be forced to fund a chapter 11 case for the benefit of secured lenders.  Absent a sufficient budget, agreed to as part of the DIP financing agreement, to ensure "payment of the freight," the Motion should be denied.

## JURISDICTION AND STANDING

3.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with the administrative oversight of cases commenced pursuant to Title 11 of the United States Bankruptcy Code. Section 586(a)(3)(G) mandates that the U.S. Trustee monitor "…the progress of cases under title 11" and further requires that the U.S. Trustee take "such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress."

4.      Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to be heard in this matter.

## STATEMENT OF FACTS

5.      On April 8, 2025 (the "Petition Date"), Royal Interco, LLC and three associated debtors (collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6.      On the Petition Date, the Debtors filed the Motion seeking entry of interim and final order authorizing the Debtors to obtain post-petition financing in the maximum amount of $10 million. The Debtors have also filed a motion to sell substantially all of their assets free and clear of all liens, claims and encumbrances in accordance with section 363 of the Bankruptcy

Code. (the "Sale Motion").  D.I. 15.

7.      The proposed purchase price is $126 million (subject to certain adjustments) as well as the assumption of certain liabilities. Sale Mot. ⁋ 7. The Debtors' prepetition secured debt exceeds $205 million. Mot. ⁋ 24.

8.      The Debtors maintain a self-funded health insurance plan for the benefit of its employees. D.I. 13 (Employee wages motion) ⁋ 36.

9.      The Motion includes only a 10-week budget.[2] Mot. Ex. B. At the end of the budget period, the Debtors will have no cash and will owe $10,723,077 in post-petition, superpriority secured debt. *Id.*

10.     At the first-day hearing, counsel for the Debtors explained that the budget is a "cash budget."  Further, counsel acknowledged that the Debtor will get "terms" and there will be accrued administrative expenses that are not included in the budget. In addition, claims under the self-funded insurance plans do not get paid for 30-90 days after they are incurred.

11.     Neither the DIP loan agreement nor the order approving same provide for the payment of all administrative expense claims through conclusion of the cases. No "wind-down" budget is included in the DIP agreement, and there is no obligation for the lenders to provide such a wind-down budget.

12.     Rather, the interim financing order provides that, subject to entry of the final order, the Debtors (and any Trustee) agree that there shall be no surcharge on the collateral, and provide for waivers of rights under 11 U.S.C. § 506(c) & 552(b).  D.I. 53 (Interim financing order) ⁋ 8. Further, the interim financing order provides that, subject to entry of the final order,

---

[2] The DIP loan agreement includes a "milestone" that requires that the Debtors close on a sale of substantially all of their assets by June 13. The ten-week budget goes through June 13.

all proceeds from the sale of the lenders' collateral will be remitted to the secured lenders, to be applied to both the pre- and post-petition secured debt. *Id.* ⁋ 13.

13.     The interim financing order also provides that, "[s]ubject to entry of the Final Order, Debtors hereby waive their rights: (a) to return any of the Aggregate Collateral pursuant to Code § 546(h); (b) to consent to any order permitting any claims pursuant to Code § 503(b)(9); and (c) to consent to setoff pursuant to Code § 553." *Id.* ⁋ 14.

## ARGUMENT

14.     The Debtors have apparently entered these cases administratively insolvent. Absent an agreement by the lenders to fund all administrative expenses, including all pre-sale claims of employees under the self-funded health insurance plans, all pre-sale administrative expenses that remain unpaid as of the closing, and a reasonable budget for post-sale administrative expense claims, these cases are being run for the benefit of the secured lenders at the expense of administrative claimants.

15.     In *In re Townsends, Inc.*, when the Debtors proposed DIP financing that would pay most administrative claims but leave the § 503(b)(9) claims behind, Judge Sontchi stated, "I would have a problem running any case that was administratively insolvent. But one that is both administratively insolvent and prefers one set of administrative creditors over another is doubly troubling." *In re Townsends, Inc., et al.,* Case No. 10-14092 (Bankr. D. Del.), 1/21/11 Tr. 24:4-24:9.[3] While the record for approval of DIP financing only needs to establish reasonable evidence that administrative claims will be paid, "to go in with a path forward that indicates. . . that a certain type of administrative expense claim won't get paid in full but yet others will, . . . I

---

[3] A copy of the transcript is attached as Exhibit A.

can't run that kind of case." *Id.* 24:18-24:22.

16.     If the lenders wish to utilize this court to obtain the benefits of Chapter 11, they must provide for a sufficient budget, including a wind-down budget, to cover the costs of administrative expense claims. The current proposed DIP proposes to pay in full professionals of the estate and those creditors whose administrative expense claims are actually paid during the budget period. But those administrative claimants who provide terms and are not paid during the budget period, section 503(b)(9) claimants, and employees who accrue claims under the self-funded health insurance plans during the budget period will not be paid. Absent provision for these claimants, these cases are administratively insolvent and must be converted to a cases under chapter 7.  Administrative claimants, including employees, cannot be required to fund these cases for the benefit of the lenders.

17.     If the Court were inclined to approve the financing and permit the Debtors to address this funding shortfall in connection with the hearing on the sale of their assets, the DIP financing order should neither approve a waiver of 506(c) rights nor should it require that the Debtors remit all sale proceeds to the lenders for application to the pre- and post-petition secured debt. Rather, the availability of a surcharge waiver and the right to receive sale proceeds should also be addressed at the sale hearing.

18.     Chapter 11 of the Bankruptcy Code is designed to allow a debtor-in-possession to retain management and control of the debtor's business operations.  *See In re Eurospark Indus*., 424 B.R 621, 627 (Bankr. E.D.N.Y. 2010).  As such, a debtor-in-possession owes fiduciary duties to the bankruptcy estate and must, among other things, "protect and . . . conserve property in [its] possession for the benefit of creditors" and "refrain [] from acting in a manner which could

damage the estate, or hinder a successful reorganization of the business." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (internal quotations and citation omitted).

19.     The Debtors must ensure that their administrative creditors are paid in full. Where a debtor comes into chapter 11 administratively insolvent, to retain management and control of the debtor's business operations, the debtor must ensure for an adequate budget – including a wind-down budget – from the debtor's secured lenders, to protect administrative creditors and prevent a situation where the secured lender reaps the benefit of the chapter 11 case, and the unpaid administrative creditors are faced with conversion to a chapter 7 case or dismissal after all of the debtor's assets are sold.

20.     In addition, the proposed order provides that the Debtors waive their rights to return collateral pursuant to § 546(h), consent to § 503(b)(9) claims, and consent to setoffs under § 553. The Debtors are fiduciaries to the estate and should not cede their duties to the lenders. Furthermore, it would be a waste of judicial resources to require the Debtors to object to valid claims under §§ 503(b)(9) and 553.

## CONCLUSION

Because these cases are administratively insolvent, the Motions must be denied absent an agreement with the lenders to fund a reasonable wind-down budget, which must include a budget that reasonably estimates all administrative expense claims and does not intentionally avoid paying certain categories of administrative expense claims.

WHEREFORE, the United States Trustee requests that this Court deny the Motions.

**Andrew R. Vara,**
**United States Trustee, Region Three**

Dated: April 29, 2025

**BY:** _/s/ Linda J. Casey_
 Linda J. Casey, Esquire
Trial Attorney
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)

# Exhibit A

Page 1

```
 1
 2    UNITED STATES BANKRUPTCY COURT
 3    DISTRICT OF DELAWARE
 4    Case No. 10-14092(CSS)
 5    - - - - - - - - - - - - - - - - - - - - - -x
 6    In the Matter of:
 7
 8    TOWNSENDS, INC., et al.,
 9
10                   Debtors.
11
12    - - - - - - - - - - - - - - - - - - - - - -x
13
14                   United States Bankruptcy Court
15                   824 North Market Street
16                   Wilmington, Delaware
17
18                   January 21, 2011
19                   1:09 PM
20
21    B E F O R E:
22    HON. CHRISTOPHER S. SONTCHI
23    U.S. BANKRUPTCY JUDGE
24
25    ECR OPERATOR:  DANA MOORE
```

1

2    HEARING re Motion of Debtors for Orders (A)Authorizing Debtors

3    (i)to Obtain Post-Petition Financing and Granting Security

4    Interests and Superpriority Administrative Expense Status

5    Pursuant to 11 U.S.C. § 364; (ii)to Use Cash Collateral

6    Pursuant to 11 U.S.C. § 363; (iii)to Provide Adequate

7    Protection Pursuant to 11 U.S.C. § 361; and (B)Scheduling a

8    Final Hearing and Establishing Related Notice Requirements

9

10   HEARING re Debtors' Motion for Entry of an Order Pursuant to 11

11   U.S.C. § 521, Fed. R. Bankr. P. 1007(c) and 9006(b) and Del.

12   Bankr. L.R. 1007-1 For Entry of an Order Granting the Debtors

13   an Extension of Time to File Schedules of Assets and

14   Liabilities and Statements of Financial Affairs

15

16   HEARING re Debtors' Motion For Entry Of An Order Pursuant To 11

17   U.S.C. §§ 105(a) And 363(b) Authorizing And Approving

18   (i)Retention And Employment Of Huron Consulting Group Nunc Pro

19   Tunc To The Petition Date; and (ii)Debtors Employment Of Dalton

20   T. Edgecomb As Chief Restructuring Officer

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

```
 1

 2   A P P E A R A N C E S :

 3   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 4        Attorneys for Debtors and Debtors-in-Possession

 5        1201 N. Market Street

 6        Wilmington, DE 19899-1347

 7

 8   BY:   DEREK C. ABBOTT, ESQ.

 9         ALISSA T. GAZZE, ESQ.

10

11   MCKENNA LONG & ALDRIDGE LLP

12        Special Counsel to Debtors and Debtors-in-Possession

13        303 Peachtree Street, NE

14        Suite 5300

15        Atlanta, GA 30308

16

17

18   BY:   WAYNE BRADLEY, ESQ.

19         (TELEPHONICALLY)

20

21

22

23

24

25
```

Page 4

```
 1
 2   WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
 3        Attorneys for the Official Committee of Unsecured
 4         Creditors
 5        222 Delaware Avenue
 6        Suite 1501
 7        Wilmington, DE 19801
 8
 9   BY:   STEVEN K. KORTANEK, ESQ.
10
11   LOWENSTEIN SANDLER PC
12        Attorneys for the Official Committee of Unsecured
13         Creditors
14        65 Livingston Avenue
15        Roseland, NJ 07068
16
17   BY:   BRUCE BUECHLER, ESQ.
18
19
20
21
22
23
24
25
```

Page 5

1

2    U.S. DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          844 King Street

5          Room 2207

6          Lockbox #35

7          Wilmington, DE 19899

8

9    BY:   MARK KENNEY, ESQ.

10

11   ECKERT SEAMANS CHERIN & MELLOTT, LLC

12          Attorneys for United States Cold Storage, Inc.

13          300 Delaware Avenue

14          Suite 1210

15          Wilmington, DE 19801

16

17   BY:   RONALD S. GELLERT, ESQ.

18

19

20

21

22

23

24

25

Page 6

```
 1

 2     GREENBERG TRAURIG LLP

 3             Attorneys for DIP Lenders and Pre-Petition Bank Group

 4              Lenders, Wilmington Trust Company, PNC Bank, N.A.,

 5              Greenstone, FCS and AgStar Financial Services, ACA

 6             The Nemours Building

 7             1007 North Orange Street

 8             Suite 1200

 9             Wilmington, DE 19801

10

11     BY:   DENNIS A. MELORO, ESQ.

12

13     GREENBERG TRAURIG LLP

14             Attorneys for DIP Lenders and Pre-Petition Bank Group

15              Lenders, Wilmington Trust Company, PNC Bank, N.A.,

16              Greenstone, FCS and AgStar Financial Services, ACA

17             Two Commerce Square

18             27th Floor

19             2001 Market Street

20             Philadelphia, PA 19103

21

22     BY:   DIANE E. VUOCOLO, ESQ.

23             KEVIN P. RAY, ESQ.

24

25
```

1

2    GREENBERG TRAURIG LLP

3         Attorneys for DIP Lenders and Pre-Petition Bank Group

4          Lenders, Wilmington Trust Company, PNC Bank, N.A.,

5          Greenstone, FCS and AgStar Financial Services, ACA

6         One International Place

7         Boston, MA 02110

8

9    BY:   JOSEPH P. DAVIS, III, ESQ.

10   SAUL EWING LLP

11        Attorneys for John Hancock Life Insurance Company (USA),

12         John Hancock Insurance Company of Vermont and John

13         Hancock Variable Life Insurance Company

14        222 Delaware Avenue

15        Suite 1200

16        Wilmington, DE 19899

17

18   BY:   TERESA K.D. CURRIER, ESQ.

19

20

21

22

23

24

25

Page 8

1

2      SULLIVAN & WORCESTER LLP

3              Attorneys for John Hancock Life Insurance Company (USA),

4               John Hancock Insurance Company of Vermont and John

5               Hancock Variable Life Insurance Company

6              One Post Office Square

7              Boston, MA 02109

8

9      BY:   GAYLE P. EHRLICH, ESQ.

10             (TELEPHONICALLY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TOWNSENDS, INC., et al.

                                                    Page 9

1                  P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.  Mr. Abbott?

4          MR. ABBOTT:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.

6          MR. ABBOTT:  Your Honor, thank you very much for

7    giving us the additional time.  I think we put it to good use.

8    The headline is peace has broken out at least among the

9    parties.

10         THE COURT:  Okay.

11         MR. ABBOTT:  We have three items on the agenda, Your

12   Honor.  But there's one off-agenda item that I'd like to

13   address with the Court quickly if I may.  Your Honor may recall

14   at the second day hearing, the Court entered a final order

15   regarding utilities.  And at the first day hearing, Your Honor

16   had made a comment about a particular aspect of that order

17   setting a deadline by which the respective utilities may need

18   to make noise or forever be barred.  You didn't like the

19   barring nature of the initially proposed order.

20         Apparently, we handed up an order that had not been

21   completely struck.  And so, your comment hadn't been baked in

22   like we thought we had.  So, if I could, Your Honor, I'd like

23   to approach with an amended order and a blackline that shows

24   that fix.

25         THE COURT:  All right.  Thank you.

1          (Pause)

2               THE COURT:  And sorry I missed it.  Give me just a

3     moment.

4               MR. ABBOTT:  Sure.

5          (Pause)

6               THE COURT:  All right.  We're good?  I'll sign the

7     order.  Thank you --

8               MR. ABBOTT:  Thank you, Your Honor.

9               THE COURT:  -- for catching that.  Mr. Buechler?

10              MR. BUECHLER:  I was just -- since I did not see the

11    proposed order or have knowledge of what they were handing up,

12    I was asking Mr. Abbott a question to clarify something which

13    he did.  Thank you.

14              THE COURT:  Okay.  Very good.  I signed the order.

15    Thank you.

16              MR. ABBOTT:  Thank you, Your Honor.  Okay.  Back to

17    the headline.  Peace has broken out, Your Honor.  There were

18    three items on the agenda.  They were all contested.  I believe

19    we've resolved all the issues.  It took us a long time, Your

20    Honor, to actually get to the table.  But once we got to the

21    table, we were able to get a resolution.  So, unfortunately,

22    I'm not in a position now to hand up an order.  What I thought

23    I would do, Your Honor, is try to describe as best I can the

24    resolution of various issues, explain them to the Court.

25    Assuming the Court doesn't have a problem, go back and get

TOWNSENDS, INC., et al.

Page 11

1   those baked into an order, circulate it among the parties and

2   then submit it under certificate assuming the Court was viewing

3   the motion favorably.

4           THE COURT:  Okay.

5           MR. ABBOTT:  Your Honor, as I indicated on the -- at

6   the first day hearing on this case, troubled industry and a

7   company that's out of money and, in fact, out of money so that

8   absent a sale or other disposition where there was some

9   assumption of payables, virtually no chance that any pre-

10  petition claims -- unsecured claims are paid.  Unfortunately,

11  that situation has deteriorated pretty dramatically post-

12  petition, Your Honor.  This business relies heavily on corn and

13  other feed ingredients to feed the chickens.  And the budget

14  that we had previously discussed, Your Honor, that went out

15  through March 20th contemplated, at the time of budgeting, what

16  was a reasonable estimate of corn prices at about $5.75 a

17  bushel.

18          Since that time, Your Honor, corn prices have risen

19  dramatically to the point where at some point this week -- I'm

20  not sure what they are today.  They were, I believe, in and

21  around $6.50 which, if I'm not mistaken, is about a fifteen

22  million dollar annual input cost delta.  What that means, Your

23  Honor, is that our budget, because it's limited in total

24  amount, had to shorten up.  We are not going to get to March

25  20th on the funding that we've got.  And we've been discussing

1 that at length over the last days and weeks with the lenders,

2 the committee professionals, et cetera.

3        The committee has done -- started some investigation,

4 has spent a lot of time getting familiar with the company.

5 They raised a number of concerns about the financing as you

6 perhaps saw in their objection.  At the end of the day, we've

7 agreed on a number of changes that have gotten the committee

8 comfortable with us going forward.  It's all predicated, Your

9 Honor, on a DIP budget and, essentially, a sale track that ends

10 basically on February 18th which is soon and sooner than we

11 wanted.

12        There have been a number of concessions by the lenders

13 and changes to the structure.  And we're going to have to also,

14 Your Honor, provide you an updated budget, obviously, that

15 shortens that time period up.  Critical among the changes, and

16 to address the committee's concern that there was inadequate

17 funding for the payment of potential 503(b)(9) claims, Your

18 Honor -- and we've gone as far as we can to address that issue.

19 And notwithstanding that, there still remains some chance that

20 503(b)(9)s will not be paid in full.  But all the adequate

21 protection payments and interest payments that had previously

22 been discussed and were built into the interim order which

23 aggregate in round numbers a million three have now been

24 revised.  And the budget's going to be changed.  And that

25 amount of money is going to be called the working capital

Case 15-10694-BLS   Doc 335   Filed 04/22/15   Page 21 of 41
TOWNSENDS, INC., et al.

Page 13

1    contingency.  It's not going to be paid to the banks until the

2    end of the case.  It is going to be available in a handful of

3    circumstances to cover either working capital shortfalls or

4    unanticipated unpaid post-petition trade payables.  And the

5    lenders have further agreed to either carve out or fund

6    depending on the nature of a sale transaction certain proceeds

7    in the event of a disposition, Your Honor.  And there's a

8    sliding scale there.  But essentially -- there really are two

9    scenarios.  Somebody pays us for assets or the lenders credit

10   bid for assets.  We've tried to account for both those

11   scenarios to the committee's satisfaction.  And in the context

12   of a third party transaction, which would either be a sale

13   under 363 or -- essentially, only a sale under 363 or

14   potentially a liquidation that could include a sale.  But

15   there's more to liquidation than just a 363 sale.

16          But in any event, Your Honor, proceeds derived from

17   either a sale or liquidation in Chapter 11 or Chapter 7, as the

18   case may be, of all or part of the lenders' collateral from the

19   proceeds from zero to fifteen million dollars, the lenders will

20   either carve out or pay if they credit bid -- let me strike

21   that.  I'm going to talk about credit bid later.  They will pay

22   from those proceeds of cash received between zero and fifteen

23   million dollars 500,000 dollars for the benefit of holders of

24   any unpaid 503(b)(9) claims.

25          The next increment, Your Honor, is between fifteen

Page 14

1   million and thirty million.  And if there are proceeds in that

2   range, there's another 250,000 dollars that goes for that same

3   benefit.

4           Between thirty million and thirty-two million, there's

5   another 250,000 dollars for the benefit of the same group.  And

6   then to the extent that there's a sale or the receipt of cash

7   proceeds in excess of thirty-two million, that -- those

8   claimants would receive the first 800,000 dollars.

9           So --

10          THE COURT:  What's your --

11          MR. ABBOTT:  -- the total is a million eight, Your

12  Honor.

13          THE COURT:  What's your estimate of 503(b)(9) claims?

14          MR. ABBOTT:  The best estimate we have today is

15  somewhere in the sixteen million dollar range, Your Honor.

16  Some of those --

17          THE COURT:  And how high do we get?  1.8 million?

18          MR. ABBOTT:  Yes, Your Honor.

19          THE COURT:  All right.

20          MR. ABBOTT:  Some of those 503(b)(9) claims may be the

21  subject of critical vendor payments.  The Court may recall that

22  critical vendor payments we authorized had the dollar for

23  dollar reduced in any 503(b)(9) claim to the extent there was

24  one.

25          That's the proceeds from a sale.  If there's a credit

Case 15-10614-BLS    Doc 335    Filed 02/22/25    Page 23 of 41
TOWNSENDS, INC., et al.

Page 15

1    bid by the lenders for any of these assets, Your Honor, the

2    lenders have simply agreed to pay that 1.8 million provided

3    that if there's a scenario where there's a sale of part and a

4    credit bid for part, they don't double pay.  So they would pay

5    the 1.8 but they would get a credit for any payments under the

6    disposition that I've just discussed.  So if there's a sale of

7    ten million, that creates a 500,000 dollar payment obligation.

8    If there's a credit bid for the rest, they'll pay the 1.8 less

9    the five for a total of 1.8.  So in no circumstance does the

10   number go beyond that 1.8, Your Honor.

11           The working capital contingency item that had

12   previously been the adequate protection payments -- we're going

13   to add some language to the order that essentially says that is

14   reserved and isn't disbursed except for necessary operational

15   expenditures approved by the lenders in advance.  Accrued

16   unpaid post-petition trade payables unpaid as of February 18th

17   as provided in the budget or necessary operational expenditures

18   approved by the lenders to facilitate some later closing beyond

19   February 18th but no later than February 25th as long as the

20   delay is not the fault of a proposed transferee.  Meaning, if a

21   buyer delays, the banks aren't obligated to pay that because

22   the buyer should.

23           In addition, Your Honor, because of the concern -- and

24   a legitimate concern, Your Honor, about the administrative

25   solvency of this case and the concern that post-petition

Case 15-10034-BLS    Doc 335    Filed 02/22/25    Page 24 of 41
TOWNSENDS, INC., et al.

Page 16

1    payables be satisfied, the debtors have agreed that if there is

2    no closing on or before February 25th, which is the extended

3    date, that the debtors would act to convert the case through a

4    case under Chapter 7 under the Bankruptcy Code as soon as

5    practicable.  We are dealing with --

6            THE COURT:  Say that part again, please.

7        (Pause)

8            MR. ABBOTT:  If there's not a closing of the

9    disposition, by February 18th or the extended date of February

10   25th and we're out of money, which is what our budget shows,

11   the debtors don't intend to continue to run the case beyond

12   where they can pay their post-petition payables.  And so

13   they've agreed that if they get to those dates and there's not

14   a closing, they would act to convert the case to Chapter 7 to

15   protect against the accrual of post-petition administrative

16   payables that were not funded.

17       (Pause)

18           MR. ABBOTT:  I'm not sure I rephrased that --

19           THE COURT:  No.  I got it.

20           MR. ABBOTT:  -- adequately.  Okay.

21           The other important aspect of this deal, Your Honor,

22   because this case is, in fact, so thin, obviously, for trade

23   creditors, is that the committee has agreed to allow the bank

24   to take liens on avoidance actions not for the purpose of

25   collecting them or pursuing them, but that the bank would take

Case 25-10094-BLS    Doc 335    Filed 02/22/25    Page 25 of 41
TOWNSENDS, INC., et al.

Page 17

1   those liens and would covenant not to bring those actions

2   against trade payables.  Carved out of that, Your Honor, are

3   any avoidance actions against the banks themselves that are

4   preserved under paragraph 29 and part of the committee clawback

5   period and any avoidance actions as to insiders.  Those liens

6   would attach only to avoidance actions against trade creditors.

7           That, in broad strokes, Your Honor, is the global

8   resolution of the committee's concerns with the funding and the

9   sale process.  Now, as I said, it presupposes a dramatic

10  shortening of the budget and the life of this case, frankly.

11  It also contemplates a sale process that's more accelerated

12  than we had initially anticipated.  And I'm not asking the

13  Court to approve anything now, but we will file, tonight over

14  the weekend, or at the latest, Monday, a motion seeking bid

15  procedures.  It will likely not include a stalking horse, but

16  we'll reserve or ask the Court to allow us to reserve the right

17  to anoint a stalking horse during the process if one should be

18  appropriate, and it contemplates a closing of that sale by

19  February 18th.  And the dates that we will be asking for, Your

20  Honor, just so it's clear and you understand the big picture in

21  the context of this DIP, we would ask to have any bids

22  submitted with all the appropriate financial wherewithal, all

23  the sort of normal materials, by February 11th.  We would

24  propose to have an auction on February 15th.  Your Honor has

25  already scheduled an omnibus hearing on February 18th, and that

Page 18

1    would be the date that we would need to close by.  And so we

2    would presume to either ask the Court to hear that sale

3    approval at the February 18th hearing at 10 a.m., or if it was

4    possible, we'll work with chambers to move that omnibus date

5    one day earlier to the 17th.  We would try to do it then so

6    we've got a little bit more room at the closing.  That's

7    obviously subject to the Court's approval of the bid procedures

8    and calendar.  But that's the -- one of the fundamental

9    assumptions of this resolution, Your Honor.

10            THE COURT:  All right.  Anyone else?

11            MR. BUECHLER:  Your Honor, Bruce Buechler from

12   Lowenstein Sandler on behalf of the official committee of

13   unsecured creditors.  Just briefly, Your Honor, because the

14   resolution would have the committee withdraw the objection to

15   the final DIP.  The committee, just by very brief background,

16   is very concerned and has come to the conclusion that these

17   debtors, as currently constituted financially, and these

18   bankruptcy cases are administratively insolvent.  And we were

19   faced with a very untenable position, given what it looks like

20   the assets will likely be sold for and the amount of secured

21   debt that we are behind in the form of the debt owed to the

22   lenders.  And granted, we are doing our lien review, and

23   nothing in our proposed settlement of the DIP impacts the

24   committee's ability to complete its lien review, and if there

25   is a valid challenge to the lenders, whether with regard to

Case 25-10674-BLS    Doc 335    Filed 02/22/25    Page 27 of 41
TOWNSENDS, INC., et al.

Page 19

1    perfection, validity, or other claims or causes of action, the

2    committee reserves those rights under paragraph 29 of the order

3    to commence such a cause of action before our deadline, which

4    is sometime in the latter part of February, if I recall.

5           But we realized, and we were very concerned as a

6    committee with ensuring that post-petition, trade creditors

7    that are doing business with this debtor may not realize the

8    gravity of this situation, make sure that there's adequate cash

9    to cover them, and the only way that was done was by the

10   debtors shortening the sale process.  And in part, when you

11   push behind their budget, it's done, also in part because they

12   were liquidating some of the inventory that they have on hand

13   to speed up their cash.

14          Number two, we negotiated to the best that we could to

15   get some monies for the 503(b)(9) claimants because in our

16   view, the Bankruptcy Code puts them on the same level.

17   Granted, they're not entitled to, by most courts, payment up

18   front, but rather at a plan, but realistically, we don't

19   envision that once these sales are done, that there's any

20   financial wherewithal or ability, financially, for these

21   companies to then confirm a plan of liquidation.  We

22   unfortunately view it as unsecured creditors we have, beside

23   the 503(b)(9)s, will have no distribution unless, from the sale

24   or the disposition, liquidation of the assets that these

25   debtors operate, unless there are potential litigation claims.

 1    And therefore, the committee was very concerned that unsecured

 2    creditors shouldn't suffer what I'll call a double travesty

 3    which is they don't get paid anything on their unsecured

 4    claims, and then the trustee may get likely appointed in these

 5    cases, unless there's potentially a dismissal, and they face

 6    preference actions which, in our experience from trade creditor

 7    cases, never really results in much of a dividend going back to

 8    the unsecured creditors in cases such as this, nature of this,

 9    especially where many of the larger creditors did business with

10    the debtor on very short terms.

11            So part of the negotiation with regard to the

12    avoidance actions is that there will be part of the bank's

13    lien, but the bank covenants that they will never prosecute or

14    sue, nor will they transfer, sell or assign them to a third

15    party, so in essence, they will not be available.  And

16    preference actions against trade creditors will not be pursued.

17    It does, as Mr. Abbott made clear, carve out that that does not

18    include claims against insiders, as defined in the Code, or the

19    members of the bank group.

20            But we were dealing with a very -- facing a very

21    serious financial reality that while this company may have done

22    a lot of business, the asset value, simply put, isn't there to

23    deal with the 503(b)(9)s to the level that we would have really

24    liked to achieve.  And therefore, we tried to negotiate, under

25    the circumstances, what was the best case and looked at whether

Case 25-14024-BLS    Doc 335    Filed 02/22/25    Page 29 of 41
TOWNSENDS, INC., et al.

Page 21

1    a liquidation or a dismissal would result in a better result

2    for creditors, including the 503(b)(9) claimants, as well as an

3    alternative.  And that is why we have come to this agreement

4    with both the lender group and the debtors.  And while it's

5    clearly a settlement that nobody is happy and in love with, it

6    just deals with very, very bad reality, which, as we comment on

7    the first page of our objection, and Your Honor commented at

8    the initial hearing that nobody was pleased with the DIP, but

9    there's some real issues that we all had to face and grapple

10   with and do the best we could.

11          So that's the rationale of why the committee is not

12   pushing this, because at the end of the day, a dismissal gets

13   nobody anything, nor does a conversion, right away, get

14   unsecured creditors any more money, and it probably will result

15   in a more negative result from the unsecured creditor

16   perspective.

17          With the settlement that we reached concerning the

18   final order and the DIP financing motion, the committee has

19   agreed to withdraw its objection to the rejection of Huron and

20   Mr. Edgecomb as the chief restructuring officer.

21          With regard to the third item on the calendar which is

22   the debtor's motion to extend time to file the statements and

23   schedules, the debtors are still seeking the deadline of

24   February 17th, which is possibly the day of the sale or the day

25   before the sale, depending on the Court's calendar.  The

Page 22

1    committee still thinks that's a little too far out.  Mr. Abbott

2    has assured us that the debtor's personnel and people in his

3    office are working to get those done as soon as possible.  We

4    were hoping that by adjourning that from last week's hearing

5    till today, they might have been done.  He's asked us to

6    withdraw that objection, as well.  Candidly, I'm somewhat

7    ambivalent because we'd like to have them filed sooner than

8    later, but he's assured us that if the committee needs any

9    data, we will get what we need, and to date, the debtor's

10   personnel, as well as the Huron team, have been cooperative

11   with the committee in giving us in a real-time basis the data

12   that we need.  So I'm not going to be pushing that objection

13   before the Court, vis-a-vis the extension of statements and

14   schedules, but the committee is somewhat realistic with the

15   economics of what we're facing.  Clearly not very happy

16   campers, if you will, in this situation, but to use the

17   expression we can't get money where it doesn't exist, and

18   unfortunately, nobody expects, given the difficult time and the

19   amount of time this has been shopped, that at this date, the

20   debtor still does not have a signed asset purchase agreement to

21   go forward with or a letter of intent that's been signed at an

22   economic value that the lenders find acceptable to move

23   forward, so that's all still in a state of play.  And we hope

24   they get there because that's crucial to that.  But that's why,

25   if there's a credit bid ultimately by the banks on the

Page 23

1    collateral, the same million-eight will be available for the

2    503(b)(9) claimants, given their administrative priority status

3    is protected by the Code.

4         Unless Your Honor has any questions of the committee

5    position, that's why we have come to difficult conclusions, and

6    it's been a lot of conversation by the committee including

7    direct conversation between the committee members and the

8    bankers, yesterday, with no professionals on the phone call to

9    discuss these issues.

10        THE COURT:  Okay.

11        MR. BUECHLER:  Thank you.

12        THE COURT:  Thank you, Mr. Buechler.  Anybody else

13   wish to be heard?

14        Let me see if I understand, Mr. Abbott.  Under no

15   scenario will the 503(b)(9) creditors be paid in full?

16        MR. ABBOTT:  Your Honor, technically, it's possible;

17   practically, impossible.  The range of values, given the amount

18   of debt, here, we just don't see a buyer clearing the secured

19   debt.

20        THE COURT:  But other administrative claims will be

21   paid in full?

22        MR. ABBOTT:  Post-petition administrative claims, we

23   expect to be paid in full under this revised budget, Your

24   Honor.

25        THE COURT:  Well, we've got a problem.  Not going to

1    run an administratively insolvent estate.  There are benefits

2    to the current administrative claims that are accruing.  There

3    are benefits to the unsecured creditors.  But it can't be done

4    on the back of the 503(b)(9) admin claims, which are admin

5    claims.  Congress has made that determination.  So certainly I

6    would have a problem running any case that was administratively

7    insolvent.  But one that is both administratively insolvent and

8    prefers one set of administrative creditors over another is

9    doubly troubling.  So that's -- well, I'm not going to do it.

10            MR. ABBOTT:  To clarify --

11            THE COURT:  I'm not making -- I'm not making the --

12    this came up on Goody's, for example, Goody's I, and it turned

13    out we were all wrong.  But the point there was there had to be

14    a set aside to pay these claims in the plan that the evidence

15    indicated was a reasonable estimate that they would get paid.

16    Turns out, it was wrong.  But the point being, I'm not making

17    anyone guarantors or insurers of the fact that the case is

18    administratively solvent.  But to go in with a path forward

19    that indicates -- and I certainly appreciate your candor to the

20    Court -- that a certain type of administrative expense claim

21    won't get paid in full but yet others will, I just -- I can't

22    run that kind of case.

23            MR. ABBOTT:  I understand that, Your Honor.  Could I

24    ask the -- well, is it --

25            THE COURT:  Need help?  Go ahead.

Case 15-14071-BLS   Doc 335   Filed 02/22/25   Page 25 of 31
TOWNSENDS, INC., et al.

Page 25

1          MR. ABBOTT:  -- fair to say, Your Honor, that that is

2     a denial, perhaps, without prejudice to our financing motion?

3          THE COURT:  Well, it's hard for me to say.  I haven't

4     seen it.  I haven't seen the final order.  But if the final

5     order indicates that that's what's going to be in it, I'm not

6     going to approve it.

7          MR. ABBOTT:  Understand, Your Honor.

8          THE COURT:  And in addition, if it appears that the

9     case is administratively insolvent, I would be inclined to

10    either, upon motion or even sua sponte, either convert or

11    dismiss the case.  Mr. Buechler?

12         MR. BUECHLER:  Maybe the parties need to talk, Your

13    Honor, and maybe we need to adjourn this to the beginning of

14    next week to do that.  The only point I will make is if we get

15    to that point where Your Honor is faced with conversion or

16    dismissal, the committee has set forth in the objection that we

17    did file regarding the DIP financing, made very clear what our

18    preference was and why.  And so we would ask the Court to -- if

19    we get to that point, understanding Your Honor's position, and

20    we appreciate that, and that's part of what we said in our

21    objection, but we had to deal with reality, too, and tried

22    to -- would clearly support dismissal as being in the best

23    interest of the unsecured creditors in the estates for the

24    reasons I stated before as well as in our response, or

25    objection, if Your Honor gets to that fork in the road.  But I

```
 1    think given what Your Honor has said, maybe it makes sense to

 2    see -- either talk for a few minutes or possibly adjourn this

 3    to the beginning of next week to let the lenders reconsider

 4    whether they're going to make a shift in position because the

 5    numbers, and the budget numbers and the 503(b)(9) numbers,

 6    simply put, don't change.

 7             THE COURT:  Yeah, I --

 8             MR. BUECHLER:  There's a cash burden.

 9             THE COURT:  I can't ask anyone to change reality, and

10    it is what it is.  Not all cases are appropriate to be handled

11    in Chapter 11.

12             MR. ABBOTT:  Understood, Your Honor.

13             Your Honor, I think my preference would be to ask the

14    Court to adjourn at least that motion until sometime next week,

15    early next week, if Your Honor has time.

16             THE COURT:  Certainly.  I'll make time.  No, it's

17    important that this issue get taken care of sooner rather than

18    later in any event because as the business continues,

19    administrative expenses continue to accrue.

20             MR. BUECHLER:  That's been one of our driving

21    concerns.  So it's really a matter of Your Honor's

22    availability.  I don't know if Diane has any idea of when

23    you'll have response from your clients, in part.

24             MR. ABBOTT:  May we have a moment, Your Honor?

25             THE COURT:  Of course.  Having said all that,
```

Page 27

```
 1    Wednesday is difficult for next week.

 2              MR. BUECHLER:  Excuse me?

 3              MR. ABBOTT:  I'm sorry, Your Honor?

 4              THE COURT:  Having said all that, Wednesday would be

 5    difficult for me next week.  Otherwise --

 6              MR. ABBOTT:  Your Honor, as you said, this is an

 7    urgent issue that needs to be dealt with.  We'd prefer Monday

 8    afternoon, if the Court's got any time.

 9              THE COURT:  Absolutely.  Let's see.  I can do -- hang

10    on, I'm getting a message here.  Not good.  Joint hearing with

11    Canada.  Yeah, I've got a joint video hearing with the Canadian

12    court in Pope & Talbot at 1.  Let me put you on for 3, but

13    don't be surprised if --

14              MR. ABBOTT:  I've never seen a joint video hearing

15    with a Canadian court go short, Your Honor.

16              THE COURT:  Yeah, no, no, there's too much formality

17    involved.

18              MR. BUECHLER:  Is 3:30 better?

19              THE COURT:  I'm sorry?

20              MR. BUECHLER:  Pushing it back another half hour,

21    would that --

22              THE COURT:  Well, I -- in case -- I don't want you to

23    waste your time cooling your heels out in the hallway, but I

24    don't want to waste a lot of time if the hearing's over early.

25    So 3:30's fine.
```

 1            MR. BUECHLER:  Can I ask one favor of the Court?

 2            THE COURT:  Yes.

 3            MR. BUECHLER:  While I'll send someone from my office

 4   to the hearing because I'm actually leaving on Sunday for

 5   vacation, would I be permitted to participate by telephone --

 6            THE COURT:  Yes.

 7            MR. BUECHLER:  -- if it works out?  Thank you, Your

 8   Honor.

 9            THE COURT:  Yes.  So 3 or 3:30, which do you prefer?

10            MR. ABBOTT:  3:30's fine, Your Honor.

11            THE COURT:  All right.

12            MR. ABBOTT:  If that is easier.

13            THE COURT:  3:30 p.m. Monday.

14            MR. ABBOTT:  May I have one other moment, Your Honor?

15            THE COURT:  Um-hmm.

16            MR. ABBOTT:  All right, Your Honor --

17            MR. BUECHLER:  Your Honor, in light of what Your Honor

18   has said, the committee will stick with its position that we

19   don't have an issue with our objection with regard to the Huron

20   retention.  So unless Your Honor has any questions, we don't

21   have an issue.

22            With regard to the DIP financing, if Your Honor has

23   not approved of the settlement at this moment, our objection

24   remains there and we'll see where things go on Monday

25   afternoon.

Case 25-14094-BLS    Doc 335    Filed 02/22/25    Page 29 of 31
TOWNSENDS, INC., et al.

Page 29

1          As to the statements and schedules issue, we leave

2    that to the Court's discretion and determination, from my

3    perspective.

4          THE COURT:  All right, well, I'll approve the Huron

5    retention and the extension of time to file schedules.

6          MR. ABBOTT:  Thank you, Your Honor.  With respect to

7    Huron --

8          Just a second, Your Honor, if we may.

9        (Pause)

10          MR. ABBOTT:  Your Honor, at the request of the U.S.

11    Trustee, we have revised the Huron retention order to make it

12    consistent with their preferred form of Jay Alix retention.

13          THE COURT:  Okay.

14          MR. ABBOTT:  And if I may approach, Your Honor, I

15    would hand up a clean and blackline of that order and a clean

16    and blackline of the schedules and statements, Your Honor.

17    Because of the dispute, Your Honor, we've left the date blank

18    in the schedules and statements.  Our request still would be

19    for February 17th, but you'll see that blank that the Court can

20    fill in.

21          THE COURT:  Well, I mean, I don't know how you sell

22    something if you don't know what you're selling, but I assume

23    Mr. Victor's more than capable of selling ice to Eskimos, so.

24          MR. ABBOTT:  I've heard that phrase used --

25          THE COURT:  It won't be a problem.

TOWNSENDS, INC., et al.

Page 30

1          MR. ABBOTT:  -- before with reference to Mr. Victor,

2    Your Honor.  May I approach?

3          THE COURT:  Yes.  Any other comments on these orders?

4    All right.  I've signed Huron.  What day are you looking for?

5          MR. ABBOTT:  February 17th, Your Honor.

6          THE COURT:  And how many extra days is that?

7          MR. ABBOTT:  I believe that would be sixty from the

8    petition, so it's thirty beyond what the local rule provides.

9          THE COURT:  Okay.  All right, I've signed it.

10          MR. ABBOTT:  Thank you, Your Honor.  We will see Your

11    Honor, then, at 3:30 on Monday afternoon.

12          THE COURT:  Very good.  Anything else?

13          MR. BUECHLER:  Thank you, Your Honor.

14          MR. ABBOTT:  Thank you, Your Honor.

15          THE COURT:  Very well.  All right, we're adjourned.

16          (Whereupon these proceedings were concluded at 1:44 p.m.)

17

18

19

20

21

22

23

24

25

Page 31

1

2                         R U L I N G S

3    DESCRIPTION                                    PAGE      LINE

4    Debtors' first day utilities motion revised      10        14

5    and entered

6    Huron retention application approved             29         4

7    Debtors' motion for extension of time to file    29         4

8    schedules and SOFAs approved

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 32

1

2                  C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    **Lisa Bar-Leib**    Digitally signed by Lisa Bar-Leib
                           DN: cn=Lisa Bar-Leib, o, ou,
                           email=digital1@veritext.com,
                           c=US
8    _____    Date: 2011.02.22 15:56:20 -05'00'

9    LISA BAR-LEIB (CET**D-486)

10   AAERT Certified Electronic Transcriber

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: February 22, 2011

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I, Linda Casey, hereby attest that on April 29, 2025, I caused to be served a copy of this

*United States Trustee's Objection to Debtors' Motion for Entry of Interim and Final Orders (I)*

*Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II)*

*Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III)*

*Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying the Automatic Stay, (V)*

*Scheduling a Final Hearing and (VI) Granting Related Relief* by electronic service on the

registered parties via the Court's CM/ECF system and upon the following parties by electronic

mail:

Morris, Nichols, Arsht & Tunnell LLP
1201 Market Street, 16th Floor
Wilmington, Delaware 19801
Attn: Robert J. Dehney, Sr., Esq.
(rdehney@morrisnichols.com)
Matthew O. Talmo, Esq.
(mtalmo@morrisnichols.com
Scott D. Jones, Esq.
(sjones@morrisnichols.com)

Goldberg Kohn
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
Attn: Randall L. Klein, Esq.
(randall.klein@goldbergkohn.com)
Prisca Kim, Esq.
(Prisca.kim@goldbergkohn.com)
Eva D. Gadzheva, Esq.
(eva.gadzheva@goldbergkohn.com)

Richards, Layton and Finger, P.A.
920 N. King St.
Wilmington, Delaware 19801
Attn: John H. Knight, Esq. (knight@rlf.com)
Paul N. Heath, Esq. (heath@rlf.com)

Gellert Seitz Busenkell & Brown, LLC
1201 North Orange Street, Suite 300
Wilmington, DE 19801
Attn: Michael Busenkell, Esq.
(mbusenkell@gsbblaw.com)
Michael Van Gorder, Esq.
(mvangorder@gsbblaw.com)

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attn: Andrew D. Behlmann, Esq.
(abehlmann@lowenstein.com)
Colleen M. Restel, Esq.
(crestel@lowenstein.com)

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, NY 10020
Attn: Bruce S. Nathan, Esq.
(bnathan@lowenstein.com)
Lindsay H. Sklar, Esq.
(lsklar@lowenstein.com)