**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ROYAL INTERCO, LLC, *et al.*,[1] | ) | Case No. 25-10674 (TMH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 16, 104, 105** |
| | ) | |

**RESPONSE OF NXT CAPITAL, LLC, AS PREPETITION AGENT AND
POSTPETITION AGENT, TO OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS AND OBJECTION OF THE UNITED STATES TRUSTEE
TO THE DEBTORS' DIP FINANCING MOTION**

NXT Capital, LLC, as Prepetition Agent and Postpetition Agent,[2] responds to the

objection of the Official Committee of Unsecured Creditors (the "Committee") ([D.I. 104], the

"Committee Objection") and the objection of the United States Trustee ("UST") ([D.I. 105], the

"UST Objection," and together with the Committee Objection, collectively, the "Objection") to

the DIP Financing Motion, and states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors, consistent with their fiduciary duties, commenced these cases to

consummate a going concern sale to the highest bidder, with a stalking horse bid serving as a floor

and with significant, ongoing interest from third parties.  A going concern sale will maximize value

for the benefit of not just secured creditors, but also employees, contract parties, vendors and

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899). The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

[2]  Capitalized terms used but not defined herein shall have the meanings given in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing And (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* ([D.I. 16], the "DIP Financing Motion").

customers. But the Debtors need incremental funding to consummate that sale and the DIP Financing Motion should be considered in that context. It may turn out that the Prepetition Agent and Prepetition Lenders, who are also the parties providing the incremental capital, will see little to no recovery on these incremental dollars that benefit other constituents. The objecting parties have trained their objections on a subset of other parties as a basis to deny the critical DIP funding and the use of cash collateral.

2.      The Debtors' independent board and financial advisor determined that the Debtors could not commence these chapter 11 cases and fund a sale process unless the Prepetition Agent and the Prepetition Lenders committed to the use of cash collateral, provided postpetition financing, and agreed to the Carveout for the benefit of estate professionals. In that regard, the Debtors conducted extensive arms'-length and good faith negotiations with the Prepetition Agent and Prepetition Lenders, as a result of which the Prepetition Agent and Prepetition Lenders agreed to consent to the use and diminution of millions of dollars of Cash Collateral, to provide the Carveout, and to provide an incremental $10 million of postpetition financing.

3.      The Committee would prefer that the proceeds of the DIP Facility and Agents' Cash Collateral be used without the protections of the Final Order and that the Agents subordinate their liens to the payment of estate professionals. In the Committee's view, the unsecured creditors should get a free ride pending the outcome of the auction, and the Postpetition Lenders should be denied the standard protections of the Final Order without regard to the critical funding provided by them. In this Response, the Postpetition Lenders start with the premise that any incremental financing and use of cash collateral resulting in diminution would result in senior administrative priority claims under section 364 of the Bankruptcy Code and administrative claims under section 507(b) of the Bankruptcy Code with priority over all other administrative creditors. The

2

Committee and UST seek to disrupt this priority scheme and elevate certain other claims (professional fees, 503(b)(9) claims, self-insurance claims and others) above the priority scheme of the Bankruptcy Code. Those objections should be denied, the DIP Financing Motion should be granted, and the sale process should be allowed to proceed to maximize value, with the sale proceeds then allocated in accordance with the priorities of the Bankruptcy Code.

4.      It used to be the case that parties in the position of the Committee and the UST would object to DIP financing used to run a sale process on the grounds that "there must be something in it for general unsecured creditors." Of course, that was not the law and eventually in *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017), the Supreme Court erased the leverage of a committee to demand a "tip" from a chapter 11, value-maximizing transaction. Now, the cries have shifted to protecting against "administrative insolvency"—but the same question should be asked whether the Bankruptcy Code requires something in addition to preserving the priority scheme of 364, then 507(b), then 503, and ultimately general unsecured claims. It does not. *In re Boomerang Tube, LLC*, Case No. 15-11247 (MFW) (Bankr. D. Del. July 17, 2015) [D.I. 276], Hr'g. Tr. 105:21-06:6 ("There is nothing that requires a buyer to pay anything to the unsecured if it feels that the enterprise does not have that value."); *In re Nova Wildcat Shur-line Holdings, Inc., et al*, Case No. 23- 10114 (CTG) (Bankr. D. Del. Mar. 2, 2023) [D.I. 212], Hr'g. Tr. 87:6-21 ("[W]e take the pre-petition capital structure as we find it. What we do care about is are we maximizing value and if the bankruptcy process is being used for the purpose of maximizing value, then that value falls the way it falls and there's nothing wrong with doing that.").

5.      General unsecured creditors, who likely will include the Prepetition Lenders as the largest unsecured claimholders, are only entitled to the remainder after the collateral value is maximized. There is no right to fence off estate assets from the reach of the Postpetition Lenders,

no right to compel Prepetition Lenders to pay a "carve-out" to committees who provide no value to the Prepetition Lenders, and no right to alter the priorities of the Bankruptcy Code.

6.      Without a consensual deal, the Debtors will need to resort to an expensive cash collateral fight, a §506(c) surcharge hearing, and an emergency hearing to approve more expensive DIP financing, while postpetition trade and other creditors will lack assurance of payment for their goods and services. With a consensual DIP Facility and consensual use of cash collateral, the Debtors can maximize the value of the estates and protect not only the senior secured parties' interests, but also provide value for post-petition creditors and constituents like employees who will benefit from preservation of the Debtors as going concerns.  Based on the Budget and the Postpetition Lenders' agreement to fund Budgeted expenses from the sale proceeds, the estate will actually be *better off* than on the filing date: assets will be worth more and the sale proceeds will be distributed in accordance with the priorities of the Bankruptcy Code. Perhaps one particular type of administrative claims, 503(b)(9) claims resulting from *prepetition claims,* will retain their place in line above priority claims and general unsecured claims. But until the 364 claims and 507(b) claims of the Postpetition Lenders and Prepetition Lenders are satisfied, there is no basis in the Bankruptcy Code to surcharge secured creditors for 503((b)(9) claims.

7.      Finally, the terms of the DIP Financing would need to be substantially modified if the requested relief is not granted.  Most notably, the consensual "Carveout" is in exchange for the various Bankruptcy Code §§ 506(c) and 552(b) waivers and the marshalling waiver.  Without these waivers, the Committee professionals will have no greater rights than as contemplated by the Bankruptcy Code – if there are unencumbered assets they will have the right to seek allowance of

their reasonable fees. If all of the assets are encumbered, then the only recourse is through surcharge, and the Committee well knows that they could not satisfy the requirements of 506(c).

8.      At this stage of the case (where there are no allowed, unpaid administrative claims), the bulk of the issues raised by the Committee and UST are premature.  The Debtors need the funds to run the sale process.  Then, if there are actual, asserted and allowable administrative claims at the time of the sale hearing, the Court can consider those claims at that time.  As noted below, substantially all of the 503(b)(9) claimants were the transferees of substantially more in payments during the 90 days preceding these Cases.  It remains to be seen whether there will in fact be any allowable 503(b)(9) claims and, in light of the preference exposure to those claimants, whether they will seek to settle their claims. We further expect to hear from the Committee that they will want a purchaser to buy and "bury" those preference claims – yet another distortion of the priority scheme of the Bankruptcy Code when other unsecured creditors may benefit from those recoveries.

## **RESPONSE**

**I.  The terms of the DIP Financing Motion have been negotiated at arms'-length and in good faith, and the Court should not supplant the Debtors' business judgment.**

9.      Although the Committee and the UST complain about the terms of the DIP Facility, including the Budget and scope of the protections granted to the Prepetition Agent and Prepetition Lenders as consented to by the Debtors, the only evidence demonstrates that such terms and protections have been proposed in good faith and are typical of the provisions required by lenders in exchange for new money and diminution of cash collateral. The Debtors made a business decision to make certain concessions in view of the overall benefits to the Debtors' estates and creditors.  The determination for the Court is whether the terms are an appropriate exercise of the

5

Debtors' business judgment. *In re Amerifirst Fin., Inc.*, Case No. 23-11240 (THM) (Bankr. D. Del. Dec. 19, 2023) [D.I. 564], Hr'g. Tr. 6:17-20 (finding that "the final DIP represents an appropriate exercise of the debtors' business judgment under Sections 363 and 364. That business judgment should not be supplanted by this Court.") *see also In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004) ("Determining whether proceeding with a financing which is subject to conditions makes sense is likewise a classic business decision. No one could, or does, argue otherwise."). Courts consistently refuse "to substitute the judgment of the objecting creditors over the business judgment of [a] [d]ebtor[]." *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 140 (Bankr. D. Del. 2010).

10.     To induce the Prepetition Agent and Prepetition Lenders to support the Debtors' sale process, the parties conducted extensive negotiations over the terms of the proposed DIP Facility and use of Cash Collateral, including the Budget and the Carveout for professionals on the one hand, and protections for the Prepetition Agent and Prepetition Lenders provided on the other hand. Accordingly, the Committee's preferred business terms cannot override the Debtors' business judgment.

11.     Here, the Debtors selected the best proposal before them. *See Declaration of Michael Ragano in Support of First Day Relief* [D.I. 3] (the "Ragano Declaration"), at ¶ 34. Allowing the Committee and UST to second guess the Debtors would contradict the business judgment rule. *See*, *e.g.*, *In re The Wet Seal Inc.*, No. 15-10081, D.I. 335, p. 52 (Bankr. D. Del. February 5, 2015) (finding, over objection, that the debtor "acted in accordance with reasonable business judgment in deciding how to proceed . . . . Either of the [possible outcomes of the

6

competing DIP proposals] might or might not be correct, but they are the judgment of the board. . . .").

12.     The DIP Facility offered by the Prepetition Agent and the Prepetition Lenders helps preserve enterprise value of the Debtors. The Prepetition Lenders continued to finance the Debtors during a lengthy and uncertain marketing process pre-filing, and agreed to finance the DIP Facility so the Debtors could successfully complete the sale process post-filing, as

> the liquidity made available under the DIP Facility, coupled with the Debtors' access to cash collateral, signals to the Debtors' vendors, suppliers, customers, and employees that the Debtors have the liquidity necessary to continue operating while they complete a successful going concern sale of their assets. Without the DIP Facility, . . . the value of the Debtors' business and assets would quickly deteriorate, materially and irreparably harming the Debtors' estates.

The Ragano Declaration, at ¶ 35.

13.     Neither the Committee nor the UST have asked the Court to deny the DIP Facility altogether, nor have they offered alternative arrangements. They provide no explanation of how, upon the default resulting from the failure of a final order to be entered, these chapter 11 cases would even survive.  Cases should not be converted to chapter 7, to be worse for other creditors, when the debtor has an opportunity to maximize value in furtherance of its fiduciary duties.  The Postpetition Lenders here have in fact agreed to "pay the freight" of the actual, reasonable and necessary administrative expenses being incurred in furtherance of the sale process as more fully set forth in the Budget and the proposed financing order.

**II. The DIP budget sufficiently covers administrative expense claims through a sale and the Postpetition Lenders are not legally required to guaranty 503(b)(9) claims or a wind-down budget as a condition to a DIP financing.**

14.     The Committee demands administrative solvency and further demands that the secured creditor fund "a liquidating trust or reserve in an amount sufficient to cover all anticipated

7

wind-down expenses . . . ." Committee Objection, at ¶¶ 28, 30. The Committee conveniently ignores the 364 claims and 507(b) claims of the Postpetition Lenders and Prepetition Lenders. Similarly, the UST is asking that the Postpetition Lenders agree to fund "all administrative expenses, including all pre-sale claims of employees under the self-funded health insurance plans, all pre-sale administrative expenses that remain unpaid as of the closing, and a reasonable budget for post-sale administrative expense claims." UST Objection, at ¶14. The UST also demands that the Postpetition Lenders provide a wind-down budget. *Id.* ¶ 16. In particular, each party expects the Postpetition Lenders to expressly guarantee payment of 503(b)(9) claims.

15.    Section 364 of the Bankruptcy Code is designed to encourage commercial lenders to provide financing to chapter 11 debtors. Congress established Section 364 without any exceptions in favor of any other administrative expenses. The Objection seeks to disrupt this priority scheme and elevate a specific class of administrative claims by requiring Section 364 lenders to become sureties for the payment of junior priority claims. Section 364 lenders should not be compelled to underwrite administrative expenses. To the contrary, the nature of Section 364 financing enables the ongoing payment of various administrative claims, including employee wages and benefits, that may not otherwise be paid but for the provision of such financing.

16.    Congress contemplated that accrued, unpaid administrative claims must be dealt with in the case of a successful chapter 11 case under Section 1129(a)(9) of the Bankruptcy Code or an unsuccessful chapter 11 case under Section 726(b) of the Bankruptcy Code. Neither section trumps the priorities provided by Section 364. "Carve-outs" are voluntary exceptions to these rules. *See In re Molycorp, Inc.*, 562 B.R. 67, 76 (Bankr. D. Del. 2017) ("'a secured creditor may, without doing violence to the letter or spirit of the Bankruptcy Code, selectively waive its liens and super-priority claims to permit payment of certain administrative expenses but not others.'") (quoting *In*

8

*re Am. Res. Mgmt. Corp.*, 51 B.R. 713, 722 (Bankr. D. Utah 1985)); *see also In re Hotel Syracuse, Inc.*, 275 B.R. 679 (Bankr. N.D. N.Y. 2002).

17.    In between Sections 1129(a)(9) and 726(b) lies the Section 363 sale. As the Committee and the UST are aware, this Court and other Courts in this District have not required guarantees of payment of all other administrative claims as a condition of approving DIP financing. To be sure, some Courts in this District have reserved judgment with respect to the prospect of unpaid administrative claims at the time of a sale hearing, but they have not compelled debtors or secured creditors, at the outset of the case, to guarantee a solution for potential section 503(b)(9) claimants. *See In re Allen Family Foods, Inc.*, No. 11-11764 (KJC) (Bankr. D. Del. July 27, 2011), at p. 44, hearing transcript excerpt attached hereto as <u>Exhibit A</u> (approving sale of assets notwithstanding "the fact that all 503(b)(9) expenses are not covered" because "there is no other better course that's available to the Debtor and to other constituents");  *In re Central Grocers, Inc.*, Case No. 17-10993 (LSS) (Bankr. D. Del. 2017) June 2, 2017 Hr'g Tr., at p. 90 ("I do think that the sale process is the best way to maximize recoveries in this case, and therefore the best way to maximize the possibility that 503(b)(9) claims will, in fact, be paid . . . [I]t's clear that the lender is not the guarantor of a case, and is not the guarantor that administrative creditors will be paid."), the relevant portion is attached hereto as <u>Exhibit B</u>; *see also In re ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.)*, No. 14-12092 (KJC) (Bankr. D. Del. Oct. 6, 2014) (overruling 503(b)(9) claimants' objection to entry of a final DIP order that did not provide for payment of 503(b)(9) claims without prejudice to the claimants' right to raise payment of 503(b)(9) claims at the appropriate time by motion); *see also In re DVI, Inc.*, 308 B.R. 703, 708 (Bankr. D. Del. 2004) (denying request for immediate payment of administrative expense claim and observing that, "[u]nlike section 365(d)(3) which requires immediate payment, an administrative claim under

9

section 503(b) need not be paid immediately but can be paid as late as the confirmation date."); *In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *12-13 (Bankr. D. Del. Dec. 21, 2006) (denying motion seeking immediate payment of 503(b)(9) claim where, *inter alia*, immediately paying all administrative claims would jeopardize the debtors' ongoing chapter 11 efforts).

18.     The timing of the payment of an administrative expense claim is within the Court's discretion. *In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005); *In re Global Home Products, LLC*, 2006 WL 3791955, at *3. Nothing in section 503(b)(9), or elsewhere in the Bankruptcy Code, explicitly authorizes the immediate payment of an administrative claim arising under section 503(b)(9). *In re Arts Dairy, LLC*, 414 B.R. 219, 221 (Bankr. N.D. Ohio 2009).

19.     Moreover, the Committee and the UST overlook the fact that 503(b)(9) claims, unlike most of the other administrative claims, relate to prepetition debt rather than postpetition debt. In fact, some courts have treated 503(b)(9) claims differently from other administrative claims in certain contexts because the debts arose prepetition. *See Brown & Cole Stores, LLC v. Associated Grocers, Inc. (In re Brown & Cole Stores, LLC)*, 375 B.R. 873, 879 (B.A.P. 9th Cir. 2007) (holding that, unlike other administrative claims, 503(b)(9) claims are subject to setoff pursuant to section 553(a) because they apply to prepetition debt). Perhaps most importantly, in these cases, it appears that each of the possible 503(b)(9) claimants received substantial preferential transfers in amounts that substantially exceed the 503(b)(9) claims. Those claimants may very well decide to seek to settle their preference exposure in lieu of asserting 503(b)(9) claims, they may not assert their claims at all, or they may have their claims assumed by a purchaser. The issue need not and should not be addressed at this time. Indeed, preserving these issues maximizes the value of these estates for all creditors, rather than preferring a small subset.

10

20.     The UST further requests that in addition to 503(b)(9) claims, the Postpetition Lenders guarantee the payment of employees' claims under the Debtors' self-funded health insurance plans. UST Objection, at ¶ 16. In the context of the DIP Financing Motion, the question should be limited to whether the Debtors have made adequate provision in the Budget for the ongoing payment of *post-petition, administrative* self-insurance claims of current employees, reasonably anticipated to be incurred during these chapter 11 cases by employees who are working for the Debtors pending the sale process. *See In re Constellation Enters. LLC*, No. 16-11213-CSS (Bankr. D. Del. July 22, 2016) Hr'g Tr. pp. 25-28, the relevant portion is attached hereto as Exhibit C (rejecting the notion that the DIP lenders "should in some way be a surety for [employee self-insured] claims," and requiring only that the debtors provide "a budget that covers the probable administrative expenses of the estate"). The Postpetition Agent expects that the Debtors will confirm that they have sufficiently budgeted for any such claims and the Prepetition Lenders and Postpetition Lenders have agreed to provide funds in accordance with that budget.

21.     Additionally, the proposed DIP budget provides for the payment of all other known, accruing unpaid administrative expenses incurred after the Filing Date through the DIP Facility termination date. The DIP budget does not guarantee a tip to unsecured creditors and does not provide for legal and financial advisors for the Committee beyond the reasonable amount set forth in the Carveout. The Debtors do not have any unencumbered funds to pay 503(b)(9) claims (who are in the same position as they would be in a chapter 7, behind the secured claimants). Accordingly, the Committee's and the UST's objections that the Postpetition Lenders should be sureties of the estate should be denied.

11

**III.     The adequate protection provided to the Prepetition Agent and the Prepetition Lenders is appropriate under the circumstances.**

22.     A secured creditor, irrespective of whether it is undersecured, is entitled to adequate protection. More specifically, section 361 of the Bankruptcy Code provides that when adequate protection is required under section 363 or 364, it may be provided by "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(2). Contrary to the Committee's claim, the adequate protection granted to the Prepetition Lenders in the Interim Order and the proposed Final Order is limited by operation of section 361 as stated in Paragraph 4 of such order.

23.     The Prepetition Agent and Prepetition Lenders also conditioned their consent upon the receipt of standard and customary adequate protection rights—including to the extent of any diminution in the value of their collateral, postpetition replacement liens on and security interests in the Postpetition Collateral.[3] The adequate protection package proposed by the Debtors in the exercise of their sound business judgment is the product of arm's length, good faith negotiation. As such, the proposed adequate protection package represents a reasonable, negotiated agreement among the Debtors and their stakeholders and is customary and consistent with the adequate protection routinely required by prepetition lenders and approved by courts. Moreover, the approval of the Prepetition Agent and Prepetition Lenders' adequate protection at this time does

---

[3] The below Section IV addresses the Committee's objection with respect to the granting of adequate protection on unencumbered assets. In fact, at this time, there are no unencumbered assets to provide adequate protection to the extent required by the Code.

12

not prejudice the rights of unsecured creditors. Nothing in the proposed Final Order precludes challenging the Prepetition Agent and Prepetition Lenders' liens or claims.

**IV. Unencumbered assets, including avoidance actions, commercial tort claims, and other unencumbered assets and proceeds belong to the estate and not unsecured creditors and may be used as collateral to secure new financing and for adequate protection**.

24.     Granting liens on unencumbered assets, including avoidance actions, commercial tort claims, proceeds of insurance, and other unencumbered assets is not novel. The Bankruptcy Code empowers debtors to encumber estate property such as avoidance actions, commercial tort claims, and insurance proceeds in order to obtain post-petition financing. Section 550 of the Bankruptcy Code provides that the debtor-in-possession may recover property in connection with avoided transfers "for the benefit of the estate." 11 U.S.C. § 550. Section 364 of the Bankruptcy Code, in turn, allows a debtor in possession to encumber "property of the estate" in order to obtain post-petition financing that meets the requirements set forth therein. *See* 11 U.S.C. §§ 364(c)(2), (3) and (d)(1). Thus, on its face, the Bankruptcy Code empowers a chapter 11 debtor to encumber estate property in the form of avoidance actions and other unencumbered assets and the proceeds thereof in connection with court-approved post-petition financings. In the case of adequate protection liens, section 361(2) expressly contemplates the imposition of "additional liens" as a form of adequate protection to the extent of any diminution in value.

25.     The United States Supreme Court has rejected the central thesis of the Committee's objection. The Committee cannot circumvent the priorities established under the Bankruptcy Code by reserving unencumbered assets for unsecured creditors. *See Jevic Holding Corp.*, 580 U.S. at 470-71 (emphasizing the importance of the Bankruptcy Code's priority system and refusing to "alter the balance struck by the statute") (citation omitted); *Norwest Bank Worthington v.*

13

*Ahlers*, 485 U.S. 197, 207 (1988) (explaining that courts cannot deviate from procedures "specified by the Code," even when they sincerely "believ[e] that... creditors would be better off"); *see also In re The Krystal Co.*, Case No. 20-61065 (Bankr. N.D. Ga. Nov. 13, 2020) [D.I. 625], at p. 8 ("[W]hen a creditor … has a claim on all of a debtor's assets for an amount that is substantially in excess of the realizable value of the assets, payment of other debts is not possible under any set of circumstances when no other sources of payment exist.  In this case, the process worked for some parties, such as employees and landlords. The result for others, like the objectors, was a disaster.  The point is that the disaster resulted from financial circumstances, not the operation of the bankruptcy laws."); *In re Timber Pharm., Inc*., Case No. 23-11878 (JKS) (Bankr. D. Del. Dec. 15, 2023) [D.I. 125], at ⁋ 5 (the DIP lender is granted superpriority claims and liens on DIP collateral, including but not limited to commercial tort claims); *In re Yellow Corp*., Case No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) [D.I. 571], at ⁋⁋ 7-8 (the DIP lender is granted superpriority claims and liens on unencumbered properties that included all tangible and intangible prepetition and postpetition property of the DIP loan parties); *In re Western Global Airlines, Inc*., No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) [D.I. 236], at ⁋ 9 (DIP secured parties are granted superpriority claims and liens on all unencumbered assets)*; In re Southcross Energy Partners*, Case No. 19-10702 (MFW) (Bankr. D. Del. May 7, 2019) [D.I. 200], at ⁋ 8 (DIP lender is granted superpriority claims and liens on unencumbered properties, including but not limited to commercial tort claims); *In re Tonopah Solar Energy, LLC*, Case No. 20-11884 (KBO) (Bankr. D. Del. Aug. 24, 2020) [D.I. 130], Hr'g Tr. at pp. 20-21 ("So I also agree with the debtors that, you know, adequate protection liens and superpriority claims in this case are limited to diminution of property and that replacement liens on unencumbered property, including avoidance action proceeds, is expressly contemplated by the Code.  And I would go as far as to say that I do

14

not believe that those proceeds are necessarily limited to the unsecured creditor body. I think there's significant case law that suggests otherwise.").

26.    Accordingly, the Objections to the scope of the DIP liens should be overruled.

**V.    The Debtors have the right to waive Bankruptcy Code §§ 506(c) and 552(b), and the marshaling provisions as a material inducement to obtain professional fee Carveouts, avoid cash collateral disputes, and incur additional commitments under the DIP Facility.**

27.    The Committee's and UST's objections to the §§ 506(c) and 552(b) waivers are misplaced. Such waivers are routinely granted as a *quid pro quo* where, as here, the Prepetition Agent and Prepetition Lenders with blanket liens on substantially all of the Debtors' assets have (a) agreed to provide new money and consented to the use of collateral in order to fund administration of the case through an approved budget and (b) agreed to subordinate their liens and claims to the payment of the Carveout. *See, e.g.*, *In re VJGJ, Inc.*, Case No. 21-11332 (BLS) (Bankr. D. Del. 2021 Nov. 15, 2021) [D.I. 174]; *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr. D. Del. May 6, 2020) [D.I. 286]; *In re True Religion Apparel, Inc.*, Case No. 20-1510941 (CSS) (Bankr. D. Del. May 29, 2020) [D.I. 278]; *In re HDR Holdings, Inc*., Case No. 19-11396 (MFW) (Bankr. D. Del. Aug. 7, 2019) [D.I. 164].

28.    The Committee and the UST fail to acknowledge that the Postpetition Lenders are funding postpetition expenses on a current basis pursuant to the Budget, funding a professional fee Carveout, which includes a reasonable carve-out for the Committee's professional fees, and funding all fees and expenses required to be paid to the Clerk of the Court and to the Office of the UST pursuant to 28 U.S.C. §§ 156(c) and 1930(a)(6). As a result, the Postpetition Lenders should not also be subject to surcharge under section 506(c). Indeed, it is standard to permit a debtor to grant a waiver of rights under section 506(c), particularly in situations where, as here, the

Postpetition Lenders are funding the Debtors' anticipated postpetition expenses and professional fees and the Debtors' negotiation of a consensual cash collateral order and DIP financing order enables the Debtors to avoid expensive and disruptive litigation.  *See*, *e.g.*, *In re The Hertz Corp.*, Case No. 20-11218 (MFW) (Bankr. D. Del. Oct. 29, 2020) [D.I. 1661]; *In re Lucky Brand Dungarees, LLC*, Case No. 20-11768 (CSS) (Bankr. D. Del July 30, 2020) [D.I. 246]; *In re Pyxus Int'l, Inc.*, Case No. 20-11570 (LSS) (Bankr. D. Del. July 20, 2020) [D.I. 195].  This Court should grant the Postpetition Agent the same relief, given the commitment for incremental funding, the use of its Cash Collateral and the subordination of liens to the Carveout.

29.    The section 552 "equities of the case" waiver is also typical in postpetition financings.  The Postpetition Agent negotiated the waiver in connection with the DIP financing package to avoid unnecessary and wasteful litigation regarding the scope of its blanket liens on substantially all of the Debtors' assets.  The absence of these waivers would substantially increase the cost of DIP financings, generally.  In fact, DIP financing and cash collateral packages benefit debtors, at market costs, precisely because bankruptcy courts routinely provide the requested protections for lenders.  The section 552 waiver is regularly approved by courts in this district, and there is nothing improper about the Debtors' decision to include it in the proposed Final Order. *See*, *e.g.*, *In re Never Slip Holdings, Inc*., Case No. 24-10663(LSS) (Bankr. D. Del. Apr. 26, 2024) [D.I. 133] (approving waiver of section 552(b) "equities of the case" exception upon entry of the final order); *In re Joann Inc*., No. 24-10418(CTG) (Bankr. D. Del. Apr. 12, 2024) [D.I. 224] (same); *In re Lucky Bucks, LLC*, Case No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) [D.I. 169] (same); *In re DeCurtis Holdings, LLC*, Case No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) [D.I. 285] (same); *In re Plastiq Inc*., Case No. 23-10671 (BLS) (Bankr. D. Del. June 22, 2023) [D.I. 138] (same); *In re Christmas Tree Shops, LLC*, Case No. 23-10576 (TMH) (Bankr.

16

D. Del. June 5, 2023) [D.I. 229] (same); *In re Structurlam Mass Timber U.S., Inc.*, Case No. 23-10497 (CTG) (Bankr. D. Del. May 19, 2023) [D.I. 136] (same); *In re Tritek Int'l Inc.*, Case No. 23-10520 (TMH) (Bankr. D. Del. May 19, 2023) [D.I. 116] (same); *In re Amerimark Interactive, LLC*, Case No. 23-10438 (TMH) (Bankr. D. Del. May 9, 2023) [D.I. 190] (same); *In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bankr. D. Del. May 1, 2023) [D.I. 202] (same); *In re SiO2 Med. Prods., Inc.*, Case No. 23-10366 (JTD) [D.I. 216] (Bankr. D. Del. April 26, 2023) (same); *In re Ryze Renewables II, LLC*, No. 23-10289 (BLS) (Bankr. D. Del. April 11, 2023) [D.I. 96] (same).

30.     The Committee also takes issue with the marshaling waiver in the proposed DIP Facility.  *See* Committee Objection, ¶ 38.  The Committee has no legal basis to request that the Prepetition Agent and Prepetition Lenders look first to any specific Postpetition Collateral before being paid from any other Postpetition Collateral.  The remedy of marshaling is equitable and available only to secured creditors, not the unsecured creditors represented by the Committee.  *In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007) (recognizing that "unsecured creditors cannot invoke the equitable doctrine of marshaling"); *see also In re Arico, Inc.*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999); *see, e.g., In re Exide Techs.*, No. 13-11482 (KJC) (Bankr. D. Del. July 25, 2013); *In re Xerium Techs., Inc.*, No. 10-11031 (KJC) (Bankr. D. Del. Apr. 28, 2010). In other words, the Committee and its constituents cannot require the Prepetition Agent and Prepetition Lenders to equitably marshal their assets.

**VI. The Committee is not entitled to accept the benefits of the Carveout without the limitations both as to amount and scope, and the current Challenge Period gives the Committee enough time to investigate the claims of the Prepetition Lenders and Postpetition Lenders.**

17

31.     The Committee also suggests that the Challenge Period (as defined in the Interim Order) (which currently expires 75 days from the date of entry of the Interim Order against the Prepetition Lenders and 120 days from entry of the Interim Order against any party holding an economic interest in the Term B Loan Obligations) is inadequate and that the budget of $25,000 to investigate potential claims against the Prepetition Lenders and Postpetition Lenders is insufficient. Committee Objection, ¶¶ 48-50. The Committee has no reasonable basis to suggest more time is needed to investigate. The 75-day (and for that matter, the 120-day) investigation period conforms to the Local Rules, *see* Del. L. Bankr. R. 4001-2(a)(i)(Q). Additionally, the Postpetition Lenders have agreed to increase the investigation budget to $50,000, subject to a global resolution of the Committee Objection.

32.     Further, the Committee argues that the Final Order should grant the Committee standing to pursue challenges. Committee Objection, ¶ 51. The Debtors have a functioning and independent board, to which the Committee must first present any claim it believes is colorable. The Committee's objection to the Final Order disregards prevailing authority regarding creditor committee standing. A committee's potential to initiate litigation is subject to a debtor's role as fiduciary of the estate. *See In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005). A creditor committee only owes fiduciary duties to general unsecured creditors; the committee's ability to sue does not serve to replace or usurp the debtor's fiduciary responsibilities. *See In re World Health Alternatives, Inc.*, 344 B.R. 291, 303 (Bankr. D. Del 2006). Modifying the circumstances under which a creditor committee may bring a claim impermissibly interferes with the debtor's fiduciary duties. *See In re Tallygenicom L.P.*, Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) [D.I. 222], at 77 ("I have to say it is unusual to see a loan that allows the debtor to actually act consistent with its fiduciary duties. It's refreshing.").

18

33.     Creditor committees are granted standing to sue under limited circumstances.  The ability to bring a claim rests with a debtor, unless the debtor unreasonably refuses to raise the claim.  *See In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001).  However, even asserting a claim the committee believes was unjustifiably denied still requires approval of the bankruptcy court.  *Id.* at 100.  The Committee cannot subjectively believe the debtor wrongfully dismissed a potential claim.  Even if a committee presents a "colorable claim," the court must determine whether the claim will benefit the estate.  *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985).  A committee may also act as a co-plaintiff with a debtor, with the bankruptcy court's approval.  *See In re Housecraft Indus. USA, Inc.*, 310 F.3d 64 (2d. Cir. 2002).

34.     The Final Order preserves the Debtors' role as fiduciary by maintaining their authority to decide whether to prosecute, settle, or compromise a claim. The Final Order properly allows the Committee to bring notice to the debtors of a potential claim, and the ability to seek standing with the court if the debtors decide not to initiate a claim. The Final Order balances the interests of the Prepetition Lenders, the Committee and the Debtors to determine the extent, validity and priority of the prepetition secured claims.

## CONCLUSION

35.     The proposed use of cash collateral and postpetition financing represent a negotiated arms' length agreement among the Debtors, Prepetition Agent and Prepetition Lenders, as contemplated by the Bankruptcy Code and Bankruptcy Rule 4001.  The Committee and the UST may wish for terms that are more favorable, including the preservation of future litigation opportunities under Bankruptcy Code §§ 506(c) and 552(b), but the Court should not supplant the Debtors' business judgment to obtain funds in pursuit of a value-maximizing transaction. Other objections, most notably pertaining to 503(b)(9), are premature and more appropriately addressed

19

in connection with a hearing to approve the sale.  For the foregoing reasons, the Court should grant the Debtors' DIP Financing Motion and enter the form of order requested by the Debtors

36.    In addition to the specific issues discussed herein, the Prepetition Agent and the Postpetition Agent each reserve the right to make additional or different arguments at the Final Hearing scheduled for May 2, 2025.

Dated: April 30, 2025

By:    */s/  John H. Knight*
**RICHARDS, LAYTON & FINGER, P.A.**
John H. Knight (No. 3848)
Paul N. Heath (No. 3704)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:  302.651.7700
Fax:  302.651.7701
Email: knight@rlf.com
           heath@rlf.com

-and-

**GOLDBERG KOHN LTD**
Randall L. Klein (admitted pro hac vice)
Prisca L. Kim (admitted pro hac vice)
Eva Gadzheva (admitted pro hac vice)
55 East Monroe, Suite 3300
Chicago, Illinois 60603
Tel:  312.201.3974
Fax:  312.332.2196
Email:  randall.klein@goldbergkohn.com
            prisca.kim@goldbergkohn.com
            eva.gadzheva@goldbergkohn.com

RLF1 32889028v.1