## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ROYAL INTERCO, LLC, *et al.*, | Case No. 25-10674 (TMH) |
| Debtors.[1] | Jointly Administered |
| | **Re: D.I. 16, 53, 104** |

**DEBTORS' REPLY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING
LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION LENDERS, (IV) MODIFYING THE AUTOMATIC STAY, (V)
<u>SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF</u>**

The above-captioned debtors and debtors in possession (collectively, the

"<u>Debtors</u>") hereby reply (this "<u>Reply</u>") in support of the *Debtors' Motion for Entry of Interim and*

*Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash*

*Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense*

*Status, (III) Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying the*

*Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [D.I. 16] (the

"<u>DIP Motion</u>")[2] and in response to the objection of the Official Committee of Unsecured Creditors

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899).  The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the First Day Declaration and the DIP Motion.

[D.I. 104] (the "Objection").[3]  In further support of the DIP Motion and this Reply, the Debtors state as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors seek approval on a final basis of the proposed DIP Facility, which the Debtors have determined in their business judgment is reasonable and appropriate to pursue a value-maximizing sale of their assets. As described at the first day hearing, the proposed DIP Facility in these cases is straightforward and provides for (i) postpetition, senior-secured financing in the principal amount of up to $10,000,000, which does not include ***any*** roll-up of the prepetition secured loans, and (ii) the Debtors' consensual use of Cash Collateral in order to allow the Debtors to fund their operations in accordance with an approved budget.  Unsurprisingly, as is customary in this District and routinely approved by the Court, the extension of postpetition financing and use of Cash Collateral are conditioned upon, among other things, adequate protection, satisfaction of certain milestones and waivers of the Debtors' right to surcharge under section 506(c), the "equities of the case" exception of section 552(b), and the equitable doctrine of marshalling of collateral. The DIP Facility was negotiated at arms' length and enables the Debtors to ensure vendors, suppliers, customers, and employees that the Debtors have the liquidity necessary to continue operating during their sale process. Absent the DIP Facility, the Debtors will be unable to operate, and the value of the Debtors' business and assets would quickly deteriorate to the detriment of the Debtors' estates.

2.      The Committee's Objection amounts to a wish list that ignores the Debtors' capital structure and applicable law. The Committee's position in its Objection is clear: unless the

---

[3]      The Debtors also received objections from the Office of the United States Trustee (D.I. 105) (who raises similar objections as the Committee) and TREA Riverside 202 Industrial LLC (D.I. 97). The Debtors are working with those parties to resolve their objections.

DIP Lender agrees to set aside funds for 503(b)(9) claims, general unsecured creditors and to confirm a plan (along with providing a litany of other gifts the Committee seeks to extract from the DIP Lender), then the Court should reject the DIP Facility regardless of whether the absolute priority rule entitles such parties to any recovery and even though no other postpetition financing is available. In fact, the Committee goes so far as to assert without basis that the DIP Facility is being proposed in bad faith.  As judges in this District have said for years, it is not a requirement for a lender to make payments to creditors they are not otherwise entitled to in order to access chapter 11. What is required is maximizing value and that the secured lender pay for the anticipated postpetition administrative costs of the case, which is precisely what the DIP Facility will do.

3.    As described below, the Debtors and DIP Lenders have negotiated and agreed to a revised DIP budget (D.I. 115-2) (the "Budget") and proposed Final DIP Order (D.I. 115-1) that provide for the payment of administrative expenses arising from and after the Petition Date through the closing of the Sale. As a result, the DIP Lenders are paying the freight required for the Debtors to pursue their value-maximizing sale process in accordance with the Budget. Despite the Committee's desires, nothing more is required under the Bankruptcy Code.

4.    The Debtors, the Committee and the DIP Lenders are engaged in ongoing discussions to resolve, or at least narrow, the objections raised by the Committee. The Debtors believe that the Budget and proposed Final DIP Order should do just that.  To the extent not, however, the Debtors file this Reply and respectfully submit that the Objection should be overruled in its entirety.

<u>REPLY</u>

**I.    The Budget Sufficiently Covers Postpetition Administrative Expense Claims and There is No Requirement that Lenders Provide for a Recovery to Unsecured Creditors if the Value of the Debtors' Assets are Less than the Secured Debt.**

5.    Throughout its Objection, the Committee argues that the DIP Lender is required to provide funding for the pursuit of a chapter 11 liquidating plan or other gifts that may lead to a recovery for unsecured creditors. If the DIP Lender does not, according to the Committee, the DIP Facility is "neither fair nor equitable." Obj. ¶ 25. Of course, the Committee cites no legal authority for its demands or that the DIP Lender's failure to acquiesce disqualifies it from receiving a "good faith" finding. *See* Obj. ¶¶ 1, 28-29, 37, 41-47.

6.    To the contrary, the case law in this District has been consistent over the decades that this is ***not*** a requirement.  For example, in *Boomerang Tube*,[4] Judge Walrath ruled that "[t]here is nothing wrong with the DIP that's paying only for a sale process or a process where the result will be the DIP lenders will end up owing the company.  There's nothing that requires a buyer to pay anything to the unsecured if it feels that the enterprise does not have that value." Hr'g. Tr. at 105:21-06:15, Case No. 15-11247 (MFW) (Bankr. D. Del. July 17, 2015) [D.I. 276].

7.    Judge Goldblatt issued a similar ruling in *In re Nova Wildcat Shur-line Holdings, Inc., et al.*:[5]

> I am not one who believes that there necessarily needs to be a recovery for unsecured in order to legitimately invoke the bankruptcy process.  I think that we take the pre-petition capital structure as we find it.  What we do care about is are we maximizing value and if the bankruptcy process is being used for the purpose of maximizing value, then that value falls the way it falls and there's nothing wrong with doing that.  On the flip side, if you're a secured creditor and want to invoke the bankruptcy process for the purpose of what will likely be maximizing the value of your collateral, you

---

4    The excerpt from the transcript is attached hereto as **<u>Exhibit A</u>**.
5    The excerpt from the transcript is attached hereto as **<u>Exhibit B</u>**.

4

don't get to impose the costs of that on other people.  So, you've got to pay the freight associated with running a process that will maximize your value.  And that includes paying the expected administrative expenses and the administrative expenses include reasonable committee fees.

Hr'g. Tr. at 87:6-21, Case No. 23-10114 (CTG) (Bankr. D. Del. Mar, 2, 2023) [D.I. 212].

8.       In *In re NEC Holdings Corp., et al.,*[6] Judge Sontchi ruled the same:

I generally have held in the past that you can run a case for the benefit of a secured creditor.  It's the crime of having collateral that some people seem to say that they can't.  They've got to pay the freight, and the freight is, at least -- the freight is not necessarily a tip to the unsecureds, but the freight is certainly an administratively solvent estate.  And while there's not a guarantee, there has to be something other than a wing and a prayer on the payment of the admin claims. . . It doesn't need to be in the DIP budget, necessarily, but there has to be something – and again, not a *guarantee*, but something, some evidence that there's a possibility – probability that they'll be paid.

Hr'g. Tr. 100:12-101:6, Case No. 10-11890 (CSS) (Bankr. D. Del. July 13, 2010), [D.I. 224].

9.       As noted herein, the Prepetition Lenders have consented to the Debtors' use of sale proceeds to pay for the expected postpetition administrative costs of these cases, so the Committee's Objection, especially as to unsupported allegations of bad faith, should be overruled.

10.       Moreover, the Budget and proposed Final DIP Order now provide for the payment of administrative expense claims arising from and after the Petition Date through the closing of the Sale, rendering the majority of the Committee's objection moot.  As explained on the record at the first day hearing, although the initial DIP budget did not account for administrative expenses that accrued after the Petition Date and remained unpaid at the end of the budget period, the Debtors and the DIP Lender acknowledged that additional funds would be made available to pay the freight once the Debtors could determine the magnitude of those obligations. Hr'g. Tr. at

---

[6]    The excerpt from the transcript is attached hereto as **Exhibit C**.

13:21-25; 14:1-2 (April 10, 2025) [D.I. 89]. The Debtors have since determined such obligations, which are now accounted for in the Budget, will be paid from the proceeds of the Debtors' sale of their assets. As such, contrary to the Committee's assertions in the Objection, the DIP Facility ensures that the Debtors are able to cover the required costs of pursuing a value-maximizing sale of their assets. Nothing more is required, including the payment of 503(b)(9) claims. *See In re Allen Family Foods, Inc.*, No. 11-11764 (KJC) (Bankr. D. Del. July 27, 2011) (approving sale of assets notwithstanding "the fact that all 503(b)(9) expenses are not covered" because "there is no other better course that's available to the Debtor and to other constituents"); *In re Central Grocers, Inc.*, Case No. 17-10993 (LSS) (Bankr. D. Del. 2017) ("I do think that the sale process is the best way to maximize recoveries in this case, and therefore the best way to maximize the possibility that 503(b)(9) claims will, in fact, be paid . . . [I]t's clear that the lender is not the guarantor of a case, and is not the guarantor that administrative creditors will be paid.").

II. **The Waivers of the Debtors' Rights Under Sections 506(c) and 552(b) of the Bankruptcy Code and the Equitable Doctrine of Marshalling are Justified, Within the Debtors' Business Judgment, and Customary.**

11.     The Committee objects to the Debtors' waiver of their section 506(c) surcharge rights, rights under section 552(b) of the Bankruptcy Code related to the equities of the case, and ability to invoke the equitable doctrine of marshalling. The Committee's assertions are both contrary to the applicable law of this District and are moot as a result of the DIP Lender's commitment to cover the expected postpetition administrative expenses of these cases.

12.     As an initial matter, the Committee's objections to the Debtors' waivers are expressly premised on the Committee's claims that the DIP Facility does not pay the freight. *See* Obj. ¶¶ 33, 37. As set forth above, the proposed Final DIP Order and Budget ensure that the Debtors will be able to satisfy postpetition administrative expenses that from and after the Petition

Date through the closing of the Sale. Therefore, the Committee's objections to the Debtors' waivers of these rights are moot.

13.    Indeed, Courts in this District have routinely approved waivers of the debtors' 506(c) and 552(b) rights, particularly where such waivers are supported by their business judgment and the secured creditor agreed to a carve out for professional fees and other amounts. *See, e.g. In re Never Slip Holdings, Inc.*, Case No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) [D.I. 133] (approving waivers of section 506(c), section 552(b) and doctrine of marshalling in the final DIP order); *In re Joann Inc.*, No. 24-10418(CTG) (Bankr. D. Del. Apr. 12, 2024) [D.I. 224] (same); *In re Lucky Bucks, LLC*, Case No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) [D.I. 169] (same). Moreover, section 506(c) claims are available to, and are an asset of, the Debtors, and not any other party in interest. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (holding that only a trustee or a debtor in possession may seek recovery under section 506(c)); *In re Muma Servs.*, 322 B.R. 541, 559 (Bankr. D. Del. 2005) ("[T]he Supreme Court has determined that creditors do not have standing under section 506(c) to assert a claim for preserving a secured creditor's collateral.").

14.    Here, the Debtors have determined in their business judgment that the clear benefit to the Debtors' estates provided by the DIP Facility more than justify the waiver of section 506(c), the "equities of the case" under section 552(b), and the equitable doctrine of marshalling. The waivers are a critical component of the DIP Facility, and the DIP Lenders would not have agreed to provide the DIP Facility nor consented to the Debtors' continued use of Cash Collateral without such waiver. As the DIP Facility ensures the payment of postpetition administrative claims

set forth in the Budget and enables the Debtors to maximize the value of their assets, the Court should overrule the Committee's objections.

### III.    The Lien Package for the DIP Lender is Appropriate.

15.    The Committee asserts that it is "inappropriate to encumber the proceeds of Avoidance Actions, commercial tort claims, any related insurance proceeds, and any other unencumbered assets." Obj. ¶ 41.  Again, the Committee's position is incorrect.

16.    It is typical and customary for a DIP lender to require superpriority claims and liens on all assets. Pursuant to Section 541 of the Bankruptcy Code, any unencumbered assets of the Debtors—including those listed by the Committee in the Objection—constitute assets of the Debtors' estates, and sections 361 and 364 of the Bankruptcy Code expressly permit a debtor to grant liens on unencumbered assets or allow superpriority claims to secure postpetition financing or provide adequate protection. *See* 11 U.S.C. sections 361(2), 364(c)(2); *In re Applied Theory Corp.*, 2008 WL 1869770, at *1 (Bankr S.D.N.Y. Apr. 24, 2008) ("Of course those assets started out unencumbered. But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection. That's expressly authorized under section 361(2).") (citation omitted).

17.    It is indeed common in this District for a DIP lender to secure repayment with superpriority claims and liens on commercial tort claims, avoidance actions and other unencumbered assets.  *See In re Timber Pharm., Inc.*, Case No. 23-11878 (JKS) (Bankr. D. Del. Dec. 15, 2023) [D.I. 125] at ⁋ 5 (the DIP lender is granted superpriority claims and liens on DIP collateral, including but not limited to commercial tort claims); *In re Yellow Corp.*, Case No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) [D.I. 571] at ⁋⁋ 7-8 (the DIP lender is granted superpriority claims and liens on unencumbered properties that included all tangible and intangible prepetition and postpetition property of the DIP loan parties); *In re Western Global Airlines, Inc.*,

No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) [D.I. 236] at ⁋ 9 (DIP secured parties are granted superpriority claims and liens on all unencumbered assets); *In re Southcross Energy Partners*, Case No. 19-10702 (MFW) (Bankr. D. Del. May 7, 2019) [D.I. 200] at ⁋ 8 (DIP lender is granted superpriority claims and liens on unencumbered properties, including but not limited to commercial tort claims); *In re Avenue Stores*, Case No. 19-11842 (LSS) (Bankr. D. Del. Aug. 13, 2019) [D.I. 223] at ¶ II(A) (DIP lien granted on avoidance actions and avoidance action proceeds); *HRI Holding Corp.*, Case No. 19-12415 (MFW) (Bankr. D. Del. Dec. 5, 2019) [D.I. 163] at ¶ II(A) (DIP lien granted on avoidance actions and avoidance action proceeds).

18.    The granting of DIP liens to the DIP Lender and adequate protection liens to the Prepetition Lenders on previously unencumbered assets was negotiated in good faith and at arms' length, as is typical for DIP loans under these circumstances. The encumbrance of unencumbered assets, including commercial tort claims and avoidance actions and their proceeds, was an essential component to obtaining postpetition financing and it is this financing that allows the Debtors to run a sale process to maximize recoveries for their stakeholders. The Committee's Objection should be overruled.

**IV.    The Proposed Challenge Period and Investigation Budget Are Fair and Reasonable.**

19.    The Committee asserts without basis that both the Investigation Period (*i.e.*, the challenge period) and investigation budget "constrain the Committee's ability to fulfill its fiduciary duties to investigate and prosecute potential Challenges for the benefit of the Debtors' estates" such that it needs more time and funding. Obj. ¶ 48. The proposed Final DIP Order permits the Committee and parties in interest to commence a challenge in accordance with the Final DIP Order within (i) 75 days from the entry of the Interim DIP Order—the time required by Local Rule 4001-2— against the Prepetition Lenders and (ii) 120 days from entry of the Interim DIP Order against any party holding an economic interest in the Term B Loan Obligations. This time is more

than sufficient for the Committee to adequately fulfill its fiduciary duties to investigate and challenge the Debtors' stipulations, admissions, and releases under the Final DIP Order. Soon after the appointment of the Committee, on April 21, 2025, the Prepetition Lenders provided the Committee with the documents needed to complete its investigation, and the Committee does not posit a legitimate reason for extending the Investigation Period based on the facts and circumstances of these cases.

20.     The proposed Final DIP Order further provides the Committee with an investigation budget of $50,000 that is more than sufficient.  Such an investigation budget is consistent with the investigation budgets provided to unsecured creditors' committees in other similar cases. *See, e.g. In re Fisker Inc.*, Case No. 24-11390 (TMH) (Bankr. D. Del. July 10, 2024) [D.I. 184] (providing, on an interim basis, for $50,000 investigation budget); *In re Clovis Oncology, Inc.*, Case No. 22-11292 (JKS) (Bankr. D. Del. Jan. 24, 2023) [D.I. 256] (providing for a $50,000 investigation budget); *In re Ambri Inc.*, Case No. 24-10952 (LSS) (Bankr. D. Del. June 13, 2024) [D.I. 163] (providing for a $25,000 investigation budget).  Therefore, the Debtors submit that the Investigation Period and the Committee's investigation budget are fair and reasonable.

**V.     The Remaining "Objectionable Provisions" Have No Bases in Law or Fact.**

21.     The remainder of the Committee's Objection lack merit:

| ISSUE | DEBTORS' RESPONSE |
|---|---|
| **Exit Fee** | The Committee fails to provide any support for its assertion that the Exit Fee is unreasonable. Additionally, the Committee presumes that if there was no Exit Fee, more cash would somehow be available for unsecured creditors. Given the capital structure of the Debtors and that unsecured creditors are out of the money, the Committee's assertion lacks merit. |
| **DIP Termination Events / Carveout Reserve** | While the Committee's assertion that the Debtors should be able to use DIP funds and Cash Collateral following a Termination Event is laudable, it is unsurprising that the Committee does not cite to any authority that requires a DIP Lender to do so. Indeed, such a requirement would render events of default and the DIP Lender's standard abilities to exercise remedies meaningless. |

| | |
|---|---|
| | Additionally, the Carveout Reserve is consistent with reserves in this District. *See e.g., In re: Omega Therapeutics, Inc.*, Case No. 25-10211 (BLS) [D.I. 101] (providing for a $125,000 reserve) and *In re: MRRC HOLD CO., et al.*, Case No. 24-11164 (CTG) [D.I. 126] (same); |
| **Lenders' Claims** | It is customary that in connection with a DIP Facility provided by the Prepetition Lenders that the Prepetition Lenders are not required to file a proof of claim. The stipulations that serve as an informal proof of claim are subject to challenge, and as such, the Committee's objection on this provision is moot. |
| **Credit Bidding** | The Prepetition Lenders and the DIP Lender's right to credit bid is subject to in all respects Section 363(k) of the Bankruptcy Code. Nothing more is required to approve the DIP Facility on a final basis. |
| **Releases** | Releases pursuant to the Final DIP Order are subject to a Challenge pursuant to section 9 of the Final DIP Order and are not granted upon entry of the Final Order. |

## **RESERVATION OF RIGHTS**

26.     For the avoidance of doubt, the Debtors reserves its rights to supplement this Reply to the extent that any party raises additional issues or arguments with respect to the proposed DIP Facility.

## CONCLUSION

WHEREFORE, for reasons set forth herein, the Debtors respectfully request that the Court overrule the Committee's Objection, grant the DIP Motion, enter the proposed Final DIP Order, and grant such other and further relief as is just and proper.

Dated: April 30, 2025
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Clint M. Carlisle*
Robert J. Dehney, Sr. (No. 3578)
Matthew O. Talmo (No. 6333)
Scott D. Jones (No. 6672)
Clint M. Carlisle (No. 7313)
Brianna N. V. Turner (No. 7468)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
     mtalmo@morrisnichols.com
     sjones@morrisnichols.com
     ccarlisle@morrisnichols.com
     bturner@morrisnichols.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*