IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>ROYAL INTERCO, LLC, *et al.*,<br><br>Debtors.¹ | Chapter 11<br><br>Case No. 25-10674 (TMH)<br><br>Jointly Administered<br><br>**Re: D.I. 15, 16** |

**DECLARATION OF JOSEPH GREENWOOD IN SUPPORT OF (I) BID PROCEDURES AND SALE MOTION AND (II) DIP FINANCING AND CASH COLLATERAL MOTION**

I, Joseph Greenwood, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a Partner at Livingstone Partners LLC ("Livingstone"), an internationally recognized, middle-market investment banking firm with over 100 professionals located across offices in Chicago, Los Angeles, Amsterdam, Dusseldorf, Hamburg, Stockholm, Valencia, Madrid, Milan, Verona, Beijing, and Seoul. Livingstone is the proposed investment banker for the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899). The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

*Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "<u>Bid Procedures Motion</u>") (D.I. 15) and the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (D.I. 16) (the "<u>DIP Motion</u>").[2]

      3.      Unless otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' management and other professionals, members of the Livingstone team, or other interested parties, my review of relevant documents, including the Bid Procedures and the Stalking Horse Agreement, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**Professional Qualifications**

      4.      I am a Partner and the head of the Special Situations practice at Livingstone. I have over 24 years of financial advisory experience, of which 21 years have involved advising debtors, creditors, and equity holders on a wide variety of restructuring transactions, both inside and outside of chapter 11. The vast majority of my experience over the last 20 years has involved advising distressed clients in M&A and financing transactions.

---

[2]   Capitalized terms not defined herein are defined in the Bid Procedures Motion or the DIP Motion, as applicable.

5.  Livingstone's professionals have been involved as investment banker and/or advisor to a diverse group of debtors in chapter 11 cases, including, among numerous others: *In re Danimer Scientific, Inc. et al.,* No. 25-10518 (MFW) (Bankr. D. Del. Mar. 18, 2025); *In re Jordan Health Products I, Inc.*, No. 24-12271 (TMH) (Bankr. D. Del. Oct. 31, 2024); *In re Oberweis Dairy*, No. 24-05385 (DDC) (Bankr. N.D. Ill. May 22, 2024); *In re Nogin, Inc.*, No. 23-11945 (CTG) (Bankr. D. Del. Jan. 11, 2024); *In re Center for Autism and Related Disorders*, No. 23-90709 (CML) (Bankr. S.D. Tex. Aug. 8, 2023); *In re Gissing North America*, No. 22-46160 (Bankr. E.D. Mich. Sept. 7, 2022); *In re Aztec/Shaffer LLC*, No. 20-35600 (Bankr. S.D. Tex. Jan. 22, 2021); and *In re Arro Corporation*, No. 19-35238 (JSB) (Bankr. N.D. Ill. Jan. 16, 2020).

6.  Prior to joining Livingstone in April 2010, I held various positions, including being one of three founding members of William Blair's Restructuring Group and serving as a Vice President within KPMG's Corporate Recovery practice. I have passed the Certified Public Accountant exam and the Certified Insolvency and Restructuring Advisor exam.

7.  I received a BBA in Accounting from the University of Wisconsin-Madison and an MBA with High Distinction from Georgetown University. I am principally responsible for overseeing the day-to-day activities of the Livingstone deal team in this engagement.

## BIDDING PROCEDURES AND SALE MOTION

### Marketing Process

8.  As noted in the *Declaration of Michael Ragano in Support of First Day Relief* (D.I. 3), Livingstone was retained by the Debtors on January 30, 2025, to market and sell the Debtors' assets in an out-of-court sale process. Immediately upon its retention, Livingstone commenced outreach to potential buyers with a one-page teaser introducing the opportunity and inviting potential buyers to enter into a confidentiality agreement ("NDA") with the Debtors to

receive access to additional information. During the prepetition sale process, Livingstone contacted approximately 159 potential bidders which included both financial and strategic parties (the "Interested Parties"). Of those Interested Parties, 70 executed NDAs, which allowed them access to a confidential information presentation that contained a detailed overview of the Debtors' business operations, assets, commercial arrangements, and historical financial results. Additionally, these potential buyers received access to an online data room that contained hundreds of unique documents and diligence materials, and potential buyers were given the opportunity to request specific diligence items, which were provided on a rolling basis into the data room. Livingstone maintained a dialogue with these potential buyers throughout the process and facilitated discussions between potential buyers and the Debtors' management. Seven potential buyers completed site visits to the Debtors' manufacturing facilities, which were accompanied by Livingstone, Novo and the Debtors' management. This initial stage of the marketing process culminated in the receipt of 14 non-binding indications of interest ("IOIs"). After reviewing the IOIs, the Debtors and Livingstone engaged with each potential buyer to discuss the terms of each potential bid. The potential bids representing the highest value for the Debtors' assets required that the Debtors consummate the sale through a chapter 11 sale process in order to realize the values stated in the IOIs. After several weeks, the Debtors reached an agreement with Sofidel America Corp. (the "Stalking Horse Bidder"), setting the floor for other potential bids to acquire certain assets during these chapter 11 cases. Due diligence, including site visits and management meetings, has continued in earnest for several Interested Parties that are contemplating submitting a competing bid.

9. As of today, the Debtors' Assets have been marketed for approximately three months, during which time dozens of Interested Parties engaged in dialogue with Livingstone

and the Debtors' management, submitted diligence information requests, and reviewed hundreds of files of diligence information in the data room maintained by Livingstone. No Interested Party has cited lack of information or the sale timeline as an impediment to placing a bid as of the filing of this Declaration. I strongly believe that the Debtors' marketing efforts to date will lead to a value-maximizing transaction for the benefit of the Debtors' stakeholders.

## **The Bid Procedures**

10. I understand that the Debtors are seeking approval of the Bid Procedures to establish a detailed and transparent process for the solicitation and consideration of Bids for some or all of their assets. I have reviewed the Bid Procedures which govern, among other things, interested parties' access to confidential information, the deadlines and requirements for submitting Bids and becoming a Qualified Bidder, the criteria by which the Debtors will evaluate Bids, the procedures for conducting the Auction, if one is necessary, and the Bid Protections offered to the Stalking Horse Bidder.

11. I also understand that the Debtors have proposed the following timeline for the Sale process:

| Event | Deadline |
|---|---|
| Deadline for Debtors to File Notice of Proposed Cure Amounts and Adequate Assurance | Five (5) business days after the Petition Date |
| Bid Procedures Hearing | May 2, 2025 |
| Sale Objection Deadline | May 12, 2025, at 4:00 p.m. (ET) |
| Bid Deadline | May 12, 2025, at 4:00 p.m. (ET) |
| Deadline to Designate Qualified Bids | May 14, 2025 |
| Auction | May 15, 2025, at 10:00 a.m. (ET) |
| Deadline to Serve Notice of Winning Bidder and Supplemental Cure Notice | One (1) business day after the close of the auction |

| | |
|---|---|
| Deadline to File Supplemental Sale Objection and Objection to Assumption or Cure Amount (If Winning Bidder is Different Than Stalking Horse Bidder) | May 19, 2025, at 11:59 p.m. (ET) |
| Sale Hearing | May 20, 2025 |

12. Based on my experience and the circumstances of these chapter 11 cases, I believe that the proposed Bid Procedures reflect a competitive, market-based sale process that is critical to preserving the Debtors' business as a going concern and maximizing the value of the Debtors' Assets for the benefit of their estates and stakeholders. I further believe that the proposed timeline has and will continue to facilitate an open, fair, and competitive sale process. I believe that these efforts will further complement Livingstone's efforts to notify as many interested parties as possible of the contemplated Sale and provide sufficient time for all interested parties to prepare and place their Bids. Because of the extensive nature of the prepetition marketing process, I believe that substantially all of the parties who might consider making an offer are already aware of the Debtors and their circumstances. Should an Auction become necessary, the Debtors will carefully evaluate all competing bids in accordance with their fiduciary duties to select the highest or otherwise best offer for the Assets.

13. I further believe that the process and timeline contemplated by the Bid Procedures will leave no doubt that, at the conclusion of that process, the Debtors will have explored all available alternatives and identified the highest or otherwise best offer for their Assets. Accordingly, I believe that the Bid Procedures will maximize the value of the Debtors' Assets and are in the best interest of the Debtors and their estates.

**Stalking Horse Bidder and Bid Protections**

14. As noted in the Bid Procedures Motion, the Debtors also seek authority to enter into the Stalking Horse Agreement with Sofidel America Corp. as the Stalking Horse Bidder.

6

I believe that the terms of the Stalking Horse Agreement are reasonable and were the product of extensive, good faith, arm's length negotiations between the Debtors and the Stalking Horse Bidder. It is my opinion that the Stalking Horse Bid establishes a floor for further bidding that may increase the consideration received in exchange for the Acquired Assets. The consideration contemplated in any Stalking Horse Agreement provides significant value to the Debtors' estates, including through the assumption of significant liabilities of customers, employees and vendors, the continued employment of substantially all the Debtors' employees, and the reduction of the Debtors' significant prepetition secured debt.

15. I also understand that the Stalking Horse Agreement includes a Break-Up Fee in the amount of $3,780,000 and an Expense Reimbursement for the actual, reasonable, documented out-of-pocket expenses up to an amount not to exceed $1,260,000 (together, the "<u>Bid Protections</u>"). In my experience, break-up fees and expense reimbursements are customary and usual protections offered to stalking horse purchasers who are willing to accept the risk that flows from the decision to submit a stalking horse bid. The Stalking Horse Bidder has expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties The terms of the Bid Protections were extensively negotiated among the parties in good faith and were agreed upon only after multiple rounds of negotiations among the parties. I do not believe that the Stalking Horse Bidder would have placed its Bid without the Bid Protections. As such, I believe that the Bid Protections are reasonable and generally consistent with bid protections approved in other cases.

**Conclusion**

16. For the reasons set forth herein, I believe that the Bid Procedures and the timeline set forth herein: (a) will encourage a robust bidding and auction process; (b) are consistent with bid procedures previously approved by Bankruptcy Courts in this District; and (c) are necessary and appropriate in light of the circumstances of these chapter 11 cases. Accordingly, I believe that the Court should approve the Bid Procedures.

**DIP FINANCING AND CASH COLLATERAL MOTION**

**The Debtors' Efforts to Obtain Postpetition Financing**

17. As more fully described in the DIP Motion, First Day Declaration and Ragano Declaration, the Debtors are facing immediate liquidity constraints that require financing and access to Cash Collateral to operate their businesses and to fund a marketing and value-maximizing chapter 11 sale process.

18. In connection with the Debtors' anticipated chapter 11 sale process, Livingstone solicited interest from 12 third-party sources of financing outside of the Debtors' capital structure (while continuing to share informational updates and engage with stakeholders across the capital structure) to determine the extent to which any such parties would be willing to provide postpetition financing to the Debtors. The potential third-party lenders contacted by Livingstone included various institutions that routinely provide DIP financing, including both well-known commercial banks, credit funds and specialty lenders.

19. The feedback from third parties that Livingstone contacted with respect to providing DIP financing was conclusive: no third party was interested in providing a DIP proposal on a: (i) non-priming basis; or (ii) non-consensual priming basis. As a result, I believe that no financing is available to the Debtors at this time on an unsecured basis or as debt junior to or *pari passu* with

the existing Prepetition Secured Debt. And based on the Debtors' negotiations with the DIP Lender, I understand that the DIP Lender would not consent to being primed by a third party. Based on my experience, seeking approval of a non-consensual, priming postpetition financing facility and the contested use of the Prepetition Lenders' cash collateral is costly, carries significant risk and is unlikely to provide value to the Debtors' estates greater than the DIP Facility. Therefore, I believe the DIP Facility is the best financing reasonably available to the Debtors under the circumstances.

### The Terms of the DIP Facility are Fair and Reasonable Under the Circumstances

20. As noted in the DIP Motion, the proposed DIP Facility consists of (i) a postpetition, senior-secured financing with the funded principal amount of up to $10,000,000, which does not include *any* roll-up of the prepetition secured loans, and (ii) the Debtors' use of Cash Collateral in order to allow the Debtors to fund their operations in accordance with an approved budget. As is customary in my experience, the extension of postpetition financing and use of Cash Collateral are conditioned upon, among other things, adequate protection, satisfaction of certain milestones and a waiver of the Debtors' right to surcharge under section 506(c), the "equities of the case" exception of section 552(b), and the equitable doctrine of marshalling of collateral.

21. Other key terms of the DIP Facility include priority liens on Prepetition and Postpetition Collateral, including claims and proceeds of avoidance actions and commercial tort claims, and a Closing Fee of $300,000 and an Exit fee of $500,000. Additionally, the Prepetition Agent and Prepetition Lenders receive adequate protection including (i) superpriority administrative expense claims and (ii) replacement liens on all Prepetition Collateral.

Additionally, the Debtors are required to comply with certain case milestones, including with respect to filing and obtaining approval of the Bid Procedures and a Sale Order.

22.  As noted in the DIP Motion, the DIP Facility matures on the earliest of (i) the date that is 90 days after the Filing Date (which may be extended by up to 30 days thereafter with the consent of the Required Lenders), (ii) the consummation of a sale of all or substantially all of the Debtors' assets, (iii) the effective date of a plan of reorganization and (iv) the date that is 24 days after the Filing Date (or such later date as Postpetition Agent may agree up to the date that is 30 days after the Filing Date) unless the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to Postpetition Agent.

23.  I further understand that the proposed form of final order approving the DIP Motion (the "<u>Final DIP Order</u>") and revised Approved Budget provide for the payment of anticipated administrative expenses arising from and after the Petition Date through the closing of the sale of the Debtors' assets (the "<u>Sale</u>"), which amounts will be paid from the proceeds of the Sale.

24.  I understand that the DIP Lender is not an insider, and the terms of the DIP Facility were negotiated in good faith and at arms' length, which in the aggregate represent a package that provides a path for the Debtors to complete a value-maximizing sale process. In my view, the provisions of the DIP Facility represent reasonable terms under the circumstances and entry into the DIP Facility represents an appropriate exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates.

## Conclusion

25.  Given the marketing process and terms of the DIP Facility described above and based on my experience as an investment banker/restructuring professional and involvement in other financing transactions, I believe that the DIP Facility is the best and only financing option

presently available to the Debtors and that the terms of the DIP Facility are in the best interests of the estates.

***

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 1, 2025
               Wilmington, Delaware

*/s/ Joseph Greenwood*
Joseph Greenwood