**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| ROYAL INTERCO, LLC, *et al.*, | Case No. 25-10674 (TMH) |
| Debtors.[1] | Jointly Administered |
| | **Re: D.I. 16, 53, 104** |

**DECLARATION OF MICHAEL RAGANO IN SUPPORT**
**OF (I) BID PROCEDURES AND SALE MOTION AND (II) DIP**
**FINANCING AND CASH COLLATERAL MOTION**

I, Michael Ragano, hereby declare under penalty of perjury as follows:

1. I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I am also a Partner with Novo Advisors, LLC ("Novo"), specializing in performance improvement, restructuring, turnarounds, and mergers & acquisitions and have assisted companies facing various challenges across various industries, including horticulture, manufacturing, distribution, publishing, specialty finance, construction, consumer products, and fundraising. Novo has a wealth of experience in providing restructuring, crisis management, accounting and financial advisory services. Novo was founded in 2012 and many of Novo's employees have more than 30 years of experience in the restructuring industry. Novo currently has 40 professionals and, among other things, has assisted troubled companies with stabilizing their financial condition, analyzing their operations, and developing appropriate business plans to accomplish the necessary restructuring of their operations and finances.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899). The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

2.  Since approximately January 24. 2025, Novo and I have provided services to the Debtors in connection with their restructuring efforts. I was appointed as CRO to (i) facilitate ongoing operations and financial matters and (ii) oversee and manage all cash disbursements and any and all financial restructuring initiatives, including, to the extent necessary, any insolvency proceedings and in- or out-of-court activities to monetize assets and reduce creditor obligation. I am familiar with the day-to-day operations and business and financial affairs of the Debtors.

3.  I submit this declaration (this "Declaration") in support of the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* (the "Bid Procedures Motion") (D.I. 15) and the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (D.I. 16) (the "DIP Motion").[2]

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the First Day Declaration and the Bid Procedures Motion or DIP Motion, as applicable.

4.      Unless otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtors' management and other professionals, members of the Novo team, or other interested parties, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## BIDDING PROCEDURES AND SALE MOTION

### Selection of the Stalking Horse Bid

5.      Prior to the Petition Date, the Debtors received an initial bid by the Stalking Horse Bidder for the purchase of the Acquired Assets. Thereafter, the Debtors engaged in extensive negotiations with the Stalking Horse Bidder at arms-length and with the assistance of the Debtors' advisors, including their counsel, Morris, Nichols, Arsht and Tunnell, LLP, and investment banker, Livingstone Partners LLC ("Livingstone").

6.      Livingstone was retained by the Debtors on January 30, 2025, to market and sell the Debtors' assets in an out-of-court sale process. Immediately upon retention, I understand that Livingstone commenced outreach to potential buyers with a one-page teaser introducing the opportunity and inviting potential buyers to enter into a confidentiality agreement ("NDA") with the Debtors to receive access to additional information.  I understand that during the prepetition sale process, Livingstone contacted approximately 159 potential bidders which included both financial and strategic parties (the "Interested Parties").  I further understand that of those Interested Parties, 70 executed NDAs, which allowed them access to a confidential information presentation that contained a detailed overview of the Debtors' business operations, assets, commercial arrangements, and historical financial results.  Additionally, I understand that these

potential buyers received access to an online data room that contained hundreds of unique documents and diligence materials, and potential buyers were given the opportunity to request specific diligence items, which were provided on a rolling basis into the data room. I further understand that Livingstone maintained a dialogue with these potential buyers throughout the process and facilitated discussions between potential buyers and the Debtors' management. I further understand that seven potential buyers completed site visits to the Debtors' manufacturing facilities, which were accompanied by Livingstone, Novo and the Debtors' management. I further understand that this initial stage of the marketing process culminated in the receipt of 14 non-binding indications of interest ("IOIs"). After reviewing the IOIs, the Debtors and Livingstone engaged with each potential buyer to discuss the terms of each potential bid. The potential bids representing the highest value for the Debtors' assets required that the Debtors consummate the sale through a chapter 11 sale process in order to realize the values stated in the IOIs.

7. After several weeks of negotiations, the Debtors reached an agreement with Sofidel America Corp. (the "Stalking Horse Bidder"), setting the floor for other potential bids to acquire certain assets during these chapter 11 cases. Under the April 8, 2025 asset purchase agreement by and among the Debtors and the Stalking Horse Bidder (as modified from time to time, the "Stalking Horse Agreement"), the Stalking Horse Bidder has committed, subject to Court approval, to acquire substantially all of the assets of the Debtors in exchange for a purchase price of One Hundred Twenty-Six Million US Dollars (US$ 126,000,000), subject to certain adjustments, plus the assumption of certain liabilities including the payment of the Cure Amounts, each as set forth in the Stalking Horse Agreement. I also understand that the Stalking Horse Agreement includes a Break-Up Fee in the amount of $3,780,000 and an Expense Reimbursement for the actual, reasonable, documented out-of-pocket expenses up to an amount not to exceed $1,260,000.

During negotiations, the Debtors sought to negotiate for the Stalking Horse Bidder to assume liability for administrative claims arising under section 503(b)(9) of the Bankruptcy Code (among other liabilities), but the Stalking Horse Bidder refused.

8.  I understand that the sale pursuant to the Stalking Horse Agreement will be subject to higher and better bids pursuant to bidding and auction procedures, and Livingstone will continue the marketing process post-petition in furtherance of maximizing the value of the Debtors' estates. In addition to the value conferred by the revised Stalking Horse Bid on the Debtors' estates through the cash purchase price and assumption or elimination of liabilities, I also understand that the Stalking Horse Bid serves a critical function of setting a "floor" for further competitive bidding on the Debtors' Assets. I understand that if the Debtors were to continue to market their Assets without the benefit of the Stalking Horse Agreement serving as the floor, the Debtors might encounter greater challenges in their pursuit of the highest or otherwise best offer for the Assets. I further understand that any offer that tops the Stalking Horse Bid will inure to the benefit of the Debtors' stakeholders. Therefore, it is my belief that the Stalking Horse Bid provides a significant benefit to the Debtors' sale process and the ability of the Debtors to maximize the value of their assets for the benefit of their stakeholders.

9.  Based on the foregoing, the Debtors determined in the exercise of their reasonable business judgment to accept the Stalking Horse Bid.

### **Bidding Procedures**

10.  In addition, I oversaw the creation of the Bid Procedures. I understand that the Bidding Procedures are designed to promote participation and active bidding, ensure an orderly and expeditious sale process, and generate the highest or otherwise best available recoveries to Debtors' stakeholders by encouraging potential bidders to submit competitive, value-maximizing

bids for the Debtors' assets. I further understand that the Bid Procedures describe, among other things, the procedures for interested parties to gain access to due diligence, the process for submitting bids, the requirements for bidders and bids to become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of one or more successful bidders, and the deadlines with respect to the foregoing. Further, I understand that the Bid Procedures allow for the flexibility to submit bids either for the entirety of the business or groups of assets.

11. Due to the identity of the Stalking Horse Bidder and the current purchase price, it is anticipated that the Stalking Horse Bidder may need to comply with the filing requirements of the Hart–Scott–Rodino Antitrust Improvements Act of 1976 ("HSR") and obtain other possible regulatory approvals. As such, I believe the timeline outlined in the Bid Procedures Motion balances the Debtors' goal of adequately marketing its assets with the time needed to complete the HSR process.

12. Although expedited, for this reason, and in light of the ongoing marketing process conducted by the Debtors with the assistance of Livingstone, I believe that this timeline and the proposed bid procedures provide the Debtors with the best chance of success, maximizes value, and is in the best interest of the Debtors and their estates.

## DIP FINANCING AND CASH COLLATERAL MOTION

### The Debtors' Marketing and Need for Postpetition Financing

13. The Debtors have a continuing need to obtain the DIP Facility to, among other things, minimize the disruption of the Debtors' business, including, but not limited to, paying certain vendors and employees critical to the Debtors' business affairs and manage and preserve the assets of their bankruptcy estates in these chapter 11 cases.

14. In connection with the Debtors' anticipated chapter 11 sale process, I understand that Livingstone solicited interest from 12 third-party sources of financing outside of the Debtors' capital structure (while continuing to share informational updates and engage with stakeholders across the capital structure) to determine the extent to which any such parties would be willing to provide postpetition financing to the Debtors. I further understand that the potential third-party lenders contacted by Livingstone included various institutions that routinely provide DIP financing, including both well-known commercial banks, credit funds and specialty lenders.

15. I understand that no third party was interested in providing a DIP proposal on a: (i) non-priming basis; or (ii) non-consensual priming basis. As a result, I understand that no financing is available to the Debtors at this time on an unsecured basis or as debt junior to or *pari passu* with the existing Prepetition Secured Debt. I further understand that the DIP Lender would not consent to being primed by a third party. I further understand that seeking approval of a non-consensual, priming postpetition financing facility and the contested use of the Prepetition Lenders' cash collateral is costly, carries significant risk and is unlikely to provide value to the Debtors' estates greater than the DIP Facility. Therefore, I believe the DIP Facility is the best financing reasonably available to the Debtors under the circumstances.

16. As noted in the DIP Motion, the DIP Facility was negotiated in good faith and at arms' length and consists of (i) a postpetition, senior-secured financing with the funded principal amount of up to $10,000,000, which does not include any roll-up of the prepetition secured loans, and (ii) the Debtors' use of Cash Collateral in order to allow the Debtors to fund their operations in accordance with an approved budget. As is customary in my experience, the extension of postpetition financing and use of Cash Collateral are conditioned upon, among other things, adequate protection, satisfaction of certain milestones and a waiver of the Debtors' right to

surcharge under section 506(c), the "equities of the case" exception of section 552(b), and the equitable doctrine of marshalling of collateral.

17. Other key terms of the DIP Facility include priority liens on Prepetition and Postpetition Collateral, including claims and proceeds of avoidance actions and commercial tort claims, and a Closing Fee of $300,000 and an Exit fee of $500,000. Additionally, the Prepetition Agent and Prepetition Lenders receive adequate protection including (i) superpriority administrative expense claims and (ii) replacement liens on all Prepetition Collateral. Additionally, the Debtors are required to comply with certain case milestones, including with respect to filing and obtaining approval of the Bid Procedures and a Sale Order.

18. As noted in the DIP Motion, the DIP Facility matures on the earliest of (i) the date that is 90 days after the Filing Date (which may be extended by up to 30 days thereafter with the consent of the Required Lenders), (ii) the consummation of a sale of all or substantially all of the Debtors' assets, (iii) the effective date of a plan of reorganization and (iv) the date that is 24 days after the Filing Date (or such later date as Postpetition Agent may agree up to the date that is 30 days after the Filing Date) unless the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to Postpetition Agent.

19. I believe that the liquidity made available under the DIP Facility, coupled with the Debtors' access to Cash Collateral, signals to the Debtors' vendors, suppliers, customers, and employees that the Debtors have the liquidity necessary to continue operating while they complete a successful going concern sale of their assets. Without the DIP Facility, I expect that the value of the Debtors' business and assets would quickly deteriorate, materially and irreparably harming the Debtors' estates. I further understand that the use of the DIP Facility and Cash Collateral is necessary to the Debtors' ability to run a value-maximizing sale process in chapter 11. Therefore,

relief requested by the motion is a necessary step to both preserving the Debtors' operations as well as bridging to a sale transaction that maximizes value for the Debtors' estates and their stakeholders.

### The DIP Budget

20. The initial DIP budget was structured as a cash-based budget and was not intended to account for the payment of administrative expenses that accrued post-Petition Date but remained unpaid at the conclusion of the budget period. These administrative expenses were expected to be satisfied using sale proceeds following the budget period. After the Debtors' first day hearing, I worked with the Debtors and the Novo team to determine the amount of postpetition administrative expenses that would accrue during the budget period. The proposed form of final order approving the DIP Motion (the "Final DIP Order") and revised approved budget ("Budget") (D.I. 115) provide for the payment of anticipated administrative expenses arising from and after the Petition Date through the closing of the sale of the Debtors' assets (the "Sale"), which amounts will be paid from the proceeds of the Sale.

21. The amounts set forth in the Budget representing anticipated postpetition administrative expenses arising from and after the Petition Date were determined by me and the Novo team in good faith based on our professional experience and experience managing the Debtors' businesses and the Debtors' current and anticipated operations and financial performance in chapter 11. In addition, in the ordinary course of business, the Debtors forecast customer orders 90 days in advance in order to create a production plan to satisfy customer orders (and therefore, are able to anticipate expected costs). Generally, the line items for anticipated postpetition administrative expenses include reasonable cushion to account for potential increased expenses, and in the case of the Debtors' self-insured healthcare plan, the Budget accounts for 150% of the

monthly expense, consistent with the Company's historical calculation of incurred but not reported health insurance liability. As a result, I believe the Budget accounts for all reasonably anticipated postpetition administrative expenses arising from and after the Petition Date.

22. Admittedly, the Budget does not amount to a guarantee that all unexpected postpetition administrative claims will be satisfied. In my experience, no budget does that. For the reasons described herein, I believe such unexpected claims are just that: unexpected and unlikely. If something does present itself, however, the Debtors would request that the DIP Lender agree that the Budget be amended to fund any such administrative claims.

23. The Budget does not account for the payment of any section 503(b)(9) claims. The Debtors proposed that the DIP Lenders also agree to satisfy any claims arising under section 503(b)(9) of the Bankruptcy Code, but the DIP Lenders declined to do so thus far. Nonetheless, I believe that the Debtors' exposure to such potential claims is limited. Prior to the Petition Date, the vast majority of the Debtors' vendors and suppliers required payment by the Debtors in advance or upon delivery before any goods would be delivered to the Debtors. As a result, such vendors and suppliers have already been paid for goods delivered to the Debtors within the 20 days of the Petition Date. I further believe that section 503(b)(9) claims will at least partly be offset by avoidance action claims against parties holding such 503(b)(9) claims, including parties who applied to older invoices payments made by the Debtors for goods delivered in the 20 days prior to the Petition Date. Regardless, I believe that entry into the DIP Facility is a sound exercise of the Debtors' business judgment for the reasons set forth herein.

## Conclusion

24. Given the terms of the DIP Facility described above, I believe that entry into the DIP Facility is a reasonable exercise of the Debtors' business judgment because the DIP Facility

is the best and only financing option presently available to the Debtors and the terms of the DIP Facility are reasonable and in the best interests of the estates.

***

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 1, 2025                                         /s/ *Michael Ragano*
                                                                              Michael Ragano
                                                                              Chief Restructuring Officer