**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ROYAL INTERCO, LLC, *et al.*, | Case No.  25-10674 (TMH) |
| Debtors[1]. | **Hearing Date: May 22, 2025, 10:00 a.m. (ET)** |
| | **Re: D.I. 15** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors in possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby submits this objection (the "Objection") to the *Debtors' Motion for (I) An Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry Into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B)*

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899).  The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

*Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [D.I. 15] (the "Sale Motion"). In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.      At this juncture in the Chapter 11 Cases, it is clear that the Debtors have no intention of facilitating an orderly liquidation as the DIP Budget and terms of the proposed Sale leave no reserve for a winddown or the ability for the Committee to pursue Estate Causes of Action, no allocation for unforeseen postpetition administrative expense claims, no allocation at all for other administrative claims, no ability to confirm a chapter 11 plan, and no recovery for creditors. To the contrary, the Debtors are improperly using the bankruptcy process to liquidate collateral solely for the benefit of their prepetition secured lender, funded by a $10 million DIP Facility that exists solely for that purpose, and that the Debtors project will be exhausted simultaneously with the closing of the Sale.

2.      Upon its appointment, the Committee's mandate was clear: to ensure the Debtors' sale process generates maximum value for the benefit of all creditors, including general unsecured creditors. The Debtors seek approval of a sale of substantially all their assets pursuant to section 363 of the Bankruptcy Code, which—absent a materially higher auction result (an unlikely outcome)—will leave the Debtors' estates administratively insolvent. Taken together, the Budget and the Sale structure will set the stage for a transaction that funnels substantially all estate value to allegedly secured creditors while leaving administrative claimants—including holders of 503(b)(9) Claims—with no assurance of payment. Such a result violates case law holding that a

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the DIP Motion (defined herein).

section 363 sale may not proceed if it would render the estate administratively insolvent. Delaware bankruptcy courts have made clear that secured creditors seeking the benefits of a bankruptcy sale must "pay the freight"—which the Debtors and Prepetition Lenders are not proposing to do.

3. Rather than providing adequate assurance of administrative solvency, as required by the Bankruptcy Code, the Debtors have manufactured a process aimed at suppressing valid claims. Through the Supplemental Notice, the Debtors essentially set a *de facto* bar date by requiring holders of claims under section 503(b)(9) of the Bankruptcy Code ("503(b)(9) Claims") to file objections to the Sale by May 19, 2025 (the "503(b)(9) Deadline"), just fourteen days after the Supplemental Notice was sent, "stat[ing] with particularity the legal and factual basis for the 503(b)(9) [C]laim and the specific grounds therefor," or risk forfeiting their statutory rights. *See* Supplemental Notice. This not only provides less notice than is required under the Bankruptcy Rules, but is an unheard-of burden shift that was not approved by this Court. Nothing in the Bankruptcy Code requires holders of 503(b)(9) Claims to affirmatively object to a sale to preserve their rights to assert their 503(b)(9) Claims. This aspect of the Supplemental Notice is no more than a transparent attempt to minimize administrative exposure for the Prepetition Lenders' benefit by deterring creditors from participating in the Chapter 11 Cases. By forcing creditors to retain bankruptcy counsel in order to preserve statutory rights that the Bankruptcy Code already confers upon them without adequate notice and without this Court having set a bar date for such claims, the Debtors are creating barriers to deprive claimants of their due process rights.

4. For these reasons, and as discussed in detail below, the Sale should not be approved unless and until (i) any final sale order establishes an escrow for sale proceeds until the Committee completes its investigation, (ii) there is adequate assurance that all allowed administrative expense claims—including 503(b)(9) Claims—will be paid in full, and (iii) the Estate Causes of Action

will continue to be carved out from the Sale in the final terms of any Asset Purchase Agreement(s), and ultimately preserved for general unsecured creditors.

## **BACKGROUND**

### A.    **General Background**

5.    On April 8, 2025 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

6.    No trustee or examiner has been appointed in the Chapter 11 Cases.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses as debtors in possession.

7.    On April 18, 2025, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to Bankruptcy Code § 1102(a)(1).  [D.I. 79].

8.    On May 6, 2025, the Debtors filed their schedules and statements of financial affairs (collectively, the "Schedules").  *See* [D.I. 150, 151, 152, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163].

9.    Additional information regarding the Debtors' prepetition capital structure is set forth in detail in the *Declaration of Michael Ragano in Support of First Day Relief* [D.I. 3] (the "First Day Declaration").

### B.    **The DIP Facility**

10.    On April 8, 2025, the Debtors filed a *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Lenders, (IV) Modifying the Automatic Stay, (V)*

*Scheduling a Final Hearing and (VI) Granting Related Relief* (the "DIP Motion") [D.I. 16], seeking approval of a $10 million DIP Facility provided by the Debtors' prepetition lender, NXT Capital, LLC (the "Prepetition Lenders"), and the participating lenders under the Credit Agreement (together with the Prepetition Lenders, the "DIP Lenders").

11.    On April 10, 2025, the Court entered the *Order Authorizing Debtors To: (A) Use Cash Collateral on an Emergency Basis Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to NXT Capital, LLC, as Agent and the Lenders* [D.I. 53] (the "Interim Order") authorizing the Debtors to draw $5 million from the DIP Facility on an interim basis.

12.    The Budget projects that the Debtors will fully exhaust the DIP Facility—which they have yet to fully draw—by the week of June 13, 2025—coinciding with the Debtors' anticipated closing date for the Sale.  *See* Final DIP Order, Ex. B.  The Budget does not include a line item for certain administrative expenses, including 503(b)(9) Claims, nor does it reserve any funds to facilitate an orderly winddown through a liquidating chapter 11 plan.  *See id.*

13.    On April 28, 2025, the Committee and the U.S. Trustee each objected to the DIP Motion (the "DIP Objections").  [D.I. 104, 105].

14.    On April 30, 2025, the Debtors and the DIP Lenders filed responses to the DIP Objections filed by the Committee and the U.S. Trustee [D.I. 117, 120].

15.    On May 1, 2025, the Debtors filed the *Declaration of Joseph Greenwood in Support of (I) Bid Procedures and Sale Motion and (II) DIP Financing and Cash Collateral Motion* [D.I. 128] and the *Declaration of Michael Ragano in Support of (I) Bid Procedures and Sale Motion and (II) DIP Financing and Cash Collateral Motion* [D.I. 129] (the "Ragano Declaration").  The Ragano Declaration confirms that the "Budget does not amount to a guarantee that all unexpected

postpetition administrative claims will be satisfied" and further states that it "does not account for the payment of any section 503(b)(9) claims." Ragano Decl., ¶¶ 22–23.

16.    On or around May 1, 2025, the Committee and the Debtors engaged in arm's-length negotiations and reached a consensual resolution of the Committee's DIP Objection.  As part of that agreement, the parties agreed (among other things) to defer the issue of the allowance and payment of any section any 503(b)(9) Claims to the Sale Hearing, with the understanding that the Budget may need to be amended to address such claims, as well as all other administrative expense claims, depending on how the case develops.  This agreement is reflected in paragraph 13 of the Final DIP Order:

> 13. Application of Sale Proceeds. Subject to entry of this Order, all proceeds from sales or other dispositions of all or any portion of the Aggregate Collateral other than in the ordinary course shall be remitted to Agents for application in accordance with Paragraph 2(c) of this Order; provided, however, that Agents and Lenders agree to consent to the use of such sale proceeds in order to enable the Debtors to pay all accrued and unpaid Budget expenses first incurred after the Filing Date and until the Termination Date and not to exceed the amounts for such expenses as set forth in the Budget (as the same may be amended from time to time); provided further, that any allowed 503(b)(9) claims will not be included in the foregoing proviso and the treatment of such allowable 503(b)(9) claims will otherwise be addressed in connection with such sale order, by assumption by the proposed purchaser, by settlement (as the same may be reduced by operation of 502(d)), or by further order of this Court. To the extent the Carveout Reserves have not been funded in the aggregate amount of the Carveouts, the first proceeds of such sale shall be used to fully fund the Carveout Reserves prior to any application of such proceeds to the Aggregate Debt, and the remainder of the sale proceeds shall be applied by the Agents as set forth in Paragraph 2(c) of this Order until the Aggregate Debt has been Paid in Full.

*Final Order Authorizing Debtors To: (A) Use Cash Collateral; (B) Incur Postpetition Debt; and (C) Grant Adequate Protection and Provide Security and Other Relief to the NXT Capital, LLC, as Agent and the Lenders* [D.I. 146] (the "Final DIP Order"), ¶ 13.

17.    Additionally, as part of the parties' resolution of the Committee's DIP Objection, the Committee was designated as a consultation party in the sale process and obtained a $150,000

increase to its professional fee budget to ensure it has the necessary resources and runway to evaluate the Sale, participate meaningfully in the auction, and pursue alternative sources of recovery for unsecured creditors.  *See* Bid Procedures Order, Ex. 1 (establishing the Committee as a consultation party); *compare* Final DIP Order, Ex. B *with* Interim Order, Ex. B.

18.     On May 2, 2025, the Court held a hearing on the proposed Bid Procedures, the DIP Motion, and remaining first day motions (the "Second Day Hearing").   At the Second Day Hearing, the Court approved the DIP Facility over the U.S. Trustee's DIP Objection, based on a revised proposed final order reflecting the resolution of the Committee's DIP Objection.

19.     While the Debtors and Committee agreed to defer resolution of 503(b)(9) Claim issues to the Sale Hearing, the U.S. Trustee objected to the extent that the Final DIP Order would leave section 503(b)(9) claimants ("503(b)(9) Claimants") without any path to recovery, thereby rendering the estate administratively insolvent.  *See* Second Day Hr'g Tr. at 34:6–37:9 [D.I. 165].

20.     At the hearing, the Debtors asserted that, due to their prepetition practice of operating on cash-in-advance ("CIA") and cash-on-delivery ("COD") terms because vendors were not providing credit terms, their exposure to 503(b)(9) Claims was minimal.  *Id.* at 5:17–23 ("We still are not getting any trade terms.  So, if you remember, at the first day, we talked about how we were not getting trade terms pre-filing, it was cash in advance, COD. Again, pretty easy to predict when you sort of know that's where you are and you have this lead time. So we're still in that situation, there's not a lot of trade terms that we're getting.").

21.     Despite these representations, the Debtors acknowledged a potential gross exposure of approximately $2 million in 503(b)(9) Claims, but emphasized that this figure was a "maximum" estimate and likely overstated as "substantially all dollars out the door were cash or COD and CIA; so, therefore, there were no trade terms extended during the twenty-day period that

would fit within the 503 definition." *Id.* at 16:25–17:4, 27:11–14.  The Debtors further asserted that the Company has approximately $10 million in potential preference defenses to 503(b)(9) Claims.  *Id.* at 28:15–19.

22.    However, as the Court observed, the evidentiary record is far from clear as to the precise timing of the shift to CIA and COD terms and the actual amount of 503(b)(9) Claims. While Debtors' counsel claimed that the company was on cash terms "virtually from the time" that Mr. Ragano arrived, "but certainly for at least the 30 days" before the Petition Date, the Court responded:

> Well, the record – it's not as clear as you're suggesting . . . it was kind of shifting over time and we couldn't put dates around that. . . . But at the same time, we're talking about potentially $2 million in 503(b)(9)s. It doesn't feel like a very crisp record to me; it seems that there are some contradictions in there.

*Id.* at 43:9–18.

23.    The Court pressed further on the dissonance between the Debtors' testimony and the asserted $2 million in potential claims: "Then how are there $2 million in 503(b)(9)s? . . . [I]t feels inconsistent to me."  *Id.* at 44:10–20.

24.    Even after conferring with Mr. Ragano and citing paragraph 23 of the Ragano Declaration, Debtors' counsel acknowledged the paragraph appeared to state that the applicable vendors had already been paid for goods delivered within the 20-day prepetition window— implying that no 503(b)(9) Claims remained.  *Id.* at 44:22–45:11.  The Court, however, pointed out that "[t]hat would mean that the 503(b)(9)s are zero because there are no outstanding claims. . . . I certainly did not understand that to be his testimony."  *Id.* at 45:3–22.

25.    During the hearing, the U.S. Trustee also raised the issue of the effectiveness of notice to 503(b)(9) Claimants in response to the Court's observation that no vendors had come forward to complain they were being "frozen out" or forced to bear the cost of the case.  *See id.* at

47:25–49:22.  Specifically, she noted that the DIP Motion was likely only served on the Debtors'

top 30 creditors, rather than all potential administrative or 503(b)(9) Claimants.  *Id.*; *see also* DIP

Motion, ¶ 57 ("Notice of this Motion will be provided to: (i) Notice of this Motion will be provided

to: (a) the Office of the United States Trustee (Attn: Linda J. Casey, Esq.

(linda.casey@usdoj.gov)); (b) the Internal Revenue Service; (c) the parties included on the

Debtors' consolidated list of their 30 largest unsecured creditors; (d) counsel to the Lenders; (e)

the Delaware Secretary of State; (f) the Delaware Secretary of the Treasury; (g) all parties known

to hold or assert liens against the Debtors' assets; and (g) all parties requesting notice pursuant to

Bankruptcy Rule 2002.").  She also pointed out that the DIP Motion may have lacked sufficient

detail to alert trade creditors to the severity of the proposed treatment of their claims.  *See id.*  As

a result, many affected parties may not have understood the implications of the relief sought or

may not have even been aware that their rights were at risk.

**C.    The Proposed Sale**

26.    Also on April 8, 2025, the Debtors filed the Sale Motion, seeking approval of the

Bid Procedures in connection with the proposed sale of substantially all of its assets (the "Sale")

and authorization to enter into that certain stalking horse agreement (the "Stalking Horse

Agreement") with Sofidel America, Corp. ("Sofidel").  Sale Motion, ¶ 6.  The Stalking Horse

Agreement provides that Sofidel will purchase substantially all of the Debtors' assets free and clear

of all liens for the Base Purchase Price of $126,000,000, plus the Inventory Adjustment Amount,

minus the Sale Leaseback Adjustment, minus the Cure Costs Adjustment Amount, and the

assumption of the Assumed Liabilities, including payment of the Cure Amounts.  *See* Sale Motion,

¶ 7.

27.    The Stalking Horse Agreement provides that Estate Causes of Action are "Excluded

Assets" from the Sale.  *See* Stalking Horse Agreement, § 2.2.  Estate Causes of Action are defined

as:

> "Estate Causes of Action" shall mean any and all causes of action, defenses, and
> counterclaims accruing to the Debtors or that is property of their Estates, based
> upon facts, circumstances and transactions that occurred prior to the Closing Date,
> including any avoidance or recovery action that belongs to or could have been
> raised by the Debtors or the debtors in possession or their respective Estates under
> Chapter 5 of the Bankruptcy Code; *provided, however,* that "Estate Causes of
> Action" shall not include causes of action of Sellers to the extent relating to the
> Acquired Assets or arising under express or implied warranties, guarantees,
> representations, covenants, indemnities, rights, claims, counterclaims, defenses,
> credits or rights of set-off from or against suppliers or other third parties with
> respect to the Acquired Assets (including rights under vendors' and manufacturers'
> warranties, service rights, indemnities and guaranties).

*Id.* § 1.1.

28.    On April 28, 2025, the Committee filed *Reservation of Rights of the Official

Committee of Unsecured Creditors in Connection with the Debtors' Motion for Entry of an Order

Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors'

Assets* [D.I. 102] (the "Reservation of Rights"), expressly reserving its rights with respect to

adequate liquidity to support an orderly winddown, the scope of proposed credit bidding rights,

the preservation of Estate Actions for the benefit of creditors, and the ultimate terms of any asset

purchase agreement.  *See* Reservation of Rights, ¶ 2.  The Committee also reserved its rights to

object once a Successful Bidder is identified and definitive sale terms are disclosed, as well as the

right to challenge any subsequent developments that may prejudice unsecured creditors or

compromise the fairness and transparency of the sale process.  *Id.* ¶ 3.

29.    At the Second Day Hearing, the Court heard the Bid Procedures Motion and

approved the proposed Bid Procedures, as well as the Debtors' entry into the Stalking Horse

Agreement.  *See Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code,*

*Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially all of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief* [D.I. 149] (the "Bid Procedures Order").

30.    Among other things, the Bid Procedures Order established the following key dates and deadlines in connection with the Sale:

| Event | Deadline |
|---|---|
| Bid Deadline | May 12 at 4:00 p.m. ET |
| Auction (if necessary) | May 15 at 10:00 a.m. ET |
| Supplemental Sale Objection Deadline | May 19 at 11:59 p.m. ET |
| Sale Hearing | May 22 at 10:00 a.m. ET |

Bid Procedures Order, Ex. 1.

31.    Seemingly in response to the concern raised at the Second Day Hearing that 503(b)(9) Claimants may not have been served with the DIP Motion, on May 5, 2025, the Debtors filed the *Supplemental Notice of Sale Hearing* [D.I. 147] (the "Supplemental Notice") requiring 503(b)(9) Claimants to both identify the basis for their claims and object to the payment of sale proceeds to the Debtors' secured lenders by May 19, 2025—just two weeks after the Supplemental Notice was filed.

32.    The Supplemental Notice provides in relevant part:

**PLEASE TAKE FURTHER NOTICE THAT, IN CONNECTION WITH THE SALE, THERE ARE PROVISIONS IN THE PROPOSED SALE ORDER DIRECTING THE PAYMENT OF THE PROCEEDS OF THE SALE TO THE DEBTORS' LENDERS, FREE AND CLEAR OF ANY LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES OF ANY KIND.**

**PLEASE TAKE FURTHER NOTICE THAT, THERE IS CURRENTLY NO EXPECTATION OF, OR PROVISION FOR, PAYMENT OF CLAIMS ASSERTED UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE, WHICH GRANTS ADMINISTRATIVE PRIORITY TO CERTAIN CLAIMS OF CREDITORS FOR THE VALUE OF ANY GOODS RECEIVED BY THE DEBTORS WITHIN 20 DAYS BEFORE THE COMMENCEMENT OF THE CHAPTER 11 CASES IF THE GOODS WERE SOLD TO THE DEBTORS IN THE ORDINARY COURSE OF BUSINESS.**

Supplemental Notice, p. 1.

33.    Although no bar date has been set for 503(b)(9) Claims or otherwise, the Supplemental Notice requires 503(b)(9) Claimants to "state with particularity the legal and factual basis for the 503(b)(9) claim and the specific grounds therefor."  *See* Supplemental Notice.

### (i)    The Committee's Investigation

34.    The Final DIP Order provides the Committee until June 24, 2025 to investigate and assert any challenge to "the extent, validity, perfection, priority or enforceability of the Prepetition Debt, the Prepetition Liens or any other claims or causes of action against Prepetition Agent and Prepetition Lenders, which Debtors, the Committee, or another party-in-interest may bring" (the "Lien Challenge Deadline"), except as to the Term B Loan obligations, which challenges must be brought by August 6, 2025 (the "Term B Challenge Deadline" and together with the Lien Challenge Deadline, the "Challenge Deadlines").  *See* Final DIP Order, Ex. A, ¶¶ 10, 21.

35.    The Final DIP Order also provides that upon expiration of the Challenge Deadlines, the Debtors are deemed to have waived and released any and all claims and causes of action against the Prepetition Lenders relating to the Prepetition Debt, Prepetition Liens, and Prepetition Loan

Documents—including claims against their officers, directors, and principals. *See* Final DIP Order, ¶ 9(b).

36.     The Lien Challenge Deadline is eleven days *after* the Debtors' anticipated Sale closing date, while the Term B Challenge Deadline extends *several months* beyond that milestone, by which time the Prepetition Lenders will have been paid substantially all of the sale proceeds unless the Court directs otherwise. The result is a procedurally compressed timeline that places the Committee in the untenable position of conducting a fulsome lien review and investigating the Prepetition Lenders' prepetition liens and claims under extreme time pressure.

37.     Immediately after its formation and retention of professionals, the Committee began fulfilling its fiduciary duties by investigating, among other things, the validity of the Prepetition Lenders' liens on, and security interests in, the Debtors' assets (the "Lien Review"), as well as potentially value maximizing claims and causes of action.

38.     On April 21, 2025, the Committee sent its initial informal document requests relating to the Lien Review and its investigation of potential claims and causes of action.

39.     Although the Debtors promptly provided documents responsive to the Committee's Lien Review, its analysis of the DIP financing, and the proposed Sale, the Committee received an initial incomplete production of documents responsive to the Committee's other requests on May 5, 2025. While the Debtors have promised that further documents are forthcoming, the Committee is concerned that there will not be adequate time to review the forthcoming documents and complete its investigation in advance of the Sale Hearing.

40.     To the extent the Committee cannot obtain documents necessary to fulfill its fiduciary duties and complete its investigation, the Committee intends to file a motion under

Bankruptcy Rule 2004 and reserves the right to seek a further extension of the Challenge Deadlines.

## <u>OBJECTION</u>

41.     Courts have repeatedly cautioned that, where a debtor proposes a sale of substantially all of its assets in the absence of the procedural safeguards afforded by the plan confirmation process, such a sale warrants heightened judicial scrutiny.  *See In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004); *see also Mission Iowa Wind Co. v. Enron Corp. (In re Enron Corp.*), 291 B.R. 39, 43 (S.D.N.Y. 2003).  Nonetheless, the overarching goal of any proposed asset sale under section 363 of the Bankruptcy Code is to maximize the value of sale proceeds received by the debtor's estate.  *See Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); se*e Burtch v. Ganz (In re Mushroom Transp. Co.*), 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets").

42.     As discussed herein, the Debtors must be required to uphold their fiduciary duties to protect and maximize the value of the estate for the benefit of all stakeholders—not just their secured lenders.  *See In re GSC, Inc.*, 453 B.R. 132, 170 (Bankr. S.D.N.Y. 2011) (holding "the [Debtor] has a fiduciary obligation to the estate as a whole, *not* to the secured creditors to ensure their maximum recovery.").  The proposed Sale is structured to deliver full recovery to the Prepetition Lenders, while providing no meaningful consideration for administrative creditors, no liquidity for a winddown, and no path to a confirmable chapter 11 plan.

43.     If this trajectory continues unchecked, the likely outcome is a dismissal or conversion to chapter 7—after secured creditors have received the benefits of the chapter 11

process and reaped all the benefits of the Sale with the cost of the process borne by unpaid administrative and unsecured creditors.

44. Accordingly, the following remedial action is urgently needed to preserve the integrity of the chapter 11 process and protect what little value may remain for the broader creditor body:

i. *First*, the Debtors must escrow the sale proceeds to ensure that the Committee's lien challenge rights under the Final DIP Order are not rendered meaningless by the immediate repayment to the Prepetition Lenders—any distribution to the Prepetition Lenders should be deferred until the Challenge Deadlines expire or until the Court enters an order resolving a challenge brought by the Committee.

ii. *Second*, the Debtors must establish an adequate reserve from the sale proceeds to fund all allowed administrative expense claims—including 503(b)(9) Claims—and to support an orderly winddown through a liquidating chapter 11 plan.

iii. *Third*, any final Asset Purchase Agreement(s) should continue to exclude Estate Causes of Action from the Sale and must expressly preserve those claims for the benefit of general unsecured creditors.  Under no circumstances should avoidance actions be pursued against ordinary-course trade creditors—creditors who are already being asked to walk away with nothing—simply to generate litigation recoveries for the benefit of secured lenders.

Absent these basic protections, the Sale Motion should not be granted.

I.      **The Sale Should Not Be Approved Unless There Is Adequate Assurance of Administrative Solvency**

45.     The Debtors' sale process is tailored exclusively to benefit their secured lenders. As currently structured, the Sale is almost certain to render the estates administratively insolvent, with no viable mechanism to satisfy administrative claims and no prospect of recovery for general unsecured creditors.  This outcome is fundamentally at odds with the principles of chapter 11, as courts have emphasized that section 363 sales should not be used to circumvent the protections for unsecured creditors mandated by the Bankruptcy Code.  *In re WestPoint Stevens, Inc.*, 333 B.R. 30, 52 (S.D.N.Y. 2005) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures") *aff'd in part, rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010), citing *Clyde Bergemann, Inc. v. Babcock and Wilcox Co. (In re The Babcock & Wilcox Co.)*, 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.").

46.     This Court and others have recognized that a secured lender cannot leverage a section 363 sale for its own benefit without bearing the associated costs (*i.e.*, they must "pay the freight").  *See, e.g.*, *In re Golden Cnty. Foods, Inc.*, Hr'g Tr. at 11:22–24 [D.I. 175], Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015) (requiring that sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of certain alleged prepetition secured debt); *In re Family Christian, LLC*, Hr'g Tr. at 100:17-20, Case No. 15-00643 (JTG) (Bankr. W.D. Mich. Apr. 14, 2015) ("I think we'll have a problem at the Sale Hearing if the administrative expenses are not to be paid in connection with the sale."); *In re NEC Holdings Corp.*, Hr'g Tr. at 23:25–24:1, Case No. 10-11890 (KG) (Bankr. D. Del. July 13, 2010) (secured creditors have "got to the pay the freight, and . . . the freight is certainly an

administratively solvent estate."); *In re Townsends, Inc.*, Hr'g Tr. 39:24–40:1, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011) (upon realizing that section 503(b)(9) claims would not be paid in full, the Court stated: "Well, we've got a problem. Not going to run an administratively insolvent estate."); *In re AFA Invs. Inc.*, Case No. 12-11127 (MFW) (Bankr. D. Del. July 12, 2012) (requiring sale proceeds in excess of postpetition financing obligations to be held in escrow until a later date pending resolution of administrative claims); *In re Encore Healthcare Assocs.*, 312 B.R. 52, 54–55 (Bankr. E.D. Pa. 2004) (denying bidding procedures motion finding that section 363 sale served no legitimate business purpose where lenders were simply utilizing the chapter 11 process to arrange a section 363 sale to be followed by a conversion to chapter 7, all while not providing for payment of all chapter 11 administrative expense claims).  Accordingly, it is inappropriate to use chapter 11 to facilitate a section 363 sale for the sole benefit of a secured lender where there is no real possibility that a plan will be confirmed or ensure that the debtor's estate is administratively solvent after consummation of the sale.

47.     Here, the Sale Motion makes clear that the process is being run exclusively for the benefit of the Prepetition Lenders.  Yet, there is no commitment from the Prepetition Lenders to fund a post-closing winddown, no reserve for administrative expense claims, and no carve-out for the payment of 503(b)(9) obligations. *See* Final DIP Order.  If the Prepetition Lenders wish to use the chapter 11 process to conduct a going-concern sale and extract the benefits of DIP priming liens, the Closing Fee, and the Exit Fee, they must also bear the cost of preserving the integrity of the estate through administrative solvency. *See In re Encore Healthcare Assocs.*, 312 B.R. 52, 57 (Bankr. E.D. Pa. 2004) (denying motion for approval of section 363 sale, finding "the proposed sale not only generates funds solely for the secured creditor . . . but more significantly advances no purpose of a Chapter 11 proceeding").  Otherwise, the Prepetition Lenders are simply using

these Chapter 11 Cases to conduct a court-supervised liquidation of their collateral — reaping the benefits of the bankruptcy process while shifting its costs onto administrative and unsecured creditors left with no path to recovery.

48.     The Debtors' own financial forecasts underscore the Committee's concerns.  While the Budget is projected to run out of cash by the anticipated sale closing date and includes no line item for a winddown or all administrative claims, the Prepetition Lenders will be getting paid from the sale proceeds.  *See* Final DIP Order, Ex. B.  The Debtors' Chief Restructuring Officer, Mr. Ragano, has admitted that the Budget does not guarantee payment of administrative expenses and entirely excludes section 503(b)(9) liabilities.  *See* Ragano Decl. ¶¶ 21–23.  The Debtors have further acknowledged in their Supplemental Notice that there is "no expectation of, or provision for, payment of claims asserted under section 503(b)(9)" in connection with the Sale.  *See* Supplemental Notice, pp. 1–2.  These admissions confirm what the Budget shows: that the estates are headed for administrative insolvency unless a materially higher auction result is achieved.

49.     While the Debtors may hope that a competitive auction will generate enough value to cover administrative expenses, the Sale Motion and Budget provide no protection in the absence of substantially higher bids.  There is no backstop, no administrative claims reserve, and no commitment to fund a liquidating plan.  Absent such protections, the Sale risks leaving unpaid administrative creditors—some of whom are trade vendors entitled to priority under section 503(b)(9)—with no recovery and no recourse.

A.     **Sale Proceeds Should be Held in Escrow Until the Conclusion of the Committee's Investigation**

50.     Compounding the Debtors' apparent administrative insolvency, the Challenge Deadlines—June 24, 2025 and August 6, 2025—are effectively illusory as the Prepetition Lenders will have already received all proceeds from the Sale *before* the Challenge Deadlines.  By the time

-18-

the Committee is able to complete its investigation and assert any meaningful challenge, the value of those claims may have been irretrievably lost.  The result is a procedurally hollow deadline—one that purports to preserve rights while functionally extinguishing a meaningful investigation.

**B.**    **Estate Causes of Action Should be Preserved for General Unsecured Creditors**

51.    In light of the Sale being run solely for the benefit of the secured lenders—while general unsecured creditors are projected to receive no recovery—any Asset Purchase Agreement(s), particularly in the event a Successful Bidder other than Sofidel emerges, must expressly carve out and preserve the Estate Causes of Action for general unsecured creditors.

52.    Given the high likelihood of administrative insolvency in these Chapter 11 Cases, the Estate Causes of Action may represent the only viable source of value for this creditor class, and allowing them to be waived, abandoned, or left unadministered would unfairly deprive unsecured creditors of their last remaining avenue for recovery.  Moreover, under no circumstances should the Debtors pursue avoidance actions against ordinary-course trade creditors—who are already being asked to absorb a total loss—simply to create litigation recoveries that benefit secured lenders.  Estate litigation should not become another mechanism to shift value away from the unsecured creditor body.

53.    Accordingly, the Sale should not be approved unless and until (i) any final sale order includes the escrow of sale proceeds until the Committee completes its investigation, (ii) there is adequate assurance that all allowed administrative expense claims—including 503(b)(9) Claims—will be paid in full, and (iii) the Estate Causes of Action are expressly carved out from the Sale and affirmatively preserved for the benefit of general unsecured creditors, with any avoidance actions against ordinary-course trade creditors expressly buried.

**II.      The Supplemental Notice Violates Due Process Rights and Attempts to Obscure Administrative Insolvency**

54.      Contrary to Debtors' assertions that they are "not hiding the ball" and "never were hiding the ball" with respect to 503(b)(9) Claims, the Debtors' Supplemental Notice attempts to effectively create a bar date for 503(b)(9) Claims that contravenes the Bankruptcy Rules and creditors' due process rights.  *See* Second Day Hr'g Tr. at 11:1–2.

55.      Indeed, pursuant to the Supplemental Notice 503(b)(9) Claimants must file an objection to the Sale by May 19, 2025 (only 14 days after the Supplemental Notice was issued), or risk forfeiting their statutory rights.  *See* Supplemental Notice.  The creation of the 503(b)(9) Deadline improperly shifts the burden from the Debtors—who are obligated under the Bankruptcy Code to ensure the payment of allowed administrative expenses—onto creditors.  Worse, the Debtors appear to be using procedural deadlines and incomplete disclosures to fabricate the appearance of solvency, rather than actually achieving it.

56.      The Bankruptcy Code does not require administrative claimants to object to the distribution of estate assets to preserve their statutory priority.  Rather, section 503(b) provides a mechanism for the allowance of administrative claims, and section 507(a)(2) grants such claims priority in payment.  *See* 11 U.S.C. §§ 503(b), 507(a)(2).  The burden rests squarely with the Debtors to ensure that the estate remains administratively solvent and that administrative claims are paid in accordance with the Bankruptcy Code's priority scheme.  *See In re Farmland Indus., Inc.*, 289 B.R. 122, 126 (B.A.P. 8th Cir. 2003) ("[T]he court must be mindful of the interests of unsecured creditors and the goal of maximizing the value of the bankruptcy estate."); *In re NEC Holdings Corp.*, Hr'g Tr. at 100:17–20 (requiring secured creditors to "pay the freight" by ensuring administrative solvency).

57.     By requiring 503(b)(9) Claimants to file an objection to the payment of sale proceeds to the Prepetition Lenders, the Debtors invert the statutory scheme.  The Bankruptcy Code does not require administrative claimants to retain counsel and object to the distribution of proceeds; rather, it is the Debtors' obligation to demonstrate that the proposed sale and distribution of proceeds will not render the estate administratively insolvent or violate the priority of administrative claims.  *See In re WestPoint Stevens, Inc.*, 333 B.R. at 52 ("[S]ection 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures."); *In re Townsends, Inc.*, Case No. 10-14092 (Bankr. D. Del. 2011) ("will not run an administratively insolvent estate, that he would doubly not want -- run one where certain administrative creditors were getting paid nothing and being discriminated against, and other creditors were being paid in full.  And specifically, those were 503(b)(9) creditors who were not included in that budget.").

58.     The Debtors' effort to shift this burden onto the 503(b)(9) Claimants is not only improper—it is profoundly inequitable.  Section 503(b)(9) claimants are now being forced to retain bankruptcy counsel (at their own expense) simply to preserve statutory rights that the Bankruptcy Code already grants them under sections 503(b)(9) and 507(a)(2).  Unlike filing a proof of claim— which does not require retaining counsel—filing a formal objection to a sale distribution, or asserting administrative priority, does.  *See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201–202 (1993) (citing 28 U.S.C. § 1654, holding "[i]t has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel. . . . [T]he rationale for that rule applies equally to all artificial entities.").  This imposes a legal and financial burden that many trade creditors are ill-equipped to bear, particularly in a case where the current Budget offers no expectation of recovery for 503(b)(9) Claims.

59.      Exacerbating this issue, the notice period for the 503(b)(9) Deadline is shorter than the 21-day notice period prescribed by the Bankruptcy Rules—yet the consequences of inaction are far more severe. *See* Fed. R. Bankr. P. 2002(a)(7) (requiring that creditors receive "at least 21 days' notice by mail" of the time fixed for filing proofs of claim). The 503(b)(9) Claimants are being asked to retain counsel to protect rights they already hold, and to do so on a compressed timeline, all while being offered *nothing* in return. This is a manufactured procedural hurdle, designed to reduce the number of asserted claims and create the appearance that the estate has no meaningful administrative exposure. Requiring creditors to incur legal fees to fight for statutory priority—on an expedited timeline and without any assurance of recovery—is itself a form of prejudice. The Bankruptcy Code does not require creditors to litigate the receipt of payments to which they are already legally entitled.

60.      The 503(b)(9) Deadline is especially troubling in light of the unclear record surrounding the status of 503(b)(9) Claims. On one hand, the Debtors and their advisors assert that trade creditors had shifted to CIA and COD terms "virtually from the time" Mr. Ragano arrived, implying little or no exposure to 503(b)(9) liability. Second Day Hr'g Tr. at 43:9–23. On the other hand, they simultaneously reference up to $2 million in potential 503(b)(9) Claims— without explaining how such claims could exist if vendors were not extending credit. *See id.* At the Second Day Hearing, the Court explicitly highlighted this inconsistency, noting that "it doesn't feel like a very crisp record" and that there was a "lack of specificity" and "contradictions" in the testimony. *Id.* 43:9–23. When Debtors' counsel attempted to explain that those vendors had already been paid and therefore 503(b)(9) Claims might be "zero," the Court responded pointedly: "I certainly did not understand that to be his testimony." *Id.* at 45:11, 21–22.

61.     In other words, the Debtors want it both ways: they want to downplay administrative exposure by asserting there are no unpaid 503(b)(9) Claims, while also creating a mechanism that shifts the burden to creditors to identify and litigate those same claims—before the Sale closes, and without any guarantee of recovery.   This is not transparency; it's gamesmanship.   The confusion surrounding the terms of trade, the unexplained presence of significant section 503(b)(9) exposure, and the Debtors' refusal to reserve any sale proceeds for administrative claims all point to a strategy designed to obscure, rather than confront, the reality of administrative insolvency.

62.     The Bankruptcy Code does not tolerate this kind of maneuvering.   Administrative solvency is not proven by who fails to object in time—it is demonstrated by the Debtors' actual capacity to pay.   Accordingly, until (i) the Debtors make a clear, credible showing that all allowed administrative claims, including 503(b)(9) Claims, will be paid in full, (ii) the final order approving the Sale includes a requirement to escrow the sale proceeds until the conclusion of the Committee's investigation, and (iii) ensure that the Estate Causes of Action will continue to be carved out from the Sale for general unsecured creditors, with any avoidance actions against ordinary-course trade creditors buried, the Sale should not be approved.

## **<u>RESERVATION OF RIGHTS</u>**

63.     The Committee reserves all of its rights to supplement or amend this Objection at or prior to the Sale Hearing.   The Committee also reserves all of its rights with respect to any filing by any party prior to the Sale Hearing.   Nothing contained in, or omitted from this Objection constitutes an admission or stipulation by the Committee, any member of the Committee or any other party with respect to any alleged claims against the Debtors, the Prepetition Lenders, or any other parties as applicable, including but not limited to the amount, validity, enforceability of any

alleged claims against the Debtors, the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' Assets, or any money damage causes of action.

64.    Additionally, because the identity of the Successful Bidder(s) and the ultimate terms of any winning bid(s) are not presently before the Court, the Committee reserves the right to object to any proposed sale(s) at the appropriate time.  For the avoidance of doubt, to the extent the Court deems any issues, including, without limitation, concerning the Successful Bidder, the final terms of any Asset Purchase Agreement(s) with respect to the Assets, successor liability, and similar claims against non-debtor third party buyers are premature and not ripe for judicial decision, the Committee reserves its rights to object to any sales or sale order(s) at the appropriate time.

## <u>CONCLUSION</u>

**WHEREFORE**, the Committee respectfully requests that this Court sustain this Objection and grant the Committee such other and further relief as this Court deems just and appropriate under the circumstances.

Dated:  May 12, 2025
Wilmington, Delaware

**GELLERT SEITZ BUSENKELL & BROWN, LLC**

*/s/ Michael Busenkell*
Michael Busenkell (DE Bar No. 3933)
Michael Van Gorder (DE Bar No. 6214)
1201 North Orange Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 425-5812
E-mail: mbusenkell@gsbblaw.com
        mvangorder@gsbblaw.com

-and-

**LOWENSTEIN SANDLER LLP**
Andrew D. Behlmann (admitted *pro hac vice*)
Colleen M. Restel (admitted *pro hac vice*)
One Lowenstein Drive
Roseland, NJ 07068

Telephone: (973) 597-2500
E-mail: abehlmann@lowenstein.com
      crestel@lowenstein.com

-and-

Bruce S. Nathan (admitted *pro hac vice*)
Lindsay H. Sklar (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
E-mail: bnathan@lowenstein.com
      lsklar@lowenstein.com


*Proposed Counsel to the Official Committee of Unsecured Creditors*