# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ROYAL INTERCO, LLC, *et al*.,<br><br>Debtors[1]. | Chapter 11<br><br>Case No.  25-10674 (TMH)<br><br>(Jointly Administered)<br><br>**Hearing Date: May 22, 2025, 10:00 a.m. (ET)**<br><br>**Re: D.I. 15** |

### SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO SOFIDEL AMERICA CORP.

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors in possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby submits this supplemental objection (the "Supplemental Objection") to the *Debtors' Motion for (I) An Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry Into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899). The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

*of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) An Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [D.I. 15] (the "Sale Motion"). In support of this Supplemental Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1. From the outset of these Chapter 11 Cases, the Committee has cautioned about the risks of running a bankruptcy process intended to exclusively benefit the Debtors' Prepetition Lenders and insiders. While the Committee was optimistic that a robust sale process could drive recoveries for other creditor constituencies, the Debtors now seek approval of an asset purchase agreement that would grant the Prepetition Lenders a $54 million windfall (at a minimum), with no proceeds earmarked for numerous other creditors.

2. Due to the compressed deadlines in these Cases, coupled with the Debtors' failure to timely respond to certain document requests relevant to the potential paydown of the Prepetition Lenders from sale proceeds, the Committee has been unable to complete its investigation into the validity, extent, and enforceability of the Prepetition Lenders' alleged liens and claims, Gridiron's purchase of that debt, or any potential value-maximizing causes of action. To date, document production has been minimal and inadequate and numerous requests remain outstanding. Without this information, the Committee cannot meaningfully assess the extent of the Prepetition Lenders' claims, the fairness of the proposed allocation of the sale proceeds, or the role of Gridiron, a

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Sale Objection (as defined herein).

controlling insider that both guaranteed and partially repaid the Prepetition Debt and now stands to benefit directly from the sale proceeds.

3. The Committee has been forced to operate under extreme time pressure and with incomplete information, while the Debtors push for a near-immediate closing that will pay substantially all of the sale proceeds to NXT Capital, LLC ("NXT")—well before the expiration of the Challenge Deadlines. Many administrative creditors, including 503(b)(9) Claimants, have been told there is no expectation of recovery. Unsecured creditors have no transparency into what, if anything, will remain for them, and yet, the Debtors seek approval of a sale that funnels all proceeds to a group of Prepetition Lenders.

4. While the Committee does not oppose a value-maximizing sale transaction, this has not been a fair or orderly process. Bankruptcy is not meant to deliver private windfalls to the Prepetition Lenders and insiders. Therefore, at a minimum, all sale proceeds (perhaps other than those needed to pay down the new money lent and NXT's first out principal) must be escrowed pending completion of the Committee's investigation and resolution of any timely Challenges. Anything less would strip stakeholders of the protections the Bankruptcy Code guarantees and undermine the legitimacy of the chapter 11 process.

## ADDITIONAL BACKGROUND

5. The Debtors entered these Chapter 11 Cases owing their Prepetition Lenders approximately $205 million (the "Prepetition Secured Debt"), which they proposed to treat as an allowed secured claim of not less than $126 million, including accrued interest and fees, under section 506(b) of the Bankruptcy Code. *See* D.I. 146, ¶ D(3) (the "Final DIP Order").

6. Part of the Prepetition Secured Debt is owed to GC Fund III RP, AIV, L.P. ("Gridiron"), affiliates of which hold an 80% equity interest in the Debtors' parent company RP

-3-

Holdco, LLC, and provided a Sponsor Limited Guaranty of up to $20 million in favor of the Prepetition Lenders. *See* First Day Declaration, ¶ 9. In January 2025, Gridiron paid over $8.3 million under that guaranty while advancing $6.5 million to the Debtors as additional Term B Loans. *Id.* ¶¶ 15–18. Upon information and belief, Gridiron also installed its own designee, Alison Watts, as Chief Finance Officer of the Debtors.

7. When the Chapter 11 Cases commenced, it was anticipated that the Prepetition Lenders may recover $126 million, following repayment of the DIP Facility, given the $126 million stalking horse bid (the "Stalking Horse Bid") from Sofidel America Corp. ("Sofidel").

8. On May 15, 2025, the Debtors conducted a competitive auction for the sale of substantially all of the Debtors' assets (the "Auction"). At the conclusion of the Auction, and after consulting with the Committee in its capacity as a Consultation Party, the Debtors designated (i) Sofidel as the Successful Bidder with a bid of $180,000,000, and (ii) Kimberly-Clark Corporation as the Back-up Bidder for the Acquired Assets. *See* Notice of Successful Bidder, Back-Up Bidder, and Auction Results for the Sale of the Acquired Assets [D.I. 186].

9. Sofidel's $180 million winning bid—an increase of at least $54 million over the Stalking Horse Bid—dramatically enhanced the Prepetition Lenders' recovery and position beyond stated expectations. Pursuant to the Final DIP Order, sale proceeds are applied first to fund the Carveout Reserves and budgeted expenses, with the remainder flowing to repay the DIP Facility and then satisfy the Prepetition Debt. *See id.* ¶ 13. Due to the increased purchase price, the DIP Lenders and Prepetition Lenders (including Gridiron), stand to be repaid in full or close to it.

10. In contrast, there is no assurance that other critical constituencies—such as holders of administrative claims other than those the Prepetition Lenders have expressly agreed to fund

pursuant to the budget—will receive any recovery at all. While the Committee had hoped the millions coming into the Debtors' estate would bolster administrative solvency and generate recoveries beyond the Prepetition Lenders, it became glaringly apparent that the incremental proceeds that resulted in large part from the bankruptcy process were destined straight into the Prepetition Lenders' pockets. Indeed, despite the enhanced sale value, the Budget does not reserve funds for these claims or for a wind-down through a liquidating chapter 11 plan. The result is a slash-and-burn liquidation where lenders and insiders are poised to recover nearly everything, while trade creditors and other administrative claimants face significant risk of being left behind.

### A. The Committee's Investigation

11. The Final DIP Order establishes a Lien Challenge Deadline of June 24, 2025, and a Term B Challenge Deadline of August 6, 2025. *See* Final DIP Order, Ex. A, ¶¶ 10, 21. Upon the expiration of these deadlines, the Debtors are deemed to have waived all claims against the Prepetition Lenders. *See id.* ¶ 9(b). These deadlines are particularly problematic: the Lien Challenge Deadline falls just eleven days after the anticipated Sale closing, and the Term B Deadline extends several months past that point—by which time the Prepetition Lenders will have already received substantially all sale proceeds. That would leave conversion or dismissal as the only likely options for winding down these estates.

12. Aware of these significant time constraints, the Committee has acted promptly and diligently. Immediately upon its appointment, the Committee began investigating the Prepetition Lenders' alleged liens and potential claims, as well as any potentially value maximizing claims and causes of action.

13. On April 21, 2025, the Committee issued informal document requests to the Debtors. While the Debtors eventually provided partial productions relating to the DIP Facility and Sale, they failed to produce documents responsive to the Committee's broader investigation.

Two weeks later, the Debtors provided an additional production, which still failed to address several of the Committee's critical requests. Alarmingly, despite the Committee's repeated reminders, and the Debtors' assurances that additional documents would be forthcoming, no further production has been made as of the date of this Supplemental Objection (other than the Debtors' organizational documents)—even after the Committee filed its Sale Objection noting such deficiencies.

## SUPPLEMENTAL OBJECTION

**A.     The Sale Proceeds Should Be Escrowed**

14.     The Debtors' dilatory behavior, coupled with the highly compressed timeline, are preventing the Committee from performing its fiduciary duties. The Committee's investigation efforts are hampered by outstanding requests related to the validity of Gridiron's alleged liens on, and security interests in, the Debtors assets, as well as potential claims and causes of action that may exist against Gridiron and others. Now, on the eve of the Sale Hearing, the Debtors have promised a voluminous "document dump," which the Committee cannot meaningfully review in time to evaluate (let alone challenge) the asserted secured claims, the insider debt purchase, the proposed sale allocations, or the ultimate distribution waterfall.

15.     Given this incomplete record—and with the Challenge Deadlines running weeks after the expected sale closing (which, in any event, threatens to moot the Committee's challenge rights)—the Court should direct that all sale proceeds remaining after repayment of the DIP Facility and NXT's loan be placed in escrow, pending (i) completion of full a document production responsive to the Committee's initial document requests, (ii) the Committee's review and, if warranted, any asserted Challenges, and (iii) further order of the Court. This is especially necessary because Gridiron stands to receive a meaningful portion of the sale proceeds after the

DIP Lenders and Prepetition Lenders are repaid, threatening to leave the estate as an administratively insolvent shell with no recourse.

16. Merely escrowing a limited carveout is insufficient. No funds should be distributed until all liens are vetted and all administrative claims are accounted for. To do so otherwise would eviscerate the purpose of the Challenge Deadlines and render the Committee's role meaningless.

**B.     The Sale Has Already Delivered a $54 Million Windfall Funded by the Chapter 11 Process**

17. Upon the commencement of these Chapter 11 Cases, the Stalking Horse Agreement contemplated a base purchase price of $126 million. The Auction has resulted in the Successful Bid of $180 million, conferring at least a $54 million incremental benefit to the Prepetition Lenders—a benefit available only because the collateral was marketed and sold through a chapter 11 process. Outside of bankruptcy, the Prepetition Lenders would have been forced to foreclose on distressed, single-purpose manufacturing assets and likely would have recovered nowhere near the purchase price now achieved through the chapter 11 process.

18. Having already secured that windfall, the Prepetition Lenders cannot fairly insist on immediate payment of the entire purchase price while (i) informal discovery remains incomplete, (ii) the Challenge Deadlines continue to run, and (iii) administrative creditors—especially holders of section 503(b)(9) claims—face a real prospect of non-payment. *See, e.g.*, *In re Golden Cnty. Foods, Inc.*, Hr'g Tr. at 11:22–24 [D.I. 175], Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015) (requiring that sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of certain alleged prepetition secured debt); *In re Family Christian, LLC*, Hr'g Tr. at 100:17-20, Case No. 15-00643 (JTG) (Bankr. W.D. Mich. Apr. 14, 2015) ("I think we'll have a problem at the Sale Hearing if the administrative expenses are not to be paid in connection with the sale."); *In re NEC Holdings*

*Corp.*, Hr'g Tr. at 23:25–24:1, Case No. 10-11890 (KG) (Bankr. D. Del. July 13, 2010) (secured creditors have "got to the pay the freight, and . . . the freight is certainly an administratively solvent estate."); *In re Townsends, Inc.*, Hr'g Tr. 39:24–40:1, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011) (upon realizing that section 503(b)(9) claims would not be paid in full, the Court stated: "Well, we've got a problem. Not going to run an administratively insolvent estate."); *In re AFA Invs. Inc.,* Case No. 12-11127 (MFW) (Bankr. D. Del. July 12, 2012) (requiring sale proceeds in excess of postpetition financing obligations to be held in escrow until a later date pending resolution of administrative claims); *In re Encore Healthcare Assocs.*, 312 B.R. 52, 54–55 (Bankr. E.D. Pa. 2004) (denying bidding procedures motion finding that section 363 sale served no legitimate business purpose where lenders were simply utilizing the chapter 11 process to arrange a section 363 sale to be followed by a conversion to chapter 7, all while not providing for payment of all chapter 11 administrative expense claims).

19. Instead, the Debtors have repeatedly stated that "there is currently no expectation of, or provision for, payment of claims asserted under section 503(b)(9)." *See* Supplemental Notice, pp. 1–2. Every dollar that would otherwise satisfy these priority claims will instead flow to the Prepetition Lenders and to Gridiron—an insider who purchased part of the Prepetition Secured Debt at a discount and, upon information and belief, installed its own designee as Chief Financial Officer of the Debtors. Permitting the Debtors to freeze out the trade vendors who kept their business operating while funneling the incremental bankruptcy premium to an insider-controlled lender violates the most basic principles of chapter 11 and invites the very abuse the Committee's investigation is designed to expose. *See In re GSC, Inc.*, 453 B.R. 132, 170 (Bankr. S.D.N.Y. 2011) (holding "the [Debtor] has a fiduciary obligation to the estate as a whole, *not* to the secured creditors to ensure their maximum recovery."); *In re WestPoint Stevens, Inc.*, 333 B.R.

30, 52 (S.D.N.Y. 2005) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures") *aff'd in part, rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010), citing *Clyde Bergemann, Inc. v. Babcock and Wilcox Co.* (*In re The Babcock & Wilcox Co.*), 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.").

20. Accordingly, the Committee respectfully requests that the Court (i) deny approval of the Sale Motion unless the final sale order (a) requires that any remaining proceeds following the repayment of the DIP Facility and NXT's loan be placed in escrow in an account maintained by the Debtors' counsel or a third-party escrow agent, and (b) prohibits any disbursement of such funds—whether to the DIP Lenders, Prepetition Lenders, Gridiron, any other lender, or any insider—absent further order of the Court after the later of (1) the Committee's completion of its investigation, (2) the expiration of the Challenge Deadlines, and (3) resolution of any timely-filed Challenges; and (ii) require the Debtors to establish a segregated reserve, senior to any distribution on account of Prepetition Secured Debt, sufficient to pay in full all allowed administrative expense claims, including—without limitation—claimants entitled to priority under section 503(b)(9) of the Bankruptcy Code;  and (c) grant such other and further relief as the Court deems just and proper.

## RESERVATION OF RIGHTS

21. The Committee reserves all of its rights to supplement or amend this Supplemental Objection at or prior to the Sale Hearing.  The Committee also reserves all of its rights with respect to any filing by any party prior to the Sale Hearing.  Nothing contained in, or omitted from this Supplemental Objection constitutes an admission or stipulation by the Committee, any member of

the Committee or any other party with respect to any alleged claims against the Debtors, the Prepetition Lenders, or any other parties as applicable, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtors, the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' Assets, or any money damage causes of action.

## **CONCLUSION**

**WHEREFORE**, the Committee respectfully requests that this Court sustain this Supplemental Objection and grant the Committee such other and further relief as this Court deems just and appropriate under the circumstances.

Dated: May 19, 2025
Wilmington, Delaware

        **GELLERT SEITZ BUSENKELL & BROWN, LLC**

        */s/ Michael Busenkell*
        Michael Busenkell (DE Bar No. 3933)
        Michael Van Gorder (DE Bar No. 6214)
        1201 North Orange Street, Suite 300
        Wilmington, DE 19801
        Telephone: (302) 425-5812
        E-mail: mbusenkell@gsbblaw.com
                mvangorder@gsbblaw.com

        -and-

        **LOWENSTEIN SANDLER LLP**
        Andrew D. Behlmann (admitted *pro hac vice*)
        Colleen M. Restel (admitted *pro hac vice*)
        One Lowenstein Drive
        Roseland, NJ 07068
        Telephone: (973) 597-2500
        E-mail: abehlmann@lowenstein.com
                crestel@lowenstein.com

        -and-

        Bruce S. Nathan (admitted *pro hac vice*)
        Lindsay H. Sklar (admitted *pro hac vice*)
        1251 Avenue of the Americas
        New York, NY 10020
        Telephone: (212) 262-6700
        E-mail: bnathan@lowenstein.com
                lsklar@lowenstein.com

        *Proposed Counsel to the Official Committee of Unsecured Creditors*