## Exhibit A

**Sofidel APA**

*Execution Version*
**CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**ROYAL INTERCO, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN,**

**AS SELLERS**

**AND**

**SOFIDEL AMERICA CORP.,**

**AS PURCHASER**


**Dated as of May 20, 2025**

**TABLE OF CONTENTS**

                                                                                                    Page

ARTICLE I DEFINITIONS ................................................................................................ 1

    1.1    Definitions ........................................................................................................ 1

ARTICLE II SALE AND PURCHASE OF ASSETS ..................................................... 13

    2.1    Sale and Purchase of Assets ........................................................................ 13

    2.2    Excluded Assets ............................................................................................ 14

    2.3    Assumed Liabilities ...................................................................................... 16

    2.4    Excluded Liabilities ..................................................................................... 16

    2.5    Non-Assignable Assets ................................................................................ 16

    2.6    Consideration ................................................................................................ 17

    2.7    Determination of Final Adjustment. ............................................................. 18

    2.8    Allocation of Consideration ......................................................................... 20

    2.9    Withholding .................................................................................................. 20

    2.10    Accounts Receivable .................................................................................. 20

ARTICLE III CLOSING; CONDITIONS TO CLOSING ............................................. 21

    3.1    Closing.......................................................................................................... 21

    3.2    Conditions to Obligations of Purchaser....................................................... 21

    3.3    Conditions to Obligations of Sellers ........................................................... 22

    3.4    Conditions to Obligations of Sellers and Purchaser .................................... 23

    3.5    Delivery of Possession of Assets ................................................................. 23

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............. 23

    4.1    Organization, Good Standing and Power ..................................................... 23

    4.2    Authority Relative to this Agreement; Execution and Binding Effect ........ 23

    4.3    Governmental and Other Consents............................................................... 24

    4.4    Assets............................................................................................................ 24

    4.5    Environmental .............................................................................................. 24

    4.6    Actions.......................................................................................................... 25

    4.7    Compliance with Laws ................................................................................. 25

    4.8    Real Property ................................................................................................ 25

4.9    Financial Statements ................................................................................................ 26

4.10   Material Contracts ................................................................................................... 27

4.11   Material Suppliers and Customers ......................................................................... 27

4.12   Intellectual Property ............................................................................................... 27

4.13   Privacy; Data Protection; IT Assets ...................................................................... 29

4.14   Employee Benefits .................................................................................................. 29

4.15   Labor ....................................................................................................................... 29

4.16   Brokers .................................................................................................................... 30

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ....................... 30

5.1    Organization, Good Standing and Power ............................................................... 30

5.2    Authority Relative to this Agreement; Execution and Binding Effect .................... 30

5.3    Governmental and Other Consents ......................................................................... 30

5.4    Brokers .................................................................................................................... 31

ARTICLE VI COVENANTS ................................................................................................... 31

6.1    Access to Facilities, Personnel, and Information ................................................... 31

6.2    Bidding Procedures and Order ............................................................................... 32

6.3    Sale Order ............................................................................................................... 32

6.4    Further Assurances; Efforts .................................................................................... 33

6.5    Employee Matters ................................................................................................... 34

6.6    Tax Matters ............................................................................................................. 37

6.7    Casualty .................................................................................................................. 38

6.8    Modification of a Schedule .................................................................................... 38

6.9    Title and Survey ..................................................................................................... 38

6.10   Conduct of Business of Seller ................................................................................ 39

6.11   Intellectual Property Matters ................................................................................. 41

6.12   Removal or Disposal of Excluded Assets .............................................................. 41

6.13   Confidentiality ........................................................................................................ 42

ARTICLE VII TERMINATION; EFFECT OF TERMINATION ............................................ 42

7.1    Termination ............................................................................................................. 42

7.2    Effect of Termination .............................................................................................. 43

ARTICLE VIII GENERAL PROVISIONS .............................................................................. 44

8.1     "As Is", "Where Is", and "With all Faults" Transaction ............................................... 44

8.2     Transaction Expenses ............................................................................................. 44

8.3     Certain Interpretive Matters and Definitions......................................................... 44

8.4     Survival; Termination of Representations and Warranties .................................... 44

8.5     Amendment ............................................................................................................ 45

8.6     Waiver .................................................................................................................... 45

8.7     Notices ................................................................................................................... 45

8.8     Jurisdiction ............................................................................................................ 46

8.9     Governing Law ...................................................................................................... 47

8.10    Damages ................................................................................................................. 47

8.11    Time is of the Essence ........................................................................................... 47

8.12    Severability ............................................................................................................ 47

8.13    Titles and Headings ............................................................................................... 47

8.14    Assignment; Successors and Assigns .................................................................... 47

8.15    No Third-Party Rights ........................................................................................... 47

8.16    Execution of this Agreement ................................................................................. 48

8.17    Waiver of Trial by Jury ......................................................................................... 48

8.18    Entire Agreement ................................................................................................... 48

8.19    Sellers' Representative ........................................................................................... 48

8.20    Bulk Sales Laws .................................................................................................... 49

8.21    Publicity.................................................................................................................. 49

EXHIBIT A Bidding Procedures ......................................................................................... 2

EXHIBIT B Form of Bill of Sale and Assignment and Assumption Agreement............................ 3

EXHIBIT C Form of Intellectual Property Assignment Agreement .................................................. 4

EXHIBIT D Form of Short Form Trademark Assignment Agreement............................................. 5

EXHIBIT E Form of Short Form Domain Name Assignment Agreement ................................... 6

EXHIBIT F Form of Deed............................................................................................................. 7

EXHIBIT G Form of Assignment of Leases.................................................................................. 8

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is dated as of May 20, 2025 and entered into by and among Royal Interco, LLC, a Delaware limited liability company ("Royal Interco"), the direct and indirect subsidiaries of Royal Interco as set forth in the signature pages attached hereto (together with Royal Interco, "Sellers" and each, individually, a "Seller"), and Sofidel America Corp., a Florida corporation ("Purchaser").  Sellers and the Purchaser are collectively referred to as the "Parties" and individually as a "Party."

**WHEREAS**, Sellers and their Affiliates are in the business of designing, developing, manufacturing, marketing, distributing, and selling personal and commercial paper products, including bath tissue, paper towels, facial tissue and napkins (the "Business");

**WHEREAS**, Sellers filed voluntary petitions for relief commencing cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. ("Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") on April 8, 2025 (the "Petition Date");

**WHEREAS**, Sellers intend to continue in the possession and control of their assets and properties in accordance with Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, Sellers desire to sell to Purchaser substantially all of their and their Affiliates' assets, properties and rights that are used or held for use in connection with, or otherwise related to, the conduct of the Business pursuant to the terms and conditions of this Agreement, and Purchaser desires to so purchase and acquire such assets, properties and rights from Sellers and their Affiliates (the "Acquisition") in accordance with the terms and conditions of this Agreement and free and clear of liens, claims, encumbrances and interests under Sections 363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing premises, the representations, warranties, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Definitions**.

As used herein, the following terms shall have the following meanings:

"Accounting Firm" means such nationally recognized independent public accounting firm that will accept such appointment and that is mutually agreed to by the Purchaser and Sellers; *provided*, *further*, that if Purchaser and the Sellers are unable to agree on a nationally recognized independent public accounting firm that will accept such appointment within five (5) Business Days of beginning discussions with respect to the selection of an Accounting Firm, either Party may request that a nationally recognized public accounting firm that has not had a material

relationship with either of the Parties in the preceding two (2) years be appointed and upon such appointment "Accounting Firm" shall mean such firm.

"Accounting Firm's Report" has the meaning assigned to that term in Section 2.7(b)(iii).

"Accounts Receivable" means all accounts receivable of the Business and other receivables of the Business (whether or not billed).

"Acquired Assets" has the meaning assigned to that term in Section 2.1.

"Acquired AR Amount" means the aggregate dollar value of the Acquired Pre-Closing Accounts Receivable as of immediately prior to the Closing.

"Acquired Pre-Closing Accounts Receivable" has the meaning assigned to that term in Section 2.1(l)(i).

"Acquisition" has the meaning assigned to that term in the recitals hereto.

"Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory.

"Additional Payment Amount" has the meaning assigned to that term in Section 2.7(c)(iii).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agent" means NXT Capital, LLC, in its capacity as Agent pursuant to the Credit Agreement.

"Agreement" has the meaning assigned to that term in the Preamble.

"Alternative Transaction" means a transaction or series of transactions, direct or indirect, pursuant to which Sellers would sell, transfer, or otherwise dispose of (a) all or a material portion of the Acquired Assets or any group of assets that includes all or a material portion of the Acquired Assets or (b) legal or beneficial ownership of a majority of the equity interests of Sellers, in either case, to a Person other than Purchaser or any Affiliate of Purchaser (or a group or joint

2

venture that includes Purchaser or any Affiliate of Purchaser) in accordance with the Bidding Procedures Order or otherwise, in either case of (a) or (b), whether by merger, sale of assets or equity, recapitalization, plan of reorganization, or otherwise, but shall exclude sales of goods or services of the Business conducted in the ordinary course.

"Ancillary Agreements" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"Assigned Contracts" has the meaning assigned to that term in Section 2.1(e).

"Assignment of Leases" has the meaning assigned to that term in Section 3.2(d).

"Assumed Liabilities" has the meaning assigned to that term in Section 2.3.

"Auction" means the auction conducted by Sellers in accordance with the Bidding Procedures.

"Avoidance Actions" means any claim, right or cause of action of a Seller arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law relating to Sellers, the Acquired Assets or the Assumed Liabilities.

"Balance Sheet Date" has the meaning assigned to that term in Section 4.9.

"Bankruptcy Code" has the meaning assigned to that term in the recitals hereto.

"Bankruptcy Court" has the meaning assigned to that term in the recitals hereto.

"Base Purchase Price" has the meaning assigned to that term in Section 2.6(a).

"Bidding Procedures" means the bidding procedures, in the Bidding Procedures Order, approved by the Bankruptcy Court for purposes of seeking bids for the purchase of the Acquired Assets at the Auction.

"Bidding Procedures Order" means the Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del.Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief (Docket No. 149) entered by the Bankruptcy Court in the Bankruptcy Cases.

"Bill of Sale and Assignment Agreement" has the meaning assigned to that term in Section 3.2(d).

"Books and Records" has the meaning assigned to that term in Section 2.1(h).

3

"Business" has the meaning assigned to that term in the Preamble.

"Business Day" means any day on which commercial banking institutions are open for business in Wilmington, Delaware, New York, New York, and in Milan, Italy.

"Business Employee" has the meaning assigned to that term in Section 4.11(a).

"Cash Purchase Price" has the meaning assigned to that term in Section 2.6(a).

"Casualty" has the meaning assigned to that term in Section 6.7.

"Chapter 11 Cases" has the meaning assigned to that term in the recitals hereto.

"Closing" has the meaning assigned to that term in Section 3.1.

"Closing Date" has the meaning assigned to that term in Section 3.1.

"Confidential Information" means any and all of the following information:

(i)       all information that is a trade secret under applicable trade secret or other Law, including, trade secrets as defined under the Uniform Trade Secrets Act.

(ii)      all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists or identities, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware and software and database technologies, systems, structures and architectures;

(iii)     all information concerning the Business (which includes historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, customer lists and files, contracts, the names and backgrounds of key personnel and personnel training techniques and materials, however, documented);

(iv)      any documents or materials marked "confidential" or "proprietary"; and

(v)       all notes, analyses, compilations, studies, summaries and other material prepared to the extent containing or based, in whole or in part, upon any information included in the foregoing.

Any trade secrets will also be entitled to all of the protections and benefits under applicable trade secret Law and any other applicable Law. If any information that the Purchaser deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this Agreement, such information will still be considered Confidential Information for the purposes

4

of this Agreement to the extent included within the definition.  In the case of trade secrets, Sellers hereby waive any requirement that the other party submit proof of the economic value of any trade secret or post a bond or other security.

"Contracts" means all agreements, contracts, leases, consensual obligations, promises or undertakings, whether written or oral.

"Contributor" has the meaning assigned to that term in Section 4.12(g).

"Credit Agreement" means that certain Credit Agreement dated as of June 15, 2018 by and among Royal Paper, LLC, an Arizona limited liability company, Doubletree Paper Mills, L.L.C., an Arizona limited liability company, and Sun Paper Company, LLC, a Delaware limited liability company, as borrowers, the lenders party thereto, and Agent, as amended.

"Cure Amounts" means all amounts, costs and expenses required to be paid and obligations that must otherwise be satisfied under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with assumption and assignment of the Assigned Contracts to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Cure Costs Adjustment Amount" means the aggregate amount of (a) in respect of the Sale Leaseback Agreement (without duplication with respect to the Sale Leaseback Adjustment) and the Real Property Leases, all Cure Amounts, in each case as of immediately prior to the Closing, *plus* (b) in respect of the other Assigned Contracts that are referred to in Schedule 2.3(a)(i), the greater of (A) the aggregate amount of all Cure Amounts as of immediately prior to the Closing, *minus* the aggregate amount of the estimated Cure Amount for such other Assigned Contracts as set forth on Schedule 2.3(a)(i) or (B) Zero US Dollar US$ 0, *plus* (c) in respect of such other Assigned Contracts that are not referred to in Schedule 2.3(a)(i), fifty percent (50%) of all Cure Amounts as of immediately prior to the Closing.

"Debtors" means Sellers collectively, and "Debtor" shall mean each of the foregoing individually.

"Deed" has the meaning assigned to that term in Section 3.2(d).

"Deposit" has the meaning assigned to that term in Section 2.6(b).

"Disputed Items" has the meaning assigned to that term in Section 2.7(b)(iii).

"Employee Benefit Plans" means (i) each "employee benefit plans" (as defined in Section 3(3) of ERISA), whether or not subject to ERISA; (ii) each employment, consulting, restrictive covenant (including non-competition and employee non-solicitation), employee loan or other compensation agreements; (iii) each collective bargaining agreement or other agreement with any works council or association; and (iv) each bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, profit sharing, change in control, severance, termination, retention, leave of absence, vacation or other paid or unpaid leave, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, Section 125 cafeteria, dependent care, pension, retirement, welfare benefit or other material employee, retiree, compensation or fringe benefit plans, policies, agreements or

arrangements, whether or not written or unwritten, qualified or unqualified, funded or unfunded, subject to ERISA and all underlying insurance policies, trusts and other funding vehicles, in each case (i) that is currently maintained, sponsored, contributed to or required to be contributed to by any Seller for current or former employees, officers, directors or consultants of any Seller, or the beneficiaries or dependents of any such individual, or (ii) under which any Seller may have any material Liability.

"Environmental Laws" means the common law and any applicable federal, state, local and foreign Law relating in any manner to pollution, the protection of human health and safety, or the environment or the disposal, generation, handling, management, manufacture, storage, transportation, treatment, use or Release of or exposure to Hazardous Materials, including, without limitation: the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq.; the Clean Water Act, as amended, 33 U.S.C. §§ 1251 et seq.; CERCLA; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901 et seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §§ 11001 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, as amended, 7 U.S.C. §§ 136 et seq.; the Occupational Safety and Health Act of 1970, as amended; and any applicable state and local Law.

"Environmental Permits" means all permits, licenses, franchises, certificates, approvals, waivers, variances, consents and other authorizations required under applicable Environmental Laws.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that, together with any Seller, is or would have been at any date of determination occurring within the preceding six (6) years, treated as a single employer within the meaning of Section 414 of the Code.

"Escrow Agent" means Kurtzman Carson Consultants, LLC dba Verita Global, LLC.

"Estate" shall mean the estate of each Debtor created by Section 541 of the Bankruptcy Code upon the Petition Date, and "Estates" shall mean, collectively, the estates of all of the Debtors created by Section 541 of the Bankruptcy Code in the Chapter 11 Cases.

"Estate Causes of Action" shall mean any and all causes of action, defenses, and counterclaims accruing to the Debtors or that is property of their Estates, based upon facts, circumstances and transactions that occurred prior to the Closing Date, including any avoidance or recovery action that belongs to or could have been raised by the Debtors or the debtors in possession or their respective Estates under Chapter 5 of the Bankruptcy Code; *provided, however,* that "Estate Causes of Action" shall not include causes of action of Sellers to the extent relating to the Acquired Assets or arising under express or implied warranties, guarantees, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits or rights of set-off from or

against suppliers or other third parties with respect to the Acquired Assets (including rights under vendors' and manufacturers' warranties, service rights, indemnities and guaranties).

"Estimated Cash Purchase Price" has the meaning assigned to that term in Section 2.6(a).

"Excluded Assets" has the meaning assigned to that term in Section 2.2.

"Excluded Books and Records" has the meaning assigned to that term in Section 2.2(e).

"Excluded Liabilities" has the meaning assigned to that term in Section 2.4.

"Final Adjustment" has the meaning assigned to that term in Section 2.7(b)(ii).

"Final Allocation Schedule" has the meaning assigned to that term in Section 2.8.

"Final List" has the meaning assigned to that term in Section 6.5(a).

"Final Order" means an order of the Bankruptcy Court that has not been appealed, reversed, modified, amended or stayed and the time to appeal from or to seek review or rehearing of such order has expired.

"Financial Statements" has the meaning assigned to that term in Section 4.9.

"GAAP" means generally accepted accounting principles, consistently applied.

"Governmental Authorization" means any consent, franchise, license, registration, permit, order or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including, as the context may require, any declarations or filings with, or expiration of waiting periods imposed by, any such Governmental Body.

"Governmental Body" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction, (ii) federal, state, local, municipal, foreign or other government, (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (iv) multinational organization or body, (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (vi) official of any of the foregoing.

"Hazardous Materials" means any pollutant, contaminant, chemical, or any toxic or hazardous agent, material, substance or waste, including all agents, materials, substances or wastes for which liability or standards of care or a requirement for investigation or remediation are imposed under, or that are otherwise subject to, Environmental Law, and including asbestos and asbestos-containing materials, petroleum (including crude oil or any fraction thereof), per- and polyfluoroalkyl substances, polychlorinated biphenyls and radioactive materials.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Indebtedness" has the meaning assigned to that term in Section 6.10(b)(i)(A).

"Intellectual Property" means all of the following, arising anywhere in the world, whether registered or unregistered: (a) trademarks, trade names, trade dress, corporate names, company names, business names, product or brand names, service marks, logos and other indicia of source or origin, including any applications and registrations for the foregoing, and all goodwill associated therewith or symbolized thereby (collectively, "Trademarks"), (b) patents and patent applications, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, re-examinations, extensions and reissues and inventions (whether or not patentable), (c) copyrights (including moral rights), and any applications for or registrations of any of the foregoing and works of authorship, (d) know-how, confidential or proprietary information, protocols, schematics, specifications, processes, customer lists and supplier lists, marketing and technical information, software, software code (in any form, including source code and executable or object code), algorithms, subroutines and techniques (collectively, "Trade Secrets"), (e) designs, (f) user interfaces, URLs, domain names and web sites and (g) other forms of technology (whether or not embodied in any tangible form), data and databases, (h) all tangible embodiments of any of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries and (i) any other intellectual property or intangible property and any rights relating to any of the foregoing.

"Inventory Adjustment Amount" means: (i) if the Inventory Amount is greater than $15,000,000.00, a positive amount equal to (A) the Inventory Amount, *minus* (B) $15,000,000.00; (ii) if the Inventory Amount is less than $13,000,000.00, a negative amount equal to (A) the Inventory Amount, *minus* (B) $13,000,000.00; and (iii) if Inventory Amount is less than or equal to $15,000,000.00 but greater than or equal to $13,000,000.00, an amount equal to $0.00.

"Inventory Amount" means the book value of all inventories of, raw materials, chemicals, packaging materials, goods in transit, semi-finished goods and finished goods and products that are used, or held for use, exclusively in the Business as of immediately prior to the Closing, as determined in accordance with past practice prior to the Petition Date; *provided*, that the book value shall exclude (a) any inventories that are obsolete or not in good working condition or (b) any inventories in excess of the quantities that are reasonably expected to be useable or saleable during the six-month period immediately following the Closing. For the avoidance of doubt, Inventory Amount shall exclude the value of any equipment or spare parts.

"knowledge" or "knowledge of Sellers" or any other similar knowledge qualification, means the actual knowledge of Michael Ragano, in his capacity as Chief Restructuring Officer of Sellers, Steven Schoembs, in his capacity as Chief Executive Officer of Sellers, and Todd Hawkins, in each case, after due inquiry of their direct or indirect reports who would reasonably be expected to have knowledge as to the relevant matter.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"Leased Real Property" shall have the meaning set forth in Section 4.8(b).

"Liability" means any and all obligations, liabilities, debts, adverse claims, responsibility, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"Lien" means any mortgage, deed of trust, lien, pledge, charge, title defect, security interest, pledge, mortgage, easement, hypothecation, claim, leasehold interest or other legal or equitable encumbrance of any kind.

"Material Adverse Effect" means any change, development, circumstance, fact or effect that, individually or taken together with any other changes, developments, circumstances, facts or effects, has had or would reasonably be expected to have a material adverse effect on (a) the operations, business assets or properties, or condition (financial or otherwise) of Sellers, taken as a whole (other than those pursuant to (or as expressly contemplated by) orders entered by the Bankruptcy Court in the Chapter 11 Cases), or (b) the ability of Sellers to perform any of its obligations under this Agreement in any material respect, but in the case of clause (a) only excluding such effect to the extent resulting from or arising in connection with (i) the pendency or consummation of the Transactions or the public announcement thereof, (ii) changes or conditions affecting the industries generally in which Sellers operate, including changes to tax, stamp duty, tariffs and similar charges, (iii) changes in national or international business, economic, political or social conditions, including the engagement of the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, (iv) changes after the date hereof in Laws or conditions generally affecting the manufacture, sale or supply of any personal and commercial paper products, (v) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), (vi) changes in Law or GAAP or interpretations thereof or (vii) any action taken by any Seller or Purchaser required or contemplated by this Agreement, *provided*, *however*, that with respect to clauses (ii), (iii), (iv), (v) and (vi) of this definition, such changes, developments, circumstances, facts or effects shall be taken into account in determining whether a "Material Adverse Effect" has occurred or would reasonably be expected to occur to the extent it materially and disproportionately affects Sellers, taken as a whole, relative to other companies operating in the industry in which Sellers operate.

"Material Contracts" has the meaning assigned to that term in Section 4.10(a).

"Material Customer" has the meaning assigned to that term in Section 4.11(b).

"Material Supplier" has the meaning assigned to that term in Section 4.11(a).

"Notice of Disagreement" has the meaning assigned to that term in Section 2.7(b)(ii).

"Non-Recourse Person" has the meaning assigned to that term in Section 8.15.

"Order" means any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or writ of any arbitrator, mediator or Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business, consistent with past practice prior to the Petition Date.

"Outside Date" has the meaning assigned to that term in Section 7.1(b).

"Owned Real Property" shall have the meaning set forth in Section 4.8(a).

"Parties" has the meaning assigned to that term in the Preamble.

"Permit" means all permits, licenses, franchises, variances, exemptions, orders, certifications, registrations and other authorizations, consents and approvals of all Governmental Bodies necessary to conduct business.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Personal Information" means any information that (a) identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual, device or household or (b) constitutes "personal data," "personal information," "protected health information," "nonpublic personal information" or other similar defined term under any applicable Law.

"Petition Date" has the meaning assigned to that term in the recitals hereto.

"Phase I ESA" has the meaning assigned to that term in Section 3.2(f).

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and any portion of any Straddle Period ending on the Closing Date.

"Privacy Laws" shall mean all Laws relating to the Processing, privacy or security of Personal Information and all regulations or guidance issued thereunder, including Section 5 of the Federal Trade Commission Act, the California Consumer Privacy Act of 2018, (as amended by the California Privacy Rights Act of 2020), the EU General Data Protection Regulation (EU) 2016/679 and all laws implementing it (including as it was retained as domestic law in the United Kingdom following the United Kingdom's exit from the EU, known as the "UK GDPR"), and all other Laws, regulations, guidelines, industry standards (including the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as may be revised from time to time) and codes of practice, relating to data protection, information security,

cybercrime, data breach notification, social security number protection, outbound communications and/or electronic marketing, use of electronic data and privacy matters (including online privacy) in any applicable jurisdictions.

"Processing" together with its cognates means any operation or set of operations which is performed upon Personal Information, by any means, such as collection, access, acquisition, recording, organization, storage, adaptation or alteration, retrieval, protection, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure, disposal, deletion, destruction or any other processing of such data.

"Proposed Allocation Schedule" has the meaning assigned to that term in Section 2.8.

"Purchaser" has the meaning assigned to that term in the Preamble.

"Purchaser Adjustment Report" has the meaning assigned to that term in Section 2.7(a).

"Purchaser's Surveys" has the meaning assigned to that term in Section 6.9.

"Real Property" shall have the meaning set forth in Section 4.8(b).

"Real Property Lease" shall have the meaning set forth in Section 4.8(b).

"Release" means any actual or threatened release, abandonment, depositing, discharging, dispersing, disposing, dumping, emitting, emptying, escaping, injecting, leaching, leaking, pumping, pouring, spilling, or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata).

"Representative" directors, officers, employees, agents or advisors of the applicable Party.

"Resolution Period" has the meaning assigned to that term in Section 2.7(b)(ii).

"Review Period" shall have the meaning set forth in Section 2.7(b)(i).

"Royal Interco" has the meaning assigned to that term in the Preamble.

"Sale Leaseback Adjustment" means the greater of (a) the value, as of immediately prior to the Closing, of all outstanding principal under the Sale Leaseback Agreement and similar sale leaseback arrangements (including any agreements, amendments, schedules and annexes in connection therewith) *minus* Six Million Two Hundred Thousand US Dollars (US$ 6,200,000) or (b) Zero US Dollar US$ 0.

"Sale Leaseback Agreement" means the Master Lease Agreement dated September 30, 2024, between Clarus Capital Funding I, LLC, Royal Paper, LLC and Sun Paper, LLC.

"Sale Order" means the order defined in Section 6.2.

"Sellers" has the meaning assigned to that term in the Preamble.

"Short Form Domain Name Assignment Agreement" has the meaning assigned to that term in Section 3.2(d).

"Short Form Trademark Assignment Agreement" has the meaning assigned to that term in Section 3.2(d).

"Straddle Period" means a Tax period that includes but does not end on the Closing Date.

"Successful Bidder" has the meaning assigned to that term in the Bidding Procedures.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, ad valorem, real property, personal property, escheat or unclaimed property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, imposed or collected by any Governmental Body responsible for imposition or collection of any such tax (domestic or foreign).

"Tax Proceeding" means any audit, request for information, investigation, hearing, litigation, claim, legal action, judicial contest or other dispute relating to Taxes.

"Tax Return" means any return, declaration, statement, report, form, information return or other document relating to Taxes filed or required to be filed with any Governmental Body responsible for the administration of Tax, including any amendment thereof or schedule or attachment thereto.

"Title Company" has the meaning assigned to that term in Section 6.9.

"Total Consideration" has the meaning assigned to that term in Section 2.8.

"Transactions" has the meaning assigned to that term in Section 2.4.

"Transferred Employees" has the meaning assigned to that term in Section 6.5(b).

"WARN Act" means the United States Federal Worker Adjustment and Retraining Notification Act, as amended, and any similar state or local Law.

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

2.1   **Sale and Purchase of Assets**.  Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Purchaser shall purchase from each Seller, and Sellers shall, and shall cause its Affiliates to, sell, assign, transfer, convey and deliver to Purchaser, all of each Seller's and its Affiliates' right, title and interest in and to all assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal, wherever located, whether owned or leased, that are used or held for use by Sellers or their Affiliates in connection with, or otherwise related to, the operation of the Business (except for the Excluded Assets), as those assets, properties, rights, interests, benefits and privileges exist on the Closing Date, free and clear of any Lien.  Without limiting the foregoing, the assets, properties, rights, interests, benefits and privileges sold, assigned, transferred, conveyed and delivered by Sellers hereunder (collectively, the "Acquired Assets") shall include all of each Seller's and its Affiliates' right, title and interest in and to the following:

(a)   all interests in Real Property (including any fee and leasehold interests), together with all plants, buildings, structures, fixtures and improvements of all kinds situated thereon, and all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of such Real Property;

(b)   all inventory, merchandise, finished goods, raw materials, works in progress, packaging, supplies, parts and other inventories;

(c)   all equipment, machinery, furniture, fixtures, supplies, office equipment, computers, tablets, hardware, information technology infrastructure, telephones, motor vehicles, trailers and other rolling stock, and all other tangible personal property of any kind;

(d)   all Intellectual Property (including as set forth on Schedule 2.1(d)) together with (i) all documentation, books and records associated with the foregoing (including all prosecution files and dockets, registration certificates, litigation files, and related opinions of counsel and correspondence relating thereto), (ii) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at Law or equity associated therewith, (iii) all goodwill connected with the use of, associated with, or symbolized by, the foregoing, (iv) any and all royalties, fees, income, damages, payments, and other proceeds now or hereafter due or payable to the owner thereof with respect to any and all of the foregoing, (v) all rights of any kind whatsoever of Sellers accruing under any of the foregoing provided by applicable Law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world, (vi) the right to prosecute, register, maintain, enforce and defend the foregoing, and (vii) all registrations and applications of the foregoing, including all issuances, extensions, renewals, reissues, continuations and continuations-in-part thereof (all such rights described in this Section 2.1(d) collectively, the "Assigned IP");

(e)   the Sale Leaseback Agreement and all other Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders set forth on Schedule 2.1(e) (collectively, "Assigned Contracts"); and *provided*, *further*, that Purchaser shall have provided adequate assurance of future performance under Section 365(b)(1)(C) of the Bankruptcy

13

Code with respect to any Assigned Contract. Purchaser hereby acknowledges and agrees that any rights with respect to any Acquired Asset that is subject to the Sale Leaseback Agreement shall be acquired subject to any Lien under the Sale Leaseback Agreement. Further, notwithstanding anything herein to the contrary, the sale of the Acquired Assets free and clear of all Liens hereunder excludes any Lien securing the Assumed Liabilities under the Sale Leaseback Agreement.

(f)     the Permits (including Environmental Permits) set forth on <u>Schedule 2.1(f)</u> and all other Permits, approvals or licenses held by Sellers and related to the Acquired Assets (in each case to the extent transferable, assignable or capable of being reissued);

(g)     all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable, assignable or capable of being reissued to Purchaser and excluding Governmental Authorizations or pending applications therefor required for the continued operation of an Excluded Asset;

(h)     all books, files, papers, agreements, correspondence, data, databases, information systems, programs, software, documents, environmental audits, environmental site assessments, environmental site investigation reports, specifications, operating or design manuals, safety and environmental protection manuals, technical manuals, records and documentation thereof related to any of the Acquired Assets (including all tangible embodiments of the Assigned IP) or the Assumed Liabilities, or used, held for use in, or otherwise related to, the conduct of the Business (together, collectively, "<u>Books and Records</u>"), *provided* that Sellers shall be entitled to retain a copy of such Books and Records solely for use in connection with each Seller's wind-down of their Estates and subject to <u>Section 6.13</u>;

(i)     all causes of action of Sellers to the extent relating to the Acquired Assets or arising under express or implied warranties, guarantees, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits or rights of set-off from or against suppliers or other third parties with respect to the Acquired Assets (including rights under vendors' and manufacturers' warranties, service rights, indemnities and guaranties);

(j)     all prepaid items that relate to the Business or the Acquired Assets, including all prepaid rentals, prepaid expenses, prepaid Taxes, prepaid charges and deposits for utilities, prepaid maintenance and supplies, prepaid inventory, prepaid freight, holdbacks (including ordinary credit card holdback payments or protection reserves), security and unbilled charges, fees and deposits (other than to the extent related to Excluded Assets or Excluded Liabilities);

(k)     all security deposits, utility deposits, and other deposits to the extent related to any Acquired Assets or the Assumed Liabilities; and

(l)     all Accounts Receivable (i) (A) that have been issued no earlier than ninety (90) days prior to the Closing Date and (B) that, as of the Closing Date, have not become overdue pursuant to the terms of the applicable invoice (the "<u>Acquired Pre-Closing Accounts Receivable</u>"), or (ii) arising after the Closing Date.

2.2     **<u>Excluded Assets</u>**.  Notwithstanding the provisions of <u>Section 2.1</u> or any other provision of this Agreement, the Acquired Assets do not include, and Sellers shall not transfer to

Purchaser any of the following assets, properties, rights, interests and privileges (collectively, the "Excluded Assets"):

        (a)      all cash, cash equivalents and marketable securities;

        (b)      all Accounts Receivable arising and in existence on or before the Closing Date other than Acquired Pre-Closing Accounts Receivable;

        (c)      all Estate Causes of Action;

        (d)      all Contracts that are not Assigned Contracts;

        (e)      all books and records, including corporate minutes books and other records, that do not relate to the Acquired Assets ("Excluded Books and Records");

        (f)      all refunds or credits or deposits of (i) prepaid insurance or (ii) Taxes with respect to the period prior to the Closing Date, including without limitation any refunds, credits or deposits of (i) prepaid insurance or (ii) Taxes arising as a result of Sellers' operation of the Business or ownership, operation, utilization or maintenance of the Acquired Assets prior to the Closing Date;

        (g)      all equity interests, or interests convertible into or exchangeable for equity interests, held by any Seller, including any such interests of any Seller in another Seller;

        (h)      all rights, claims or causes of action against any director, manager, officer or employee of any Seller to the extent arising out of events occurring prior to the Closing Date;

        (i)      all rights, claims or causes of actions against Agent, or any lender pursuant to the Credit Agreement;

        (j)      the directors and officers insurance policies, and all claims, credits, causes of action or rights thereunder and proceeds thereof;

        (k)      all Avoidance Actions;

        (l)      all assets, properties and rights identified on Schedule 2.2(l);

        (m)      all Employee Benefit Plans and all assets of or relating to the Employee Benefit Plans (wherever held);

        (n)      all rights, receivables, claims or causes of action related to any Excluded Asset; and

        (o)      any rights or obligations granted to Sellers under this Agreement.

Notwithstanding any other provision of this Agreement to the contrary, Purchaser shall have the right to notify Sellers in writing of any Acquired Assets that it does not wish to acquire up to three (3) Business Day prior to the Closing, and (i) any such previously considered Acquired Assets that Purchaser no longer wishes to acquire shall be automatically deemed removed from the Schedules

related to Acquired Assets and automatically deemed added to the Schedules related to Excluded Assets, in each case, without any adjustment to the Purchase Price; provided, however, that this provision shall not apply to any and all machinery and equipment located at the Duncan, South Carolina location, which shall in all cases constitute Acquired Assets and, for the avoidance of doubt, Purchaser shall have no right to designate such assets as Excluded Assets pursuant to the foregoing provisions.

2.3    **Assumed Liabilities**.  Upon the terms and subject to the conditions set forth herein, at the Closing, Purchaser shall assume and shall timely perform, satisfy and discharge, including in accordance with their respective terms, (a) all (i) Cure Amounts and (ii) Liabilities of Sellers under the Assigned Contracts that arise out of, or relate to any performance obligation first arising after the Closing Date, other than any Liability as a result of any pre-Closing breach by any Seller thereof, default by any Seller thereunder, or misrepresentation or fraud by any Seller in connection therewith, in each case to the extent not cured by the payment of the Cure Amounts in respect thereof, (b) all Liabilities (including for any Tax) that arise on or after the Closing Date with respect to Purchaser's ownership or operation of the Acquired Assets (other than the Assigned Contracts) on and after the Closing (determined, in the case of Taxes, in a manner consistent with Section 6.6(c)), and (c) such other Liabilities of Sellers set forth on Schedule 2.3(c) after the Closing Date (collectively, the "Assumed Liabilities").

2.4    **Excluded Liabilities**.  Purchaser, by its execution and delivery of this Agreement and the Ancillary Agreements and its performance of the transactions contemplated by this Agreement and the Ancillary Agreements (the "Transactions"), shall not assume or otherwise be responsible for any Liability (including Liabilities arising under Environmental Laws) of Sellers, the Business or the Acquired Assets of whatever nature (whether arising prior to, at the time of, or subsequent to Closing), including (a) those relating to, arising out of or in connection with the operation of the Business or the Acquired Assets (including the use and ownership thereof) except as expressly indicated as an Assumed Liability, (b) the employment or termination of employment or engagement or termination of engagement of any current or former director, manager, officer, employee, individual consultant or other individual service provider (or the beneficiary or dependents of any of the foregoing) of any Seller and Transferred Employees, (c) any Employee Benefit Plan, including in respect of any medical or other welfare benefit claims, (d) amounts owed by Seller to or on behalf of any current or former director, manager, officer, employee, individual consultant or other individual service provider of any Seller and, with respect to the period ending at the Closing, Transferred Employees (or the beneficiary or dependents of any of the foregoing) and (e) the Liabilities set forth on Schedule 2.4 ((a) through (e), collectively, the "Excluded Liabilities").

2.5    **Non-Assignable Assets**.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Acquired Asset or any right thereunder if an attempted assignment, without the consent of a third party or pursuant to an order of the Bankruptcy Court under Sections 105, 363 and/or 365 of the Bankruptcy Code, would constitute a breach or in any way adversely affect the rights of Purchaser or any Seller thereunder.  If such consent is not obtained or such assignment is not attainable pursuant to an order of the Bankruptcy Court under Sections 105, 363 and/or 365 of the Bankruptcy Code, in form and substance acceptable to Sellers and Purchaser, then such Acquired Assets shall not be transferred hereunder; *provided*, *however*, that Sellers and Purchaser will use reasonable efforts to

obtain all such consents or assignments before the Closing.  If any such consents or assignments are not obtained prior to the Closing, unless and until such consent or assignment is obtained, Sellers and Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations (only to the extent such obligations would be Assumed Liabilities if such Acquired Assets had been transferred to Purchaser at Closing) of any such Acquired Asset (including, in the case of any Assigned Contract, each of Purchaser and Sellers using their respective commercially reasonable efforts to discuss alternative arrangements with the applicable counterparty to convey the economic effect of such Assigned Contract to the fullest extent reasonably practicable).  Upon satisfying any requisite consent requirement applicable to such Acquired Asset after the Closing, Sellers' right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order.

2.6    **Consideration**.

(a)    The aggregate consideration for the sale, transfer, and conveyance of the Acquired Assets to Purchaser by Sellers shall be (i)(A) the amount of One Hundred Seventy Four Million, Nine Hundred Sixty Thousand US Dollars (US$ 174,960,000) (the "Base Purchase Price"), *plus* (B) the Inventory Adjustment Amount, *minus* (C) the Sale Leaseback Adjustment, *minus* (D) the Cure Costs Adjustment Amount, *plus* (E) the Acquired AR Amount (the result of the forgoing calculation, the "Cash Purchase Price") and (ii) the assumption by Purchaser of the Assumed Liabilities including payment of the Cure Amounts.  Sellers shall deliver or cause to be delivered to Purchaser good faith estimate of the Cash Purchase Price (such estimated amount, the "Estimated Cash Purchase Price"), Inventory Adjustment Amount, the Sale Leaseback Adjustment, the Cure Costs Adjustment Amount and the Acquired AR Amount in each case, as of the Closing Date, together with reasonably detailed calculations and supporting information in respect thereof, no less than five (5) Business Days prior to Closing.  In the event that Purchaser disagrees with Sellers' estimate, Parties shall discuss in good faith and use commercially reasonable efforts to reach an agreement no less than two (2) Business Days prior to Closing.  At the Closing, Purchaser shall deliver the Estimated Cash Purchase Price (less the Deposit and any interest thereon) by wire transfer of immediately available funds to an account designated in writing by Sellers to Purchaser no less than two (2) Business Days prior to Closing.

(b)    Purchaser shall make a good faith deposit in an aggregate amount, taken together with any good faith deposit made by Purchaser prior to the date hereof, equal to Seventeen Million, Four Hundred Ninety Six Thousand US Dollars (US$ 17,496,000) (the "Deposit") on or before the date of this Agreement to the Escrow Agent.  Sellers shall cause the Escrow Agent to distribute the Deposit and any interest thereon within five (5) Business Days of the following events:

(i)    If the Closing shall occur, the Deposit and any interest thereon shall be applied towards the Cash Purchase Price payable by Purchaser to Sellers pursuant to Section 2.6 and delivered to Sellers;

(ii)    Except as provided in clause (iv) below, in the event that Sellers close a sale of any of the Acquired Assets to any party other than Purchaser, then the Deposit and any interest thereon shall be returned to Purchaser;

(iii)    In the event that this Agreement is terminated by Purchaser due to a material breach of this Agreement by Sellers, or Sellers' failure to perform any material obligation or condition required under this Agreement, then the Deposit and any interest thereon shall be returned to Purchaser;

(iv)    In the event that this Agreement is terminated by Sellers due to a material breach of this Agreement by Purchaser, or Purchaser's failure to perform any material obligation or condition required under this Agreement, then the Deposit shall be distributed to Sellers and any interest thereon shall be distributed to Purchaser; or

(v)    If this Agreement is terminated for any reason prior to the Closing other than as contemplated by Section 7.1(d) or Section 7.1(i), then the Deposit and any interest thereon shall be returned to the Purchaser.

The parties hereto acknowledge that the Deposit is subject to a Lien in favor of Agent pursuant to the Credit Agreement; *provided*, that, notwithstanding the foregoing, such Lien shall be junior and subordinate to Purchaser's interest in the Deposit and Purchaser's right to distribution as provided in this Section 2.6(b) shall not be affected whatsoever by such Lien.

2.7    **Determination of Final Adjustment**.

(a)    As soon as reasonably practicable following the Closing (but no later than thirty (30) days after the Closing Date), Purchaser shall deliver to Sellers a statement (the "Purchaser Adjustment Report") setting forth in reasonable detail Purchaser's good-faith calculation of the Cash Purchase Price, the Inventory Adjustment Amount, the Sale Leaseback Adjustment, the Cure Costs Adjustment Amount and the Acquired AR Amount, each as of the Closing Date.

(b)    The following procedures shall apply with respect to the review of the Purchaser Adjustment Report:

(i)    Sellers shall have a period of fifteen (15) days after receipt by Sellers of the Purchaser Adjustment Report to review such report (the "Review Period"). Following the delivery of the Purchaser Adjustment Report and prior to the final determination of the Inventory Adjustment Amount, Sale Leaseback Adjustment, the Cure Costs Adjustment Amount and the Acquired AR Amount, the Purchaser shall make available to Sellers and its Representatives reasonable access during normal business hours to the personnel, Representatives of the Purchaser, and the Books and Records of Purchaser, in each case used by the Purchaser in its preparation of the Purchaser Adjustment Report, in connection with Sellers' review of the Purchaser Adjustment Report and any dispute with respect thereto as contemplated by this Section 2.7.

(ii)    If Sellers do not deliver to Purchaser a written statement describing any objections Sellers have to the Purchaser Adjustment Report (a "Notice of Disagreement") on or before 5:00 p.m., Eastern Time, on the final day of the Review Period, then Sellers shall be deemed to have irrevocably accepted such Purchaser Adjustment Report, and such Purchaser Adjustment Report shall be deemed to be the "Final Adjustment" for purposes of the payment (if any) contemplated by Section 2.7(c). If Sellers deliver to the Purchaser a Notice of Disagreement on or before the final day of the Review Period, then the Purchaser and Sellers shall attempt to

18

resolve in good faith the matters contained in the Notice of Disagreement within fifteen (15) days after the Purchaser's receipt of the Notice of Disagreement (the "Resolution Period"). If the Purchaser and Sellers reach a resolution with respect to such matters on or before the final day of the Resolution Period, then the Purchaser Adjustment Report, as modified by such resolution, shall be deemed to be the "Final Adjustment" for purposes of the payment (if any) contemplated by Section 2.7(c).

            (iii)     If such a resolution is not reached on or before the final day of the Resolution Period, then the Purchaser and Sellers shall promptly (and in any event no later than fifteen (15) days after the last day of the Resolution Period) retain the Accounting Firm (including by executing a customary agreement with the Accounting Firm in connection with its engagement) and submit any unresolved objections covered by the Notice of Disagreement (the "Disputed Items") to the Accounting Firm for resolution in accordance with this Section 2.7(b)(iii). The Accounting Firm will be instructed to: (A) make a final determination on an expedited basis (and in any event within thirty (30) days after submission of the Disputed Items) with respect to each of the Disputed Items (and only the Disputed Items) that is within the range of the respective positions taken by each of the Purchaser and Sellers; and (B) prepare and deliver to the Purchaser and Sellers a written statement setting forth its final determination (and a reasonably detailed description of the basis therefor) with respect to each Disputed Item (the "Accounting Firm's Report"). The Accounting Firm shall act as an expert and not an arbitrator. During the ten (10) days after submission of the Disputed Items to the Accounting Firm, each of Purchaser and Sellers may provide the Accounting Firm with a definitive statement in writing of its positions with respect to the Disputed Items (and only the Disputed Items). The Accounting Firm will be provided with reasonable access to the Books and Records for purposes of making its final determination with respect to the Disputed Items, and Purchaser and Sellers and the Company shall otherwise reasonably cooperate with the Accounting Firm in connection therewith. Each of the Purchaser and Sellers agree that: (1) the Accounting Firm's determination with respect to each Disputed Item as reflected in the Accounting Firm's Report shall be deemed to be final, conclusive, binding and non-appealable; (2) the Purchaser Adjustment Report, as modified by any changes thereto in accordance with the Accounting Firm's Report, shall be deemed to be the "Final Adjustment" for purposes of the payment (if any) contemplated by Section 2.7(c); and (3) the procedures set forth in this Section 2.7 shall be the sole and exclusive remedy with respect to the final determination of the Final Adjustment.

            (c)     Within two (2) Business Days after the determination of the Final Adjustment in accordance with this Section 2.7(c) (including by failure to timely deliver a Notice of Disagreement):

            (i)     if the Additional Payment Amount is a positive number, then the Purchaser shall pay, or cause to be paid, an amount in cash equal to the Additional Payment Amount to Sellers by wire transfer of immediately available funds to an account of Sellers designated in writing by Sellers to the Purchaser; or

            (ii)     if the Additional Payment Amount is a negative number, then Sellers shall pay, or cause to be paid, an amount in cash equal to the Additional Payment Amount to the Purchaser by wire transfer of immediately available funds to an account of Purchaser designated in writing by the Purchaser to Sellers.

(iii)    For purposes hereof, "Additional Payment Amount" means an amount equal to (A) the sum of (i) the Inventory Adjustment Amount, *minus* (ii) the Sale Leaseback Adjustment, *minus* (iii) the Cure Costs Adjustment Amount, *plus* (iv) the Acquired AR Amount, in each case, as finally determined in the Final Adjustment, *minus* (B) the sum of (i) the Inventory Adjustment Amount, *minus* (ii) the Sale Leaseback Adjustment, *minus* (iii) the Cure Costs Adjustment Amount, *plus* (iv) the Acquired AR Amount, in each case, as provided by Sellers pursuant to Section 2.6(a).

2.8    **Allocation of Consideration**.  The parties shall allocate the Cash Purchase Price as well as any amounts treated as consideration for Tax purposes (the "Total Consideration") among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.  Prior to Closing, Purchaser shall prepare a proposed allocation of the Total Consideration among the Acquired Assets (the "Proposed Allocation Schedule").  As soon as practicable (and in any event no later than 90 days) after Closing, Purchaser shall deliver to Sellers a final allocation of the Total Consideration among the Acquired Assets (the "Final Allocation Schedule").  Each of Purchaser and Sellers shall file, and cause its Affiliates to file, its respective Tax Returns, including the IRS Form 8594 or any equivalent statements, in accordance with the Final Allocation Schedule.  Each of Purchaser and Sellers shall not take, and shall cause its Affiliates not to take, any position inconsistent with the Final Allocation Schedule on any applicable Tax Return or in any Tax Proceeding.  In the event that the allocation set forth on the Final Allocation Schedule is disputed by any Governmental Body, the party receiving notice of the dispute shall promptly notify the other Party hereto concerning the commencement of the dispute.

2.9    **Withholding**.  Notwithstanding anything to the contrary herein, Purchaser and any other applicable withholding agent shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any such amounts that are required to be deducted and withheld under applicable Law. To the extent that any such amounts are so deducted or withheld and timely remitted to the appropriate Governmental Body, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

2.10    **Accounts Receivable**.  In the event that Purchaser receives any amounts due to any Seller related to Accounts Receivable or unbilled work in progress, in each case, (a) that constitute Excluded Assets and (b) are payable with respect to the Business for periods prior to the Closing, such amounts shall be held in trust by Purchaser for the benefit of such Seller, Purchaser shall promptly remit all such amounts to such Seller.  In the event that Sellers receive any amounts related to Accounts Receivable or unbilled work in progress (A) which are included in the Acquired Assets and (B) which are payable with respect to the Business for periods on or after the Closing, such amounts shall be held in trust by Sellers for the benefit of Purchaser and Sellers shall promptly remit all such amounts to Purchaser.  In connection with the collection by Sellers or Purchaser following the Closing of any Accounts Receivable, payments received shall be allocated

in accordance with the applicable treatment of such Accounts Receivable provided for in the Sale Order.

## ARTICLE III
## CLOSING; CONDITIONS TO CLOSING

3.1     **Closing**.  Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place by means of a virtual closing through electronic exchange of documents and signatures on the first (1st) Business Day of the week following the date that is the third (3rd) Business Day after the day on which all of the conditions to closing set forth in this Article III are satisfied or waived (other than conditions that are intended to be satisfied at the Closing), or at such other date, time or place as the Parties may agree.  The time and date upon which the Closing occurs is referred to herein as the "Closing Date."  All transactions at the Closing shall be deemed to take place simultaneously and none shall be deemed to have taken place until all shall have taken place.

3.2     **Conditions to Obligations of Purchaser**.   The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may be waived by Purchaser in its sole discretion:

(a)     Representations and Warranties.   The representations and warranties of Sellers set forth in (i) Section 4.1 and Section 4.2 of this Agreement shall be true and correct as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of the specified date) in all material respects and (ii) any other section of Article IV of this Agreement shall be true and correct as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of the specified date), in each case, disregarding any "materiality" or "Material Adverse Effect" qualifications, except where failure to be true and correct would not have a Material Adverse Effect.

(b)     Agreements and Covenants.   Sellers shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by them under this Agreement at or before the Closing in all material respects.

(c)     No Material Adverse Effect shall have occurred.

(d)     Deliveries at Closing.   Purchaser shall have received from Sellers (i) a Bill of Sale and Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit B (the "Bill of Sale and Assignment Agreement"), duly executed by Sellers, (ii) an Intellectual Property Assignment Agreement substantially in the form attached hereto as Exhibit C (the "Intellectual Property Assignment Agreement"), duly executed by Sellers and their applicable Affiliates, a Short Form Trademark Assignment Agreement substantially in the form attached hereto as Exhibit D (the "Short Form Trademark Assignment Agreement"), duly executed by Sellers and their applicable Affiliates, a Short Form Domain Name Assignment Agreement substantially in the form attached hereto as Exhibit E (the "Short Form Domain Name Assignment

Agreement"), duly executed by Sellers and their applicable Affiliates, (iii) a Special Warranty Deed in the form attached hereto as Exhibit F (the "Deed") and any transfer tax forms required in the jurisdiction of the Owned Real Property, each duly executed by Sellers, an Assignment and Assumption of Leases in the form attached hereto as Exhibit G (the "Assignment of Leases"), duly executed by Sellers, (iv) an IRS Form W-9 of each Seller (or its regarded parent, as applicable) that is treated as a "United States person" within the meaning of Section 7701(a)(30) of the Code, and (v) such other duly executed assignments, general trademark assignments, lease assignments, bills of sale or certificates of title, as may be reasonably requested by Purchaser, dated as of the Closing Date, whereby Sellers will transfer to Purchaser free and clear of any Lien all of Sellers' right, title and interest in and to the Acquired Assets and the Assumed Liabilities.

(e)    Certification.  The delivery by Sellers to the Purchaser of an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Seller certifying that the conditions set forth in Sections 3.2(a)(i), 3.2(b) and 3.2(c) have been satisfied.

(f)    Phase I Environmental Site Assessment.  (i) Sellers shall have complied in all respects with its obligations under Section 6.9 and (ii) Purchaser shall have received either (x) a reliance letter authorizing Purchaser to rely on the Phase I Environmental Site Assessment ("Phase I ESA") for the 31201 West Thayer Road, Gila Bend, Arizona, 85337, prepared for Sellers by Partner Engineering and Science, Inc., dated as of February 10, 2025, or (y) if the Closing Date is more than 180 days after February 10, 2025, a Phase I ESA in final form with respect to 31201 West Thayer Road, Gila Bend, Arizona 85337, in either case as sufficient to satisfy the "all appropriate inquiries" standard (or comparable term) in order to permit Purchaser to qualify as a "innocent landowner" (or comparable term) under applicable Environmental Laws.

3.3    **Conditions to Obligations of Sellers**.  The obligation of Sellers to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may be waived by Sellers in their sole discretion:

(a)    Representations and Warranties.  The representations and warranties of Purchaser set forth in Article V of this Agreement shall be true and correct in all material respects on the date of this Agreement and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Agreements and Covenants.  Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c)    Deliveries at Closing.  Sellers shall have received from Purchaser all fully executed instruments or documents as Sellers may reasonably request to fully effect the transfer of the Acquired Assets and assumption of the Assumed Liabilities and to otherwise consummate the Transactions.

(d)    Certification.  The delivery by Sellers to the Purchaser of an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of each Seller certifying that the conditions set forth in Sections 3.3(a) and 3.3(b) have been satisfied.

3.4 **Conditions to Obligations of Sellers and Purchaser**. The obligations of Sellers and Purchaser to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions:

(a) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order and such order shall be a Final Order.

(b) <u>Approvals</u>. Any waiting period (and extensions thereof) applicable to the Acquisition under the HSR Act shall have expired or been terminated and any other required approvals, consents, waivers, clearances or other authorizations under any other antitrust laws relating to the Acquisition shall have expired, been terminated or obtained, as applicable.

(c) <u>Governmental Order</u>. No law or order from any Governmental Body shall have been enacted or entered which would prevent the performance of this Agreement or the consummation of any of the transactions contemplated hereby, declare unlawful the transactions contemplated by this Agreement or cause such transactions to be rescinded.

3.5 **Delivery of Possession of Assets**. Right to possession of all Acquired Assets shall transfer to Purchaser at the Closing. Purchaser shall bear all risk of loss with respect to the Acquired Assets from and after the Closing.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Each Seller represents and warrants to Purchaser as follows:

4.1 **Organization, Good Standing and Power**. Each Seller is validly existing and in good standing under the laws of its jurisdiction of organization. Subject to the applicable provisions of the Bankruptcy Code, each Seller has the power to own its properties and carry on its business as now being conducted and is qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary.

4.2 **Authority Relative to this Agreement; Execution and Binding Effect**. Each Seller has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, to consummate the Transactions. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the members, or board of managers, as applicable, of such Seller, and, except for Bankruptcy Court approval, no other proceedings or approvals on the part of such Seller are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by such Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and

binding obligation of such Seller, enforceable against such Seller in accordance with their terms, except as set forth in the Bidding Procedures.

4.3    **Governmental and Other Consents**.    Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, no consent, notice, authorization, or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by each Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions, except as set forth on Schedule 4.3.

4.4    **Assets**.    Each Seller has good and valid title to the Acquired Assets.    Upon the terms and subject to the conditions contained in this Agreement and subject to requisite Bankruptcy Court approvals and the terms of the Sale Order, at the Closing, such Seller shall transfer and deliver to Purchaser good and valid title to the Acquired Assets, free and clear of all Liens.

4.5    **Environmental**.    Except as set forth on Schedule 4.5, to the knowledge of Sellers:

(a)    Sellers, with respect to the Business and the Acquired Assets, are and, for the past three (3) years, have been in compliance with applicable Environmental Laws and Environmental Permits in all material respects.

(b)    Sellers have not received, with respect to the Acquired Assets, the Business or the Assumed Liabilities, any written communication alleging that Sellers, the Business or any of the Acquired Assets is not in compliance with or is liable or potentially liable under applicable Environmental Laws or Environmental Permits and neither Sellers, the Business nor any Acquired Assets are a party to or subject to the provisions of any Order or Lien pursuant to Environmental Law.

(c)    There are no Actions or information requests pending or threatened against Sellers or affecting the Business or Acquired Assets related to Environmental Laws or arising from the Release or presence of or exposure to Hazardous Materials.

(d)    There has been no Release or presence of, arrangement for disposal of, manufacture, marketing or sale of, or exposure to any Hazardous Materials (or products containing Hazardous Materials), whether on or off the property currently or formerly owned or operated by Sellers, in each case that would reasonably be expected to result in liability or a requirement for notification, investigation or remediation by Sellers or the Business under any Environmental Law.

(e)    Sellers have delivered to, or have otherwise made available for inspection by the Purchaser, all written assessments, audits, investigations, reports, studies, test results or similar documents in the possession, control or custody of Sellers related to environmental, health or safety matters or Hazardous Materials.

4.6    **Actions**.  Except as set forth in Schedule 4.6, as of the date hereof, there are no Actions pending or, to the knowledge of Sellers, threated by or against Sellers or any of its members relating to or affecting the Business or any of the Acquired Assets.

4.7    **Compliance with Laws**.  The Transactions do not violate any applicable Law. Except as set forth in Schedule 4.7, during the past two (2) years there has been no material violation of or default under any Law or Order applicable to Sellers, the Business, the Acquired Assets, Real Property, or the Assumed Liabilities, in each case, other than as a result of the Chapter 11 Cases.  Each Seller is, and for the past two (2) years has been, in compliance in all material respects with all applicable Laws regulating such Seller, the Business, the Acquired Assets, or the Real Property.

4.8    **Real Property**.

(a)    Owned Real Property.  To the knowledge of Sellers, a list of all real property owned in fee by Sellers (the "Owned Real Property") is set forth in Schedule 4.8(a).  Sellers have good, valid and marketable fee title to its interest in its Owned Real Property, free and clear of all Liens.  To the knowledge of Sellers, Sellers have not leased, licensed or otherwise granted any Person the right to use or occupy such Owned Real Property.  To the knowledge of Sellers, no Seller has received written notice of any actual proceedings of condemnation and, to the knowledge of Sellers, there are no existing or threatened in writing proceedings of condemnation or similar proceedings with respect to any part of the Owned Real Property, which would have a Material Adverse Effect.  Except as otherwise disclosed in the public records, to the knowledge of Sellers, no Person other than the applicable fee owner of an Owned Real Property or lessee under a Real Property Lease has any possessory interest in any Real Property or right to occupy the same.

(b)    Leased Real Property.  To the knowledge of Sellers, a list of all real property leased by Sellers (the "Leased Real Property") is set forth in Schedule 4.8(b).  The Owned Real Property and Leased Real Property are collectively referred to herein as the "Real Property." To the knowledge of Sellers, true and correct copies of all leases (each a "Real Property Lease") for Leased Real Property pursuant to which a Seller is a lessee as of the date hereof have been made available to Purchaser prior to the date hereof, together with all amendments and modifications thereto entered into prior to the date hereof.  To the knowledge of Sellers, each Real Property Lease is valid and binding on the Seller that is a party thereto, enforceable in accordance with its terms, except as would not have a Material Adverse Effect.  To the knowledge of Sellers, the applicable Seller has a valid leasehold relating to the Leased Real Property, free and clear of all Liens or otherwise to be transferred to Purchaser free and clear of all Liens.

(c)    Except as disclosed in Schedule 4.8(c), to the knowledge of Sellers, Sellers have not received a written notice of default under any Real Property Lease beyond the expiration of applicable notice and cure periods.  To the knowledge of Sellers, Sellers have complied in all material respects with the terms of all Real Property Leases and all such Real Property Leases are in full force and effect, enforceable in accordance with their terms against Sellers and the counterparties thereto.

(d)    To the knowledge of Sellers: (i) there are no material violations of any zoning ordinances, building codes or other governmental or regulatory laws affecting the Real

Property or planned material changes in any zoning ordinances or building codes or other governmental or regulatory Laws that would materially and adversely affect the Real Property; (ii) the buildings and improvements on the Real Property are in all material respects in good operating condition and in a state of good repair, ordinary wear and tear excepted, are in compliance with all applicable building codes and are suitable for their current uses and purposes; (iii) there are no physical conditions on any part of the Real Property that would materially impair the continued operation of the Business as presently conducted at each such Real Property; (iv) there have been no recent material casualties affecting the Real Property; and (v) there is no planned or required substantial expenditure in relation to the Real Property.

(e)    Each part of the Real Property has adequate rights of access to dedicated public roads or ways and is served by water, electric, sewer, sanitary sewer and storm drain facilities, in each case to the extent reasonably necessary for the operation, use and occupancy of such Real Property as currently operated and used.

(f)    There are no rights of first refusal, options to purchase, purchase agreements, contracts for deed or installment sale agreements in effect with respect to all or any part of the Real Property.

(g)    There are no contracts relating to the Real Property for any proposed or pending purchase, sale, lease or construction of facilities by Sellers or any subsidiary thereof.

(h)    No change has been made by Sellers to the improvements shown on survey made by R.B. Williams & Associates, Inc. dated June 14, 2018.

(i)    Groundwater Wells.  To the knowledge of Sellers, and subject to the further provisions of this Section 4.8(i), there are two non-exempt groundwater wells on the Owned Real Property and both wells are registered with the Arizona Department of Water Resources.  There are no unregistered wells located on the Owned Real Property.  The wells referenced above are in all material respects in good operating condition and in a state of good repair, ordinary wear and tear excepted.  Schedule 4.8(i) provides a copy of the well registry reports and Request to Change Well Information completed as to the Sellers information.  In addition to the wells referenced in this Section 4.8(i) as set forth above, there are two additional groundwater wells on the Owned Real Property that are no longer in service, and have been closed in accordance with the regulations of the Arizona Department of Water Resources.

4.9    **Financial Statements**.  Attached to Schedule 4.9 are the unaudited statements of financial position as of March 2025 and the audited statements of financial position as of year-end 2023, and the related statements of loss and cash flows for each fiscal year then ended, in each case of Sellers (collectively, the "Financial Statements" and such fiscal year end, the "Balance Sheet Date").  The Financial Statements have been prepared, in each case, in conformity in all material respects with GAAP consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of March 2025 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof.  The Financial Statements present fairly in all material respects, in accordance with GAAP consistently applied, the consolidated financial condition and results of operations of Sellers, taken

26

as a whole, as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

4.10    **Material Contracts**.

(a)    Sellers have made available to Purchaser accurate and complete copies of all of the written Contracts in their possession (and written summaries of any oral Contracts) to which any Seller is a party, each of which is identified in <u>Schedule 4.10(a)</u> (collectively, "<u>Material Contracts</u>").

(b)    Subject to entry of the Sale Order and payment of all Cure Amounts, each Material Contract is in full force and effect, is fully assignable without the consent of any Person, except as set forth on <u>Schedule 4.10(b)</u>, and is valid, binding and enforceable in accordance with its terms as to Sellers and, to the knowledge of Sellers, the other parties to the Material Contract. Sellers have performed and are performing all obligations required to be performed by it under the Material Contracts.

(c)    Except as set forth in <u>Schedule 4.10(c)</u>, no material default or material breach of a Material Contract exists (or, solely as a result of the consummation of the transactions contemplated hereby, will exist) on the part of Sellers or, to the knowledge of Sellers, on the part of any other Person under any such Material Contracts, and no condition or event has occurred that, after notice or lapse of time, or both, would constitute a material default or material breach of such Material Contracts.

4.11    **Material Suppliers and Customers**.

(a)    <u>Schedule 4.11(a)</u> sets forth a true and complete list of the twenty (20) largest suppliers of services, raw goods or finished products to Sellers (based on the dollar amount of payments made by Sellers, taken as a whole) for the twelve month period ending on December 31, 2024 (each, a "<u>Material Supplier</u>").

(b)    <u>Schedule 4.11(b)</u> sets forth a true and complete list of the twenty (20) largest customers of Sellers (based on the dollar amount of payments received by Sellers, taken as a whole) for the twelve month period ending on December 31, 2024 (each, a "<u>Material Customer</u>"); *provided*, *however*, that to the extent Sellers have fewer than twenty (20) customers, all of such customers are listed on <u>Schedule 4.11(b)</u>.

(c)    Except as set forth on <u>Schedule 4.11(c)</u>, no Material Supplier or Material Customer has provided written notice to any Seller in respect of any dispute or that it will cancel or terminate or otherwise adversely modify in any material respect its business relationship with Sellers.

4.12    **Intellectual Property**.

(a)    <u>Schedule 4.12(a)</u> sets forth a true and complete list to the knowledge of Sellers as of the date hereof, of all (i) Intellectual Property that is issued by, registered with or the subject of a pending application before the U.S. Patent & Trademark Office or U.S. Copyright Office, or any equivalent or corresponding Governmental Body anywhere in the world, or domain

name registrar and (ii) material unregistered Trademarks, in each case of the foregoing (i) and (ii), that is included in the Assigned IP.  To the knowledge of Sellers, each item of Assigned IP is subsisting, valid and enforceable.

(b)    Sellers or one of their Affiliates are, and immediately after the Closing, Purchaser or one of its Affiliates will be, the sole and exclusive owner of all right, title and interest in and to the Assigned IP, free and clear of all Liens.

(c)    To the knowledge of Sellers, immediately after the Closing, Purchaser or one of its Affiliates will own or have sufficient rights to all Intellectual Property used or held for use in connection with, or otherwise related to, or necessary for the operation of, the Business as presently conducted and currently contemplated to be conducted by Sellers.

(d)    There is no pending, or to the knowledge of Sellers, threatened, and during the three (3) years prior to the date hereof, there has not been any pending, or threatened, Action (including cease-and desist letters or invitations to license) (i) in which a third party is or was alleging that the operation of the Business or that the designing, developing, manufacturing, marketing, distributing or selling the products of the Business, infringes, misappropriates, dilutes or otherwise violates, or infringed, misappropriated, diluted or otherwise violated, the Intellectual Property of any Person, (ii) challenging the use, ownership, validity, enforceability or registerability of any Assigned IP or (iii) in which Sellers or their Affiliates are or were challenging the, use, ownership, validity, enforceability or registerability of any Intellectual Property of a third party.  To the knowledge of Sellers, none of the Sellers or any of their Affiliates is subject to any outstanding Order that restricts the use of any Assigned IP.

(e)    To the knowledge of Sellers, neither the operation of the Business, nor the designing, developing, manufacturing, marketing, distributing or selling of the products of the Business, has infringed, misappropriated, diluted or otherwise violated, or does or immediately following the Closing, will infringe, misappropriate, dilute or otherwise violate any Intellectual Property owned by any other Person.

(f)    To the knowledge of Sellers, no Person is infringing, misappropriating, diluting or otherwise violating any item of Assigned IP.  To the knowledge of Sellers, no Actions (including in the form of cease and desist letters or invitations to license) are pending or have been brought or threatened against any Person by Sellers or their Affiliates in the three (3) years prior to the date hereof, alleging that a Person is infringing, misappropriating, diluting or otherwise violating, any Assigned IP.

(g)    Sellers and their Affiliates have taken reasonable steps to maintain the material Assigned IP and to protect and preserve the confidentiality of all material Trade Secrets (including any information that would have been a Trade Secret but for any failure of Sellers or their Affiliates to act in a manner consistent with this Section 4.12(g)) included in the Assigned IP or provided by third parties to the Business under conditions of confidentiality.  To the knowledge of Sellers, each employee, contractor and consultant involved in the creation, invention or development of any material Intellectual Property (collectively, "Contributor") for or on behalf of the Business has executed a valid and enforceable written assignment of all such Intellectual Property to Sellers or one of their Affiliates.  To the knowledge of Sellers, no third party has made

28

claim to rights to any such Intellectual Property. To the knowledge of Sellers, none of Sellers or any of their Affiliates has any outstanding financial or other obligation to any Contributor with respect to any Assigned IP.

4.13 **Privacy; Data Protection; IT Assets**.

(a) With respect to the Business (i) Sellers and their Affiliates have taken reasonable efforts (including implementing and monitoring compliance with administrative, technical and physical safeguards, policies, procedures and security measures that conform with all applicable contractual obligations, Privacy Laws and applicable industry standards) to ensure the confidentiality, security and continuous operation of any systems, software, databases, information technology devices, equipment and infrastructure, networks and websites owned, leased or licensed by Sellers and their Affiliates and any information (including Trade Secrets and data, including Personal Information), stored or contained therein or Processed thereby (the "IT Assets"), (ii) there has been no unauthorized or improper access to, violations, failures, disruptions, breaches or unauthorized uses of, the IT Assets, (iii) there has been no security breaches or other unauthorized access to, use or disclosure of, or other similar adverse events or incidents affecting, any data (including Trade Secrets and Personal Information) processed by or on behalf of the Business, and no disclosure of any of the foregoing has been or should have been made by Sellers or their Affiliates under any applicable Privacy Law to any Governmental Body or affected Person and (iv) the IT Assets operate and perform in accordance with their documentation and functional specifications and otherwise as required in connection with, the operation of the Business, and have not materially malfunctioned or failed within the past three (3) years.

(b) In the past three (3) years, the operation of the Business has been in material compliance with all applicable data Privacy Laws and all contractual obligations and policies relating to the processing of Personal Information. With respect to the Business, none of Sellers or any of their Affiliates (and, to the knowledge of Sellers, all third parties Processing Personal Information on their behalf) have received any written notice or claim (including any communication from any Governmental Body) alleging a material violation of any Privacy Law, contractual or fiduciary obligations relating to privacy or Personal Information or any policy of Sellers or their Affiliates relating to privacy or Personal Information, or otherwise indicating that such Person is being investigated or is the subject of enforcement action in respect of a breach of any Privacy Laws with respect to the Business.

4.14 **Employee Benefits**. No Employee Benefit Plan is or was within the past six (6) years (i) a "multiple employer plan" for purposes of Sections 4063, 4064 or 4066 of ERISA, (ii) a "multiemployer plan" within the meaning of Sections 3(37) or 4001(a)(3) of ERISA, or (iii) subject to Section 412 of the Code or Section 302 or Title IV of ERISA.

4.15 **Labor**.

(a) With respect to the employees listed on Schedule 4.15(a) (each such employee, a "Business Employee"), Sellers have made available to Purchaser a true and complete list of such employees' (i) the dates of hire and the rates of base pay or base salary for each such employee as of the date hereof, (ii) rate of all bonus or any other cash compensation, (iii) location of service, (iv) full or part-time status (or partially retired), (v) exempt or non-exempt status under

29

the Fair Labor Standards Act, (vi) job title or position, (vii) employment status (active or leave, but not the reason for the leave, and, if applicable, the expected return date), (viii) annual paid time off accrual, (ix) type and duration of work visa (if applicable), and (x) any benefits other than those generally provided to all such employees.

(b)    No Seller is a party to or bound by any collective bargaining agreement or other agreement with a labor union or like organization, and, to the knowledge of Sellers, there are no activities or proceedings by any individual or group of individuals, including representatives of any labor organizations or labor unions, to organize any employees of any Seller.  There is no pending, and, to the knowledge of Sellers, there has not been any threatened, strike, lockout, slowdown, work stoppage, unfair labor practice or other material labor dispute, or arbitration or grievance that may interfere with the business activities of any Seller.  To the knowledge of Sellers, each Seller is in material compliance with all applicable Laws respecting labor, employment and employment practices, terms and conditions of employment, wages and hours and occupational safety and health.

4.16    **Brokers**.  Except as set forth in <u>Schedule 4.16</u>, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers:

5.1    **Organization, Good Standing and Power**.  Purchaser is validly existing and in good standing under the laws of the State of Florida.  Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary.

5.2    **Authority Relative to this Agreement; Execution and Binding Effect**.  Purchaser has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the Transactions.  The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder, member or otherwise) on the part of Purchaser are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions.  This Agreement has been duly and validly executed and delivered by Purchaser.  Assuming due authorization, execution and delivery by each Seller, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms.

5.3    **Governmental and Other Consents**.  No consent, notice, authorization, or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the

execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions, except as required under the HSR Act or as otherwise set forth on <u>Schedule 5.3</u>.

5.4    **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser.

## ARTICLE VI
## COVENANTS

6.1    <u>**Access to Facilities, Personnel, and Information**</u>.

(a)    Prior to the Closing, Sellers shall permit representatives of Purchaser to have reasonable access during regular business hours and upon reasonable notice, and in a manner so as not to unreasonably interfere with the normal business operations of Sellers, to all premises, personnel (solely for purposes of evaluation and determination of the Final List pursuant to <u>Section 6.5(a)</u> and making offers to Business Employee listed on the Final List as contemplated by Section <u>6.5(b)</u>), property, books, records (including Tax records), Contracts, and documents of or pertaining to the Business (*provided* that any representatives of Purchaser shall be subject to confidentiality obligations as may reasonably be requested by Sellers).

(b)    From the Closing Date through and including the second anniversary of the Closing Date, Purchaser shall provide copies to Sellers and its respective representatives of any books and records transferred to Purchaser pursuant to this Agreement during regular business hours and upon reasonable notice for the purpose of allowing Sellers or their successors or their respective representatives to perform the duties necessary for the liquidation of the Debtors' Estates (*provided* that any representatives of Sellers or their successors shall be subject to confidentiality obligations as may reasonably be requested by Purchaser).  At the sole expense to the Estates and to the extent reasonably required by Sellers, and subject to confidentiality obligations as may reasonably be requested by Purchaser, Purchaser shall make one or more of the Transferred Employees available to Sellers to assist in each Seller's wind-down of their Estates *provided* that such access does not unreasonably interfere with the conduct of the Business by Purchaser.

(c)    From the Closing Date through and including the earlier to occur of (i) the second anniversary of the Closing Date or (ii) the completion of the winding down of the Sellers, upon the reasonable request of Purchaser, Sellers shall provide copies to Purchaser and its respective Representatives (at no additional expense to Purchaser) of any books and records relating to the Business that are in Sellers' possession and which were not transferred to Purchaser at the Closing.  During such period, Sellers shall use their reasonable best efforts to preserve, and shall not destroy, and books and records relating to the Business without the prior written consent of Purchaser.

(d)    Sellers shall provide site access to the Real Property and shall deliver or cause to be delivered all information necessary to satisfy the "all appropriate inquiries" standard (or comparable term), in order to permit Purchaser to qualify as an "innocent landowner" (or

comparable term) under applicable Environmental Laws, including either (i) a reliance letter authorizing Purchaser to rely on the Phase I ESA for the 31201 West Thayer Road, Gila Bend, Arizona, 85337, prepared for Sellers by Partner Engineering and Science, Inc., dated as of February 10, 2025 or (ii) if the Closing Date will be more than 180 days after February 10, 2025, all information required by any "user questionnaire" necessary for Purchaser and its representatives to prepare a Phase I ESA with respect to the transferred real property, and Purchaser shall, at its sole cost and expense, use commercially reasonable efforts to obtain, as promptly as reasonably practicable following the date hereof, such a Phase I ESA.

6.2    **Bidding Procedures and Order**.  Upon the conclusion of the Auction that took place on May 15, 2025, Purchaser was designated as the Successful Bidder in accordance with the terms of the Bidding Procedures Order.  Sellers shall seek entry of an order by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code reasonably acceptable to the Purchaser and Sellers (the "Sale Order"), and as set forth in Section 6.3.

6.3    **Sale Order**.

(a)    Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Sellers shall use their commercially reasonable efforts to obtain entry of the Sale Order, which shall approve of Sellers' entry into and performance under this Agreement and the transactions described herein, and which shall contain the following provisions in terms reasonably acceptable to the parties hereto (it being understood that certain provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order):

(i)    that Sellers may sell, transfer and assign the Acquired Assets and assume and assign the Assigned Contracts to Purchaser pursuant to this Agreement and Sections 105, 363 and 365 of the Bankruptcy Code, as applicable;

(ii)    the transfers of the Acquired Assets by Sellers to Purchaser (A) vest or will vest Purchaser with all right, title and interest of Sellers in and to the Acquired Assets, free and clear of all Liens, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Delaware;

(iii)    the transactions contemplated by this Agreement are undertaken by Purchaser and Sellers at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties hereto are entitled to the protections of Section 363(m) of the Bankruptcy Code and the Purchaser and the Transactions are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(iv)    a determination that selling the Acquired Assets free and clear of all Liens is in the best interest of Sellers' Estates;

(v)    find that Purchaser has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts;

(vi)    that Purchaser shall not assume any Excluded Liabilities and the Purchaser shall have no Liability for any Excluded Liabilities; and

(vii)    that Purchaser is not a mere continuation of Sellers or their estates, and Purchaser shall not have any successor liability of any kind or character.

(b)    If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; *provided*, *however*, that nothing herein shall preclude the parties hereto from consummating the Transactions if the Sale Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of Section 363(m) of the Bankruptcy Code.

6.4    **Further Assurances; Efforts**.

(a)    Purchaser and Sellers shall use commercially reasonable efforts to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the transactions contemplated by this Agreement and the Ancillary Agreements and further secure to each party hereto the rights intended to be conferred hereby and thereby; *provided*, *however*, that nothing in this <u>Section 6.4(a)</u> shall prohibit Sellers from ceasing operations or winding up its affairs following the Closing. Purchaser shall use commercially reasonable efforts to cooperate with Sellers and provide Sellers with information reasonably sufficient to enable Sellers to demonstrate adequate assurance of future performance (as required by Section 365 of the Bankruptcy Code) as to Purchaser.  If after the Closing (i) Purchaser holds or receives any Excluded Assets or Excluded Liabilities or (ii) Seller holds or receives any Acquired Assets or Assumed Liabilities, Purchaser or Seller, as applicable, will promptly transfer or cause to be transferred such assets or, in the case of Liabilities, assume or discharge, or cause to be assumed or discharged, such Liabilities, to or from or with respect to the other Party, as applicable.  Prior to any such transfer, the Party receiving or possessing any such misallocated asset shall hold it in trust for the benefit of the applicable Party (at the cost of such Party); *provided*, that nothing contained in this <u>Section 6.4(a)</u> shall affect Parties' rights and obligations pursuant to <u>Section 6.12</u>.

(b)    Each of Purchaser, on the one hand, and Sellers, on the other hand, shall use their respective reasonable commercial efforts, and shall reasonably cooperate with each other, and shall cause their Affiliates to use reasonable commercial efforts and reasonably cooperate, to (i) prepare all documentation necessary to make all necessary filings with any Governmental Body as promptly as reasonably practicable following the date hereof, (ii) making or causing to be made all filings and submissions under the HSR Act in connection with the consummation of the transactions contemplated herein (such filings under the HSR Act shall be made in any event within two (2) Business Days of the date hereof), and (iii) obtaining any consents and approvals (or waivers thereof), or expiration or termination of any waiting periods, of any Governmental Body, in each case that are required to permit the consummation of the transactions contemplated by this Agreement as determined by Purchaser upon the advice of its counsel.  Each of Purchaser, on the one hand, and Sellers, on the other hand, shall advise each other as to material developments with respect to the status of receipt of such consents, approvals and waivers.  Each of Purchaser,

on the one hand, and Sellers, on the other hand, shall promptly respond to any requests for additional information from any Governmental Body in respect of any required consents, approvals and waivers, or expiration or termination of any waiting periods,.  Purchaser shall pay all filing and related fees in connection with any such filings.  Each of Purchaser and the Sellers shall request early termination in connection with any such filings.  Each of Purchaser, on the one hand, and Sellers, on the other hand, shall, and shall cause their Affiliates to, and shall instruct their respective counsel to, cooperate with each other and use reasonable commercial efforts to facilitate and expedite the identification and resolution of any issues arising under any filings with any Governmental Authorities.   Such reasonable commercial efforts and cooperation include counsel's undertaking (i) to keep each other appropriately informed of communications from and to personnel of the reviewing Governmental Bodies, and (ii) to confer with each other regarding appropriate contacts with and response to personnel of such Governmental Bodies and the content of any such contacts or presentations; *provided*, that such communications may be redacted as necessary to address legal privilege or confidentiality concerns, or, to comply with applicable Law; and provided, further, that portions of such copies that are competitively sensitive may be designated as "outside counsel only".  None of Purchaser, on the one hand, or any of the Sellers, on the other hand (nor any advisors, representatives or agents on behalf of any such Person) shall participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other party prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion (which, at the request of Purchaser or Royal Interco, shall be limited to outside antitrust counsel only).  Purchaser shall have the principal responsibility for (x) devising and implementing the strategy for obtaining any consents, approvals, or waivers, or the expiration or termination of any waiting periods, and (y) leading and directing all submissions to, meetings and communications with any Governmental Body in connection with matters under the HSR Act or other applicable Law,

(c)     Notwithstanding anything to the contrary contained in this Agreement, for the purposes of obtaining any consents and approvals (or waivers thereof), or expiration or termination of any waiting periods, of any Governmental Body, neither Purchaser nor its Affiliates shall be required (and neither the Sellers nor any of its Affiliates may agree to any of the following without the express written consent of the Purchaser): (i) to sell or otherwise dispose of, or hold separate or agree to sell or otherwise dispose of, assets, categories of assets or businesses of the Purchaser, Sellers or their respective Affiliates; (ii) to terminate existing relationships, contractual rights or obligations of the Purchaser, the Sellers or their respective Affiliates; (iii) to terminate any venture or other arrangement; (iv) create any relationship, contractual rights or obligations of the Purchaser, Sellers or their respective Subsidiaries or Affiliates; (v) effectuate any other change or restructuring of the Purchaser, the Sellers or their respective Affiliates; or (vi) to avoid, resist, resolve or defend any action, proceeding or suit that is threatened or instituted by any Governmental Body or any other entity challenging the validity or legality or seeking to restrain the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements.

6.5     **Employee Matters**.

(a)     No later than ten (10) Business Days prior to the Closing, Sellers will make available to Purchaser a true, accurate and complete final version of the list described in Section

4.15(a) brought down to such date, which reflects solely the changes permitted or consented to by Purchaser under Section 6.10(b)(ix) and which will reflect each Business Employee's name, supervisor or reporting relationship, employment status (active or leave, but not the reason for the leave, and, if applicable, the expected return date) and, with respect to employee benefits, (i) the extent to which such has not satisfied any applicable waiting periods, eligibility, vesting requirements, (ii) the level of benefits for which such employee is then eligible, including the extent to which any limitations as to pre-existing conditions, exclusions, waiting periods, and actively at work requirements have been satisfied or waived, and the extent to which any deductible, co-insurance and covered out-of-pocket expenses have been satisfied. Following receipt of such revised list and up to three (3) Business Days prior to the Closing Date, Purchaser may add any number or subtract up to twenty-five (25) Business Employees from such revised list in Purchaser's sole discretion (such list, as further revised by Purchaser, the "Final List").

(b)    No later than two (2) Business Days prior to the Closing Date (or, in the case of a Business Employee on leave, no later than two (2) Business Days following the expiration of such Business Employee's absence under applicable Law or policy of Sellers; provided such Business Employee returns within six (6) months after the Closing Date), Purchaser shall, or shall cause an affiliate of Purchaser to make offers of employment, effective immediately after the Closing Date and contingent only upon the Closing (or, for a Business Employee on leave, the date that is no later than four (4) Business Days following the expiration of such Business Employee's absence under applicable Law or policy of Sellers and contingent only on the Closing), but, in each case, subject to Purchaser's right to require successful completion of customary employee background checks prior to offering employment to any such employee, to each Business Employee listed on the Final List (subject to, for a Business Employee on leave, such Business Employee returning within six (6) months after the Closing Date) on terms and conditions substantially similar to those applicable to similarly situated employees of Purchaser as of the Closing Date. Effective as of the Closing Date, such employees who accept employment (including by merely reporting for work) with Purchaser as of or after the Closing Date are referred to herein as "Transferred Employees". Effective as of the Closing Date, Sellers shall terminate the employment of all Transferred Employees as of immediately prior to the Closing and reasonably assist Purchaser in effecting the change of employment of the Transferred Employees as of the Closing in an orderly fashion, including by making each such Business Employee on the Final List reasonably accessible to Purchaser. Purchaser's obligations under this Agreement are not conditioned upon any particular employees agreeing to employment with Purchaser. Notwithstanding any provision herein to the contrary, during the 12-month period immediately following the Closing Date, Purchaser shall provide Sellers with reasonable access to any management level Transferred Employee and enable any such Transferred Employee to respond to inquiries reasonably made by Sellers, or any of them, to the extent any such Transferred Employee has actual knowledge of matters that would assist Sellers, or any of them, with winding up their estates; provided that any such access or response may not exceed, individually or in the aggregate, more than five hours during any consecutive seven-day period. Notwithstanding anything to the contrary in this Agreement, it shall not be deemed a breach of this Agreement, and Purchaser shall not be responsible for any Liability resulting from, if Purchaser is unable to make offers to such employees in accordance with this Section 6.5 due to any delay resulting from untimely receipt of accurate information reasonably necessary to make an offer of employment from Sellers described in Section 6.5(a).

(c)     Effective as of the Closing (or, for a Business Employee on leave, the date such Business Employee becomes a Transferred Employee), Transferred Employees shall cease to participate in all Employee Benefit Plans (other than as a former employee of Sellers to the extent, if any, permitted by the terms of such Employee Benefit Plan).  For purposes of all other Employee Benefit Plans, Transferred Employees will be considered to have terminated employment with Sellers immediately after the Closing Date (or, for a Business Employee on leave, the date such Business Employee becomes a Transferred Employee).

(d)     Purchaser shall be liable for (i) all obligations under (including providing any notice required pursuant to) the WARN ACT, any successor Law, and any other applicable plant closing notification Law, with respect to a layoff or plant closing with respect to the Business solely to the extent any such obligation arises after the Closing or the Transferred Employees, and (ii) all pay in lieu of notice and any withholding and employer paid employment taxes incurred by Sellers under such Laws due to Purchaser's failure to comply with its obligation to make offers of employment on substantially similar terms in breach of this Section 6.5 (other than as set forth in Section 6.5(b)).  For the avoidance of doubt, Purchaser does not assume obligations and liabilities for WARN Act compliance (x) relating to the Business that arises prior to the Closing Date or (y) with respect to Excluded Assets or Sellers' disposition thereof or Sellers' employees other than Transferred Employees that arise following the Closing Date, including any Business Employee on leave who does not become a Transferred Employee.

(e)     The Purchaser will use its commercially reasonable efforts to recognize the service of Transferred Employees prior to the Closing Date as service with the Purchaser in connection with any qualified defined contribution plan and employee welfare benefit plan and policy (including vacations and severance policies) maintained by the Purchaser which is made available following the Closing Date by the Purchaser for purposes of any waiting period, vesting, eligibility and benefit entitlement (provided that (i) Sellers recognized such service under a substantially similar Employee Benefit Plan immediate prior to the Closing, (ii) the Purchaser is not required to count such service of the Transferred Employees prior to the Closing Date in calculating the amount of that employee's benefit under the Purchaser's plan or policy and (iii) such crediting shall not result in the duplication of benefits with respect to any Transferred Employee).

(f)     Sellers shall provide Purchaser with all documents, employee data or other information relating to the Employee Benefit Plans, *provided* that Purchaser shall execute mutually agreeable confidentiality documents or other similar agreements as necessary to comply with applicable laws protecting the confidentiality of such documents, data and information.

(g)     Nothing in this Agreement shall constitute any commitment, Contract or understanding (expressed or implied) of any obligation on the part of Purchaser to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Purchaser may establish pursuant to individual offers of employment.  Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote or demote any of the Transferred Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, future benefits, other compensation or terms or conditions of Purchaser's employment of such employees.  Sellers shall be responsible for the payment of and shall pay all outstanding Liabilities

owed to Sellers' employees that arose or originated prior to the Closing.  Purchaser shall be responsible for payment of and shall pay all Liabilities owed to the Transferred Employees that arise in respect of employment after the Closing.

(h)     Notwithstanding anything in this <u>Section 6.5</u> to the contrary, nothing contained herein, whether express or implied, shall be treated as an amendment or other modification of any Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates, or shall limit the right of Purchaser to amend, terminate or otherwise modify any Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates following the Closing Date.  If (i) a party other than the parties hereto makes a claim or takes other action to enforce any provision in this Agreement as an amendment to any Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates, and (ii) such provision is deemed to be an amendment to such Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates even though not explicitly designated as such in this Agreement, then, solely with respect to the Employee Benefit Plan or employee benefit plan maintained by Purchaser or any of its Affiliates at issue, such provision shall lapse retroactively and shall have no amendatory effect with respect thereto.

6.6    **Tax Matters**.

(a)     **Transfer Taxes**.  Notwithstanding anything to the contrary in this Agreement, Purchaser shall bear and be responsible for all sales, use, transfer, stamp, conveyance, value added or other similar Taxes imposed by any Tax authority, domestic or foreign, recording or filing fees, notarial fees and other similar costs of Closing, in each case, imposed on the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities hereunder. Purchaser and Sellers shall cooperate to prepare, timely file, and provide to the other party any Tax Returns relating to the amounts described in the foregoing sentence.

(b)     **Cooperation**.  Each Party shall, and shall cause its Affiliates to, reasonably cooperate with and provide to the other Party and its Affiliates such documentation, information and assistance as may reasonably be requested in connection with (i) the preparation of any Tax Return relating to the Acquired Assets, Assumed Liabilities, or the Business (ii) the determination of liability for Taxes or a right to refund of Taxes pursuant to this Agreement or (iii) the conduct of any Tax Proceeding relating to the Acquired Assets, the Assumed Liabilities, or the Business.

(c)     **Straddle Period Tax Returns**.  For purposes of this Agreement, with respect to any Straddle Period, (A) in the case of Taxes that are imposed on a periodic basis (such as property Taxes), the amount of such Taxes allocable to the Pre-Closing Tax Period shall be determined by multiplying the total amount of such Taxes for the entire Straddle Period by a fraction, the numerator of which is the number of calendar days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the total number of calendar days in the entire Straddle Period, and (B) in the case of Taxes not described in clause (A), the amount of such Taxes allocable to the Pre-Closing Tax Period shall be computed as if such Tax period ended as of the end of the day on the final day of the Pre-Closing Tax Period, *provided* that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the Pre-Closing Tax Period and the remainder of the Straddle Period in proportion to the number of days in each period.

6.7    **Casualty**.  If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty, or any other cause (each a "Casualty"), then Purchaser shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Sellers of all insurance proceeds payable to Sellers in respect of the applicable Casualty (and Sellers shall reasonably cooperate to pursue such proceeds from the applicable insurer as promptly as practicable and shall assign such proceeds to Purchaser or its designee); or (b) in the event that the applicable Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

6.8    **Modification of a Schedule**.  Between the date of this Agreement and the Closing Date, Sellers shall notify Purchaser of, and shall promptly supplement or amend a Schedule to this Agreement with respect to, any matter that (a) may arise after the execution date of this Agreement by Purchaser and that, if existing or occurring at or prior to the execution date of this Agreement by Purchaser, would have been required to be set forth or described in a Schedule to this Agreement or (b) makes it necessary to correct any information (including incomplete or missing information) in a Schedule or in any representation and warranty of Sellers that has been rendered inaccurate thereby.  Each such notification or supplementation shall be made promptly.  No supplement or amendment to a Schedule (including delivery of previously incomplete or missing information) to this Agreement or any delivery of a Schedule after the execution date of this Agreement by Purchaser (unless expressly acknowledged and agreed by Purchaser in its sole and absolute discretion, as a cure or modification) shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement or impair Purchaser's right to terminate this Agreement pursuant to Section 7.1.  Notwithstanding anything in this Agreement to the contrary, the Purchaser may, in its sole and absolute discretion, amend or revise Schedule 2.1(e) setting forth the Assigned Contracts, in order to add any Contract to, or eliminate any Contract from, such Schedule at any time during the period commencing on the date of this Agreement and ending on the date that is three (3) Business Days prior to the Closing; *provided*, *however*, that Purchaser shall not, and shall not have the right to, eliminate the Sale Leaseback Agreement as an Assigned Contract. Automatically upon the addition of any Contract to Schedule 2.1(e), it shall be an Assigned Contract for all purposes of this Agreement.  Automatically upon the removal of any Contract from Schedule 2.1(e), it shall be an Excluded Asset for all purposes of this Agreement, and no liabilities arising thereunder shall be assumed or borne by the Purchaser unless such liability is otherwise specifically assumed hereunder.

6.9    **Title and Survey**.  Sellers agree that it will provide commercially reasonable assistance to Purchaser as Purchaser may reasonably request in connection with the compilation of title to the Owned Real Property and in connection with Purchaser's efforts to obtain title insurance policies by a nationally recognized title company (the "Title Company") on behalf of itself and/or its lender, including by providing customary affidavits, including standard indemnities, and other similar instruments as are reasonably required by the Title Company for the deletion of any standard or printed exceptions in any title insurance policies issued pursuant thereto that are customarily deleted by virtue of a seller delivering such instruments in commercial real estate transactions in the state or province in which the Owned Real Property which is the subject of such a title insurance policy is located.  Such cooperation by Sellers and its Subsidiaries shall include providing Purchaser and the Title Company copies of, with respect to the Owned Real Property, reasonably requested existing surveys, maps, existing title reports and title insurance

policies and true and complete copies of the encumbrance documents identified therein, to the extent the same are not publicly available. Between the date of this Agreement and the Closing, Purchaser may obtain, at Purchaser's sole cost, such surveys or updates to surveys of the Owned Real Property (the "Purchaser's Surveys") and, upon reasonable prior written notice, Sellers shall afford to Purchaser and all surveyors acting on Purchaser's behalf such access during normal business hours to the Owned Real Property as is reasonably required to permit such surveyors to conduct surveys and prepare Purchaser's Surveys. Notwithstanding the foregoing, to the extent that Purchaser chooses to use a survey provided by Sellers in connection with obtaining a title insurance policy, Sellers will execute a standard affidavit stating that no change has been made by Sellers to the improvements shown on such survey.

6.10    **Conduct of Business of Seller**. Purchaser acknowledges that, following the commencement of the Chapter 11 Cases, Sellers will be operating the Business in the context of the Chapter 11 Cases. Subject to the foregoing, except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code to the extent required in connection with the Chapter 11 Cases, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.10, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned):

(a)    each Seller shall use its commercially reasonable efforts to (A) carry on its business in the Ordinary Course of Business in all material respects, (B) preserve its relationships with its employees, officers, and material customers and vendors and (C) maintain any license, authorization, Permit and insurance that are required in connection with, or otherwise related to, the operation of the Business in the Ordinary Course of Business;

(b)    each Seller agrees that it shall not:

(i)    (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course of Business, (2) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $500,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; *provided* that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other

derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)     sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets (other than the Assigned IP) for consideration, except Ordinary Course of Business dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the Business of Seller;

(iii)    make any acquisition of, or investment in, another business (whether by asset, stock or other equity, or merger);

(iv)    make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law, Governmental Body or quasi-governmental authority;

(v)     grant any Lien on any of its Acquired Assets other than to secure indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms);

(vi)    waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such waiver, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in excess of $50,000, individually or in the aggregate, (B) waive or release any material rights or claims that would constitute or adversely affect Acquired Assets or the Business or (C) impose any material limitations on the conduct or operation of the Business or include any obligations that would be binding on Purchaser or its Affiliates following the Closing;

(vii)   (A) make, change or revoke any Tax election; (B) settle or compromise any Tax Proceeding for an amount in excess of amounts reserved therefor on the Financial Statements; (C) surrender any right to a Tax refund; (D) enter into or terminate any material closing agreement; or (E) request a Tax ruling;

(viii)  terminate, fail to renew, abandon, cancel, allow to enter into the public domain or let lapse, encumber, subject to a Lien, license (including through covenants not to sue), sell, transfer or otherwise dispose of any Assigned IP;

(ix)    except as required pursuant to the terms of any Employee Benefit Plan in effect as of the date hereof, or as otherwise required by applicable Law, (A) increase in any manner the compensation or benefits of any Business Employee, (B) enter into, adopt, amend or terminate any Employee Benefit Plan, or accelerate payment or vesting of amounts or benefits or amounts payable or to become payable under any Employee Benefit Plan, in each case, in respect of Business Employees, (C) hire or terminate any Business Employee other than for cause or (D) implement any employee layoffs that could implicate the WARN Act;

(x)     (A) amend or otherwise modify any term of, or terminate or waive any right under any Material Contract or enter into any Contract that would have been a Material

40

Contract if in effect on the date of this Agreement, or (B) reject any Material Contract under section 365 of the Bankruptcy Code;

(xi)    extend employment to, or hire, any employee or officer providing annual base compensation in excess of $75,000 or terminate any such employee or officer with an annual base compensation in excess of $75,000 other than a termination for cause or due to permanent disability (provided that such termination due to permanent disability is in accordance with Law); or

(xii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Sellers' operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Affiliates' operations.  Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

6.11    **Intellectual Property Matters**.  As of and following the Closing, neither Sellers nor their Affiliates will, directly or indirectly (i) exploit, disclose, or make use of all or any part of the Assigned IP or (ii) attempt to register any Trademark included in the Assigned IP or any Trademark confusingly similar thereto; and Sellers and their Affiliates will consent to, and not challenge or interfere with the Purchaser's or its Affiliates' efforts to apply for, defend or enforce registrations for, and rights in, any Assigned IP worldwide, or the use or ownership thereof by the Purchaser and its Affiliates.  Without limiting the foregoing, as of the Closing, Sellers shall, and shall cause their Affiliates to (x) cease to, and not at any time thereafter, hold itself or themselves out as having any affiliation or association with the Business or the Purchaser or any of its Affiliates, except to the extent Sellers would be permitted to do so under the fair use doctrine under applicable Law and (y) with respect to any Seller or any Affiliate thereof whose corporate name, business name, trade name or fictitious name includes a Trademark included in the Assigned IP, to change its name within one (1) month after Closing to a name that does not include any such Trademark or any Trademark confusingly similar thereto, including making any filings with any Governmental Body necessary to effect such change.

6.12    **Removal or Disposal of Excluded Assets**.  Sellers shall use their reasonable best efforts to remove any Excluded Assets from the Real Property prior to the Closing. Notwithstanding anything to the contrary contained in <u>Section 6.4</u>, in the event that an Excluded Asset is not removed prior to the Closing Date, such Excluded Asset shall be deemed an Acquired Asset, and shall be transferred to Purchaser free and clear of all Lien and Liability, without any adjustment to the Cash Purchase Price.  For the avoidance of doubt, following the Closing,

Purchaser shall have the right to dispose of any such asset in its sole discretion and shall be entitled to any proceeds in connection therewith.

6.13     **Confidentiality**.

(a)     Sellers acknowledge that from and after the Closing, all Confidential Information relating to the Acquired Assets and Assumed Liabilities will be valuable and proprietary to the Purchaser and its Affiliates.  Each Seller agree that, from and after the Closing, Seller will not, and will cause its Affiliates and Representatives not to, directly or indirectly, without the prior consent of the Purchaser, disclose to any Person any Confidential Information relating to the Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.  In furtherance of the foregoing, each Seller shall, and shall cause its Affiliates to, at the Seller's option, (i) assign to the Purchaser or its Affiliates all rights under any confidentiality agreement between the Seller and its Affiliates and any other prospective bidder with respect to the Business or (ii) designate the Purchaser, effective as of the Closing, as a third-party beneficiary entitled to enforce the terms of any confidentiality agreement between the Seller and its Affiliates and any other prospective bidder with respect to the Business.

(b)     If a Seller is required by Law to make any disclosure that is prohibited or otherwise constrained by this Section 6.13, Seller will provide the Purchaser with prompt notice of such compulsion or request so that it may seek an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this Section 6.13. In the absence of a protective order or other remedy, Seller may disclose that portion (and only that portion) of the Confidential Information relating to the Acquired Assets or the Assumed Liabilities that, based upon advice of the Seller's counsel, Seller is legally compelled to disclose; *provided*, *however*, that Seller will use commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded by any Person to whom any Confidential Information is so disclosed.

## ARTICLE VII
## TERMINATION; EFFECT OF TERMINATION

7.1     **Termination**.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)     by mutual consent of Purchaser and Sellers;

(b)     by Sellers or Purchaser in the event the Closing has not occurred on or before June 13, 2025 (the "Outside Date"); *provided*, that the Outside Date shall automatically and without any action of any of the Parties be extended until July 1, 2025, if the sole reason that Closing has not then occurred is for failure to satisfy the condition as set forth in Section 3.4(b) of this Agreement and the non-terminating Party is acting in good faith to satisfy such condition to Closing;

(c)     by Purchaser if Sellers consummate a sale of all or part of the Acquired Assets to a third party other than Purchaser;

(d)     by Sellers if Purchaser fails to make the Deposit in accordance with this Agreement;

42

(e)        by Sellers or Purchaser if there is in effect a final non-appealable Order of a Governmental Body of competent jurisdiction, enjoining or otherwise prohibiting the consummation of the Transactions;

(f)        by Sellers or Purchaser if Sellers enter into a definitive agreement with respect to an Alternative Transaction and the Bankruptcy Court enters an order approving the Alternative Transaction;

(g)        by Sellers or Purchaser if the Bankruptcy Court shall have stated unconditionally that it will not enter the Sale Order approving the sale to Purchaser;

(h)        by Purchaser if following entry by the Bankruptcy Court of the Sale Order, the Sale Order is amended, modified or supplemented without Purchaser's prior written consent or is voided, reversed or vacated (*provided* that Purchaser shall not be able to terminate this Agreement pursuant to this Section 7.1(h) if, prior to such termination, the Sale Order shall have become a Final Order or if Purchaser's rights in the Transaction are not materially or adversely affected by such action by virtue of the protections of Section 363(m) of the Bankruptcy Code or otherwise);

(i)        by the non-breaching party upon a material breach of any provision of this Agreement; *provided* that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party, without cure for a period of five (5) Business Days (*provided* that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of this Agreement); or

(j)        by any party hereto by giving written notice to the other parties hereto if any court of competent jurisdiction or other competent Governmental Body shall have enacted or issued a Law or decree or taken any other action permanently restraining, enjoining, or otherwise prohibiting the Transaction and such Law or decree or other action shall have become final and non-appealable; *provided*, *however*, that the right to terminate this Agreement under this Section 7.1(j) shall not be available to a party hereto if the failure to consummate the Closing because of such action by a Governmental Body shall be due to the failure of such party hereto to have fulfilled any of its obligations under this Agreement.

7.2        **Effect of Termination**.  If this Agreement is terminated pursuant to Section 7.1, neither Purchaser nor Sellers shall have any Liabilities under this Agreement (except in respect of any fraud or willful breach of this Agreement prior to such termination); *provided*, *however*, that the obligations of Sellers in Section 8.2 shall survive and the Deposit shall be distributed in accordance with this Agreement.  Distribution of the Deposit to Sellers shall be Sellers' exclusive remedy for breach of this Agreement by Purchaser except for fraud or willful breach of this Agreement by Purchaser.  The foregoing shall not prohibit either Party from seeking an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof prior to termination of this Agreement

or with respect to provisions of this Agreement that expressly survive termination of this Agreement.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     **"As Is", "Where Is", and "With all Faults" Transaction**.  PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN ARTICLE  IV, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS.  PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE CONDITION OF CERTAIN ACQUIRED ASSETS AND SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND IN PROCEEDING WITH THE ACQUISITION, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INVESTIGATIONS.  ACCORDINGLY, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.2     **Transaction Expenses**.  Except as expressly provided for herein, each party hereto shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated by this Agreement are consummated.

8.3     **Certain Interpretive Matters and Definitions**.  Unless the context requires, (a) references to the plural include the singular and references to the singular include the plural, (b) references to any gender includes the other gender, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (d) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (e) all references to Sections, Articles, Exhibits or Schedules are to Sections, Articles, Exhibits or Schedules of or to this Agreement, (f) when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded, and if the last day of such period is a day other than a Business Day, such period will end on the next succeeding Business Day, (g) the words "to the extent" shall mean "the degree by which" and not simply "if" and (h) any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item has been included in the online data site titled "Project Canyon" hosted by secureddocs.com and accessible to Purchaser and its advisors from three (3) days prior to the closing of the Auction.

8.4     **Survival; Termination of Representations and Warranties**.  The representations and warranties of the Parties hereto set forth in this Agreement shall terminate upon, and be of no further force or effect after, the consummation of the Closing.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder for such period expressly set forth in this Agreement, or if not expressly set forth for a period no greater than six (6) months after the Closing Date.

8.5    **Amendment**.  This Agreement may be amended or modified in whole or in part at any time by an agreement in writing among the Parties hereto; *provided*, that any material amendment hereto shall also require the prior written consent of Agent.

8.6    **Waiver**.  The waiver by a party hereto of a breach of any covenant, agreement, condition or undertaking contained herein shall be made only by a written waiver in each case.  No waiver of any breach of any covenant, agreement, condition or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement, condition or undertaking or as a waiver of any breach of any other covenant, agreement, condition or undertaking.  Any material waiver hereunder by any Seller or Sellers shall also require the prior written consent of Agent.

8.7    **Notices**.  All notices, requests and other communications hereunder will be deemed to have been duly given if (a) delivered personally, (b) by an established overnight delivery company, (c) by certified or registered mail, postage prepaid, return receipt requested, or (d) by email as follows:

        If to Sellers:

        Royal Interco, LLC

        Attn: Alison Watts
        711 North 17th Avenue
        Phoenix, AZ 85007
        Email: awatts@royalpaper.us
        with a copy to:

        Morris, Nichols, Arsht & Tunnell LLP

        Attn: Robert J. Dehney, Matthew O. Talmo, and Scott D. Jones

        1201 N. Market St.
        Suite 1600
        Wilmington, DE 19801
        Email: rdehney@morrisnichols.com
        mtalmo@morrisnichols.com

sjones@morrisnichols.com

and with copies (which shall not constitute notice) to:

NXT Capital, LLC, as Agent
191 N. Wacker Drive
30th Floor
Chicago, IL 60606
Attn: Joseph Levenstein
Email: Joseph.Levenstein@nxtcapital.com

and

Goldberg Kohn Ltd.
55 E. Monroe Street
Suite 3300
Chicago, IL 60603
Attn: Randall Klein; William Loesch
Email: Randall.Klein@goldbergkohn.com; William.Loesch@goldbergkohn.com

If to Purchaser:

Sofidel America Corp.
300 Welsh Road, Building One
Horsham, PA 19044-2248
Attention: Luca Colageo
Email: Luca.Colageo@sofidel.com

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention: Charles W. Allen; Sean A. O'Neal; Thomas S. Kessler
Email: callen@cgsh.com; soneal@cgsh.com; tkessler@cgsh.com

or to such other address as may hereafter be designated by a Party hereto by the giving of notice in accordance with this <u>Section 8.7</u>.  All notices, requests or other communications shall be deemed given when (a) actually delivered if delivered personally or by an established overnight delivery company, (b) upon actual receipt if delivered by certified or registered mail, postage prepaid, return receipt requested or (c) on the date the delivering Party receives an affirmative confirmation (excluding automatic acknowledgement of receipt) from the Party to whom notice was intended (or if such affirmative confirmation is not received on the day of delivery, on the next Business Day following the date of delivery).

8.8     **Jurisdiction**.  Each Party irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this

Agreement and the transactions contemplated thereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court), and waives any objection to the laying of venue of any such litigation in the Bankruptcy Court.  To the extent the Bankruptcy Court declines, or is otherwise unable to, exercise jurisdiction, then the Parties agree that the state or federal courts in the County of New Castle, State of Delaware, shall have jurisdiction.

8.9    **Governing Law**.  To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

8.10   **Damages**.    NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY HERETO SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, EXCEPT IN THE CASE OF FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

8.11   **Time is of the Essence**.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

8.12   **Severability**.  If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

8.13   **Titles and Headings**.  Titles and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

8.14   **Assignment; Successors and Assigns**.  This Agreement and the rights, duties and obligations hereunder may not be assigned by Sellers without the prior written consent of Purchaser, and any attempted assignment without consent shall be void.  Purchaser may assign this Agreement or its rights, interests, and obligations hereunder and to the Acquired Assets and the Assigned Contracts in whole or in part to one or more of any of its affiliates in its sole discretion, *provided*, that, if Purchaser so assigns, Purchaser remains bound (until assignee fully discharges) and the assignee is able to fully discharge all of Purchaser's obligations under this Agreement.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee(s) unless the context otherwise requires.  Subject to this Section 8.14, this Agreement and the provisions hereof shall be binding upon each of the parties hereto, their successors and permitted assigns.

8.15   **No Third-Party Rights**.  The parties hereto do not intend to confer any benefit hereunder on any Person other than the parties hereto; *provided*, that notwithstanding the foregoing, Agent is a third party beneficiary of this Agreement.  This Agreement may be enforced against, and any dispute related to this Agreement may be brought against, only the Persons that are expressly named as Parties and not against any other Persons.  Except to the extent named as

a Party, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or advisor of any Party (each, a "Non-Recourse Person") will have any Liability (whether in contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or Liabilities of any of the Parties or for any dispute related to this Agreement and (ii) in no event shall any Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons and the Non-Recourse Persons are intended third party beneficiaries of this Section 8.15 and shall be entitled to enforce this Section 8.15 as if a party directly hereto.

8.16   **Execution of this Agreement**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  The Parties agree that this Agreement and any Ancillary Agreements may be electronically signed to the maximum extent permitted by Law, and that electronic signatures appearing on this Agreement or any Ancillary Agreements are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.  The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties hereto transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

8.17   **Waiver of Trial by Jury**.  THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

8.18   **Entire Agreement**.  All Exhibits, Schedules and the Seller Disclosure Letter attached hereto are hereby incorporated into this Agreement by reference and made a part hereof. This Agreement and the Ancillary Agreements constitute the entire understanding and agreement of the Parties with respect to the subject matter hereof and thereof and supersede any and all prior understandings, negotiations, or agreements among the Parties of any nature, whether written or oral.

8.19   **Sellers' Representative**.  Royal Interco has the power and authority to unilaterally act on behalf of all or any Seller for the purposes specified under this Agreement.  Such power

will include the power to make all decisions, actions, Consents, and determinations on behalf of Sellers, including to make any waiver of any condition or agree to any amendment to this Agreement.  No Party shall have any right to object, dissent, protest, or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Royal Interco on behalf of Sellers.

8.20   **Bulk Sales Laws**.   The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens in the Acquired Assets (including any Lien claims arising out of any "bulk sales," "bulk transfers," or similar Laws), and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with any "bulk sales," "bulk transfers," or similar Laws in respect of the Transactions.

8.21   **Publicity**.   Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party (which approval will not be unreasonably conditioned, withheld, or delayed), unless, in the reasonable judgment of the applicable disclosing Party, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the contents of such release.  However, a copy of this Agreement will be filed with the Bankruptcy Court.

*(Signatures appear on following page)*

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute this Agreement as of the day and year first written above.

SELLERS:

ROYAL INTERCO, LLC, a Delaware limited liability company
By:_____
Name:_____
Title:_____

SUN PAPER COMPANY, LLC, a Delaware limited liability company
By:_____
Name:_____
Title:_____

ROYAL PAPER, LLC, an Arizona limited liability company
By:_____
Name:_____
Title:_____

DOUBLETREE PAPER MILLS, L.L.C., an Arizona limited liability company
By:_____
Name:_____
Title:_____

**PURCHASER:**

**SOFIDEL AMERICA CORP.**

By:_____
Name: Luigi Lazzareschi
Title: Director, President

## EXHIBIT A

**Bidding Procedures**

[See attached.]

## <u>EXHIBIT B</u>

**Form of Bill of Sale and Assignment and Assumption Agreement**

[See attached.]

## **EXHIBIT C**

**Form of Intellectual Property Assignment Agreement**

[See attached.]

# **EXHIBIT D**

**Form of Short Form Trademark Assignment Agreement**

[See attached.]

## EXHIBIT E

**Form of Short Form Domain Name Assignment Agreement**

[See attached.]

## **EXHIBIT F**

**Form of Deed**

[See attached.]

## **EXHIBIT G**

**Form of Assignment of Leases**

[See attached.]