# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>ROYAL INTERCO, LLC, *et al.*,<br>Debtors.[1] | Chapter 11<br>Case No. 25-10674 (TMH)<br>Jointly Administered<br>**Re: D.I. 15, 149** |

**DECLARATION OF JOSEPH GREENWOOD IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE SALE
OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS,
AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF</u>**

I, Joseph Greenwood, hereby declare as follows:

1. I am a Partner at Livingstone Partners LLC ("<u>Livingstone</u>"), an internationally recognized, middle-market investment banking firm with over 100 professionals located across offices in Chicago, Los Angeles, Amsterdam, Dusseldorf, Hamburg, Stockholm, Valencia, Madrid, Milan, Verona, Beijing, and Seoul. Livingstone is the investment banker for the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>").

2. Pursuant to the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections (C) Approving Procedures for the Assumption and Assignment or Rejection of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899). The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

*Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [D.I. 15] (the "Sale Motion")[2] filed on April 8, 2025, the Debtors seek entry of an order, among other things, authorizing and approving the sale of certain of the Debtors' assets to Sofidel America Corp. (the "Sofidel") pursuant to that Asset Purchase Agreement by and between the Debtors and Sofidel, dated May 20, 2025 (the "Asset Purchase Agreement") [D.I. 210].

       3.      I submit this declaration (the "Declaration") in support of the entry of the Debtors' proposed *Order (I) Approving the Sale of the Debtors' Assets Free and Clear Of Claims, Liens, and Encumbrances, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Sale Order"). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors of the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[2] Capitalized terms not defined herein are defined in the Sale Motion.

## THE MARKETING AND SALE PROCESS

4. Livingstone was retained by the Debtors on January 30, 2025, to market and sell the Debtors' assets in an out-of-court sale process. Immediately upon its retention, Livingstone commenced outreach to potential buyers with a one-page teaser introducing the opportunity and inviting potential buyers to enter into a confidentiality agreement ("NDA") with the Debtors to receive access to additional information. During the prepetition sale process, Livingstone contacted approximately 159 potential bidders which included both financial and strategic parties (the "Interested Parties"). Of those Interested Parties, 70 executed NDAs, which allowed them access to a confidential information presentation that contained a detailed overview of the Debtors' business operations, assets, commercial arrangements, and historical financial results. Additionally, these potential buyers received access to an online data room that contained hundreds of unique documents and diligence materials, and potential buyers were given the opportunity to request specific diligence items, which were provided on a rolling basis into the data room. Livingstone maintained a dialogue with these potential buyers throughout the process and facilitated discussions between potential buyers and the Debtors' management. Seven potential buyers completed site visits to the Debtors' manufacturing facilities, which were accompanied by Livingstone, Novo and the Debtors' management.

5. This initial stage of the marketing process culminated in the receipt of 14 non-binding indications of interest ("IOIs"). After reviewing the IOIs, the Debtors and Livingstone engaged with each potential buyer to discuss the terms of each potential bid. Although the Debtors and the Prepetition Lenders hoped the Debtors could complete a sale transaction without having to file for bankruptcy, the potential bids representing the highest value for the Debtors' assets required that the Debtors consummate the sale through a chapter 11 sale process in order to realize

the values stated in the IOIs. After several weeks, the Debtors reached an agreement with Sofidel to serve as the Stalking Horse Bidder, setting the floor for other potential bidders to acquire the Debtors' assets during these chapter 11 cases. Due diligence, including site visits and management meetings, continued postpetition in earnest for those Interested Parties that contemplated submitting a competing bid.

6.    The Debtors received four bids before the Bid Deadline on May 12, 2025. Three of the four bids were for all or substantially all of the Debtors' assets, and one bid was a partial bid for a subset of the Debtors' assets. After consulting with the Consultation Parties, the Debtors determined that two of the bids were Qualified Bids—the Stalking Horse Bid and the bid submitted by Kimberly-Clark Corporation ("Kimberly-Clark").

7.    The Auction was held on May 15, 2025. The Qualified Bidders and the Consultation Parties participated in the Auction in person or by videoconference. One of the unqualified bidders, Georgia-Pacific, was present at the Auction and participated on a limited basis. The Auction ultimately encompassed a total of 11 rounds of bidding from the Qualified Bidders. At the conclusion of the Auction and following consultation with the Consultation Parties, the Debtors selected Sofidel as the Successful Bidder with a Successful Bid of $180,000,000 and Kimberly-Clark as the Back-Up Bidder. The cash component of the Successful Bid exceeds the Stalking Horse Bid by approximately $49,000,000.

8.    At all times, the Debtors' discussions with the potential bidders for the assets were conducted in good faith and at arm's length, and by parties who were represented by their own counsel or advisors. I believe that Sofidel and Kimberly-Clark have acted at all times in good faith, and I am not aware of any evidence of collusion in the sale process or that Sofidel or Kimberly-Clark are an "insider" of the Debtors (as defined in section 101(31) of title 11 of the

United States Code). I am not aware of any facts demonstrating or suggesting that the sale process was controlled by any agreement among potential bidders or that the Sale is being consummated for any unlawful purpose.

9.  Based on my experience and the circumstances of these chapter 11 cases, I believe that the proposed sale to Sofidel, and to the extent applicable Kimberly-Clark, is the product of a competitive sale process. The marketing and sale process was conducted in a manner that afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Debtors' assets. The Debtors and their representatives conducted the marketing and sale process for the Debtors' assets in accordance with the Bid Procedures Order[3] and the Bid Procedures in all respects. The marketing process was effective in testing the market value of the Debtors' assets, the time-period for marketing the Debtors' assets was adequate, and the outcome from the sale process yielded the highest acceptable bid for the Debtors' assets, and the best possible outcome for the Debtors and their estates under the circumstances. No other person or entity has offered to purchase the Debtors' assets on acceptable or more favorable terms for an amount that would give greater economic value to the Debtors compared to the value being provided by Sofidel.

10.  I understand that Sofidel and Kimberly-Clark would not agree to purchase the Debtors' assets on the terms of the Successful Bid and Back-Up Bid without such sale being free and clear of liens, claims and encumbrances. I also believe that the Debtors have sound business

---

[3] On May 6, 2025, the Court entered an *Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 And 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry Into Stalking Horse Agreement and Related Bid Protections; (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief* [D.I. 149] (the "Bid Procedures Order").

justification for, and compelling circumstances to, promptly consummate the transactions contemplated by the Asset Purchase Agreement and doing so is in the best interests of the Debtors, their estates, and all parties in interest.

11. Based on the foregoing, I believe that the sale of the Debtors' assets to Sofidel, under the terms of Asset Purchase Agreement, is in the best interests of the Debtors, their estates and their creditors because the Successful Bid is the best offer available for such assets and will maximize recoveries for creditors. In light of the Debtors' comprehensive sale and marketing process, I do not believe that further marketing of the assets would result in higher or otherwise better offers for the Debtors' assets. Therefore, I believe that the Court should enter the Sale Order and approve the sale of the Debtors' assets to Sofidel.

***

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 21, 2025                    */s/ Joseph Greenwood*_____
                                       Joseph Greenwood