**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>ROYAL INTERCO, LLC, *et al.*,<br>Debtors.[1] | Chapter 11<br>Case No. 25-10674 (TMH)<br>Jointly Administered<br>**Re: D.I. 15, 149** |

**DECLARATION OF MICHAEL RAGANO IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE SALE
OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS,
AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

I, Michael Ragano, hereby declare as follows:

1. I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I am also a Partner with Novo Advisors, LLC ("Novo"), specializing in performance improvement, restructuring, turnarounds, and mergers and acquisitions and have assisted companies facing various challenges across various industries, including horticulture, manufacturing, distribution, publishing, specialty finance, construction, consumer products, and fundraising. Novo has a wealth of experience in providing restructuring, crisis management, accounting and financial advisory services. Novo was founded in 2012 and many of Novo's employees have more than 30 years of experience in the restructuring industry. Novo currently has 40 professionals and, among other things, has assisted troubled companies with stabilizing their financial condition, analyzing their operations, and developing appropriate business plans to accomplish the necessary restructuring of their operations and finances.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal EIN, are as follows: Royal Interco, LLC (7913); Doubletree Paper Mills, L.L.C. (1830); Royal Paper, LLC (9937); and Sun Paper Company, LLC (7899). The Debtors' mailing address is 711 North 17th Avenue, Phoenix, AZ 85007.

2. Since approximately January 24, 2025, Novo and I have provided services to the Debtors in connection with their restructuring efforts. I was appointed as CRO to (i) facilitate ongoing operations and financial matters and (ii) oversee and manage all cash disbursements and any and all financial restructuring initiatives, including, to the extent necessary, any insolvency proceedings and in- or out-of-court activities to monetize assets and reduce creditor obligations. I am familiar with the day-to-day operations and business, the financial affairs of the Debtors, and the prepetition and postpetition sale process.

3. Pursuant to the *Debtors' Motion for (I) an Order Pursuant to Sections 105, 363, 364, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9007 and Del. Bankr. L.R. 2002-1 and 6004-1 (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving the Debtors' Entry into Stalking Horse Agreement and Related Bid Protections (C) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; and (F) Granting Related Relief; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [D.I. 15] (the "Sale Motion")[2] filed on April 8, 2025, the Debtors seek entry of an order, among other things, authorizing and approving the sale of certain of the Debtors' assets to Sofidel America Corp. ("Sofidel") pursuant to that Asset Purchase Agreement by and between the Debtors and Sofidel, dated May 20, 2025 (the "Asset Purchase Agreement") [D.I. 210].

---

[2] Capitalized terms not defined herein are defined in the Sale Motion.

4. I submit this declaration (the "Declaration") in support of the Sale Motion and entry of the Debtors' proposed *Order (I) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Sale Order") authorizing and approving the sale of certain of the Debtors' assets to Sofidel pursuant to the Asset Purchase Agreement. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors of the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## THE MARKETING AND SALE PROCESS

5. On January 30, 2025, the Debtors engaged Livingstone Partners LLC ("Livingstone") as the Debtors' investment banker. With my input, Livingstone managed the marketing and sale process during these cases. Filed concurrently with this Declaration is the *Declaration of Joseph Greenwood in Support of Debtors' Motion for Entry of an Order (I) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, And (III) Granting Related Relief* (the "Greenwood Declaration"). I believe the Greenwood Declaration accurately sets forth the robust marketing and sale strategy and process.

6. Through the sale process, Livingstone regularly reported updates to the Debtors' independent manager, the Debtors' bankruptcy counsel, the Novo team and me. Based on these updates and discussions, I understand that Livingstone broadly marketed the Debtors' assets and

facilitated extensive due diligence to ensure all potentially interested parties had a full and fair opportunity to submit a bid for the Debtors' assets.

7. I understand that, during the prepetition sale process, Livingstone contacted approximately 159 potential bidders which included both financial and strategic parties (the "Interested Parties"). I further understand that, of those Interested Parties, 70 executed NDAs, which allowed them access to a confidential information presentation that contained a detailed overview of the Debtors' business operations, assets, commercial arrangements, and historical financial results. Additionally, these potential buyers received access to an online data room that contained hundreds of unique documents and diligence materials, and potential buyers were given the opportunity to request specific diligence items, which were provided on a rolling basis into the data room. Livingstone maintained a dialogue with these potential buyers throughout the process and facilitated discussions between potential buyers and the Debtors' management. Seven potential buyers completed site visits to the Debtors' manufacturing facilities, which were accompanied by Livingstone, Novo personnel and the Debtors' management.

8. This initial stage of the marketing process culminated in the receipt of 14 non-binding indications of interest ("IOIs"). After reviewing the IOIs, the Debtors and Livingstone engaged with each potential buyer to discuss the terms of each potential bid. Although the Debtors and the Prepetition Lenders hoped the Debtors could complete a sale transaction without having to file for bankruptcy, the potential bids representing the highest value for the Debtors' assets required that the Debtors consummate the sale through a chapter 11 sale process in order to realize the values stated in the IOIs. After several weeks, the Debtors reached an agreement with Sofidel to serve as the Stalking Horse Bidder, setting the floor for other potential bids to acquire certain assets during these chapter 11 cases. Due diligence, including site visits and management

meetings, continued postpetition in earnest for those Interested Parties that contemplated submitting a competing bid.

9. At the conclusion of a thorough marketing process, the Debtors received four bids before the Bid Deadline. Three of the four bids were for all or substantially all of the Debtors' assets, and one bid was a partial bid for a subset of the Debtors' assets. After consulting with the Consultation Parties, the Debtors determined that two of the bids were Qualified Bids—the Stalking Horse Bid and the bid submitted by Kimberly-Clark Corporation ("Kimberly-Clark"). The Debtors conducted the Auction on May 15, 2025. The Qualified Bidders and the Consultation Parties participated in the Auction in person or by videoconference. One of the unqualified bidders, Georgia-Pacific, was present at the Auction and participated on a limited basis. At the conclusion of the Auction and following consultation with the Consultation Parties, the Debtors selected Sofidel as the Successful Bidder with a Successful Bid of $180,000,000 and Kimberly-Clark as the Back-Up Bidder. The cash component of the Successful Bid exceeds the Stalking Horse Bid by approximately $49,000,000.

10. In my business judgment, the Successful Bid represents the highest and best acceptable bid for the Debtors' assets, and to the extent the Successful Bidder fails to meet its obligations to close the transaction, the Back-Up Bidder represents the next highest acceptable bid for the Debtors' assets. I also believe that the bids of the Successful Bidder and the Back-Up Bidder represent the best available, fair and reasonable offers to purchase the Debtors' assets because, among other things, they are the result of a comprehensive and transparent marketing, auction and sale process. Any other transactions, including a piecemeal liquidation of the Debtors' assets, would not have yielded as favorable an economic result.

11.     Despite the Debtors' significant funded debt, I believe that the chapter 11 cases and the Sale confers substantial benefits on parties other than the DIP Lenders and Prepetition Lenders, including the Debtors' employees, vendors and counterparties to contracts and leases who will be assumed and assigned to Sofidel in connection with the Sale. As a result of the sale process and the DIP Facility, the Debtors have continued to operate in the ordinary course of business, allowing them to honor their commitments to such parties and preserve the going-concern value of the business. During the chapter 11 cases, the Debtors have paid not less than $18.2 million in rent, payroll and vendor payments. The chapter 11 cases and Sale also allow the Debtors to save 430 jobs that otherwise would not be saved in a liquidation. The Debtors further anticipate that over $6.5 million in cure amounts and other liabilities will be paid to contract and lease counterparties whose contracts and leases will be assumed and assigned in connection with the Sale.

12.     In short, I believe that the Debtors' decision to sell their assets to the Successful Bidder or the Back-Up Bidder constitute a reasonable and sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estates, and their creditors, and should be approved. I further believe that time is of the essence in consummating the Sale.

13.     To my knowledge, the Debtors' discussions with the potential bidders for the assets were conducted in good faith and at arm's length, and by parties who were represented by their own counsel or advisors.  I believe that Sofidel and Kimberly-Clark have acted at all times in good faith, and I am not aware of any evidence of collusion in the sale process or that Sofidel or Kimberly-Clark are insiders of the Debtors.  I am not aware of any facts demonstrating or suggesting that the sale process was controlled by any agreement among potential bidders or that the Sale is being consummated for any unlawful purpose.

**DIP BUDGET**

14. The Debtors and DIP Lenders negotiated and agreed to the entry of the Final DIP Order [D.I. 146] that approved a revised Budget provided for the payment of budgeted administrative expenses arising from and after the Petition Date through the closing of the Sale. As I testified in connection with the entry of the Final DIP Order, the amounts set forth in the Budget representing anticipated postpetition administrative expenses arising from and after the Petition Date were determined by me and the Novo team in good faith based on our professional experience and experience managing the Debtors' businesses and the Debtors' current and anticipated operations and financial performance in chapter 11. In addition, in the ordinary course of business, the Debtors forecast customer orders 90 days in advance in order to create a production plan to satisfy customer orders (and therefore, are able to anticipate expected costs). Generally, the line items for anticipated postpetition administrative expenses include reasonable cushion to account for potential increased expenses, and in the case of the Debtors' self-insured healthcare plan, the Budget accounts for 150% of the monthly expense, consistent with the Company's historical calculation of incurred but not reported health insurance liability.

15. I still believe the Budget accounts for all reasonably anticipated postpetition administrative expenses arising from and after the Petition Date. Admittedly, the Budget does not amount to a guarantee that all unexpected postpetition administrative claims will be satisfied. In my experience, no budget does that. To date, however, the Debtors have operated well within the Budget and have generated a net positive variance. As of the filing of this Declaration, I am unaware of any postpetition administrative expenses that are not accounted for in the budget.

\*\*\*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: May 21, 2025                      */s/ Michael Ragano*
                                                Michael Ragano
                                                Chief Restructuring Officer